Ashley Keller (*pro hac vice forthcoming*)
ack@kellerlenkner.com
Warren Postman (*pro hac vice forthcoming*)
wdp@kellerlenkner.com
Seth Meyer (*pro hac vice forthcoming*)
sam@kellerlenkner.com
Tom Kayes (*pro hac vice forthcoming*)
tk@kellerlenkner.com
**KELLER LENKNER LLC**
150 N. Riverside Plaza, Suite 4270
Chicago, Illinois 60606
Tel: (312) 741-5220

Michael A. Geibelson (SBN 179970)
mgeibelson@robinskaplan.com
Aaron M. Sheanin (SBN 214472)
asheanin@robinskaplan.com
Tai S. Milder (SBN 267070)
tmilder@robinskaplan.com
**ROBINS KAPLAN LLP**
2440 W. El Camino Real, Suite 100
Mountain View, California 94040
Tel:  (650) 784-4040
Fax:  (650) 784-4041

*Attorneys for Plaintiff and the Proposed Classes*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIVA LIMOUSINE, LTD., individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>UBER TECHNOLOGIES, INC.; RASIER, LLC; RASIER-CA, LLC; UBER USA, LLC; and UATC, LLC.<br><br>*Defendants*. | Case No. _____<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW AND THE CALIFORNIA UNFAIR PRACTICES ACT**<br><br>**Jury Trial Demanded** |

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

1

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

## INTRODUCTION

2          1.          Uber's CEO, Dara Khosrowshahi, has admitted that Uber's rapid accumulation of

3    market share in the transportation industry was accompanied by a culture of rule breaking. In his

4    words, "[t]he culture went wrong" at Uber and "[t]he governance of the company went wrong."

5    Khosrowshahi has assured the public that the company has changed its ways. But Uber has not

6    changed its culture of rule breaking in two fundamental ways. First, Uber continues to misclassify

7    its drivers as independent contractors when California law clearly requires that they be paid

8    minimum wage and overtime and be given other protections and compensation as employees.

9    Second, Uber uses these illegal cost savings to bolster a larger strategy of pricing its rides far

10   below their true cost, and to take business and market share from competitors who pay the

11   required costs of complying with the law. Each day that Uber misclassifies its primary workforce,

12   it steals wages from drivers earning below a living wage and gains millions of dollars in unlawful

13   cost savings. Uber uses these savings to price its services far below their cost. California prohibits

14   this form of unfair competition and gives Plaintiff and a class of similarly situated companies a

15   right to an injunction stopping these practices as well as treble damages.

16          2.          California law requires that businesses provide a wide range of protections to their

17   employees including minimum wage, overtime, workers' compensation insurance, unemployment

18   insurance, and expense reimbursement. These protections aren't required for independent

19   contractors. But a worker in the transportation industry can only be treated as an independent

20   contractor if he or she (A) is free from the control of the hiring business, (B) does a job that is

21   outside the usual course of the hiring entity's business and has no tangible connection to the

22   hiring business, and (C) has set up an independent business separate from his or her work for the

23   hiring business.

24          3.          Uber is a company that sells rides. Uber's subsidiary is licensed in California as a

25   Transportation Network Company, which is defined as an entity "that provides prearranged

26   transportation services for compensation using an online-enabled application or platform," Pub.

27   Util. Code § 5431(a). Uber and its subsidiary also hold licenses as Transportation Charter Party

28

carriers, which are defined to mean persons "engaged in the transportation of persons by motor vehicle for compensation, over any public highway in [California]."  Pub. Util. Code § 5360.

4.       The drivers who provide Uber's rides are integral to its business. Uber's own executives have stated to drivers that "Uber would not exist without you." Therefore, Uber's drivers are employees under California law and must be treated as such.

5.       But Uber does not treat its drivers as employees; it classifies them as independent contractors. By doing so, Uber is violating California law.

6.       Uber's misclassification allows the company to avoid major costs. Based on a recent study, Uber avoids an average of $9.07 an hour in expenses and benefits that it would have to pay drivers if it properly classified them as employees. That means that the average cost to Uber of a full-time driver after adjusting for the expenses and other benefits that Uber fails to pay is the equivalent of paying a W-2 employee $7.48 per hour. Due to high variation in pay, many drivers earn far less after adjusting for expenses and benefits. Some earn the equivalent of $5 an hour. Some earn $3 an hour. Some drivers even lose money. From full-time drivers in California alone, Uber's misclassification likely saves the company roughly $250 million each year. Uber's total cost savings from misclassification in California may exceed $500 million each year.

7.       California's Unfair Competition Law ("UCL") allows a competitor who is injured by unlawful or unfair conduct to obtain an injunction to stop the violation.

8.       Uber's legal violations have injured Plaintiff and caused it to lose money. Plaintiff is a provider of livery services who pays its drivers as employees in accordance with California (and federal) law. As a result, Plaintiff bears significant burdens, including minimum wage obligations, overtime, meal and rest breaks, workers' compensation insurance, unemployment insurance, health insurance, and the employer's share of Social Security and Medicare taxes.

9.       By avoiding these costs, Uber can charge lower prices. Uber's lower prices take market share from Plaintiff and also constrain Plaintiff's ability to increase the prices it charges as its costs increase, including for such things as wages, fuel, and other expenses. This injures Plaintiff by reducing its revenue as well as its profit margin. Plaintiff and a class of all providers

of livery services that earn revenue from rides in California are therefore entitled to an injunction stopping Uber's unlawful competition.

10.     The California Unfair Practices Act ("UPA") provides that when a business prices its services below cost and harms competition, the business (as well as its officers and directors who assist or aid, directly or indirectly, in such violation) are liable for damages unless they can prove that they priced below cost without a purpose to harm competition.

11.     In measuring whether a company prices below its costs, the UPA looks to the total average costs of a business, including any costs the law requires the business to bear.

12.     Uber prices its rides below its total average costs, even without counting the hundreds of millions that Uber saves by avoiding the cost of providing employment benefits to its drivers. After factoring in these illegal cost savings, Uber's prices are even further below their true cost.

13.     Uber prices its rides below cost for the purpose of injuring competitors. For-hire transportation is a service that is inherently resistant to economies of scale because 85% of the cost of each ride typically goes to labor and vehicle costs that do not decrease with volume. Uber's investors would never have accepted ongoing losses in the billions of dollars if Uber had simply planned to create a transportation company that competes on even footing with small and mid-size competitors. Instead, investors understand that Uber's purpose is to create a behemoth that counts customers in the millions and drives enough competitors out of the market that they will later be able to charge higher prices in the long run. Uber's investors have provided billions of dollars of subsidies for Uber rides because, as one analyst has observed, "Uber is using cash as a competitive weapon."

14.     Uber's below-cost and anticompetitive pricing has reduced the revenue and profit margins of Plaintiff. Plaintiff and a Class of all for-hire transportation services that have been injured by Uber's below cost pricing are therefore entitled to damages, which are subject to trebling under the UPA.

CLASS ACTION COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

**PARTIES**

15.     Plaintiff Diva Limousine Ltd. is a California corporation headquartered at 12711 Ventura Blvd, Suite 220, Studio City, CA 91604.

16.     Defendant Uber Technologies, Inc. is a Delaware corporation headquartered at 1455 Market Street, San Francisco, CA 94103. It owns and operates the Uber transportation company.

17.     Defendant Rasier, LLC is a Delaware limited liability company headquartered at 1455 Market Street, San Francisco, CA 94103.

18.     Raiser-CA, LLC is a Delaware limited liability company headquartered at 1455 Market Street, San Francisco, CA 94103.

19.     Defendant Uber USA, LLC is a Delaware limited liability company headquartered at 1455 Market Street, San Francisco, CA 94103.

20.     Defendant UATC, LLC is a Delaware limited liability company headquartered at 1455 Market Street, San Francisco, CA 94103. Defendants are all related business entities and defendants are collectively referred to as "Uber" herein.

**JURISDICTION AND VENUE**

21.     This Court has subject matter jurisdiction over all claims asserted in this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). On behalf of a class, Plaintiff seeks injunctive relief under the UCL as well as injunctive relief, damages, and treble damages under the UPA. This relief has value to the class and would have a cost to Defendants in excess of $5 million exclusive of interest and costs. Members of the proposed class of Plaintiffs are citizens of states different from Defendants, and fewer than two thirds of proposed class members are domiciled in California. A prior class action has been filed in the past three years asserting similar factual allegations against Uber.

22.     This Court has personal jurisdiction over Defendants because they reside in and have their principal place of business in the State of California, and/or substantial parts of the unlawful conduct at issue took place in and caused harm in the State of California.

CLASS ACTION COMPLAINT

23.     Venue is proper in this District because the Defendants have their principal places of business in this District and are subject to personal jurisdiction in this District, and the unlawful conduct at issue was agreed upon and occurred in this District.

**FACTUAL ALLEGATIONS**

**A.     Plaintiff Operates A Prearranged Transportation Company That Relies On Employee Drivers**

24.     When single passengers or small groups of passengers hire non-shared rides between locations of their choice, they have traditionally had two types of services to choose from: (1) taxicabs ("taxis" or "cabs"), also known as public hire, hailed, or street taxis, and (2) livery services (including various types of sedans, limousines, SUVs and vans) that are licensed to provide pre-arranged transportation services.

25.     In California, taxis are licensed and regulated by cities and counties and may be hailed from the street.

26.     Except for taxis, public transit, and other service categories not at issue here, "every [other] person engaged in the transportation of persons by motor vehicle for compensation" in California is defined as a "charter-party carrier of passengers" and must obtain a license from the California Public Utilities Commission ("CPUC").  Cal. Pub. Util. Code § 5360.  The most common form of license is a TCP license.

27.     TCP license holders may not be hailed from the street and must instead provide rides that are prearranged.

28.     Plaintiff is a licensed provider of livery services in California.

29.     Before commencing operations, Plaintiff obtained and paid for a TCP permit from the California Public Utilities Commission ("CPUC") authorizing it to provide pre-booked transportation to passengers.

30.     As a requirement of that license, Plaintiff must, among other things:

(a)     Obtain specialized insurance coverage.

(b)     Comply with vehicle inspection regulations.

(c)     Enroll in a controlled substance and alcohol testing program.

(d)     Procure airport licensing and permitting.

(e)     Obtain a DMV weight certificate.

(f)     Complete and submit forms for the DMV's employer pull notice program.

31.     Because drivers are integral to Plaintiff's business, they are Plaintiff's employees. California law requires Plaintiff to ensure that its drivers earn a minimum wage. The California minimum wage is currently $11.00 per hour throughout the state and higher in most major cities. For example, the current minimum wage in Los Angeles for a business with 26 or more employees is $13.25 per hour. The current minimum wage in Oakland is $13.23 per hour, in San Jose is $13.50 per hour, and in San Francisco is $15.00 per hour. An employer is not allowed to require that an employee pay for business expenses out of these wages.

32.     California law requires Plaintiff to pay a premium wage of 1.5 times a driver's regular rate of pay for all hours worked in excess of eight hours up to and including 12 hours in any workday, and for the first eight hours worked on the seventh consecutive day of work in a workweek. California law further requires that an employer pay double the employee's regular rate of pay for all hours worked in excess of 12 hours in any workday and for all hours worked in excess of eight on the seventh consecutive day of work in a workweek.

33.     In calculating the hours for which it must pay drivers, Plaintiff is required to include short breaks during the day when the drivers are not working.

34.     Plaintiff also bears substantial costs to protect its employees in the event they become unemployed or suffer a work-related disability. Plaintiff pays up to $427 per driver per year in unemployment insurance. Plaintiff must also pay workers' compensation insurance premiums.

35.     Workers' compensation premiums are high in the for-hire transportation industry. For example, Plaintiff currently pays premiums of 15.20 cents for every dollar of wages paid to a driver.

36.     Plaintiff also helps provide employees with a safety net in retirement by paying a 6.2% social security tax (on the first $128,400 of wages per year) and a 1.45% Medicare tax.

CLASS ACTION COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

**B.     Uber Operates A Prearranged Transportation Company While Avoiding Numerous Costs Through Violations of Employment Laws.**

37.     In 2009, Travis Kalanick and Garrett Camp launched UberCab in San Francisco, California.

38.     UberCab's investor deck marketed the company as a "fast & efficient on-demand car service." UberCab promised to use the "[l]atest consumer web & device technology" to "automate dispatch to reduce wait-time" and suggested that it could become "the ubiquitous 'premium' cab service."

39.     UberCab began operating its "'premium' cab service" without seeking a license, permit, or regulatory approval to operate a taxi service from the San Francisco Municipal Transportation Agency.

40.     UberCab also began operating without obtaining a TCP permit to operate a pre-booked livery service.

41.     On October 19 and 20, 2010, UberCab received cease and desist letters from the San Francisco Municipal Transportation Authority and the CPUC. In response, UberCab changed its name to Uber, but continued to operate in the same manner.

42.     Uber riders use a smartphone app to request service at the time of need and are notified of the wait time for a vehicle and their expected arrival time.

43.     Around July 2012, Uber launched "UberX," which offered transportation in less expensive, non-luxury vehicles driven by drivers without commercial licenses. Uber offered UberX as a lower cost alternative to its original service, which it subsequently renamed UberBLACK. At first, rates for UberX were similar to those of taxis and were 35% cheaper than UberBLACK, but Uber quickly lowered them.

44.     Around July 2012, Uber also launched "UberSUV" as a premium service for up to six passengers. And in May 2014, Uber launched "UberXL" as a "Low-Cost SUV Option."

CLASS ACTION COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

45.     On November 13, 2012, the Consumer Protection and Safety Division of the CPUC issued a citation alleging that Uber was violating sections of the Public Utilities Code related to charter-party carriers.

46.     In January 2013, Uber settled with the CPUC and agreed that Uber would engage in TCP operations that complied with a number of CPUC requirements. The CPUC later found that, instead of abiding by all of the CPUC requirements, Uber evaded them by "licensing" Uber's TCP operations and the Uber smartphone app to the wholly-owned entities that are listed as Defendants in this complaint.

47.     In 2013, the CPUC created a new subcategory of charter-party carrier license for a Transportation Network Company ("TNC"). A TNC is a type of transportation company that dispatches its vehicles using a smartphone or other online application. Specifically, a TNC is defined as any entity "that provides prearranged transportation services for compensation using an online-enabled application or platform to connect passengers with drivers using a personal vehicle." Pub. Util. Code § 5431(c).

48.     In 2014, Uber's wholly-owned subsidiary, Raiser-CA, LLC applied for and obtained a TNC license from the CPUC to operate as a charter-party carrier.

49.     In 2017, Uber's wholly-owned subsidiary, UATC, LLC, obtained a TCP permit from the CPUC to operate as a charter-party carrier.

50.     In May of 2018, the CPUC determined that Uber Technologies Inc. improperly failed to register as both a TNC and a TCP and must register as a transportation company going forward. Uber Technologies Inc. now has an active TCP permit and a pending TNC permit.

51.     The CPUC has not set the rates charged by Uber or other TNCs or TCPs.

**C.      Uber Misclassifies Its Drivers In Violation Of California State Laws.**

52.     Uber misclassifies its drivers as independent contractors when California law requires them to be paid as employees.

53.     California applies an "ABC" test that presumptively treats all workers as employees and will recognize them as independent contractors only if the employer carries its burden of proving that *all* of the following factors are present:

CLASS ACTION COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

A. The worker is "free from the control and direction of the hirer";

B. The worker "performs work that is outside the usual course of the hiring entity's business"; and

C. The worker "is customarily engaged in an independently established trade, occupation, or business" and "takes the usual steps to establish and promote his or her independent business" separately from working for an employer.

54.    Uber drivers are employees under the ABC test.

55.    In the common lexicon, "getting an Uber" refers to hailing a ride.

56.    The CPUC has issued a rulemaking, which found that Uber Technologies Inc. is a transportation company, both as a transportation network company (TNC) and charter-party carrier (TCP).

57.    Uber advertisements have asserted that "Uber" is in the business of "moving people" and provides the "safest rides on the road."

 

58.    Uber's website has encouraged consumers to "Start riding with Uber" because Uber is "the best way to get wherever you're going" and provides "always the ride you want."



59.     Uber has advertised itself to businesses as "a better way to get there," noting that, it offers, *inter alia*, "[a] ride to the airport" for business travel and "a car for [business] clients" to ride in.



A better way to get there

A ride to the airport. A car for your clients. It's easy to create options that make sense for the way your organization travels.

60.     Uber requires that all drivers operating under its TNC license display Uber's trade dress in two locations on their vehicles whenever signed onto the Uber app.

61.     This ensures that the work of Uber drivers is performed in service of Uber's brand.

62.     In short, since its inception as a "premium' cab service," Uber has been in the business of selling rides.

63.     The drivers who provide Uber's rides operate in the usual course of Uber's business.

64.     It is clearly *not* the case that the work done by Uber drivers has "no tangible connection to [Uber's] business."

65.     Rather, Uber's drivers are integral to its business.

66.     Uber's executives have stated in a message to drivers, "simply put, Uber wouldn't exist without you."

67.     Uber's drivers are also not free from Uber's control and have generally not taken steps to establish a business independent of working for Uber.

68.     In order to deliver a uniform brand, Uber dictates terms of its transportation service with a specificity that does not allow drivers the sort of discretion consistent with an independent business. Uber controls the precise manner in which the driver delivers *Uber's* service. Uber unilaterally decides the price that Uber charges for the driver's services, collects all money from riders, sets the compensation earned by the drivers, decides which rides are offered to drivers, and unilaterally chooses how to resolve customer complaints.

- 11 -                                    CLASS ACTION COMPLAINT

69.     Uber denies drivers information about the destination of the rides they will be performing until after the driver has accepted the ride and penalizes drivers who cancel rides after accepting them. Uber also prohibits drivers from soliciting riders for business outside of the Uber app. Drivers are therefore unable to make any entrepreneurial choice about which rides to perform and are unable to develop business goodwill by working for Uber, other than goodwill for Uber.

70.     The significant majority of Uber drivers invest minimal or no capital in, and take no steps to establish, an independent business. Rather, for many drivers, all that is required to start a "business" with Uber is to have a driver's license and pass a background check.

71.     The economics of driving for Uber confirm that Uber drivers bring little investment or skill to the job. As explained more fully below, a majority of full-time Uber drivers earn net pay that is well below the equivalent of minimum wage. Independent businesses that truly deploy investment capital and managerial skill do not typically produce average earnings below minimum wage.

72.     Uber therefore violates California law by failing to provide its drivers with the minimum protections owed to employees.

**D.      Uber's Unlawful Conduct Gives It A Substantial Competitive Advantage.**

73.     Uber saves a massive amount of money by evading the many responsibilities that the law imposes on employers.

74.     In California, State Industrial Welfare Commission Order 9-2001 and Labor Code § 510, impose:

- a minimum wage (currently $11.00 per hour for large employers throughout the state, but $13.00 per hour or more in most large cities);

- overtime of one and one-half times the regular hourly rate for hours worked in excess of eight hours per day or 40 hours per week or the first eight hours of the seventh consecutive workday of the workweek; and

- payment of double the regular hourly rate for hours worked in excess of twelve hours per workday or eight hours on the seventh consecutive workday of the workweek.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

CLASS ACTION COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

75.      In addition to circumventing minimum wage and overtime laws, Uber also avoids numerous other costs associated with properly classifying its drivers as employees. First, Uber fails to pay drivers for short breaks during their work day, as is required for employees. Second, Uber shirks significant tax obligations, including the 6.2% employer social security tax, the 1.45% employer Medicare tax, and unemployment insurance contributions. These expenses cost thousands of dollars per year per driver. Third, Uber dodges significant worker's compensation insurance costs. Finally, pursuant to the Affordable Care Act, because Uber has 50 or more full-time equivalent employees, it is required to provide health coverage to all full-time employees. According to Kaiser, the average annual cost of employer coverage for an individual employee was $6,690 in the 2017. Uber avoids paying these costs for its full-time drivers.

76.      The economic effect of Uber evading these obligations is substantial.

77.      A recent study estimated that the net pay earned by an *average* Uber driver, after deducting the expenses and other benefits Uber would have to pay if it properly classified drivers, is the equivalent of $9.21 an hour, which is already significantly below the statewide minimum wage in California and is far below the minimum in the urban localities in which most Uber drivers operate.[1]

78.      This study estimated the cost of workers' compensation insurance based on a surcharge collected by the Black Car Fund in New York City, which is significantly lower than the premiums charged by insurers in California. Many livery companies in California pay 15 to 25 cents of workers' compensation premiums for every dollar they pay to drivers.

79.      When adjusted for the substantial cost of workers' compensation insurance in California, Uber avoids an average of $9.07 an hour in business expenses and employee benefits that it would have to pay if it properly classified drivers as employees. As a result, Uber pays costs for the average driver that are equivalent to what an employer would bear if they (illegally) paid their W-2 employees $7.48 per hour.

---

[1] Lawrence Mishel, Uber and the labor market: Uber drivers' compensation, wages, and the scale of Uber and the gig economy, *available at* https://www.epi.org/files/pdf/145552.pdf.

CLASS ACTION COMPLAINT

1    80.    Due to high variation in pay, many drivers earn far less. Some earn the equivalent

2    of $5 an hour. Some earn $3 an hour. Some even lose money. Thus, Uber is likely saving $5 or

3    more for every hour a driver works.

4    81.    Uber recently stated that it had 148,000 active drivers in California at the end of

5    2017. Based on these numbers, Uber's violation of California law causes it to avoid roughly $250

6    million each year in compensation and benefits payments to just full-time, California drivers.

7    Uber's total cost savings from misclassification in California may exceed $500 million each year.

8    82.    These avoided costs are material to Uber's business. Financial reports obtained by

9    The Wall Street Journal indicate that Uber pays over 75 percent of gross bookings to drivers. And

10   Uber's payments to drivers are over 7.5 times its gross profits. Accordingly, even a small

11   percentage reduction in Uber's payments to drivers makes a significant impact on Uber's bottom

12   line. For example, a 5% reduction in payments to drivers would result in a 37.5% increase in

13   gross profits to Uber.

14   **E.    Uber Prices Its Rides Below Its Total Average Cost With The Purpose Of Injuring**

15   **      Competition.**

16   83.    Uber has priced its rides at a level that is far below the total costs attributable to

17   those rides.

18   84.    Assessing Uber's pricing is relatively straightforward in Uber's case, because the

19   company essentially sells only one type of product: rides. Uber's financial statements report two

20   kinds of revenue: "gross bookings," which come from rides, and "other revenue."[2] The most

21   recent quarterly gross-revenue figure was $11.3 billion dollars. The contemporaneous other-

22   revenue figure is only $47 million. That means that rides accounted for about 99.5% of Uber's

23   revenue that quarter.

24   85.    Uber's financial data show that Uber has consistently lost massive amounts of

25   money. That is, the revenue Uber obtains from its "gross bookings" is far below the costs Uber

26   incurs in producing those bookings.

27   _____

28   [2] *See* The Wall Street Journal recently published some of Uber's financial statements. Bensinger
     et al., Uber's Financials: An Inside Look, The Wall Street Journal (May 24, 2018).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

86.     Predatory pricing strategies have been a feature, not a bug, of Uber's business model. Plaintiff is informed and believes and thereon alleges that certain individuals, including Dara Khosrowshahi, Travis Kalanick, Garrett Camp, John Thain, Ursula Burns, Wan Ling Martello, Yasir Al Rumayyan, Matt Cohler, David Trujillo, Ryan Graves, Arianna Huffington, and Ronald Sugar, are or were officers or directors of Uber and participated in meetings and approved of Uber's long-term financial plans, business model, and pricing strategies that intentionally incurred sustained financial losses through below-cost pricing.

87.     Upon information and belief, and as explained by one industry expert:

[I]n the year ending September 2015, Uber had GAAP losses of $2 billion on revenue of $1.4 billion, a negative 143% profit margin. The published reports of full year 2016 results indicated EBITDAR contribution of negative $2.8 billion on a $5.5 billion revenue base, meaning 2016 GAAP losses would easily exceed $3 billion. Thus, Uber's . . . operations in 2015 and 2016 depended on over $5 billion in subsidies, funded out of the $13 billion in cash its investors have provided. In the year ending in September 2015, Uber was only recovering 41% of its costs. Uber's growth was driven by its ability to capture market share from competitors who had to cover 100% of their costs from passenger fares.

Hubert Horan, *Will The Growth Of Uber Increase Economic Welfare?*, 44 Transp. L.J., 33, 44 (2017) ("*Growth of Uber*").[3]

88.     Uber's financials for 2017 showed a GAAP operating loss of $4.5 billion, and an operating margin of negative 61%.

89.     Because Uber loses massive amounts of money overall and because 99.5% of its revenue comes from one type of product, it is clear that this product is being priced at below its overall cost.

90.     California is known as a state in which the costs of doing business are unusually high, especially fuel costs, a substantial input cost for most ground transportation. It is therefore reasonable to infer that Uber's operations in California are even further below cost than they are nationwide.

---

[3] *Available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2933177.

CLASS ACTION COMPLAINT

91.     These numbers and an analysis of the costs of transportation services demonstrate that Uber's business model is in fact fundamentally inefficient. Detailed cost data of traditional operators show that 58 cents of every gross passenger dollar (fares plus tips) went to driver take home pay and benefits, 9 cents went to fuel and direct fees, and 18 cents went to vehicle costs. Thus, 85 cents went to driver and vehicle expenses and the remaining 15 cents covered corporate overhead.

92.     Uber's transportation model is structurally inefficient on every metric.

93.     Uber's overhead is substantially higher than that of traditional transportation providers. Upon information and belief, and as explained by one industry expert:

> Uber's costs are much, much higher; even though they provide less than half the service of traditional companies. The P&L data clearly show[] these charges come nowhere close to covering Uber's actual corporate expenses. . . . Uber fees need to cover the cost of global marketing, software development programs, branding and lobbying programs, the huge market development costs of Uber's expansion into hundreds of new cities and must also fund a return on the $13 billion its owners have invested.

Hubert Horan, *Can Uber Ever Deliver? Part Two: Understanding Uber's Uncompetitive Costs*.[4]

94.     The vehicle costs of Uber's transportation model are also substantially higher than those of traditional transportation providers. Upon information and belief, and as explained by one industry expert:

> It is inconceivable that hundreds of thousands of independent, poorly-financed Uber drivers could ever achieve lower vehicle ownership, financing, licensing and maintenance costs than professional fleet managers at traditional taxi/limo companies . . .  Not only does shifting operating costs and capital risk from Uber's investors onto its drivers fail to eliminate them from the overall business model, but the shifting makes the costs and risks higher.

*Growth of Uber*, 44 Transp. L.J., at 46.

95.     In order to lure drivers away from traditional transportation options, Uber was forced (initially) to offer higher compensation.

---

[4] https://www.nakedcapitalism.com/2016/11/can-uber-ever-deliver-part-one-understanding-ubers-bleak-operating-economics.html.

CLASS ACTION COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

96.     However, Uber responded to the unsustainable cost of its vehicle fleet and labor force by shifting vehicle expenses onto its drivers and then deceiving drivers about their net compensation:

> Uber . . . deliberately misrepresented gross receipts as net take-home pay. [It] also failed to disclose the substantial financial risk its drivers faced since Uber could cut their pay or terminate them at will, even if they were locked into long-term vehicle financing obligations. Uber claimed "[our] driver partners are small business entrepreneurs demonstrating across the country that being a driver is sustainable and profitable" and that ". . .the median income on UberX is more than $90,000/year/driver in New York and more than $74,000/year/driver in San Francisco," even though Uber had no drivers with earnings anything close to these levels. After these claims were readily debunked, Uber aggressively publicized the higher Uber driver pay reported by supposedly "academic" research (which Uber co-authored and paid for) without explaining that the study made no attempt to deduct vehicle costs and risks from gross Uber pay that would be required-to calculate actual net earnings and to provide a legitimate comparison of take home pay rates. . . .

> In mid-2015, after hundreds of thousands of drivers were locked in to vehicle financial obligations, Uber eliminated driver incentive programs and reduced the driver share of each passenger dollar by one-third. This transfer from Uber drivers to Uber investors produced the 2016 margin improvement . . . , but also eliminated much (if not all) of the economic incentive that got drivers to switch to Uber in the first place.

*Id.* at 47-49.

97.     In short, Uber has consistently lost money on Uber rides, and would lose even more if it bore the full costs of its vehicle fleet and labor force rather than illegally shifting them onto drivers.

98.     The economics of Uber also demonstrate that, unlike some startups, Uber has no hope of using economies of scale to create margin improvements and "grow into profitability" through additional cost savings.

99.     Upon information and belief, and as explained by one industry expert:

> [U] rban car service operators have never demonstrated significant scale economies, and Uber has not found any source of major margin improvements other than driver compensation cuts. No one in the history of urban car services has ever observed economies that drove high levels of concentration in individual markets or allowed individual companies to rapidly expand into other cities, much less the economies needed to expand globally.

*Id.* at 51.

CLASS ACTION COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

100.     Uber could not reasonably expect to grow into profitability through economies of scale. The only rational purpose for Uber subsidizing rides as it has done and continues to do is to drive enough competitors out of business to be able to raise prices down the road. Massive subsidies for uneconomic prices are only a prudent investment if one believes that future profits and equity valuations will cover the cost of those subsidies. And the only way an inefficient producer can cover the costs of such subsidies is by driving enough competitors out of business that normal market forces will not preclude higher prices in the future.

101.     The magnitude of investment in Uber at the same time the company was hemorrhaging money likewise confirms that investors believed Uber could eventually drive competitors out of business and extract higher prices in the long run:

> [T]he staggering $13 billion in cash its investors provided is consistent with the magnitude of funding required to subsidize the many years of predatory competition required to drive out more efficient incumbents. Uber's investors did not put $13 billion into the company because they thought they could vanquish those incumbents under "level playing field" market conditions; those billions were designed to replace "level playing field" competition with a hopeless battle between small scale incumbents with no access to capital struggling to cover their [bare] bone costs and a behemoth company funded by Silicon Valley billionaires willing to subsidize years of multi-billion dollar losses.

Hubert Horan, *Can Uber Ever Deliver? Part Four: Understanding That Unregulated Monopoly Was Always Uber's Central Objective*.[5]

102.     Stated differently, the world's most sophisticated investors did not invest billions of dollars in a company with huge operating losses and minimal economies of scale because they expect it to someday eek out modest profits in a highly competitive market with low margins.

103.     As one analyst reported: "[People] wonder why Uber keeps raising so much money. . . . The answer is that Uber is using cash as a competitive weapon. When a competitor enters an Uber market, one investor in an Uber-competitor says, Uber immediately and radically cuts its prices. Uber then happily loses money on each ride, knowing that the new competitor, with inferior scale, will lose even more money on each ride. Uber bleeds the competitor until the

---

[5] *Available at* https://www.nakedcapitalism.com/2016/12/can-uber-ever-deliver-part-four-understanding-that-unregulated-monopoly-was-always-ubers-central-objective.html.

CLASS ACTION COMPLAINT

1    competitor realizes that Uber will do whatever it takes to crush it. The competitor then often gives

2    up and withdraws — and Uber raises its prices again."  Henry Blodget, *Meanwhile, Here's the*

3    *Chatter about That Huge Financing Uber is Doing*, Bus. Insider (Nov. 20, 2014).[6]

4    **F.    Uber's Unlawful Competitive Advantage Allows It To Take Substantial Revenue and**

5            **Profits from Plaintiff and Other Competitors.**

6            104.    Uber's unlawful competition has allowed it to gain substantial market share with

7    astonishing speed in the for-hire transportation industry in California and caused losses of money

8    and property to Plaintiff and other members of the Classes.

9            105.    As Uber's pricing strategy illustrates, price is a significant factor in consumer

10   decisions regarding ground transportation. While other factors may influence consumer choice as

11   well, it is clear that Uber would not have obtained the same market share had it not priced below

12   costs.

13           106.    In less than a decade, Uber's pricing has allowed it to ascend from a single city

14   "premium cab service" to dominating the market for for-hire ground transportation services.

15           107.    According to Certify, a travel-management firm which handles corporate travel

16   transactions, Uber controlled 55 percent of the ground travel expenditures of business travelers in

17   the second quarter of 2017.

18           108.    Uber's below-cost pricing has caused the market share held by traditional ground

19   transportation providers to plummet.

20           109.    Plaintiff's business is no exception. Since Uber began operating in Los Angeles,

21   Plaintiff has lost a substantial portion of its corporate account business as well as its retail client

22   business. It has seen a substantial drop in airport-related business, a shift in corporate account

23   usage, and complaints concerning pricing from customers asking Plaintiff to charge less money in

24   light of Uber's lower prices.

25           110.    To slow the loss of market share, Plaintiff has been compelled not to raise its rates

26   in line with its expenses, knowing that if it did, it would lose additional customers to Uber.

27

28   [6] *Available at* https://www.businessinsider.com/uber-raising-money-2014-11.

- 19 -                                CLASS ACTION COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

111.    Plaintiff has also seen a dramatic decrease in the number of rides referred to it by Plaintiff's out-of-state affiliates. It is a longstanding practice in the livery industry for companies to form affiliate relationships that allow their clients to book a ride when they are outside a company's service area. For example, several New York limousine companies affiliate with Plaintiff so that when a New York client is traveling in Los Angeles, they can book a ride through the New York company, which is then fulfilled by Plaintiff. Plaintiff's out-of-state affiliates receive a share of each ride they refer. Uber's unlawful pricing has taken business from these affiliates as well, who have also seen their bookings and profit margins reduced.

112.    Signs of car service and taxi providers' decline have manifested nationwide, but perhaps they are nowhere more noticeable than Uber's birthplace, the Bay Area.

113.    San Francisco's most recognizable taxi operator, Yellow Cab Cooperative, which had been in business since 1977 and was made up of 300 owners and operators with more than 500 cabs, filed for chapter 11 bankruptcy in January 2016.

114.    In San Francisco, taxi medallions that sold in 2010 for $250,000 are effectively worthless, as the market has collapsed and not a single medallion has been sold in almost two years.

115.    These impacts should not be surprising given that the California Supreme Court has emphasized the unfair competitive impact of businesses violating employment protections. *See Dynamex Operations W., Inc. v. Superior Court*, 4 Cal. 5th 903, 913 (2018), *reh'g denied* (June 20, 2018) (emphasizing that the definition of "employee" should be interpreted broadly to prevent "the unfair competitive advantage the business may obtain over competitors that properly classify similar workers as employees and that thereby assume the fiscal and other responsibilities and burdens that an employer owes to its employees.").

## CLASS ACTION ALLEGATIONS

116.    Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and b(3) on behalf of itself and two separate classes of similarly situated persons.

117.    **UCL Class Definition**: Plaintiff brings its UCL claim on behalf of:

CLASS ACTION COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

> All persons (including natural persons and entities) who earned revenue through the provision of pre-arranged ground transportation services for non-shared rides in California from September 10, 2014 to the present (the "Class Period").

118.   Included in this class are persons throughout the United States who obtain revenue through affiliate relationships with providers of pre-arranged ground transportation services in California.

119.   Excluded from this Class are: (1) any Judge or Magistrate presiding over this action and members of their families; and (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current, former, purported, and alleged employees, officers, and directors; (3) counsel for Plaintiff and Defendants; (4) the legal representatives, successors, or assigns of any such excluded persons; (5) all persons who have previously had claims similar to those alleged herein finally adjudicated or who have released their claims against Defendants; and (6) all persons who provided ground transportation services for non-shared rides between locations from September 10, 2014 to the present (the "Class Period") in the United States and who did not classify their drivers as employees.

120.   The UCL Class seeks certification for injunctive relief under California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq*.

121.   **UPA Class**: Plaintiff brings its UPA claim on behalf of:

> All persons (including natural persons and entities) who earned revenue from ground transportation services for non-shared rides in California from September 10, 2015 to the present (the "Class Period").

122.   Included in this class are persons throughout the United States who obtain revenue through affiliate relationships with providers of prearranged ground transportation services in California.

123.   Excluded from this Class are: (1) any Judge or Magistrate presiding over this action and members of their families; and (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current, former, purported, and alleged employees, officers, and

CLASS ACTION COMPLAINT

directors; (3) counsel for Plaintiff and Defendants; (4) the legal representatives, successors, or assigns of any such excluded persons; and (5) all persons who have previously had claims similar to those alleged herein finally adjudicated or who have released their claims against Defendants.

124.    The UPA Class seeks certification for injunctive relief and damages pursuant to the California Unfair Practices Act, Cal. Bus. & Prof. Code §§ 17000 *et seq.*

125.    **Numerosity**: The exact number of class members in the UCL and UPA classes is unknown to Plaintiff at this time, but clearly exceeds 100, rendering individual joinder impracticable.

126.    **Commonality**: There are many questions of law and fact common to the claims of Plaintiff and the UCL and UPA class.

127.    Common issues for the UCL class include:

      a.    Whether Uber unlawfully classifies its drivers as non-employee independent contractors under California law;

      b.    Whether Uber unlawfully and/or unfairly gains a cost advantage over other ground transportation services providers;

      c.    Whether Uber violated California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* by engaging in unlawful conduct;

      d.    Whether Uber violated California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* by engaging in unfair conduct;

      e.    Whether Uber's conduct caused injury to the business or property of Plaintiff and members of the Class;

      f.    The appropriate form and scope of injunctive relief necessary to prohibit further and future injury to members of the Class from Uber's unlawful conduct;

      g.    The nature, form, and amount of the equitable relief necessary to restore the inequities now existing in Uber's favor and at the Class' detriment caused by Uber's anticompetitive, unlawful, and unfair conduct and business practices.

128.    Common issues for the UPA class include:

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

CLASS ACTION COMPLAINT

a.   Whether Uber has priced its services below their cost;

b.   Whether Uber's below-cost pricing has allowed it to take market share from competitors;

c.   Whether Uber's below-cost pricing has reduced the profit margins of its competitors;

d.   The amount of market share Uber has gained from pricing below cost;

e.   Whether Uber's below-cost pricing caused injury to the business or property of Plaintiff and members of the Class;

f.   Whether Uber's below-cost pricing was done with the purpose of injuring competition;

g.   The appropriate form and scope of injunctive relief necessary to prohibit further and future injury to members of the Class from Uber's below-cost pricing; and

h.   The nature, form, and amount of the equitable relief necessary to restore the inequities now existing in Uber's favor and at the Class' detriment caused by Uber's below-cost pricing.

129.   **Typicality**: Plaintiff's claims are typical of the claims of all the other UCL Class and UPA Class members.  Plaintiff provided ground transportation services during the Class Period in California.  Plaintiff and the UCL Class and UPA Class members sustained substantially similar injuries as a result of Defendants' uniform wrongful conduct, based upon the same interactions that were made uniformly with Plaintiff and the public.

130.   **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the other UCL Class and UPA Class members. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and its counsel are committed to vigorously prosecuting this action on behalf of the UCL Class and UPA Class members and have the financial resources to do so. Neither Plaintiff nor their counsel has any interest adverse to those of the other UCL Class and UPA Class members.

131.   **Risk of Inconsistent Adjudications:**  Prosecuting separate actions by individual members of the UCL and UPA classes would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendants; or (B) adjudications with respect to individual UCL Class

CLASS ACTION COMPLAINT

1    and UPA Class members that, as a practical matter, would be dispositive of the interests of the

2    other members not parties to the individual adjudications or would substantially impair or impede

3    their ability to protect their interests.

4    132.    **Policies Generally Applicable to the UCL Class and UPA Class**: Defendants

5    have acted and failed to act on grounds generally applicable to Plaintiff and the other UCL Class

6    and UPA Class members, requiring the Court's imposition of uniform relief to ensure compatible

7    standards of conduct toward the UCL Class and UPA Class.

8    133.    **Superiority**: This case is also appropriate for class certification because class

9    proceedings are superior to all other available methods for the fair and efficient adjudication of

10   this controversy as joinder of all parties is impracticable. The UCL Class does not seek individual

11   damages, thereby eliminating a large number of potentially individual questions.  Moreover, the

12   UPA Class seeks damages based on the overall market share obtained by Uber from its unlawful

13   pricing, which may be reasonably calculated on a class-wide basis including lost profits.

14   134.    **Predominance:**  Common issues, as detailed above, predominate over individual

15   issues applicable only to any individual member of the UCL Class and UPA Class.

16   135.    Plaintiff reserves the right to revise the definition of the UCL Class and UPA Class

17   based on further investigation, including facts learned in discovery.

## CAUSES OF ACTION

### COUNT I:

### Violations of the California Unfair Competition Law

### (Plaintiff and the UCL Class)

22   136.    Plaintiff realleges each allegation contained in the paragraphs above as if fully set

23   forth herein.

24   137.    Uber is committing acts of unfair competition within the meaning of Section

25   17200 of the UCL by engaging in unlawful and unfair conduct. Uber's unlawful and unfair

26   conduct has harmed competition in California and threatens significant harm to competition in the

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

future. Uber's conduct is a direct and proximate cause of injury and the loss of money and property to Plaintiff and to the UCL Class.

138.     Uber has engaged in unfair conduct within the meaning of the UCL by, *inter alia*, systematically misclassifying its drivers as "independent contractors" and failing to pay them as employees, in violation of the California Labor Code, California Unemployment Insurance Code, and California Insurance Code in order to reduce the company's labor expenses and prices, which in turn harms competition.

139.     Violations of California law constitute unlawful and unfair business practices for purposes of the UCL. *See Dynamex*, 4 Cal. 5th at 913 (stating that one reason to interpret "employee" broadly is to prevent "the unfair competitive advantage the business may obtain over competitors that properly classify similar workers as employees and that thereby assume the fiscal and other responsibilities and burdens that an employer owes to its employees"); *id.* at 952 (noting that Wage Orders "are also clearly intended for the benefit of those law-abiding businesses that comply with the obligations imposed by the wage orders, ensuring that such responsible companies are not hurt by unfair competition from competitor businesses that utilize substandard employment practices").

140.     This misclassification allows Uber to lower prices, which in turn has taken and threatens to continue to take market share from Uber's direct competitors, including Plaintiff.

141.     Uber's unlawful and unfair conduct has significantly harmed competition in the markets for ground transportation services within California and elsewhere, conduct that threatens continuing and irreparable harm to competition if not restrained, and threatens an incipient violation of an antitrust law, and violates the policy or spirit of one of those laws.

142.     Plaintiff and the Class have suffered injury as a direct, proximate, and foreseeable result of Uber's unlawful and unfair business activities. Plaintiff and the Class have suffered and continue to face the threat of, *inter alia*, loss of customers, loss of profits, and loss of goodwill, resulting from Uber's illegal cost advantage.

CLASS ACTION COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

**COUNT II:**

**Violations of the California Unfair Practices Act**

**(Plaintiff and the UPA Class)**

143.     Plaintiff realleges each allegation contained in the paragraphs above as if fully set forth herein.

144.     Defendants sold, and continue to sell, transportation services below cost and on a loss leader basis in violation of Cal. Bus. & Prof. Code §§ 17043, 17044.

145.     Defendants' rates are not set by the CPUC.

146.     Plaintiff is informed and believes and thereon alleges that the directors and officers of Uber at the time of the above-referenced violations included the following persons: Dara Khosrowshahi, Travis Kalanick, Garrett Camp, John Thain, Ursula Burns, Wan Ling Martello, Yasir Al Rumayyan, Matt Cohler, David Trujillo, Ryan Graves, Arianna Huffington, and Ronald Sugar (chair). Additionally, Dara Khosrowshahi is the current CEO of Uber; Travis Kalanick is a co-founder of Uber, and formerly served as Uber's CEO; Garrett Camp is a co-founder of Uber.

147.     Defendants performed the above-mentioned acts for the purpose of destroying competition and injuring Plaintiff and the members of the UPA class.

148.     As a direct result of the above-mentioned acts of Defendant, Plaintiff has been deprived of the patronage of a large number of their actual and potential customers.  Defendant's conduct has in fact proximately caused damages to Plaintiff in an amount to be proved at trial.

149.     Unless restrained, Defendant will continue to contract with riders on a loss leader basis.

**PRAYER FOR RELIEF**

150.     Plaintiff, on behalf of themselves and the UCL and UPA classes of all others similarly situated, requests that the Court enter an order or judgment against Defendants including the following:

(a)     That Uber's conduct be adjudged and decreed to violate the law as alleged in the Complaint;

CLASS ACTION COMPLAINT

(b)     That Uber be enjoined and restrained from in any manner continuing, maintaining, or renewing its unlawful and anticompetitive conduct or adopting or following any practice, plan, program, or device with a similar purpose or effect;

(c)     That Plaintiff and the UPA Class be awarded damages and treble damages under the UPA.

(d)     That Plaintiff, the UCL Class, and the UPA Class be awarded reasonable attorney's fees and costs, including expert costs, as allowable under law; and

(e)     All other relief to which Plaintiff and the UCL Class and UPA Class may be entitled at law or in equity including injunctive relief as the Court may deem just and proper.

Dated: September 10, 2018

/s/ *Michael A. Geibelson*
Michael A. Geibelson
Aaron M. Sheanin
Tai S. Milder
**ROBINS KAPLAN LLC**
2440 W. El Camino Real, Suite 100
Mountain View, California 94040
Telephone:  (650) 784-4040
Facsimile:  (650) 784-4041


**KELLER LENKNER LLC**
Ashley Keller*
Warren Postman*
Seth Meyer*
Tom Kayes*
150 N. Riverside Plaza, Suite 4270
Chicago, Illinois 60606
Tel: 312.741.5220

*Application for Admission Pro Hac Vice forthcoming*

*Counsel for Plaintiff and the Proposed Classes*

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

CLASS ACTION COMPLAINT