Ashley Keller (*pro hac vice*)
ack@kellerlenkner.com
Seth Meyer (*pro hac vice*)
sam@kellerlenkner.com
Tom Kayes (*pro hac vice*)
tk@kellerlenkner.com
**KELLER LENKNER LLC**
150 N. Riverside Plaza, Suite 4270
Chicago, Illinois 60606
Tel: (312) 741-5220

Warren Postman (*pro hac vice*)
wdp@kellerlenkner.com
**KELLER LENKNER LLC**
1300 I Street, N.W., Suite 400E
Washington, D.C. 20005
Tel: (202) 749-8334

Michael A. Geibelson (SBN 179970)
mgeibelson@robinskaplan.com
Aaron M. Sheanin (SBN 214472)
asheanin@robinskaplan.com
Tai S. Milder (SBN 267070)
tmilder@robinskaplan.com
**ROBINS KAPLAN LLP**
2440 W. El Camino Real, Suite 100
Mountain View, California 94040
Tel: (650) 784-4040
Fax: (650) 784-4041

*Attorneys for Plaintiff and the Proposed Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| DIVA LIMOUSINE, LTD., individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>UBER TECHNOLOGIES, INC., et al.,<br><br>*Defendants*. | No. 3:18-cv-05546-EMC<br><br>**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:      November 15, 2018<br>Time:      1:30 p.m.<br>Location: Courtroom 5<br>Judge:     Hon. Edward M. Chen |

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**NOTICE OF MOTION AND MOTION**

TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on November 15, 2018, at 1:30 p.m., in Courtroom 5 of this Court, located at 450 Golden Gate Avenue, 15th Floor, San Francisco, California, Plaintiff Diva Limousine, Ltd., will move the Court under Rule 56 of the Federal Rules of Civil Procedure for partial summary judgment in its favor and against all Defendants (collectively "Uber").

This motion seeks partial summary judgment on a single issue: Whether Uber drivers are employees of Uber under California's transportation industry wage order. This issue is appropriate for early, summary disposition. The California Supreme Court recently held that a transportation worker is an employee unless the hiring entity can show that the worker "performs work that is outside the usual course of the hiring entity's business." *Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903, 925 (2018), reh'g denied (June 20, 2018). Uber cannot make that showing. "Uber does not simply sell software; it sells rides." *O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133, 1141 (N.D. Cal. 2015). And Uber's rides are provided by its drivers within the usual course of its business.

No discovery is needed to establish the necessary facts. And summary judgment on this issue will substantially streamline this case. Adjudicating partial summary judgment at this time is not only permitted by Rule 56(a); it is also efficient case management.

This motion is based on this notice of motion and motion, the memorandum of points and authorities below, the concurrently filed Declaration of Tom Kayes and appendix of evidence provided therewith and the Request for Judicial Notice, all pleadings and papers on file in this action, any matters of which the Court may or must take judicial notice, and such additional evidence or argument as may be presented at any hearing.

Dated: October 5, 2018            Respectfully submitted,


/s/ Tom Kayes
Tom Kayes
Ashley Keller
Seth Meyer
**KELLER LENKNER LLC**
150 N. Riverside Plaza, Suite 4270
Chicago, Illinois 60606
Tel: (312) 741-5220

**ROBINS KAPLAN LLP**
Michael A. Geibelson
Aaron M. Sheanin
Tai S. Milder
2440 W. El Camino Real, Suite 100
Mountain View, California 94040
Telephone: (650) 784-4040
Facsimile: (650) 784-4041

**KELLER LENKNER LLC**
Warren Postman
1300 I Street, N.W. Suite 400E
Washington, D.C. 20005
Tel: (202) 749-8334

*Counsel for Plaintiff Diva Limousine, Ltd., and the Proposed Class*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

# TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . 1

II. UNDISPUTED FACTS . . . . . . . . 2

    A. Uber was formed to sell rides . . . . . . 2

    B. Uber's core business is still selling rides . . . . 3

    C. Uber drivers are integral to Uber selling rides . . . 4

III. ARGUMENT . . . . . . . . . 5

    A. Legal Standards . . . . . . . . 5

        1. Partial summary judgment . . . . . 5

        2. Classification of drivers under California
           employment law . . . . . . 5

    B. The Court should grant partial summary judgment
       holding that Uber's drivers are its employees . . . 7

        1. California Wage Order 9 applies to Uber's drivers . . 8

        2. Under Wage Order 9, drivers must be classified
           as employees unless Uber can prove that their
           work is merely incidental to Uber's business . . . 8

        3. Uber cannot prove that drivers' work is merely
           incidental to its business . . . . . 9

        4. Uber cannot defeat summary judgment by calling
           itself a "broker" or a "technology company"—labels courts
           have roundly rejected . . . . . . 11

V. CONCLUSION . . . . . . . . 13

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

iv

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) . . . . . . . . 4

*Awuah v. Coverall N. Am., Inc.*,
    707 F. Supp. 2d 80 (D. Mass. 2010) . . . . . . 11

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) . . . . . . . . 4

*Crawford v. Uber Techs., Inc.*,
    2018 WL 1116725 (N.D. Cal. Mar. 1, 2018) . . . . 10

*Delta Sav. Bank v. United States*,
    265 F.3d 1017 (9th Cir. 2001) . . . . . . 4

*Doe v. Uber Techs., Inc.*,
    184 F. Supp. 3d 774 (N.D. Cal. 2016) . . . . . 10

*Dynamex Operations W. v. Superior Court*,
    4 Cal. 5th 903 (2018) . . . . . . . passim

*Goldberg v. Whitaker House Cooperative, Inc.*,
    366 U.S. 28 (1961) . . . . . . . . 7-8

*Granite State Ins. Co. v. Truck Courier, Inc.*,
    2014 WL 316670 (Mass. Super. Jan. 17, 2014) . . . 9

*O'Connor v. Uber Techs., Inc.*,
    82 F. Supp. 3d 1137 (N.D. Cal. 2015) . . . . . passim

*Martins v. 3PD*,
    2013 WL 1320454 (D. Mass. Mar. 28, 2013) . . . . 10, 11

*McPherson Timberlands v. Unemployment Ins. Comm'n*,
    714 A.2d 818 (Me. 1998) . . . . . . . 12

*Razak v. Uber Techs., Inc.*,
    2018 WL 1744467 (E.D. Pa. Apr. 11, 2018) . . . . 9, 11

*Real v. Driscoll Strawberry Associates, Inc.*,
    603 F. 2d 748 (9th Cir. 1979) . . . . . . 8

*Reardon v. Uber Techs.*, Inc.,
    115 F. Supp. 3d 1090 (N.D. Cal. 2015) . . . . . 11

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

**Cases (cont.)**

*Rutherford Food Corp. v. McComb*,
     331 U.S. 722 (1947) . . . . . . . . 8

*S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations*,
     48 Cal. 3d 341 (1989) . . . . . . . . 8

**Statutes**

Cal. Code Reg. § 11000 . . . . . . . . 5

Cal. Code Reg. § 11090 . . . . . . . . 5, 7

Cal. Labor Code §§ 1171-1194 . . . . . . . 4

Cal. Labor Code § 1182.11 . . . . . . . 4

Cal. Pub. Util. Code § 5360 . . . . . . . 3, 9

**Rules**

Fed. R. Civ. P. 56 . . . . . . . . 4

**Other**

Stephen T. Melnick, Shareholder, *California Announces a New Wage and Hour Independent Contractor Test* (May 1, 2018), *available at* https://www.littler.com/publication-press /publication/california-announces-new-wage-and- hour-independent-contractor-test . . . . . . 6

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Unlike Diva Limousine, Ltd., Uber misclassifies its drivers as independent contractors even though California law requires them to be classified as employees. California's Unfair Competition Law prohibits these unlawful acts and practices. The first step in establishing this claim is therefore determining whether Uber's drivers must be classified as employees. This Court can decide that issue and substantially streamline this case by answering one question: Is providing rides an integral part of Uber's business? If the answer is yes, Uber drivers are Uber's employees. Courts in this district and elsewhere have already answered this question in the affirmative. Because no genuine dispute of material fact exists, the court should grant partial summary judgment on the issue of misclassification.

The California Supreme Court recently simplified the analysis this issue requires. Workers a company uses to conduct its business are presumed to be employees. *Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903, 955 (2018), *reh'g denied* (June 20, 2018) ("*Dynamex*"). To overcome this presumption and lawfully classify a worker as an independent contractor, a company must prove three things:

(A)    that the worker is free from the control and direction of the hirer;

(B)    that the worker performs work that is outside the usual course of the hiring entity's business; and

(C)    that the worker is customarily engaged in an independently established trade, occupation, or business.

*Id*. at 925. This motion seeks partial summary judgment based on the second of these factors – whether "the worker performs work that is outside the usual course of the hiring entity's business." *Id*. at 966. Work is outside the usual course of the hiring company's business if it is "merely incidental to" and not "an integral part of" that business. *Id*. at 961 n.29. Uber drivers provide rides that are indisputably an integral part of, and not merely incidental to, Uber's business. Those drivers are therefore Uber's employees.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

## II. UNDISPUTED FACTS

### A. Uber was formed to sell rides.

Uber began as a "simple idea" – "what if you could request a ride from your phone?" Ex. 1 at 2.[1] Uber's founders thought of the company as a "Next Generation Car Service." Ex. 2 at 5. The company was originally called UberCab. *Id*. In its founders' early marketing efforts to investors, Uber was described as providing a "fast & efficient on-demand car service" that was meant to be "faster & cheaper than a limo, but nicer & safer than a taxicab." *Id*. at 8, 15; *see also* ex. 22 at 205 (making Ex. 2 public). Other early self-descriptions emphasized that Uber was in the business of selling rides. Ex. 2 at 27 (referring to UberCab as "the ubiquitous 'premium' cab service," "The One-click cab," and "Cabs2.0."). The concept was pitched to investors by touting the size of the "Overall Market" for "Taxi and Limousine Services" as the market UberCab might conquer. *Id*. at 21-22. UberCab provided its first ride on July 5, 2010, in San Francisco. Ex. 4 at 34. A few months later, UberCab dropped the "Cab" to become Uber. Ex. 5 at 37.

### B. Uber's core business is still selling rides.

Uber has always been in the business of selling rides under the Uber brand. "Uber" is the dba of Uber Technologies, Inc. Ex. 6 at 40. Uber markets itself as providing a transportation service. It has billed itself as an "On-Demand Car Service," *O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1137, 1141 (N.D. Cal. 2015), and it refers to itself as "Everyone's Private Driver," *Id*.; *see also* exs. 7 at 46; ex. 8 at 52. Today, Uber describes itself as "the largest global ridesharing network," ex. 9 at 65, and claims as its "simple mission" making "transportation as reliable as running water everywhere, for everyone," ex. 10 at 72. Part of that mission is "UberEverywhere," which is the "bold idea that no matter where you are, a reliable ride with Uber is just 5 minutes away." *Id*. Internal Uber documents proclaim that "Uber provides the best transportation service" and that

---

[1] The citations are to the exhibits attached to the concurrently filed declaration of Tom Kayes. The page numbers referred to in the citations are those that have been applied in red to the lower, right-hand corner of the exhibits. These numbers have the prefix "Pls.' PSJM." Moreover, for the reasons stated in the concurrently filed request for judicial notice, Diva requests that the Court take judicial notice of all facts and matters properly noticed in and from exhibits 6, 7, 8, 11, 17, 18, 19, 20, 22, 23, 28, 29, 30, 32, 33, 37, 38, and 39.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

Uber "will be taking some major steps to improve both driver and vehicle quality on the Uber system." Ex. 11 at 78; *O'Connor*, 82 F. Supp. 3d at 1142-44.

Since its first ride, Uber has grown dramatically. Uber measures its growth by the number of rides it has sold. Uber hit 1 billion rides in less than six years. Ex. 12 at 82. Just six months after that, Uber sold ride number 2 billion. Ex. 13 at 85. Ride number 5 billion was in May 2017. Ex. 14 at 88. And Uber passed the 10-billion-ride mark just a few months ago, on July 24, 2018. Ex. 15 at 91. Passengers can now get an Uber in more than 600 cities throughout the world. Ex. 16 at 104.

When selling a ride, Uber sets the terms and collects the money. Uber determines what to charge for each ride using Uber's own pricing formula. Ex. 17 at 106; Ex. 21 at 193; *O'Connor*, 82 F. Supp. 3d at 1136 ("Uber sets the fares it charges riders unilaterally"). Uber's revenue comes from selling rides. Ex. 18 at 143, 147; Ex. 19 at 155; *O'Connor*, 82 F. Supp. 3d at 1142 ("Uber's revenues do not depend on the distribution of its software, but on the generation of rides by its drivers."). Uber collects the full fare from the customer and remits a percentage to the driver. Ex. 20 at 171-73; Ex. 21 at 193-94; *O'Connor*, 82 F. Supp. 3d at 1136 ("Because Uber receives the rider's payment of the entire fare, the relevant contracts provide that Uber will automatically deduct its own 'fee per ride' from the fare before it remits the remainder to the driver.").

As Uber has grown, it has diversified the types of rides it sells. UberCab began as a black car service. Exs. 2 at 17. Uber has since grown to include regular cars, large cars, luxury cars, SUVs, and vans, under product names like UberX, UberBLACK, UberXL, UberSUV, and UberSELECT—all available through the Uber App. Exs. 14 at 88, 23 at 215-16. Now Uber is working on self-driving cars. Ex. 24 at 320. As Uber has expanded, it has branched out into other sectors of the transportation industry. It has launched Uber Freight, "an easy-to-use tool that connects trucking companies and their drivers directly with shippers." Ex. 25 at 325. It also has Uber for Business, which acts like "a digital 'headquarters' for all your company's ground transportation." Ex. 26 at 328. Uber even has a medical transportation business in its portfolio. Ex. 27 at 330. Thus, Uber's existing and future business plans fall squarely within the transportation industry.

Uber even operates under a number of transportation company permits. Uber holds a

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

California Transportation Charter Party ("TCP") permit, ex. 28 at 342, which is for an entity "engaged in the transportation of persons by motor vehicle for compensation, over any public highway in [California]," Cal. Pub. Util. Code § 5360. Uber's subsidiary, UATC, also holds a TCP permit. Ex. 29 at 344. Another wholly-owned subsidiary, Rasier-CA, holds a "Transportation Network Company" (or "TNC") permit, which is a Class P sub-type of a TCP permit. Ex. 30 at 346. That permit authorizes Uber to "transport[] passengers by motor vehicle over the public highways of the State of California" using "an online enabled application or platform." *Id*. Uber drivers operating under the TNC permit must display Uber's "trade dress," which are the distinctive "Uber" decals on the front and rear of the vehicles. Ex. 31 at 349-51. Uber also has a pending TNC permit application for the Uber parent entity, Uber Technologies, Inc. Ex. 28 at 342. After a lengthy and detailed administrative proceeding, the CPUC determined that Uber is both a TCP and a TNC. Ex. 33 at 465.[2]

### C. Uber drivers are integral to Uber selling rides.

Uber has always depended and continues to depend on its drivers to provide the rides that Uber sells. Exs. 20, 21, 34 at 504. Uber's success, indeed its entire business, would not have been possible without Uber's drivers – a fact readily acknowledged by Uber's leadership. In a letter to drivers, Uber's heads of U.S. operations and of driver experience acknowledged: "simply put, Uber wouldn't exist without you." *Id*. Other Uber personnel have expressed similar sentiments about the centrality of drivers to Uber's business, saying "Uber wouldn't be what it is without drivers and couriers – they are at the heart of the Uber experience," ex. 35 at 509, and "Drivers are the heart of our service," ex. 36 at 516. Because drivers are at the heart of the Uber experience, Uber, as part of offering "the best transportation service," works hard to ensure that drivers provide riders with a consistently positive experience. Exs. 37 at 526-31; *O'Connor*, 82 F. Supp. 3d at 1142.

These sentiments reflect the same reality that this Court recognized in *O'Connor*: "Uber

---

[2] Further, in that proceeding, Uber submitted statements regarding Uber's corporate organization, admitting that Rasier-CA, Rasier, and Uber USA are all wholly-owned subsidiaries and that the ultimate parent is Uber Technologies, Inc. *See, e.g.*, ex. 33 at 212-28. The CPUC determined that UATC is also a subsidiary of another company, with Uber Technologies, Inc. as the ultimate parent. *See* ex. 33 at 547, n. 22. The CPUC found that Rasier-CA had no employees. *Id*. at 470. The same was true for Uber USA. *Id*. at 474.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

1  does not simply sell software; it sells rides." 82 F. Supp. 3d at 1141. The conclusion that Uber sells

2  rides is inescapable. Uber's revenue is not from selling software to riders. Kayes Dec. ¶ 4. Uber's

3  revenue is not from selling software to drivers. *Id.*; ex. 32 at 361. Uber gives its app away for free.

4  "Uber's revenues do not depend on the distribution of its software, but on the generation of rides

5  by its drivers." *O'Connor*, 82 F. Supp. 3d at 1142; Exs. 18 at 143, 147. And—at least until cars

6  drive themselves—every ride needs a driver. Despite Uber's reliance on these drivers to provide

7  the rides that are its core business, Uber classifies these drivers as independent contractors, not

8  employees, and compensates them as such. Ex. 23 at 291.

9      These facts demonstrate that Uber drivers perform work that is within the usual course of

10  Uber's business. Accordingly, Diva seeks partial summary judgment holding Uber's drivers are

11  employees under applicable California law.

## III.  ARGUMENT

### A.  Legal Standards

#### 1.  Partial summary judgment

15  A party may seek summary judgment at any time on any part of a claim. Fed. R. Civ. P.

16  56(a). Partial summary judgment motions are subject to the same standards as motions for summary

17  judgment targeting entire claims or defenses. *Delta Sav. Bank v. United States*, 265 F.3d 1017, 1021

18  (9th Cir. 2001). The Court "shall grant summary judgment if the movant shows that there is no

19  genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

20  Fed. R. Civ. P. 56(a). A factual dispute is material only if it "might affect the outcome of the suit

21  under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a factual

22  dispute is genuine only if "the evidence is such that a reasonable jury could return a verdict for the

23  nonmoving party" based upon it. *Id.* To determine whether a factual dispute is genuine, the court

24  must view the evidence in the light most favorable to the non-moving party and draw all reasonable

25  inferences in that party's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

#### 2.  Classification of drivers under California employment law

27  California labor law secures for employees the right to a minimum wage, overtime, and

28  other benefits. *E.g.*, Cal. Labor Code §§ 1171-1194. Many of these rights are further defined by

5

"wage orders" issued by California's Industrial Welfare Commission. *Id.* § 1182.11. These wage

2 orders have the force of law and are "final and conclusive for all purposes." *Id.* There is a general

3 minimum wage order, Cal. Code Reg. § 11000, and there are wage orders specific to particular

4 industries, *id.* §§ 11010-11170. Transportation workers are covered by Wage Order 9. Cal. Code

5 Reg. § 11090. With certain irrelevant exceptions, Wage Order 9 "appl[ies] to all persons employed

6 in the transportation industry whether paid on a time, piece rate, commission, or other basis." *Id.* §

7 11090(1). The order defines "employ" as "to engage, suffer, or permit to work." *Id.* §§

8 11090(2)(D)-(E).

9      This suffer-or-permit language defining employment under the wage order has "striking

10 breadth." *Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903, 925 (2018), reh'g denied (June

11 20, 2018) ("*Dynamex*"). It "presumptively considers all workers to be employees and permits

12 workers to be classified as independent contractors only if the hiring business demonstrates that the

13 worker in question satisfies each of three conditions." *Id.* at 955.

14      Those three conditions are:

15 (a)   that the worker is free from the control and direction of the hirer in connection with

16        the performance of the work, both under the contract for the performance of the

17        work and in fact; and

18 (b)   that the worker performs work that is outside the usual course of the hiring entity's

19        business; and

20 (c)   that the worker is customarily engaged in an independently established trade,

21        occupation, or business of the same nature as that involved in the work performed.

22 *Id.* at 955-56. The test is commonly referred to as the ABC test. "[E]ach part of the ABC test may

23 be independently determinative of the employee or independent contractor question ... ." *Id.* at 966.

24 If an employer fails to satisfy a single part of the test, then the workers in question are its employees.

25 *Id.*

26      This motion turns on part B. A "hiring entity must establish that the worker performs work

27 that is outside the usual course of its business in order to satisfy part B of the ABC test." *Id.* at 961.

28 Work that is "an integral part" of the hiring company's business is within the usual course; work

that is "merely incidental to" the hiring company's business is not. *Id.* at 961 n.29. In other words, a worker is an employee unless the hiring business proves that the work performed is merely incidental to its business.

The California Supreme Court in *Dynamex* offered several examples to illustrate the application of part B of the ABC test. On the independent contractor side of the line is a retail store hiring a plumber to repair a bathroom leak or an electrician to install a new electrical line. *Id.* at 959-60. On the other side, the employee side, are work-at-home seamstresses hired by a clothing manufacturer to make the dresses the manufacturer sells and a bakery hiring cake decorators to work on a regular basis on custom cakes. *Id.* These examples demonstrate that businesses cannot satisfy part B if they classify as independent contractors the workers performing the work that lies at the heart of their operations.

Uber's long-time employment counsel, Littler Mendelson P.C., agrees: "As a practical matter, for most companies, this narrow B prong works as a 'de facto ban,' and prevents the use of independent contractors except where the person's work has no tangible connection to the hiring entity's business." Stephen T. Melnick, Shareholder, *California Announces a New Wage and Hour Independent Contractor Test* (May 1, 2018), *available at* https://www.littler.com/publication-press/publication/california-announces-new-wage-and-hour-independent-contractor-test.

**B.      The Court should grant partial summary judgment holding that Uber's drivers are its employees.**

Summary judgment is appropriate here. Wage Order 9 applies to Uber's drivers. And, according to the Wage Order, the drivers are Uber's employees unless Uber can prove that the drivers' work is merely incidental to Uber's business. That is not going to happen. Uber sells rides and each ride needs a driver. Uber itself agrees, admitting that the company "wouldn't exist" without its drivers. Ex. 34 at 504. The drivers who provide rides for Uber must therefore be classified as employees.

7

### 1. California Wage Order 9 applies to Uber's drivers.

Wage Order 9 "appl[ies] to all persons employed in the transportation industry whether paid on a time, piece rate, commission, or other basis … ." Cal. Code Reg. § 11090(1). And "'Transportation Industry' means any industry, business, or establishment operated for the purpose of conveying persons or property from one place to another whether by rail, highway, air, or water [ ], and all operations and services in connection therewith." *Id.* § 11090(2)(N).

Uber drivers self-evidently operate "in the transportation industry." There could be no more quintessential participant in the transportation industry than a driver. The driver of a for-hire vehicle is primarily responsible for "conveying persons or property from one place to another . . . by . . . highway." Thus, Uber drivers are covered by Wage Order 9.

### 2. Under Wage Order 9, drivers must be classified as employees unless Uber can prove that their work is merely incidental to Uber's business.

Wage Order 9 defines "employ" as "to engage, suffer, or permit to work." *Id.* §§ 11090(2)(D)-(E). As noted, the California Supreme Court recently interpreted this language, holding that it turns on application of the ABC test. *Dynamex*, 4 Cal. 5th at 925. Under part B of that test, a worker is an employee unless the hiring business proves "that the worker performs work that is outside the usual course of the hiring entity's business." *Id.* at 955-56. Work that is "an integral part" of the hiring company's business is within the usual course; work that is "merely incidental to" the hiring company's business is not. *Id.* at 961 n.29. In other words, a worker is an employee unless the hiring business proves that the work performed is merely incidental to its business.

Part B addresses a fundamental concern regarding the evasion of employment protections. Businesses face a temptation to reduce labor costs by exploiting vulnerable workers; yet those workers, in turn, are most in need of the Act's protection. In the past, some businesses have given in to this temptation by engaging in subterfuge, such as by retaining the same unskilled workers they would normally hire to produce their core product or service, but compensating these workers on a piece-rate system to avoid having to pay overtime or minimum wages.

Courts have uniformly rejected these efforts to sidestep wage protections. *E.g.*, *Goldberg v.*

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

*Whitaker House Cooperative, Inc.*, 366 U.S. 28, 28-30 (1961) (holding that home workers were employees rather than members of a supposed "cooperative" because "[a]part from formal differences, they are engaged in the same work they would be doing whatever the outlet for their products"); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729-31 (1947) (holding that "meat boners" were employees of a slaughterhouse despite a contract that purported to hire them as independent contractors, noting "[w]here the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the Act"); *Real v. Driscoll Strawberry Associates, Inc.*, 603 F. 2d 748, 755 (9th Cir. 1979) (rejecting argument that migrant strawberry pickers paid on a piece work basis were independent contractors, noting that the workers' "appear to be an integral part of [the defendant's] strawberry growing operation"); *S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341, 355 (1989) (holding that migrant workers compensated on piece work basis were employees because "[a] business entity may not avoid its statutory obligations by carving up its production process into minute steps, then asserting that it lacks 'control' over the exact means by which one such step is performed by the responsible workers").

The California Supreme Court in *Dynamex* recognized a similar concern:

> If the wage order's obligations could be avoided for workers who provide services in a role comparable to employees but who are willing to forgo the wage order's protections, other workers who provide similar services and are intended to be protected under the suffer or permit to work standard would frequently find themselves displaced by those willing to decline such coverage.

*Id.* Accordingly, the *Dynamex* Court reasoned, "[t]reating all workers whose services are provided within the usual course of the hiring entity's business as employees" is critical to the welfare of those workers who need the wage orders' protections. *Id.* at 960.

### 3. Uber cannot prove that drivers' work is merely incidental to its business.

There is no need to empanel a jury to see if Uber can prove that driving is outside the usual course of its business. Uber was founded as a "fast & efficient on-demand car service." Ex. 2 at 8. Uber's first pitch to investors focused on the size of the market for rides. Ex. 2 at 21-23. Uber has referred to itself as a "Next Generation Car Service" and as a "premium cab service." Ex. 2 at 5;

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

Ex. 2 at 27. And it marks its business milestones in rides sold—1 billion, 2 billion, 5 billion, 10

2 billion. Exs. 12-15. Uber now touts itself as the "largest global ridesharing network." Ex. 9 at 65.

3 And Uber readily admits the obvious: Uber could not operate its business without its drivers. Ex.

4 34 at 504. They are, in Uber's own words, the "heart" of Uber's "service" and "experience." Exs.

5 35 at 509, 36 at 516. Uber admits that it "wouldn't exist without" them. Ex. 34 at 504.

6 Uber also holds multiple licenses as a transportation company. Uber is licensed as a TCP

7 charter-party carrier, ex. 28 at 342, which is defined to mean an entity "engaged in the transportation

8 of persons by motor vehicle for compensation, over any public highway in [California]," Cal. Pub.

9 Util. Code § 5360. And Uber is likewise licensed (via a wholly-owned subsidiary) as a TNC carrier,

10 ex. 30 at 346, which "transports passengers by motor vehicle over the public highways of the State

11 of California" using "an online-enabled application or platform."

12 These indisputable facts demonstrate that providing rides is within the usual course of

13 Uber's business. No reasonable jury could believe that workers who are essential to a company's

14 survival, who are the heart of its businesses, and who perform the service for which it is licensed

15 are—in spite of all that—merely incidental to that business.

16 Prior summary judgment decisions in suits against Uber support this conclusion. This Court

17 found that "Uber simply would not be a viable business entity without its drivers." *O'Connor*, 82

18 F. Supp. 3d at 1141. Even courts that have found Uber drivers to be outside the Fair Labor Standard

19 Act's definition of "employee," have nonetheless recognized that they are integral to Uber's

20 business. For instance, one federal district court recently found that "Uber drivers are an essential

21 part of Uber's business as a transportation company," and said that "it seems beyond dispute that

22 if Uber could not find drivers, Uber would not be able to function." *Razak v. Uber Techs., Inc.*,

23 2018 WL 1744467, at *19 (E.D. Pa. Apr. 11, 2018).

24 Courts have also granted summary judgment under part B of the ABC test in materially

25 identical cases. *Granite State Ins. Co. v. Truck Courier, Inc.* is just one example. 2014 WL 316670

26 (Mass. Super. Jan. 17, 2014). There, a courier company was sued by its worker's compensation

27 carrier for premiums owed. (The company had had not paid premiums for its drivers because it

28 considered them independent contractors; the insurer thought they were employees and demanded

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

premiums.) The courier company, which offered "same-day pick-up and delivery services," argued that the drivers who did the pick-ups and deliveries were not employees but independent contractors because they owned their own cars. *Id.* at *1. The court granted plaintiff's motion for summary judgment under part B of the ABC test, holding that the courier company "specializes in same day pick-up and delivery services, which [are] entirely dependent on having vehicles and drivers. [The company] cannot seriously dispute that the drivers' services were necessary to its business model and were a regular and continuing part of its business." *Id.* at *4. The case was simple: "The undisputed facts are clear that without the drivers, [the company] would not have a business. Because [the company] cannot prove all three elements [of the ABC test], the drivers must be considered employees as a matter of law." *Id*. The same is true here. Uber admits it would not "exist" without its drivers. ex. 34 at 504, so they are its employees as a matter of law. *See also Martins v. 3PD,* 2013 WL 1320454, at *14 (D. Mass. Mar. 28, 2013) (granting driver-plaintiffs' motion for summary judgment against last-mile delivery company, because drivers were "engaged in the exact business the employer was," and were essential to that business).

These decisions correctly hold that essential workers cannot be "merely incidental" to the business they work for. This same principle requires summary judgment here under part B.

> **4.      Uber cannot defeat summary judgment by calling itself a "broker" or a "technology company"—labels courts have roundly rejected.**

Uber frequently argues in misclassification litigation that it is merely a "'broker' of transportation services," *e.g., Doe v. Uber Techs., Inc*., 184 F. Supp. 3d 774, 786 (N.D. Cal. 2016), or sometimes that it is a "technology company" rather than a transportation company, *e.g., Crawford v. Uber Techs., Inc*., 2018 WL 1116725, at *3–4 (N.D. Cal. Mar. 1, 2018). Uber may offer the same argument here—that driving is outside the usual course of its business because it is just a broker or just a tech company. This argument is both factually incorrect and legally irrelevant.

First, Uber's self-serving label cannot be reconciled with the undisputed facts. As the Court explained in *O'Connor*, "Uber's self-definition as a mere 'technology company' focuses exclusively on the mechanics of its platform (i.e., the use of internet enabled smartphones and software applications) rather than on the substance of what Uber actually does (i.e., enable

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

customers to book and receive rides).” 82 F. Supp. 3d at 1141–42. This “unduly narrow frame”

focuses on “one instrumentality” used by Uber but ignores the nature of Uber’s overall business.

*Id.* “Uber does not simply sell software; it sells rides.” *Id.*

Other courts have reached the same conclusion. *See Razak*, 2018 WL 1744467, at *19; *Doe v. Uber Techs., Inc.*, 184 F. Supp. 3d 774, 786 (N.D. Cal. 2016) (“In their briefs and at the hearing, Uber has argued that it is not a common carrier but that it is a ‘broker’ of transportation services. The Court is not persuaded by this argument.”); *Reardon v. Uber Techs.*, Inc., 115 F. Supp. 3d 1090, 1095–96 (N.D. Cal. 2015) (agreeing with the reasoning of *O'Connor* that “Uber is not a technology company that primarily sells software; rather, Uber sells transportation services”). Similarly, the CPUC has issued an administrative decision concluding that Uber is a transportation company—a TCP charter-party carrier—as a matter of California law. Ex. 33 at 465.[3]

Second, Uber’s self-serving label misapprehends the nature of the governing standard under part B. Under that standard, a hiring business cannot lawfully alter the classification of the workers who perform its core service just by calling itself a broker of that service. *See, e.g.*, *Awuah v. Coverall N. Am., Inc.*, 707 F. Supp. 2d 80, 84 (D. Mass. 2010) (cited with approval in *Dynamex*, 4 Cal. 5th at 959). For example, in *Awuah*, a company called Coverall claimed to sell “janitorial cleaning business” franchises. 707 F. Supp. 2d at 81. The reality was different. Businesses that wanted cleaning service would call Coverall, pay Coverall, and Coverall would collect a portion of the fee and have a “franchisee” do the actual cleaning. *Id.* at 82. The franchisees sued Coverall, alleging misclassification, and moved for summary judgment under part B. Coverall argued that it was not a cleaning service because “it sells franchises and trains and supports the franchisees, but it does not clean any establishments, nor does it employ anyone who cleans.” *Id.* at 82-83. The district court rejected Coverall’s argument, holding that “Coverall sells cleaning services, the same services provided by these plaintiffs,” and granted the plaintiffs’ motion. “Because Coverall failed to establish the second prong of [the ABC Test] the Court [held] that the Massachusetts franchisees

---

[3]Uber is appealing this decision. But, while the appeal is pending, Uber must abide by its prior settlement agreement with the CPUC in which it agreed to exert control over how drivers provide the rides that Uber sells. Ex. 38.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

were misclassified as independent contractors," and granted the franchisees' motion. *Id.* at 85. Many other cases have rejected defendants' attempts to avoid wage protections with a broker argument. *E.g.*, *McPherson Timberlands v. Unemployment Ins. Comm'n*, 714 A.2d 818, 821 n.29 (Me. 1998) (granting summary judgment to plaintiffs, rejecting argument that workers who harvested timber for defendant that bought trees and sold cut timber were merely incidental to its business); *Martins*, 2013 WL 1320454 at *14 (granting summary judgment under part B, and rejecting defendant delivery company's argument that it was merely a "property brokering and freight forwarding business" rather than a delivery and transport company).

Indeed, many cases in which a defendant fails to satisfy part B of the ABC test, the defendant has argued that it is merely facilitating the work of the plaintiff/employee rather than acting as an employer. The very purpose of part B is to foreclose those resorts to form over substance. *Dynamex* "bring[s] within the 'employee' category all individuals who can reasonably be viewed as working in the hiring entity's business, that is, all individuals who are reasonably viewed as providing services to that business in a role comparable to that of an employee, rather than in a role comparable to that of a traditional independent contractor." 4 Cal. 5th at 959.

The application of these principles to Uber is clear. Uber is in the transportation business. It says so itself: "Uber's mission is to bring transportation—for everyone, everywhere." Ex. 10. It applied for and received multiple licenses from California as a transportation company. The drivers that do the transporting are undeniably working in the usual course of Uber's business. They are therefore Uber's employees under Wage Order 9.

## V.    CONCLUSION

For all the foregoing reasons, no genuine issue of material fact remains to be decided. Providing rides is integral to Uber's business and Uber drivers' work is within the usual course of Uber's business. Therefore, under Wage Order 9 and part B the ABC test adopted by the California Supreme Court in *Dynamex*, the Court should grant partial summary judgment finding that Uber's

MOT. FOR PARTIAL SUMM. J.
CASE NO. 3:18-CV-05546-EMC

drivers are employees and not independent contractors

Dated: October 5, 2018                    Respectfully submitted,

                                          /s/ Tom Kayes
                                          Tom Kayes
                                          Ashley Keller
                                          Seth Meyer
                                          **KELLER LENKNER LLC**
                                          150 N. Riverside Plaza, Suite 4270
                                          Chicago, Illinois 60606
                                          Tel: (312) 741-5220

                                          **ROBINS KAPLAN LLP**
                                          Michael A. Geibelson
                                          Aaron M. Sheanin
                                          Tai S. Milder
                                          2440 W. El Camino Real, Suite 100
                                          Mountain View, California 94040
                                          Telephone: (650) 784-4040
                                          Facsimile: (650) 784-4041

                                          **KELLER LENKNER LLC**
                                          Warren Postman
                                          1300 I Street, N.W. Suite 400E
                                          Washington, D.C. 20005
                                          Tel: (202) 749-8334

                                          *Counsel for Plaintiff Diva Limousine, Ltd., and
                                          the Proposed Classes*

**CERTIFICATE OF SERVICE**

I certify that on October 5, 2018, I served this document on all ECF-registered counsel via the Court's CM/ECF system.

/s/ Tom Kayes
Tom Kayes