# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

DIVA LIMOUSINE, LTD., individually and on behalf of all others similarly situated,

*Plaintiff*,

v.

UBER TECHNOLOGIES, INC.; RASIER, LLC; RASIER-CA, LLC; UBER USA, LLC; and UATC, LLC

*Defendants*.

Case No. 3:18-cv-05546-EMC

**DECLARATION OF STEVEN P. LEHOTSKY**

## DECLARATION OF STEVEN P. LEHOTSKY

I, Steven P. Lehotsky, declare based on personal knowledge as follows:

1. I am the Senior Vice President and Chief Counsel of the U.S. Chamber Litigation Center. I am over the age of 18 and suffer from no impairments that would prevent me from giving a declaration.

2. The Chamber of Commerce of the United States of America (the "Chamber of Commerce") is the world's largest business federation, representing 300,000 direct members and indirectly representing an underlying membership of more than three million U.S. businesses and professional organizations of every size and in every economic sector and geographic region of the country. The mission of the Chamber of Commerce is to advocate for the interests of the business community, so that private employers may create jobs. An important function of the Chamber of Commerce is to represent the interests of its members before Congress, the Executive Branch, and the courts.

3. The U.S. Chamber Litigation Center ("Litigation Center") is a separately incorporated non-profit affiliate of the Chamber of Commerce. The Litigation Center regularly files amicus briefs

and commences affirmative litigation on behalf of the Chamber of Commerce, in cases that raise issues of concern to the nation's business community. The Litigation Center routinely litigates cases involving antitrust, labor and employment, consumer protection, and class action and arbitration law. The mission of the Litigation Center is to shape the law in order to help free enterprise flourish so that businesses may grow and create jobs. In this declaration, I use the term "the Chamber" to refer to the Chamber and the Litigation Center collectively.

4. I have worked at the Litigation Center since April 2013, and have held my current title of Senior Vice President and Chief Counsel since January 1, 2018. I was Vice President and Chief Counsel for Regulatory Litigation from 2015-2017, and from 2013-2015 I was Deputy Chief Counsel for Litigation. During my tenure at the Litigation Center, I have worked on every issue that the Chamber litigates in the courts, both as a plaintiff, petitioner, or intervenor and as an amicus curiae. I have personal knowledge of all of the Litigation Center's legal work, operations, and staff from April 2013 to the present.

5. Warren Postman joined the Chamber in April 2014 as Senior Counsel. In 2015 he became an Associate Chief Counsel for Litigation. In 2017, he became Deputy Chief Counsel for Litigation. In January 2018, Mr. Postman moved into the title of Vice President and Chief Counsel for Appellate Litigation. In this last position, he managed amicus strategy for the Chamber.

6. During the time that Mr. Postman and I worked at the Litigation Center, lawyers have been required to treat communications with members about litigation and other legal issues as confidential, including those the Chamber has had with Uber. The Chamber has a written policy that requires employees, including lawyers, to "[o]bserve the confidentiality of information acquired in carrying out one's duties and responsibilities, except where disclosure is approved by the Chamber or legally mandated. Confidential information includes, but is not limited to, all non-public information about the Chamber or its members." Employees, including Mr. Postman and I, were required to review this policy (and others) annually, and to certify that they had read, understood, and would follow the policies. It is my understanding that Mr. Postman certified that he reviewed the policies, including the policy as to maintaining confidentiality, and agreed to adhere to them on an annual basis, as I did. In accordance with its policy, it is my understanding that the Chamber has

2

never intended that confidential communications with members about litigation and other legal issues would be used or disclosed without the consent of the Chamber and the member from which the information was provided, including the confidential communications with Uber described below.

7. During his tenure at the Litigation Center, Mr. Postman played a leading role for the Chamber on independent-contractor misclassification lawsuits, federal and state (particularly California) wage-and-hour litigation, consumer protection (including under California law) cases, and on class action and arbitration issues.

8. As of July 2015, Uber was a member of the Chamber of Commerce.

9. In September 2015, Ms. Lindsey Haswell, then Senior Counsel, Litigation at Uber Technologies, Inc. reached out to Mr. Postman and me to discuss a proposed ordinance that was before the City Council of Seattle that would permit the unionization of certain independent contractors, including independent contractors using the Uber app. The Seattle ordinance ("Ordinance Relating to Taxicab, Transportation Network Company, and For-Hire Vehicle Drivers," which was eventually enacted as part of the Seattle Municipal Code on January 22, 2016), authorized unions to organize for-hire drivers working as independent contractors.

10. Throughout the remainder of 2015 and into early 2016, Mr. Postman and I, along with other attorneys at the Litigation Center, engaged in repeated confidential discussions with in-house counsel at Uber, including, among others, Lindsey Haswell, Jason Allen and Dalene Bramer, to determine, among other things, (a) how the ordinance would affect companies that have independent contractors, rather than employees, providing transportation to riders; and (b) how strategically to counter (through litigation) the ordinance in Seattle and in other jurisdictions, including California, Massachusetts, and the City of New York, that were considering similar efforts to permit the unionization of independent contractors working as part of the "gig economy."

11. With respect to Seattle's ordinance, we identified the classification of drivers as employees or independent contractors as an important issue to consider because the ordinance applied only to those individuals classified as independent contractors.

12. The Chamber, on the one hand, and Uber and its subsidiary Rasier, on the other, shared a number of common interests in connection with contemplated Seattle litigation, including interests

3

in maintaining the ability of drivers and companies to contract on a for-hire, independent-contractor basis and in preventing unduly restrictive state and municipal regulation of independent-contractor relationships.

13. Counsel for the Chamber and Uber, including its subsidiary Rasier, mutually agreed to share confidential information pursuant to those common interests. Beginning in 2015, Mr. Postman and I regularly received communications from in-house counsel at Uber marked as "COMMON INTEREST PRIVILEGE," or similar designations such as "JOINT DEFENSE PRIVILEGE," "ATTORNEY WORK PRODUCT," or "PRIVILEGED AND CONFIDENTIAL."

14. Pursuant to our common interests, Mr. Postman and I exchanged confidential information and attorney work product with in-house counsel for Uber in written communications and oral communications, the latter of which took place during regularly scheduled telephone conferences and in face-to-face meetings. These communications covered matters such as potential legal claims and defenses, timing and tactics of motion practice, legal strategy, and other strategic considerations. An example of these communications is a document from December 2015, entitled "Seattle Driver Ordinance – Litigation Overview" that Mr. Postman was involved in preparing and that I circulated to Uber (cc'ing Mr. Postman). The document provided high-level guidance on our litigation strategy and what we viewed as the main claims and issues we might encounter. The document includes the headers "ATTORNEY-WORK PRODUCT," "COMMON-INTEREST PRIVILEGE," and "PRIVILEGED AND CONFIDENTIAL." We routinely exchanged attorney work-product of this nature with Uber pursuant to our common interest agreement. It is my experience that the free exchange of confidential information regarding legal and business strategy facilitates the Chamber's affirmative litigation efforts, such as the Seattle litigation.

15. On March 3, 2016, the Chamber filed a lawsuit, captioned *Chamber of Commerce of the United States of America v. City of Seattle*, No. 2:16-cv-00322 (W.D. Wash.) ("*City of Seattle I*"). Mr. Postman was involved in the drafting and editing of the complaint in that action, which included seeking confidential input from Uber concerning the status of their drivers as independent contractors.

4

The Chamber's complaint, which listed Mr. Postman as counsel, was brought on behalf of Chamber members operating in the Seattle area, including Uber's wholly owned subsidiary Rasier, LLC. The *City of Seattle I* complaint sought a declaratory judgment that the ordinance violated the Sherman Antitrust Act, the National Labor Relations Act ("NLRA"), and various state laws; it also sought an injunction preventing Seattle from enforcing the ordinance. In August 2016, the district court dismissed the *City of Seattle I* lawsuit on ripeness grounds.

16. In March 2017, the Chamber brought suit in a second case, captioned *Chamber of Commerce of the United States of America v. City of Seattle*, No. 2:17-cv-00370 (W.D. Wash.) ("*City of Seattle II*"). The *City of Seattle II* complaint stated that the Chamber brought the action on behalf of members of the Chamber, including Rasier, LLC. Mr. Postman was again named on the complaint as one of the counsel for the Chamber. Mr. Postman again was deeply involved in the drafting and editing of this complaint. Drafts of the complaint exchanged between the Chamber and Uber were marked as "Common-Interest Privilege."

17. Rasier, LLC joined *City of Seattle II* as a named co-plaintiff on April 11, 2017. Mr. Postman was named on the joint amended complaint as one of the counsel for the Chamber.

18. Both of these complaints pleaded that the City's ordinance violated, or was preempted by, federal antitrust laws. The complaints alleged that drivers using the Uber app were independent contractors, not employees, and thus were independent economic actors. Because the City's ordinance permitted drivers who are independent economic actors to form a collective organization to collude in negotiating the price of their services vis-à-vis Uber and its subsidiary Rasier and the terms and conditions of their services (output), the City's ordinance was preempted and also per se unlawful under federal antitrust law.

19. Both of these complaints also pleaded that the NLRA preempted the City's ordinance on two grounds. First, that the City could not regulate drivers as independent contractors under "*Machinists* preemption." *Lodge 76, International Ass'n of Machinists & Aerospace Workers v. Wisconsin Employment Relations Commission*, 427 U.S. 132 (1976) ("*Machinists*"). Second, that the City could not regulate drivers as independent contractors under "*Garmon* preemption." *Garmon San Diego Building Trades 7 Council v. Garmon*, 359 U.S. 236 (1959). The Chamber asserted that the

5

DECLARATION OF STEVEN P. LEHOTSKY
CASE NO. 3:18-cv-05546-EMC

ordinance improperly required the City of Seattle to determine whether drivers for on-demand-economy companies like Uber were employees or independent contractors, even though the *Garmon* doctrine assigns such decisions to the exclusive jurisdiction of the National Labor Relations Board ("NLRB"). In the course of analyzing this claim, and particularly the *Garmon* argument, and in the course of drafting the complaint and subsequent briefing, Mr. Postman and I were part of communications with counsel for Uber concerning whether drivers using the Uber app could be classified as employees, and we had communications regarding the status of pending charges filed against Uber before the NLRB alleging that drivers using the Uber app were unlawfully misclassified as independent contractors.

20. The complaints the Chamber filed in both cases repeatedly addressed and categorically supported the classification by companies, including Uber, of its drivers as independent contractors. The Chamber's complaint did not plead that drivers using the Uber app were independent contractors under Washington law; it pleaded categorically that they are independent contractors. It did not limit its factual and legal allegations regarding Uber's independent-contractor model to Seattle or even Washington; it addressed the nature and benefits of Uber's model globally. Our complaints argued that absent judicial intervention, the City of Seattle and thousands of other municipalities would be free to adopt their own disparate regulatory regimes, which would balkanize the market for independent-contractor services and inhibit the free flow of commerce among private service providers around the Nation. We sought to challenge the ordinance because it would restrict the market freedom relied upon by all for-hire drivers (and companies hiring such drivers) who are part of independent-contractor arrangements, whether with a transportation network company, a traditional taxicab company, or a limousine service.

21. As Chief Counsel for Regulatory Litigation at the time and in my current role as overall Chief Counsel, I was responsible for the day-to-day management of the litigation against the City of Seattle. But Mr. Postman played a pivotal role in the case. Mr. Postman communicated regularly with in-house counsel for Uber, as well as with Uber's outside counsel. My impression was that Mr. Postman became a point person at the Chamber for Uber and its counsel, and that he engaged directly on issues pertaining to the classification of drivers as employees or independent contractors. I believe

that, although he was never an attorney for Uber, Uber's counsel trusted and had great confidence in Mr. Postman due to our mutual common interests on independent-contractor litigation matters.

22. Mr. Postman's involvement in this matter spanned a period of more than two and a half years. As stated above, his involvement began before the complaint in *City of Seattle I* was filed. He was involved in the drafting and editing of the complaint in that suit and in *City of Seattle II*, including portions of the complaints that pleaded that drivers using the Uber app were independent contractors, and not employees, and that there were benefits to drivers, riders, and the economy more broadly from Uber's independent-contractor model. In-house counsel for Uber provided confidential information and substantive comments and edits on drafts of this complaint to me and to Mr. Postman, and those comments and edits included edits and comments on the arguments regarding Uber drivers as independent contractors. Drafts of the complaints exchanged via email between counsel for the Chamber, including Mr. Postman, and counsel for Uber were marked as "Common-Interest Privilege." Mr. Postman was named on the complaints as one of the counsel for the Chamber.

23. It has been my consistent belief and understanding that all communications containing confidential information, views on tactical litigation decisions, and overall legal strategy that we received from counsel for Uber, including its subsidiary Rasier, in connection with the Seattle litigation, however designated, would and should be kept confidential. And I expected that Uber and Rasier would treat similar communications from the Chamber as confidential as well. I have the same understandings and expectations today. I had no communications with Mr. Postman during his time at the Chamber that cause me to think he had any contrary understandings or expectations.

24. During Mr. Postman's tenure at the Litigation Center, the Chamber also filed several amicus briefs in several cases where Uber was a defendant. These briefs are attached hereto as Exhibits 1 through 4. *See O'Connor v. Uber Technologies, Inc.*, 9th Cir. Nos. 15-17420, 15-17422, 15-17475 (9th Cir. Mar. 25, 2016) (Ex. 1); *Mohamed v. Uber Technologies, Inc.*, 9th Cir. Nos. 15-16178, 15-16181, 15-16250 (9th Cir. Oct. 28, 2015) (Ex. 2); *see also Cullinane v. Uber Technologies, Inc.*, 1st Cir. No. 16-2023 (1st Cir. Apr. 24, 2017) (Ex. 3); *Meyer v. Uber Technologies, Inc.*, 2d Cir. Lead No. 16-2750 (2d Cir. Oct. 31, 2016) (Ex. 4). These cases, some of which were commenced in this district (and before this Court), concerned claims that Uber misclassified drivers as independent

contractors, rather than employees, and that Uber violated federal and state antitrust laws. The Chamber focused its amicus briefs on the enforceability of Uber's arbitration agreements with its contractors.

25. Mr. Postman was the lead day-to-day lawyer at the Chamber for each of these briefs. I worked closely with Mr. Postman on some of those briefs, including the *Meyer* and *Cullinane* cases. With respect to those two cases, Mr. Postman and I engaged with in-house counsel for Uber to discuss overall strategy.

26. In May 2018, the Chamber and its co-plaintiffs, including Raiser, obtained a unanimous victory before a three-judge panel of the U.S. Court of Appeals for the Ninth Circuit in the Seattle litigation. Mr. Postman notified Uber of the victory in an email I also received.

27. The next month, Mr. Postman left the Chamber and joined Keller Lenkner LLP as a partner.

28. The Chamber is concerned that Mr. Postman, after years of working closely with in-house counsel for Uber on independent-contractor and antitrust issues, has now left the Chamber and immediately commenced litigation against Uber related to these same issues. The Chamber's expectation has been—and remains—that any information shared with the Chamber pursuant to a common-interest privilege would be protected and kept confidential. It also has been and remains the Chamber's expectation that any information shared with the Chamber pursuant to a common-interest privilege would not be used in subsequent litigation against the Chamber member that provided the information to the Chamber.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on October 24, 2018.

By: *[signature]*
Steven P. Lehotsky