1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    DIVA LIMOUSINE, LTD.,                    Case No.  18-cv-05546-EMC

8                     Plaintiff,

9            v.                              ORDER GRANTING DEFENDANTS'
                                             MOTION TO DISQUALIFY
10   UBER TECHNOLOGIES, INC., et al.,
                                             Docket Nos. 40, 85
11                    Defendants.

12

13          Plaintiff Diva Limousine ("Diva"), a licensed provider of livery services in California,

14   brings this putative class action on behalf of providers of pre-arranged ground transportation

15   services against Uber Technologies and related business entities ("Uber").  Diva alleges that Uber

16   secures cost savings by misclassifying its drivers as independent contractors instead of employees

17   and in doing so takes market share from competitors like Diva that operate their businesses in

18   compliance with the law.  Diva asserts two causes of action: a claim under the California Unfair

19   Competition Law ("UCL"), and a claim under the California Unfair Practices Act ("UPA").

20          Diva filed its class action complaint on September 10, 2018.  *See* Docket No. 1.  It then

21   filed a motion for partial summary judgment on a "single issue": whether Uber drivers are

22   properly classified as independent contractors or employees under the California Supreme Court's

23   recent ruling in *Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903 (2018).  Docket No. 33.

24   On October 24, 2018, Uber filed the instant motion to disqualify Diva's counsel Warren Postman

25   and his firm, Keller Lenkner LLC ("KL").  *See* Docket No. 40 ("Mot.").  Uber contends that Mr.

26   Postman, during his previous tenure at the U.S. Chamber of Commerce Litigation Center ("the

27   Chamber"), had worked with Uber on litigation implicating the driver classification question

28   under a common interest agreement, pursuant to which he became privy to Uber's privileged and

confidential information.

For the reasons discussed below, Uber's motion to disqualify is **GRANTED**.

## I.     BACKGROUND

A.     Factual Background

A handful of basic facts are not in dispute.  Mr. Postman joined the Chamber as Senior Counsel for Litigation in 2014 and worked there in various positions until he joined KL in June 2018.  *See* Mot. at 1; Opp. at 5, 8.  While at the Chamber, Mr. Postman worked with Uber in several areas of litigation, two of which Uber highlights.  First, in March 2016, the Chamber filed a lawsuit challenging a Seattle ordinance that authorized independent contractor drivers to collectively bargain with "driver coordinators" like Uber (the "Seattle litigation").  *See* Mot. at 3–4; Opp. at 6.  In April 2017, Uber joined the litigation as a co-plaintiff with the Chamber.  *See* Mot. at 6; Opp. at 6.  Second, during Mr. Postman's time at the Chamber, the Chamber filed amicus briefs in several appeals in driver classification suits against Uber.  *See* Mot. at 8; Opp. at 8.  Among those appeals is *O'Connor et al. v. Uber Technologies*, Inc., No. 13-3826 (N.D. Cal. filed August 16, 2013), which originated in this Court and to which the instant case has been related.  *See* Docket No. 23.  The issue on appeal was whether the driver classification suits should be sent to arbitration, and the Chambers' amicus briefs supported Uber's position that the arbitration agreements in Uber's contracts with its drivers were enforceable.  *See* Mot. at 8; Opp. at 8.

From here, the parties' characterization of the facts diverges.

Uber's account: In the Seattle litigation, Uber exchanged confidential communications with the Chamber about "[l]egal strategy and litigation tactics," "[p]otential legal claims and defenses," and "[t]hreshold legal issues such as ripeness and standing."  Mot. at 4.  Uber recognizes that it did not have a formal, written common interest agreement with the Chamber, but asserts that "Uber and the Chamber agree that (i) they entered into a common interest agreement by December 2015 for the purpose of pursuing a joint legal strategy as to the Seattle Ordinance; (ii) they shared privileged information and attorney work product under the agreement; and (iii) Mr. Postman was intimately involved at every step along the way."  *Id.* at 5.  In particular, "Uber

2

United States District Court
Northern District of California

1   and the Chamber frequently exchanged confidential and privileged communications on the driver

2   classification issue." *Id.* at 7.  And as part of the Chamber's work on the appellate amicus briefs,

3   Mr. Postman "'engaged with in-house counsel for Uber to discuss overall strategy,' and

4   exchanged draft work product with Uber's outside counsel pursuant to their common interest in

5   the appeals."  Mot. at 8 (quoting Docket No. 42 (Declaration of Steven Lehotsky, or "Lehotsky

6   Decl.") ¶ 25).  Uber states that Mr. Postman "regularly received or sent communications marked

7   'ATTORNEY CLIENT PRIVILEGED,' 'SUBJECT TO JOINT DEFENSE PRIVILEGE' and/or

8   'COMMON INTEREST PRIVILEGE' related to the Seattle litigation and multiple amicus briefs."

9   Mot. at 2–3.

10      Additionally, Mr. Postman notified Uber and other members of the Chamber's Labor and

11   Employment Litigation Advisory Committee about a petition for rehearing of *Dynamex* before the

12   California Supreme Court, "provided his legal assessment of that petition," and "solicited

13   'additional thoughts' from members, including Uber, about the Chamber's legal strategy" before

14   submitting an amici curiae letter supporting the petition for rehearing.  Mot. at 9.  The letter urged

15   the California Supreme Court not to give retroactive effect to the *Dynamex* decision, which

16   announced a new "ABC test" for classifying workers as employees or independent contractors.

17   *See* Amici Curiae Letter in Support of Petition for Rehearing, *Dynamex Operations West, Inc. v.*

18   *Superior Court of Los Angeles* (Cal. No. S222732),

19   https://www.chamberlitigation.com/cases/dynamex-operations-west-inc-v-superior-court-los-

20   angeles-0.

21      Diva's account: In contrast, Diva asserts that "Mr. Postman has no confidential

22   information from or about Uber that is related to this case."  Opp. at 2.  According to Diva, the

23   Chamber only raised facial challenges to the Seattle ordinance and "[t]he position that Uber

24   drivers were misclassified as independent contractors was never asserted by any party in the

25   litigation."  *Id.* at 6.  Diva acknowledges that communications regarding the litigation were

26   sometimes marked privileged, but points out that there was no written common interest agreement

27   and that "[t]hroughout the litigation, the Chamber shared . . . case strategy, draft pleadings, and

28   status updates[] with other Chamber members and donors that were not parties."  *Id.* at 7.  Diva

United States District Court
Northern District of California

1   claims "Uber was aware of some of those disclosures and did not object to them." *Id.*  As for the

2   amicus briefs, Diva contends the Chamber was only involved on appeal and its briefs "dealt solely

3   with whether drivers' state-law arguments for avoiding arbitration were preempted by the Federal

4   Arbitration Act." *Id.* at 8.  "The Chamber never filed a brief addressing misclassification in any

5   case involving Uber." *Id.*  Finally, Diva states that Mr. Postman's communication analyzing the

6   *Dynamex* decision and indicating the Chamber's intent to supporting rehearing was distributed to

7   hundreds of the Chamber's members.  *Id.* at 6.

8        Prior to Mr. Postman joining KL, he and KL separately consulted legal ethics experts

9   about the conflict that may potentially arise from Mr. Postman litigating against Uber on the driver

10   classification issue.  *Id.* at 8–9.  "Both experts independently advised that Mr. Postman's work at

11   the [Chamber] did not establish an attorney-client relationship with Uber" and "did not appear" to

12   create a conflict.  *Id.*

13        Diva believes that Uber is seeking to disqualify Mr. Postman and KL "for strategic gain

14   rather than out of a genuine concern about unfair advantage," "[p]erhaps" because Diva recently

15   filed a motion for partial summary judgment in this case based on *Dynamex*, or because KL over

16   the past few months has served Uber with over 10,000 demands for arbitration on behalf of

17   individual Uber drivers in *Razak v. Uber Technologies, Inc.*, No. 18-1944 (3d Cir. filed Apr. 27,

18   2018), a Third Circuit appeal about the driver classification issue.  Opp. at 3.  Uber has not moved

19   to disqualify KL in *Razak*.  *See id.*

20   B.   Diva's Post-Hearing Administrative Motion

21        After the hearing on this motion, Diva sought to alert the Court to "new evidence . . .

22   material to Uber's motion to disqualify" through an administrative motion under Local Rule 7-11.

23   *See* Docket No. 85.  This new evidence takes the form of declarations submitted by Lyft in support

24   of a lawsuit Lyft recently filed against KL and Mr. Postman.  The lawsuit alleges tort claims based

25   on KL's representation of Lyft drivers.  *See Lyft v. Postman et al.*, No. 18-cv-6978-EMC (N.D.

26   Cal. filed Nov. 16, 2018), Docket Nos. 4-2, 4-3, 4-4.  Diva contends that the declarations show the

27   Chamber shared "weekly updates" about the Seattle litigation with Lyft, "Uber's fiercest

28   competitor," and therefore "undermine[] Uber's claim of a confidential, common-interest

4

United States District Court
Northern District of California

1  arrangement with the Chamber."  Docket No. 85 at 1–2.

2      An administrative motion is intended to address "miscellaneous administrative matters,"

3  N.D. Cal. Civ. L.R. 7-11, but Diva's motion makes substantive legal arguments regarding the

4  Chamber's duty of confidentiality to Uber and attorney disqualification, *see* Docket No. 85 at 2–5.

5  Accordingly, Diva's administrative motion is **DENIED**.  In any event, the declarations and legal

6  arguments discussed in the motion do not change the Court's analysis, as explained in Part II.B.,

7  *infra*.

8  **II.      DISCUSSION**

9  A.      Legal Standard

10      1.      Disqualification Generally

11      Lawyers appearing before this Court must "comply with the standards of professional

12  conduct required of the members of the State Bar of California."  N.D. Cal. Civ. L.R. 11-4(a)(1).

13  Thus, "we apply state law in determining matters of disqualification."  *In re Cty. of Los Angeles*,

14  223 F.3d 990, 995 (9th Cir. 2000).

15      "The right to disqualify counsel is a discretionary exercise of the trial court's inherent

16  powers."  *Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*, 264 F. Supp. 2d 914, 918

17  (N.D. Cal. 2003).  Courts subject disqualification motions to "strict judicial scrutiny" because they

18  present the threat of tactical abuse.  *Optyl Eyewear Fashion Int'l Corp. v. Style Cos., Ltd.*, 760

19  F.2d 1045, 1050 (9th Cir. 1985).  In deciding a motion for disqualification, a court should consider

20  "a client's right to chosen counsel, an attorney's interest in representing a client, the financial

21  burden on a client to replace disqualified counsel, and the possibility that tactical abuse underlies

22  the disqualification motion."  *People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*, 20

23  Cal. 4th 1135, 1145 (1999).  However, "[t]he paramount concern must be to preserve public trust

24  in the scrupulous administration of justice and the integrity of the bar."  *Id.*  Thus, while the

25  "drastic measure" of disqualification is "generally disfavored and should only be imposed when

26  absolutely necessary," *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 814 (N.D. Cal. 2004),

27  "[t]he important right to counsel of one's choice must yield to ethical considerations that affect the

28  fundamental principles of our judicial process," *SpeeDee Oil*, 20 Cal. 4th at 1145.  To assess

United States District Court
Northern District of California

1  Uber's motion, the Court first looks to the ethical rules applicable to attorneys under California

2  law.

3          2.       <u>Disqualification Where Movant is a Non-Client</u>

4        The parties disagree about the disqualification standard that should be applied under

5  California law where, as here, the party moving for disqualification and the allegedly conflicted

6  attorney have never had an attorney-client relationship.  Uber asserts that where "an attorney

7  assumes ethical duties to a non-client," as it alleges Mr. Postman did to Uber here, that attorney is

8  subject to California Rule of Professional Conduct 3-310(E).  Mot. at 12.  Diva counters that Rule

9  3-310(E) recognizes a conflict only where an attorney is adverse to a "client or former client."

10  Opp. at 12.  The language of the rule and the case law support Diva's interpretation.

11        Rule 3-310(E) provides:

12             A member [of the California Bar] shall not, without the informed
           written consent of the client or former client, accept employment
13             adverse to the client or former client where, by reason of the
           representation of the client or former client, the member has
14             obtained confidential information material to the employment.

15  As Diva underscores, the rule by its terms only applies to a "client or former client."  This is in

16  contrast to the former Rule 5-102(B), which prohibited the representation of "conflicting interests"

17  more broadly.  *William H. Raley Co. v. Superior Court*, 197 Cal. Rptr. 232, 235 (Ct. App. 1983)

18  (quoting former California Rule of Professional Conduct 5-102(B)).  The California Court of

19  Appeal held in *Raley* that former Rule 5-102 "includes conflicts of interest arising other than in the

20  course of legal representation" and that a conflict under the rule "may arise from an attorney's

21  relationship with a non-client."  *Id.* at 235–36.  "Since that time, however, the California Supreme

22  Court adopted the revised Rules of Professional Conduct, combining former rules 5-102 and 4-101

23  into current rule 3-310."  *McElroy v. Pac. Autism Ctr. for Educ.*, No. 14-CV-04118-LHK, 2015

24  WL 2251057, at *4 (N.D. Cal. May 13, 2015) (citation omitted).  "Unlike former rule 5-102, rule

25  3-310 controls conflicts of interest and disqualification motions *only in the context of attorney-*

26  *client relationships*."  *Id.* (quoting *Oaks Mgmt. Corp. v. Superior Court*, 51 Cal. Rptr. 3d 561, 569

27  (Ct. App. 2006) (emphasis in original).

28        *McElroy* explained that the California Supreme Court's decision to "expressly remov[e]

United States District Court
Northern District of California

1  former Rule 5-102 (which did not mention 'client') and replac[e] it with new Rule 3-310 (which

2  refers to conflicts involving clients or former clients only)" is a "compelling reason to believe"

3  that the new rule "intended to clarify that only attorney-client relationships may give rise to

4  conflicts of interest." *Id.* at *5. Other California appellate and federal courts have reached the

5  same conclusion. *See, e.g.*, *Allen v. Acad. Games Leagues of Am., Inc.*, 831 F. Supp. 785, 787

6  (C.D. Cal. 1993) ("Inasmuch as [attorney] did not represent plaintiff as a 'client,' the relationship

7  is not controlled by 3-310(E)."); *Oaks Mgmt. Corp.*, 51 Cal. Rptr. 3d at 569 ("[R]ule 3-310

8  controls conflicts of interest and *disqualification motions only in the context of attorney-client*

9  *relationships*.") (emphasis in original); *In re Lee G.*, 1 Cal. Rptr. 2d 375, 380 (Ct. App. 1991)

10  ("The rule, of course, never becomes applicable where the party seeking the attorney's

11  disqualification fails to establish that such party was or is 'represented' by the attorney 'in a

12  manner giving rise to an attorney-client relationship.'"). Here, Uber does not dispute that it was

13  never Mr. Postman's client. Accordingly, Rule 3-310(E) does not govern Uber's disqualification

14  motion.

15          But that is not the end of the inquiry. The non-applicability of Rule 3-310(E) does not

16  mean that an attorney owes no duty to a non-client whatsoever. "There are exceptions . . . to the

17  general rule that an attorney has no duty to preserve the confidences of nonclients," *Acacia Patent*

18  *Acquisition, LLC v. Superior Court*, 184 Cal. Rptr. 3d 583, 589 (Ct. App. 2015), and the "[c]ase

19  law abounds with examples of orders disqualifying counsel that have not been the product of

20  motions by present or former clients," *Kennedy v. Eldridge*, 135 Cal. Rptr. 3d 545, 550–51 (Ct.

21  App. 2011) (collecting cases).

22          Where an attorney successively represents clients with adverse interests, his

23  disqualification is required under the California Rules of Professional Conduct if "the subjects of

24  the two representations are substantially related." *SpeeDee Oil*, 20 Cal. 4th at 1146. However,

25  "even when counsel has been shown to have committed an ethical rule infraction the court retains

26  discretion to decline to order disqualification." *UMG Recordings, Inc. v. MySpace, Inc.*, 526 F.

27  Supp. 2d 1046, 1063 (C.D. Cal. 2007) (quoting Richard E. Flamm, *Lawyer Disqualification:*

28  *Conflicts of Interest and Other Bases* § 23.3 at 449–50 (Banks and Jordan, 2003)); *id.* ("The

discretion courts have to determine whether the specific facts of a case warrant a sanction short of disqualification is broad indeed.").  The "substantial relationship" test examines "the similarities between the two factual situations, the legal questions posed, and the nature and extent of the attorney's involvement with the cases." *Acacia Patent*, 184 Cal. Rptr. 3d at 588 (citation omitted). Uber argues that the same substantial relationship test also applies in the non-client context, but Diva insists that "where there was never an attorney-client relationship, more is required than in the former-client context to show that matters are substantially related." Opp. at 13.  Specifically, Diva cites five cases as evidence that, in the non-client context, "substantially related" means both matters must be "based on essentially identical facts." *Id.* at 15–16.

A review of the cases belies Diva's contention.  To be sure, in each of the five cited cases, the successive representations at issue arose from the same underlying facts.  But each court made clear that it was applying the regular substantial relationship test in its analysis.  *See All Am. Semiconductor, Inc. v. Hynix Semiconductor, Inc.*, No. C 06-2915, 2008 WL 5484552, at *7 (N.D. Cal. Dec. 18, 2008) ("[T]he proper standard for assessing whether the information [an attorney] received as [counsel for a client who had a joint-defense agreement with the party seeking disqualification] disqualifies him from representing plaintiffs is the 'substantial relationship' test ordinarily applied in successive representation cases), *order clarified*, No. C 07-1200 PJH, 2009 WL 292536 (N.D. Cal. Feb. 5, 2009); *Acacia Patent*, 184 Cal. Rptr. 3d at 591 ("If an attorney is deemed to have a duty of confidentiality to a nonclient arising out of . . . a past representation, courts apply the substantial relationship test from successive representation doctrine to determine whether to disqualify counsel in a case against the nonclient."); *Meza v. H. Muehlstein & Co.*, 98 Cal. Rptr. 3d 422, 429 (Ct. App. 2009) ("If there is a 'substantial relationship' between the subjects of the antecedent and current representations, the attorney must be disqualified."); *Rosen v. Cream*, No. A150378, 2018 WL 2146761, at *5 (Cal. Ct. App. May 10, 2018) (in the absence of an attorney-client relationship, courts usually rely on "the substantial relationship test from successive representation cases"); *McElroy*, 2015 WL 2251057, at *5 (courts in non-client situations "have applied a 'substantial relationship' test similar to the one typically used in

conducting an analysis under Rule 3-310 for successive attorney-client relationships").[1]  In none of these cases did the court purport to apply a different legal standard.

In short, courts have applied the regular substantial relationship test even where there was no prior attorney-client relationship.  For example, *All American Semiconductor* applied the substantial relationship test to disqualify a law firm that had previously represented the vice president of a company in a criminal investigation from representing plaintiffs suing the company, even though there had never been an attorney-client relationship between the law firm and the company; the vice president and the company merely had a joint-defense agreement during the criminal investigation.  2008 WL 5484552, at *7.  Another example is *Morrison Knudsen Corporation v. Hancock, Rothert & Bunshoft*, 81 Cal. Rptr. 2d 425 (Ct. App. 1999), which Diva concedes "appear[s] to depart from the same-facts rule."  Opp. at 16 n.3.  In that case, the insurance underwriters for the Morrison Knudsen Corporation ("Morrison") retained a law firm to monitor defense attorneys Morrison retained on errors and omissions claims.  *Morrison Knudsen*, 81 Cal. Rptr. 2d at 428.  In its capacity as "monitoring counsel," the law firm "received detailed confidential communications from Morrison's defense counsel concerning the progress of cases and Morrison's potential liability."  *Id.*  The same law firm was then retained by a water district to bring claims against Morrison for problems arising from a dam construction project.  *Id.*  Although the firm had never directly represented Morrison, the California Court of Appeal ruled that it should be disqualified.  The court first affirmed that "the proper standard for assessing whether the information [the law firm] received as the underwriters' counsel disqualified it from representing the District is . . . the 'substantial relationship' test ordinarily applied in successive representation cases."  *Id.* at 432.  It then concluded that a substantial relationship existed even though different litigation and different facts were involved.  *See id.* at 433.

Diva attempts to distinguish *Morrison Knudsen* by pointing out that it involved unusual

---

[1] Diva seizes upon the phrase "similar to" in the court's language to argue that *McElroy* applied a more stringent disqualification standard, but in the very next paragraph the court articulated the regular substantial relationship test: "an inquiry into the similarities between the two factual situations, the legal questions posed, and the nature and extent of the attorney's involvement with the cases."  *McElroy*, 2015 WL 2251057, at *5 (citation omitted).  *McElroy* then applied this test. *See id.* at *5–7.

circumstances—the law firm there continued to serve as monitoring counsel with access to Morrison's confidential information while litigating against Morrison.  *See* Opp. at 16 n.3.  That may be true, but it does not help Diva because *Morrison Knudsen* specifically rejected the argument that underlying facts in the successive representations must be near-identical to trigger disqualification.  As the court reasoned, "the facts of cases are never entirely alike, and no cases would ever be 'substantially related' if they could be distinguished on such narrow grounds." *Morrison Knudsen*, 81 Cal. Rptr. 2d at 433.  Thus, the court concluded that the "similar factual and legal issues" prong of the substantial relationship test was met even though the firm's representation of Morrison's insurance underwriters and its representation of the water district involved different claims against Morrison arising from different construction projects.  *Id.*  It was enough that both representations implicated "duty of care issues arising from professional services rendered in connection with construction projects" and similar factual questions regarding the adequacy and thoroughness of Morrison's construction work.  *Id.*  Diva's "same-facts rule" finds no support in *Morrison Knudsen*.

Thus, the Court will apply the regular "substantial relationship" test under California law here.

B.    Substantial Relationship

As noted above, in evaluating whether there is a substantial relationship between successive representations courts look to "the similarities between the two factual situations, the legal questions posed, and the nature and extent of the attorney's involvement with the cases," *Acacia Patent*, 184 Cal. Rptr. 3d at 588, as well as "the attorney's possible exposure to formulation of policy or strategy," *Morrison Knudsen*, 81 Cal. Rptr. 2d at 432.  On occasion, courts have "also considered whether 'there is a reasonable probability counsel has obtained information the court believes would likely be used advantageously against an adverse party during the course of the litigation.'"  *Rosen*, 2018 WL 2146761, at *5 (quoting *Kennedy*, 135 Cal. Rptr. 3d at 551).  Other courts have suggested that this is not an additional consideration distinct from the regular "substantial relationship" factors, but rather a different formulation of the same inquiry.  *See Trone v. Smith*, 621 F.2d 994, 998 (9th Cir. 1980) ("If there is a reasonable

probability that confidences were disclosed which could be used against the client in later, adverse representation, a substantial relation between the two cases is presumed.").  The purpose of the substantial relationship inquiry is to determine if "information material to the evaluation, prosecution, settlement or accomplishment of the former representation given its factual and legal issues is also material to the evaluation, prosecution, settlement or accomplishment of the current representation given its factual and legal issues." *Jessen v. Hartford Cas. Ins. Co.*, 3 Cal. Rptr. 3d 877, 887–88 (Ct. App. 2003).  To be "material," the information acquired during the first representation must be "directly at issue in, or have some critical importance to, the second representation." *Farris v. Fireman's Fund Ins. Co.*, 14 Cal. Rptr. 3d 618, 623 (Ct. App. 2004).

The burden is on the party seeking the disqualification "to show both the fact of the former representation and the existence of a substantial relationship between the former and current representations." *In re Charlisse C.*, 45 Cal. 4th 145, 166 n.11 (2008).  Generally, when there is a substantial relationship between the two representations, courts disqualify counsel from representing the second client. *City & Cty. of San Francisco v. Cobra Sols., Inc.*, 38 Cal. 4th 839, 847 (2006).  However, mindful of ultimate power of judicial discretion, disqualification is not inevitable, and its "propriety . . . depends on the circumstances of the particular case in light of competing interests."[2] *Oaks Mgmt.*, 51 Cal. Rptr. 3d at 569.

    1.   <u>Duty of Confidentiality</u>

The substantial relationship test applies where "an attorney is deemed to have a duty of confidentiality to a nonclient arising out of . . . a past representation." *Acacia Patent*, 184 Cal. Rptr. 3d at 591.  Thus, before engaging in the substantial relationship analysis, the Court must first answer the threshold question whether Mr. Postman owed a duty of confidentiality to Uber based on his work at the Chamber.  Such a duty may be created where "an attorney obtains confidential

---

[2] These interests include "a client's right to chosen counsel, an attorney's interest in representing a client, the financial burden on a client to replace disqualified counsel, and the possibility that tactical abuse underlies the disqualification motion." *SpeeDee Oil*, 20 Cal. 4th at 1145.  In criminal cases, defendants are additionally entitled to a Sixth Amendment "presumption in favor of [their] counsel of choice," which must be considered in any disqualification analysis. *Wheat v. United States*, 486 U.S. 153, 164 (1988).

United States District Court
Northern District of California

1    information about a co-defendant of a client during a joint defense of an action," or information

2    shared pursuant to a common interest agreement. *All Am. Semiconductor*, 2008 WL 5484552, at

3    *6; *see United States v. Henke*, 222 F.3d 633, 637 (9th Cir. 2000); *United States v. Gonzalez*, 669

4    F.3d 974, 978 (9th Cir. 2012).

5         The joint defense or common interest privilege[3] allows "persons who share a common

6    interest in litigation . . . to communicate with their respective attorneys and with each other to

7    more effectively prosecute or defend their claims." *Gonzalez*, 669 F.3d at 978 (quoting *In re

8    Grand Jury Subpoenas*, 902 F.2d 244, 249 (4th Cir. 1990)). Although commonly referred to as

9    privileges, "[t]he joint defense and common interest doctrines are not privileges in and of

10   themselves." *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 578 (N.D. Cal. 2007). "Rather,

11   they constitute exceptions to the rule on waiver [of the attorney-client and work product

12   privileges] where communications are disclosed to third parties." *Id.* (citing *United States v.

13   Bergonzi*, 216 F.R.D. 487, 495–96 (N.D. Cal. 2003)). Using common parlance, the common

14   interest privilege applies where (1) a communication is made by separate parties in the course of a

15   matter of common legal interest; (2) the communication is designed to further that effort; and (3)

16   the privilege has not been waived. *Nidec Corp.*, 249 F.R.D. at 578. Although parties can

17   memorialize a common interest agreement in writing, "no written agreement is required" for the

18   common interest privilege to apply, since an agreement "may be implied from conduct and

19   situation, such as attorneys exchanging confidential communications from clients who . . . have

20   common interests in litigation." *Gonzalez*, 669 F.3d at 979; *see Amphastar Pharm., Inc. v. Aventis

21   Pharma SA*, No. EDCV 09-23-MJG (OPX), 2013 WL 12136380, at *5 (C.D. Cal. Aug. 9, 2013)

22   (noting that the common interest privilege "applies to cooperating plaintiffs"), *order clarified*, No.

23   EDCV 09-23-MJG (OPX), 2013 WL 12149230 (C.D. Cal. Sept. 27, 2013).

24        Here, Uber asserts that "[t]he Chamber and Uber had a common interest agreement starting

25

26   _____

     [3] The joint defense privilege and common interest privilege are the same privilege under different
27   names. It is typically referred to as the "joint defense" privilege in the criminal defense context
     and as the "common interest" elsewhere. *See Gonzalez*, 669 F.3d at 978; *OXY Res. California
28   LLC v. Superior Court*, 9 Cal. Rptr. 3d 621, 634 (Ct. App. 2004).

by December 2015," after the "parties expressly conveyed their expectations that Uber and the Chamber had a common interest in challenging the Seattle Ordinance."[4]  Mot. at 14.  And while the two parties—who eventually became co-plaintiffs in the Seattle litigation—never reduced their understanding to a formal written common interest agreement, they exchanged privileged information and attorney work product through communications that were often marked as privileged.  *Id.*  Diva does not dispute that Uber and the Chamber communicated with each other to further their common interest in challenging the Seattle Ordinance.[5]  Instead, Diva argues that Uber waived its common interest privilege, because it was aware that the purportedly privileged information it communicated to the Chamber was "regularly shared [by the Chamber] with entities who were not parties to" the Seattle litigation or amicus briefing.  Opp. at 18–19.

Diva is correct that communications "made in the presence of, or shared with, third-parties destroys the confidentiality of the communications and the privilege protection that is dependent upon that confidentiality."  *Nidec Corp.*, 249 F.R.D. at 578 (citation and internal quotation marks omitted).  Nevertheless, Diva's waiver argument fails because there is no indication that any of the information shared by the Chamber with third parties was confidential.  Diva represents that Chamber "staff regularly shared updates on the Seattle case . . . with Chamber donors, potential donors, the Litigation Center's Board of Directors, the Litigation Center's advisory committees, other working groups at the Chamber, and other trade associations."  Docket No. 58 (Declaration of Warren Postman, or "Postman Decl.") ¶ 38.  But Diva does not suggest that the Chamber shared *every* piece of information from Uber in this manner, nor identify any particular communication explicitly designated "privileged" that was broadly distributed.[6]  To the contrary,

---

[4] A common interest agreement does not turn a party into a client of its co-party's attorneys; the agreement simply exempts the parties from the rule of waiver that would otherwise apply if they exchanged confidential information with each other.  *See Nidec Corp.*, 249 F.R.D. at 578.

[5] Diva asserts that Uber's brief "never argues that those communications were confidential."  Opp. at 18.  This ignores the declarations submitted by Uber attesting that it shared confidential information with the Chamber pursuant to their common interest agreement.  *See, e.g.*, Lehotsky Decl. ¶¶ 14–16, 22–23; Docket No. 46 (Declaration of Jason Allen, or "Allen Decl.") ¶¶ 14, 23.

[6] Diva pointed out at the hearing that Uber, as the party asserting that its communications with the Chamber were privileged, "bears the initial burden" of establishing the privilege.  *United States v.*

United States District Court
Northern District of California

Steven Lehotsky, who worked with Mr. Postman on Uber litigation at the Chamber, states categorically that "the Chamber never shared Uber's confidential information with any other Chamber member."[7]   Docket No. 70 (Supplemental Declaration of Steven Lehotsky, or "Lehotsky Supp. Decl.") ¶ 14.  And Mr. Postman himself concedes that "because the claims in the [Seattle] case were facial preemption challenges that turned on pure questions of law[,] . . . a draft complaint, or a strategy memo about the complaint, could be shared in full with other members *without disclosing any confidential details* about Uber."  *Id.* ¶ 39 (emphasis added).  Needless to say, the disclosure of non-confidential and non-privileged communications does not abrogate the common interest privilege as to communications which were *not* shared.[8]

Moreover, Diva cannot show that any information shared regarding the Chamber's amicus briefs resulted in a waiver of the common interest privilege.  Mr. Postman recounts that when the Chamber is asked to file an amicus brief, it typically discusses the case "with lawyers from dozens of companies and law firms on Litigation Center advisory committees" and sometimes "share[s] a draft brief" with the committees.  Postman Decl. ¶¶ 16, 18.  He believes that "[t]his practice presumably reflects counsel's understanding that sharing a brief with a diverse group of lawyers who do not represent the client places the draft outside the attorney-client privilege."  *Id.* ¶ 18.  But, as Uber avers, its counsel discussed legal issues and strategy with the Chamber regarding the amicus briefs "with the expectation that such communications . . . would be confidential," and that the written communications were typically marked privileged.  Docket No. 44 (Declaration of

---

*Ruehle*, 583 F.3d 600, 608 (9th Cir. 2009).  However, if Uber is able to do so, the burden then shifts to Diva to "offer evidence of a waiver."  *Guidiville Rancheria of California v. United States*, No. 12-CV-1326 YGR, 2013 WL 6571945, at *5 (N.D. Cal. Dec. 13, 2013) (citing *GTE Directories Serv., Corp. v. Pac. Bell Directory*, 135 F.R.D. 187, 192 n.2 (N.D. Cal. 1991); 2 Paul R. Rice, Attorney-Client Privilege In The United States (2012), § 9:22).  Uber has carried its initial burden by demonstrating that it communicated with the Chamber pursuant to a common interest agreement, and that no confidential communications were disclosed to third parties.  *See* Lehotsky Decl. ¶¶ 13–14; Lehotsky Supp. Decl. ¶ 14.

[7] Nowhere do the declarations submitted with Diva's post-hearing administrative motion state that the Chamber shared Uber's confidential information with Lyft.  *See* Docket No. 85, Exhs. A–C.

[8] It is entirely possible, for instance, that Uber shared in confidence with only Mr. Postman potential weaknesses and vulnerabilities of their legal and factual arguments.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Theane Evangelis, or "Evangelis Decl.") ¶¶ 6, 8.  "Case law discussing the privilege status of communications made between trade association members and the association's attorney is somewhat spare," but courts have held that where the communications "related to a legal matter and were made with an expectation of confidentiality," they "did not effect a waiver of any privilege or protection."  *Bacchi v. Massachusetts Mut. Life Ins. Co.*, 110 F. Supp. 3d 278, 283 (D. Mass. 2015) (holding that discussions between a trade association's counsel and its members regarding an amicus brief were privileged where there was a confidentiality agreement in place covering discussions); *see In re Processed Egg Prod. Antitrust Litig.*, No. 08-MD-02002, 2014 WL 6388436, at *12 (E.D. Pa. Nov. 17, 2014) (finding that if communications between a trade association and its members "were attorney advice within the scope of the member's role within the association and given for the sake of advising the association," the communications would be privileged).  Here, the Chamber's communications with its members about the Uber amicus briefs related to a legal matter and were made with an expectation of confidentiality.  And as with the Seattle litigation, even if draft amicus briefs were shared with others outside the privilege, Diva has not shown that all communications between Uber and Mr. Postman related thereto was shared with others.

Thus, Mr. Postman owed a duty of confidentiality to Uber with respect to his work on the Seattle litigation and amicus briefs, and the substantial relationship test applies.  *See All Am. Semiconductor*, 2008 WL 5484552, at *6–7.

      2.    <u>Seattle Litigation</u>

          a.    <u>Similarity of Factual and Legal Issues</u>

The first two prongs of the substantial relationship test assess the similarities between the factual and legal issues raised between the allegedly conflicting representations.  The Seattle litigation concerned similar factual issues as this case but posed different legal questions.  The Seattle litigation was a facial challenge to a municipal ordinance that allowed drivers working as independent contractors to collectively bargain with "driver coordinators" like Uber.  The complaint alleged that the ordinance was preempted by the Sherman Antitrust Act and the National Labor Relations Act ("NLRA").  Amended Complaint ("Seattle Am. Compl.") ¶¶ 69–88,

United States District Court
Northern District of California

United States District Court
Northern District of California

1    *Chamber of Commerce of U.S. v. Seattle*, 274 F. Supp. 3d 1155 (W.D. Wash. 2017) (No. 13-370),

2    *aff'd in part, rev'd in part and remanded*, 890 F.3d 769 (9th Cir. 2018).  Because Uber and the

3    Chamber brought the suit as a facial challenge, it was litigated on the administrative record

4    without discovery from the Chamber or Uber.  Postman Decl. ¶ 39.  This is illustrated in the

5    briefing, which emphasized that the NLRA preemption claim "presents a 'pure question of law'

6    that does not require consideration of any Chamber members' specific factual circumstances."

7    Docket No. 66, Exh. 4 at 21.

8         Nevertheless, Uber insists that "the question of whether Uber drivers were independent

9    contractors or employees was at the center of numerous arguments in the Seattle litigation and

10   formed the basis for the Chamber's arguments that the City of Seattle's ordinance was improper."

11   Lehotsky Supp. Decl. ¶ 8.  This is belied by the record.  The premise that Uber's drivers were in

12   fact independent contractors was never disputed or litigated, and the district court specifically

13   noted that "[n]either the Chamber nor the individual plaintiff has made even a bare assertion that

14   for-hire drivers are employees: both have taken the position that the for-hire drivers covered by the

15   Ordinance are independent contractors."  *Seattle*, 274 F. Supp. 3d at 1170–71.  Both the district

16   court and Ninth Circuit rulings addressed only pure legal questions such as standing, ripeness,

17   state immunity, and preemption.  *See id.* at 1159–60; *Seattle*, 890 F.3d at 775–76.

18        In contrast, Diva's complaint in this case centers squarely on driver classification.  Its two

19   causes of action under the UCL and UPA are both predicated on allegations that "Uber continues

20   to misclassify its drivers as independent contractors when California law clearly requires that they

21   be paid minimum wage and overtime and be given other protections and compensation as

22   employees" and that "Uber uses these illegal cost savings to bolster a larger strategy of pricing its

23   rides far below their true cost, and to take business and market share from competitors who pay

24   the required costs of complying with the law."  Compl. ¶ 1.  With respect to legal issues, then,

25   there is minimal, if any, overlap between the two representations.

26        However, the lack of overlap in legal issues is not dispositive.  Courts have cautioned

27   against "posit[ing] overly restrictive limitations on what it is reasonable to assume is

28   communicated between lawyers and their clients," because "clients should not be expected to limit

16

themselves to giving their attorneys only the information most relevant or critical to a particular engagement" and "frequently provide attorneys with far more than the bare minimum the attorneys need to carry out the assignment." *Openwave Sys., Inc. v. 724 Sols. (US) Inc.*, No. C 09-3511 RS, 2010 WL 1687825, at *5 (N.D. Cal. Apr. 22, 2010); *see Jessen*, 3 Cal. Rptr. 3d at 887 ("[T]he attorney may acquire confidential information about the client or the client's affairs which may not be directly related to the transaction or lawsuit at hand but which the attorney comes to know in providing the representation to the former client with respect to the previous lawsuit or transaction."). For this reason, courts should not "limit[] the comparison of the two representations to their precise legal and factual issues." *Jessen*, 3 Cal. Rptr. 3d at 887. The key inquiry is whether "the nature of the former representation" is such that "confidential information material to the current dispute would normally have been imparted to the attorney." *H. F. Ahmanson & Co. v. Salomon Bros., Inc.*, 280 Cal. Rptr. 614, 619 (Ct. App. 1991).

There are indications that Uber's driver classification model was a sufficiently important factual predicate to Uber's legal arguments in the Seattle litigation that "confidential information material to [driver classification] would normally have been imparted to the [Chamber]" during Mr. Postman's work on the litigation. *Id.* The crux of Diva's claims in this case is that Uber avoids certain wage, tax, and benefits obligations by improperly classifying its drivers as independent contractors instead of employees, and thus unfairly undercut its competitors on price. *See* Compl. ¶ 1. In the Seattle litigation, Uber opposed collective bargaining for its drivers precisely because it would "essentially require[] driver coordinators to treat independent contractors as employees" and erode the advantages of Uber's "business model that depends on partnering with independent contractors." Seattle Am. Compl. ¶ 57. In Uber's telling, "[a]s a result of the collective-bargaining process, those companies also will incur additional costs of doing business with the conspirators, such as reimbursement of driver's expenses or payment of other benefits" that would "threaten the viability of companies that provide ride-referral services." *Id.* ¶ 64. Thus, it is reasonably likely that Uber disclosed to the Chamber, *e.g.*, facts about how driver classification impacts its business model and legal strategies relating to driver classification; these facts and strategies are "directly at issue in, or have some critical importance to," this case.

*Farris*, 14 Cal. Rptr. 3d at 623.

For instance, in support of Uber's argument that its drivers should not be allowed to engage in collective bargaining, the Seattle complaint touted the benefits of the independent contractor model for both Uber and its drivers.  *See* Seattle Am. Compl. ¶¶ 29, 30 ("Drivers who receive ride requests from these software apps choose when they work, choose where they work," and "may, if they choose to, contract [to drive] with more than one service.").  According to the complaint in the Seattle case, the "benefits to drivers from these flexible arrangements are significant and well-documented."  *Id.* ¶ 29.  Facts about the degree of control Uber exerts over its drivers are material to the driver classification question in the case at bar, which turns in part on whether a worker "is free from the control of the hiring business."  Compl. ¶ 2.

The Seattle complaint also noted that "[s]ome drivers have challenged their status as independent contractors in various jurisdictions," including in the *O'Connor* case before this Court and in a petition with the National Labor Relations Board.  Seattle Am. Compl. ¶ 34.  Given Uber's concerns about maintaining the independent contractor status of its drivers, it is reasonable to expect that Mr. Postman and Uber "discussed Uber's independent contractor business model" and shared "legal analyses and strategies related to the classification issue" during the Seattle litigation.  Mot. at 6, 7.

Diva's post-hearing administrative motion cites four cases that purportedly "den[ied] disqualification even where an attorney *directly and repeatedly represented* the movant in defending against a cause of action and later *brought the same cause of action* against the movant."  Docket No. 85 at 4 (emphasis in original).  None of those cases involved the same degree of factual overlap as in this case.  In *Fabric Selection, Inc. v. Wal-Mart Stores, Inc.*, No. CV 09-01537 DDP(FFM), 2009 WL 3876281 (C.D. Cal. Nov. 17, 2009), the successive representations raised legal claims that were similar "[a]t a very general level" but the party moving for disqualification did "not identif[y] any concrete *factual* similarity between the [representations]."  *Id.* at *3 (emphasis in original).  Similarly, the successive representations in *Khani v. Ford Motor Co.*, 155 Cal. Rptr. 3d 532 (Ct. App. 2013) "involved claims under the same statute," but otherwise the movant presented only "bare-bones evidence . . . insufficient to

18

United States District Court
Northern District of California

1    establish that [the attorney]'s previous representation . . . exposed him to confidential information

2    that would be material to his current representation." *Id.* at 536.  In *Banning Ranch Conservancy*

3    *v. Superior Court*, 123 Cal. Rptr. 3d 348 (Ct. App. 2011), the City of Newport Beach sought to

4    disqualify a law firm that had once represented the City on legal matters concerning certain land

5    developments from representing a nonprofit organization on a challenge to an entirely different

6    development project.  *Id.* at 351–52.  Instead of asserting any factual similarities between the

7    matters, the City merely argued that the law firm had knowledge of the City's "general business

8    practices or litigation philosophy," which the court held was "an insufficient basis for

9    disqualification."  *Id.* at 358.  Disqualification was likewise denied in *N.L.A. v. Cty. of Los*

10   *Angeles*, No. CV1502431DDPGJSX, 2016 WL 5661974 (C.D. Cal. Sept. 29, 2016) because the

11   allegedly conflicted attorney was at most "exposed to some general information about the

12   [movant's] approach to section 1983 cases during her employment at [movant's law firm]," and

13   the actual § 1983 cases at issue were "dissimilar," involving a different underlying incident and

14   different sheriff's deputies.  *Id.* at *3–4.  Thus, these four cases are distinguishable from the case

15   at bar.

16          Diva also suggested at the hearing that it is significant that Uber has never veered from the

17   position that its drivers are independent contractors as opposed to employees.  In Diva's view, this

18   cuts against any inference that Uber would have discussed driver classification during the Seattle

19   litigation.  *See* Docket No. 91 at 41:2–6.  But just because Uber has maintained the same stance on

20   driver classification does not mean driver classification was not an issue.  However consistent or

21   confident Uber may have been in its public position, it still had to anticipate challenges to that

22   position from other parties, which likely engendered frank discussion of legal and factual issues

23   relevant to driver classification, including possibly any weaknesses or vulnerabilities in Uber's

24   arguments.  *See H. F. Ahmanson*, 280 Cal. Rptr. at 620 (cautioning that "to apply the remedy of

25   disqualification" only "when there is no realistic chance that confidences were disclosed would go

26   far beyond the purpose of the substantial relationship test") (citation and internal quotation marks

27   omitted).

28          In sum, notwithstanding that the legal issues in the Seattle litigation are largely distinct

1   from those in this case, there is sufficient overlap between the factual contexts to infer that

2   "information material to the evaluation, prosecution, settlement or accomplishment of the [Seattle

3   litigation] . . . is also material to the evaluation, prosecution, settlement or accomplishment of the

4   current representation." *Jessen*, 3 Cal. Rptr. 3d at 887–88.

                b.      <u>Nature and Extent of Attorney's Involvement</u>

6         The nature and extent of Mr. Postman's involvement with the Seattle litigation further

7   counsel disqualification. "[T]here is reason to differentiate for disqualification purposes between

8   lawyers who become heavily involved in the facts of a particular matter and those who enter

9   briefly on the periphery for a limited and specific purpose relating solely to legal questions." *H. F.*

10  *Ahmanson*, 280 Cal. Rptr. at 621 (citation omitted). Mr. Postman's role falls under the former

11  category. Uber characterizes him as "a point-person for the Chamber-Uber relationship." Mot. at

12  2. His "involvement in the Seattle litigation spanned two-and-a-half years," and "extended to all

13  aspects of the Seattle litigation, including contributing to pleadings and legal briefs at both the trial

14  and appellate levels, as well as providing high-level advice on legal strategy." Allen Decl. ¶¶ 22–

15  24. He "engaged in regularly-scheduled telephone conferences" with Uber during which counsel

16  "discussed legal strategy, issues that required immediate consideration, and any key developments

17  in the various court proceedings." *Id.* ¶ 20. Mr. Postman also acknowledges that he "spoke

18  regularly with Uber lawyers" regarding the lawsuit and was involved in the amended complaint

19  jointly filed by the Chamber and Uber. Postman Decl. ¶¶ 33–34.

20        Mr. Postman's involvement in the Seattle litigation was extensive. *See Oliver v. SD-3C,*

21  *LLC*, No. C 11-01260 JSW, 2011 WL 13156460, at *3 (N.D. Cal. Aug. 4, 2011) (finding

22  substantial involvement where attorney represented client "for almost two years and negotiated a

23  settlement agreement over several months"); *MMCA Grp., Ltd. v. Hewlett-Packard Co.*, No. C-06-

24  7067 MMC, 2007 WL 607659, at *4 (N.D. Cal. Feb. 23, 2007) (finding substantial involvement

25  where attorney had worked as a company's outside counsel "for years"). "The undisputed

26  evidence of [Mr. Postman]'s long-standing involvement in overseeing [the Chamber]'s

27  relationship with [Uber] supports a rational conclusion that he obtained confidential information in

28  the course of that relationship that is material to his current representation of [Diva] in the instant

1    action against [Uber]." *MMCA Grp.*, 2007 WL 607659, at *4 (citation and internal quotation

2    marks omitted).

3         Accordingly, the subject of Mr. Postman's work with Uber in the Seattle litigation is, for

4    purposes of disqualification under California law, substantially related to this case.

5         3.    Amicus Briefs

6         On the other hand, the connection between this case and the amicus briefs the Chamber

7    filed in support of Uber is more tenuous.  Two of the cases in which amicus briefs were

8    submitted—*O'Connor* and *Mohamed*—brought driver misclassification claims.  But the

9    Chamber's work in those cases was limited to the appeals stage, and their amicus briefs solely

10   addressed arbitration.  *See* Lehotsky Decl., Exh. 1 (*O'Connor* amicus brief); Exh. 2 (*Mohamed*

11   amicus brief).  Uber itself describes the amicus briefs as "supporting Uber's position that [the

12   misclassification] suits should be sent to arbitration."  Mot. at 8.  Uber conspicuously tacks onto

13   the end of that sentence ". . . pursuant to driver agreements which classify the drivers as

14   independent contractors," *id.*, but does not explain why the classification of drivers under their

15   contracts has anything to do with arbitrability.  Uber merely asserts that as part of Mr. Postman's

16   work on the amicus briefs, he "engaged with in-house counsel for Uber to discuss overall strategy"

17   and "exchanged draft work product with Uber's outside counsel."[9]  Mot. at 8.  Since driver

18   classification was not at issue at all in the appeals, and there is no indication that Mr. Postman's

19   communications with Uber on the amicus briefs would have or did touch on driver classification,

20   it cannot be said that Mr. Postman acquired information during the first representation that was

21   "directly at issue in, or have some critical importance to, the second representation."  *Farris*, 14

22   Cal. Rptr. 3d at 623.

23        "[B]ecause [Uber] ha[s] failed to carry [its] burden to show any overlap in the factual

24   situations or legal questions presented," the factor examining the nature and extent of Mr.

25   Postman's involvement in the amicus briefs "is not dispositive."  *McElroy*, 2015 WL 2251057, at

26

27   ───────────────────

28   [9] Uber suggests that the Court should put weight on Diva's request to relate this case to *O'Connor*.
     Mot. at 8.  But Diva related this case to the district court proceedings in *O'Connor* (which
     addresses driver classification), not the appeal (which did not).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    *7.  There is no substantial relationship between his work on the amicus briefs and his

2    representation of Diva in this litigation.

3             4.      Disqualification is Generally Required Where a Substantial Relationship is Found

4             Where, as here, "the requisite substantial relationship between the subjects of the prior and

5    the current representations can be demonstrated, access to confidential information by the attorney

6    in the course of the first representation . . . is *presumed*."  *Flatt*, 9 Cal. 4th at 283 (emphasis in

7    original).  However, Diva contends, based on language from *Acacia Patent*, that a greater showing

8    is necessary in order to invoke disqualification.  *See* Opp. at 19–20.  In particular, Diva argues that

9    Uber must also show "the first representation resulted in a *broad disclosure* of the nonclient's

10   privileged information."  *Acacia Patent*, 184 Cal. Rptr. 3d at 593 (emphasis added).

11            The quoted language from *Acacia Patent* is inapposite here because it is drawn from a very

12   specific context—where "a duty of confidentiality to a litigation *adversary* aris[es] by way of [an

13   attorney] representing a law firm against that adversary in a different action."  *Id.* at 592 (emphasis

14   added).  This is illustrated by the unusual facts of *Acacia Patent*.  There, a company sought to

15   disqualify a law firm, AlvaradoSmith, that had once represented another law firm in an attorney

16   fees dispute against the company.  *Id.* at 585.  Later, a third law firm retained AlvaradoSmith to

17   sue the same company for attorney fees.  *Id.* at 586.  The company argued that AlvaradoSmith was

18   conflicted because it had obtained the company's confidential information while litigating the first

19   fee dispute.  *Id.* at 586–87.  The *Acacia Patent* court recognized the factual situation as "a wild

20   card," because "the supposed duty of confidentiality . . . would be owed to a party that was

21   adverse to AlvaradoSmith's clients in both the prior and subsequent litigation."  *Id.* at 592.

22   Surveying the limited case law on the issue, the court concluded that "a disqualifying conflict can

23   arise[] with regard to an adverse nonclient," but only where "the first representation resulted in a

24   broad disclosure of the nonclient's privileged information" *and* a substantial relationship exists

25   between the two matters.  *Id.* at 593.  Because the Chamber and Uber were co-plaintiffs in the

26   Seattle litigation, not adverse parties, the "broad disclosure" requirement does not apply here.[10]

27

28   [10] The only case that has cited the "broad disclosure" language from *Acacia Patent* also involved a
     law firm that was adverse to the party moving for disqualification in the prior representation.  *See*

1    Instead, the general rule governs.  Access to confidential information is "presume[d]"

2  based on a substantial relationship between the successive representations.  *Id.* at 595.  The

3  presumption is "conclusive," and "justified as a rule of necessity, 'for it is not within the power of

4  the [party seeking disqualification] to prove what is in the mind of the attorney." *Id.*  Because Mr.

5  Postman's work on the Seattle and this case is substantially related, his access to Uber's

6  confidential information is presumed, and under California Rules of Professional Conduct

7  "disqualification of [his] representation of [Diva] is mandatory; indeed, the disqualification

8  extends vicariously to the entire [KL] firm." *Flatt*, 9 Cal. 4th at 283.  Nonetheless, in this federal

9  litigation, the Court still must determine whether it is appropriate to order disqualification, taking

10  into account, *inter alia*, equitable considerations.  *See* n.2, *supra*; *SpeeDee Oil*, 20 Cal. 4th at

11  1145.

12  C.    Equities

13    Diva urges the Court to exercise its discretion to refrain from disqualifying KL on

14  equitable grounds.  Diva asks the Court to take into account that "Mr. Postman and [KL]

15  conscientiously sought and obtained expert ethical guidance before becoming adverse to Uber,"

16  and "reasonably relied on that advice."  Opp. at 24.  While it may have been prudent for Mr.

17  Postman and KL to seek an ethics consultation before undertaking to represent Diva, unilaterally

18  obtained ethics guidance is not a shield that allows counsel to continue a representation where that

19  representation creates an untenable conflict.  Diva cites no cases so holding.

20    Diva also claims Uber's alleged misclassification of its drivers has been such a high profile

21  legal issue that "[i]t is difficult to conceive of a non-public fact or legal argument that [KL] could

22  possess . . . that would cause Uber prejudice in this case."  Opp. at 24–25.  But as noted above,

23  consistency in a public position, high profile or not, does not disprove that frank and confidential

24  information may have been exchanged.  The receipt of confidential information is *presumed* where

25  there is a substantial relationship between two representations.  *See Acacia Patent*, 184 Cal. Rptr.

26  3d at 595.

27

28  _____

*Gobar v. Gong*, No. D070876, 2017 WL 2729537, at *8 (Cal. Ct. App. June 26, 2017).

United States District Court
Northern District of California

1    Thus, Diva has not provided a basis in equity to deny the disqualification motion.

2    Moreover, Diva has not shown that Uber unduly delayed in bringing this motion, that Uber's

3    motion constitutes tactical abuse,[11] or that disqualification will result in undue hardship or impose

4    an undue financial burden in Diva's prosecution of this litigation.

5    D.    Waiver

6         Diva contends that, even if Mr. Postman is found to be conflicted, Uber has waived its

7    right to seek disqualification by not raising the conflict in the *Razak* litigation in the Third Circuit,

8    which also centers on the driver classification issue. *See* Opp. at 23. KL appeared as counsel of

9    record in *Razak* on July 25, 2018, but Uber has not moved to disqualify KL there. *Id.* Diva views

10   this as evidence that Uber is seeking KL's disqualification here for strategic reasons. *Id.* In

11   particular, Diva points to its motion for partial summary judgment in this case and the more than

12   10,000 arbitration demands that KL has filed against Uber on behalf of individual drivers as

13   powerful incentives for Uber to attempt to remove KL. *See id.* at 24.

14        "It is well settled that a former client who is entitled to object to an attorney representing

15   an opposing party on the ground of conflict of interest but who knowingly refrains from asserting

16   it promptly is deemed to have waived that right." *Tr. Corp. of Montana v. Piper Aircraft Corp.*,

17   701 F.2d 85, 87 (9th Cir. 1983). But the party asserting waiver must "offer[] prima facie evidence

18   of . . . prejudice to the current client" resulting from the unreasonable delay by the former client in

19   bringing the disqualification motion. *River W., Inc. v. Nickel*, 188 Cal. App. 3d 1297, 1309 (Ct.

20   App. 1987); *see Employers Ins. of Wausau v. Albert D. Seeno Const. Co.*, 692 F. Supp. 1150, 1165

21   (N.D. Cal. 1988) ("In making the equitable determination regarding waiver, it is also appropriate

22   to consider such factors as . . . whether disqualification would result in prejudice to the nonmoving

23   party."). Diva has not described any particular prejudice it would suffer as a result of Uber

24   moving for KL's disqualification here, while not so moving in in *Razak*. This case is still in its

25   early stages; no discovery has been conducted nor any dispositive motions litigated. *Compare*

26

27   _____
     [11] Although KL appeared as counsel of record in *Razak*, Mr. Postman did not. Even if Uber had
     known of Mr. Postman's role in KL, it is not clear what tactical advantage Uber would have
28   gained by not moving for disqualification in *Razak* but doing so here. On this record, the Court
     does not find the motion at bar constitutes tactical abuse.

*Employers Ins. of Wausau*, 692 F. Supp. at 1166 (finding prejudice where conflicted attorney "has done an extensive amount of work in this action" and "any new counsel would have to spend a great deal of time becoming familiar with the many claims and issues in dispute"); *Skyy Spirits, LLC v. Rubyy, LLC*, No. C 09-00646WHA, 2009 WL 3762418, at *4 (N.D. Cal. Nov. 9, 2009) (finding prejudice where "substantial work has gone in to this case and the discovery deadline . . . is fast approaching"); *Sharma v. VW Credit, Inc.*, No. CV 11-08360 DDP EX, 2013 WL 1163801, at *6 (C.D. Cal. Mar. 20, 2013) (finding prejudice where conflicted attorney "has advanced the litigation to the brink of class certification").  Uber has not delayed in this case in moving to disqualify Mr. Postman and KL.

Accordingly, Uber has not waived its right to seek KL's disqualification.

## III.     CONCLUSION

For the foregoing reasons, Uber's motion to disqualify Mr. Postman and Keller Lenkner is **GRANTED**.

This order disposes of Docket Nos. 40 and 85.


**IT IS SO ORDERED**.


Dated: January 9, 2019

_____
EDWARD M. CHEN
United States District Judge