Michael A. Geibelson (SBN 179970)
mgeibelson@robinskaplan.com
Aaron M. Sheanin (SBN 214472)
asheanin@robinskaplan.com
**ROBINS KAPLAN LLP**
2440 W. El Camino Real, Suite 100
Mountain View, California 94040
Tel: (650) 784-4040
Fax: (650) 784-4041

*Attorneys for Plaintiff and the Proposed Classes*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIVA LIMOUSINE, LTD., individually and on behalf of all others similarly situated,<br><br>     *Plaintiff*,<br><br>  v.<br><br>UBER TECHNOLOGIES, INC.; RASIER, LLC; RASIER-CA, LLC; UBER USA, LLC; and UATC, LLC.<br><br>     *Defendants*. | Case No. 3:18-cv-05546-EMC<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW AND THE CALIFORNIA UNFAIR PRACTICES ACT**<br><br>**Jury Trial Demanded**<br><br>Judge: Hon. Edward M. Chen |

**INTRODUCTION**

1. Uber's CEO, Dara Khosrowshahi, has admitted that Uber's rapid accumulation of market share in the transportation industry was accompanied by a culture of rule breaking. In his words, "[t]he culture went wrong" at Uber and "[t]he governance of the company went wrong." Khosrowshahi has assured the public that the company has changed its ways. But Uber has not changed its culture of rule breaking.

2. First, Uber continues to misclassify and pay its drivers as independent contractors when California law clearly requires that they be paid minimum wage and overtime and be given other protections and compensation as employees. Each day that Uber misclassifies its primary

workforce, it steals wages from drivers earning below a living wage and gains millions of dollars in unlawful cost savings. California prohibits this form of unfair competition and gives Plaintiff and a class of similarly situated companies a right to an injunction stopping these practices.

3.      California law requires that businesses provide a wide range of protections to their employees including minimum wage, overtime, workers' compensation insurance, unemployment insurance, and expense reimbursement. These protections aren't required for independent contractors. But a worker in the transportation industry can only be treated as an independent contractor if he or she (A) is free from the control of the hiring business, (B) does a job that is outside the usual course of the hiring entity's business and has no tangible connection to the hiring business, and (C) has set up an independent business separate from his or her work for the hiring business.

4.      Uber is a company that sells rides. Uber's subsidiaries are licensed in California as Transportation Network Companies, which is defined as an entity "that provides prearranged transportation services for compensation using an online-enabled application or platform," Pub. Util. Code § 5431(a). Uber and its subsidiaries also hold licenses as Transportation Charter Party carriers, which are defined to mean persons "engaged in the transportation of persons by motor vehicle for compensation, over any public highway in [California]." Pub. Util. Code § 5360.

5.      The drivers who provide Uber's rides are integral to its business. Uber's own executives have stated to drivers that "Uber would not exist without you." Therefore, Uber's drivers are employees under California law and must be treated as such.

6.      But Uber does not treat its drivers as employees; it classifies them as independent contractors and pays them as such. By doing so, Uber is violating California law.

7.      Uber's misclassification allows the company to avoid major costs. Based on a recent study, Uber avoids an average of $9.07 an hour in expenses and benefits that it would have to pay drivers if it properly classified them as employees. That means that the average cost to Uber of a full-time driver after adjusting for the expenses and other benefits that Uber fails to pay is the equivalent of paying a W-2 employee $7.48 per hour. Due to high variation in pay, many drivers earn far less after adjusting for expenses and benefits. Some earn the equivalent of $5 an

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

hour. Some earn $3 an hour. Some drivers even lose money. From full-time drivers in California alone, Uber's misclassification likely saves the company roughly $250 million each year. Uber's total cost savings from misclassification in California may exceed $500 million each year.

8.      California's Unfair Competition Law ("UCL") allows a competitor who is injured by unlawful or unfair conduct to obtain an injunction to stop the violation.

9.      Uber's legal violations have injured Plaintiff and caused it to lose money. Plaintiff is a provider of limousine and chauffeur-driven ground transportation services that pays its drivers as employees in accordance with California (and federal) law. As a result, Plaintiff bears significant burdens, including minimum wage obligations, overtime, meal and rest breaks, workers' compensation insurance, unemployment insurance, health insurance, and the employer's share of Social Security and Medicare taxes. By avoiding these costs, Uber can and does charge even lower prices than it otherwise would.

10.     Uber's prices take market share from Plaintiff and also constrain Plaintiff's ability to increase the prices it charges as its costs increase, including for such things as wages, fuel, and other expenses. This injures Plaintiff by reducing its revenue as well as its profit margin. Plaintiff and a class of business entities that earned revenue through the provision of pre-arranged limousine, town car, or chauffeur-driven ground transportation services for non-shared rides in California are therefore entitled to an injunction stopping Uber's unlawful competition.

11.     Second, Uber has pursued a strategy of pricing its rides far below their true cost to take business and market share from competitors.

12.     The California Unfair Practices Act ("UPA") provides that when a business prices its services below cost and harms competition, the business (as well as its officers and directors who assist or aid, directly or indirectly, in such violation) are liable for damages unless they can prove that they priced below cost without a purpose to harm competition.

13.     In measuring whether a company prices below its costs, the UPA looks to the total average costs of a business, including any costs the law requires the business to bear.

14.     Uber prices its rides below cost for the purpose of injuring competitors. For-hire transportation is a service that is inherently resistant to economies of scale because 85% of the

1   cost of each ride typically goes to labor and vehicle costs that do not decrease with volume.

2   Uber's investors would never have accepted ongoing losses in the billions of dollars if Uber had

3   simply planned to create a transportation company that competes on even footing with small and

4   mid-size competitors. Instead, investors understand that Uber's purpose is to create a behemoth

5   that counts customers in the millions and drives enough competitors out of the market that they

6   will later be able to charge higher prices in the long run. Uber's investors have provided billions

7   of dollars of subsidies for Uber rides because, as one analyst has observed, "Uber is using cash as

8   a competitive weapon."

9       15.     Uber's below-cost and anticompetitive pricing has reduced the revenue and profit

10   margins of Plaintiff. Plaintiff and a class of business entities that earned revenue through the

11   provision of pre-arranged limousine or chauffeur-driven ground transportation services for non-

12   shared rides in California are therefore entitled to damages, which are subject to trebling under

13   the UPA.

14                                          **PARTIES**

15

16      16.     Plaintiff Diva Limousine Ltd. is a California corporation headquartered at 12711

17   Ventura Blvd, Suite 220, Studio City, CA 91604.

18      17.     Defendant Uber Technologies, Inc. is a Delaware corporation headquartered at

19   1455 Market Street, San Francisco, CA 94103.

20      18.     Defendant Rasier, LLC is a Delaware limited liability company headquartered at

21   1455 Market Street, San Francisco, CA 94103.

22      19.     Raiser-CA, LLC is a Delaware limited liability company headquartered at 1455

23   Market Street, San Francisco, CA 94103.

24      20.     Defendant Uber USA, LLC is a Delaware limited liability company headquartered

25   at 1455 Market Street, San Francisco, CA 94103.

26      21.     Defendant UATC, LLC is a Delaware limited liability company headquartered at

27   1455 Market Street, San Francisco, CA 94103. Defendants are all related business entities and

28   defendants are collectively referred to as "Uber" herein.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

22.     Uber's wrongful conduct as alleged herein originated, was coordinated, emanated from, and was developed at Uber's corporate headquarters in California.

23.     All critical decisions concerning Uber's misclassification of its California drivers as independent contractors, and its failure to pay and provide benefits to its California drivers as employees, were made within California.

24.     All critical decisions concerning Uber's pricing structure, including its pricing of rides below cost with the purpose of harming competition, were made within California.

25.     Plaintiff and the proposed classes sustained injuries within California as a result of Uber's wrongful conduct as alleged herein, even though more than one third of the class is located outside of California.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over all claims asserted in this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). Plaintiff seeks declaratory and injunctive relief under the UCL on behalf of itself and the UCL Class, as defined below. Plaintiff also seeks damages and ancillary injunctive relief under the UPA on behalf of itself and the UPA Class, as defined below. This relief has value to each of the classes and would have a cost to Defendants in excess of $5 million exclusive of interest and costs.

27.     Members of each of the proposed classes of Plaintiffs includes citizens of states different from Defendants. Fewer than two-thirds of proposed class members are citizens of California. Each of the proposed classes includes companies that provide limousine and chauffeur-driven ground transportation services within California. Each of the proposed classes also includes affiliates of those companies that are not citizens of California. These non-California affiliates book limousine and chauffeur-driven rides for their customers traveling within California by referring or "farming out" that business to California-based companies, and earn a fee or commission on those rides taking place in California.

28.     Plaintiff is informed and believes that approximately 17,300 limousine and chauffeur-driven ground transportation companies exist in the United States, and only

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

1   approximately 2,700 or 16 percent of those companies are based in California, while

2   approximately 14,600 or 84 percent are based outside California.[1] Plaintiff is further informed

3   and believes that the overwhelming majority of these companies that have their principal place of

4   business in states other than California are also incorporated in states other than California.

5         29.    Plaintiff is further informed and believes that approximately 19 percent of

6   limousine and chauffeur-driven ground transportation companies farm out business to their

7   affiliates.[2] Thus, each of the proposed classes is reasonably estimated to include more than 2,700

8   companies that are not citizens of California, approximately half of the members of each of the

9   putative classes.

10         30.    All the proposed class members, whether citizens of California or another state,

11   compete in the same market as Uber for pre-arranged ground transportation services for non-

12   shared rides within California, and for the revenue from those rides.

13         31.    A prior class action has been filed in the past three years asserting similar factual

14   allegations against Uber.

15         32.    This Court has personal jurisdiction over Defendants because they reside in and

16   have their principal place of business in the State of California, and/or substantial parts of the

17   unlawful conduct at issue took place in and caused harm in the State of California.

18         33.    Venue is proper in this District because the Defendants have their principal places

19   of business in this District and are subject to personal jurisdiction in this District, and the

20   unlawful conduct at issue was agreed upon and occurred in this District.

21   **<u>FACTUAL ALLEGATIONS</u>**

22   **A.**     **In California, A Prearranged Transportation Company That Relies On Employee**
        **Drivers Must Obtain a License from the CPUC**

23

24         34.    When single passengers or small groups of passengers hire non-shared rides

25   between locations of their choice, they have traditionally had two types of services to choose

26   _____

27   [1] D&B Hoovers reports for "Limousine Service" companies categorized under the NAICS Code
"485320 Limousine Service."

28   [2] *LCT Magazine (Limousine, Charter & Tour)*, 2015-2016 Fact Book & Industry Guide (June
2015).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

from: (1) taxicabs ("taxis" or "cabs"), also known as public hire, hailed, or street taxis, and (2) livery services (including various types of sedans, limousines, SUVs and vans) that are licensed to provide pre-arranged transportation services.

35.     In California, taxis are licensed and regulated by cities and counties and may be hailed from the street.

36.     Except for taxis, public transit, and other service categories not at issue here, "every [other] person engaged in the transportation of persons by motor vehicle for compensation" in California is defined as a "charter-party carrier of passengers" and must obtain a license from the California Public Utilities Commission ("CPUC").  Cal. Pub. Util. Code § 5360.  The most common form of license is a TCP license.

37.     TCP license holders may not be hailed from the street and must instead provide rides that are prearranged.

38.     As a requirement of the license, TCP license holders must, among other things:

(a)     Obtain specialized insurance coverage;

(b)     Comply with vehicle inspection regulations;

(c)     Enroll in a controlled substance and alcohol testing program;

(d)     Procure airport licensing and permitting;

(e)     Obtain a DMV weight certificate; and

(f)     Complete and submit forms for the DMV's employer pull notice program.

**B.     Plaintiff Operates A Prearranged Transportation Company That Relies On Employee Drivers**

39.     Plaintiff Diva Limousine, Ltd. is a licensed provider of limousine and chauffeur-driven ground transportation services in California. Diva began as a single limousine service four decades ago and later took its name after chauffeuring the actress Elizabeth Taylor. Prior to Uber entering the market, Diva was one of the nation's largest privately-held chauffeured ground transportation companies.

40.     Before commencing operations, Plaintiff obtained and paid for a TCP permit from the CPUC authorizing it to provide pre-booked transportation to passengers.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

41. Since Uber began operating in Los Angeles, Plaintiff has lost corporate account business as well as retail client business. It has seen a drop in airport-related business, a reduction in corporate account usage, complaints concerning pricing from customers asking Plaintiff to charge less money in light of Uber's lower prices, and at the demands of prospective customers has been required to negotiate rates for services based upon and with reference to the prices being charged by Uber.

42. To slow the loss of market share, Plaintiff has been compelled not to raise its rates in line with its expenses, knowing that if it did, it would lose additional customers to Uber.

43. Plaintiff has also seen a decrease in the number of rides referred to it by Plaintiff's out-of-state affiliates.

44. It is a longstanding practice in the limousine and chauffeur-driven ground transportation industry for companies to form interstate affiliate relationships that allow their clients to book rides outside a company's service area, including in other states. Such affiliate relationships are commonplace. Typically, a referring affiliate receives a fee or commission ranging from 10 percent to 30 percent of the revenue from these rides.

45. For example, Plaintiff has been affiliated with more than 100 limousine companies outside of California including in Arizona, Colorado, Connecticut, Florida, Georgia, Hawaii, Iowa, Illinois, Indiana, Louisiana, Massachusetts, Maryland, Minnesota, Missouri, North Carolina, New Jersey, Nevada, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, Tennessee, Texas, Virginia, Washington, Wisconsin, and Wyoming. Within the four years preceding the filing of this Complaint, scores of non-California limousine companies farmed out business to Plaintiff, so that their out-of-state clients could use Plaintiff's services for rides in the Los Angeles area. Plaintiff's out-of-state affiliates receive a share of the revenue for each ride they refer to Plaintiff. As a result of Uber's unlawful practices, these affiliates have lost revenue from the rides they farmed out to Plaintiff and other limousine and chauffeur-driven ground transportation companies in California, and lost revenue from rides they could not place because of the price differential caused by Uber's unlawful practices. This harm occurred in California, as

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

these affiliates lost revenue and business in California as a result of Uber's wrongful conduct within the state.

46.     Limousine and chauffeur-driven ground transportation companies increasingly report losing business to Uber.  A recent survey shows that 55 percent of these companies lost business to Uber and other TNCs in 2017, but that number shot up to 72 percent in 2018.[3] Diva is among the companies that has lost business, revenue, and otherwise suffered injury to its business as a result of Uber's conduct of its business.

## CLASS ACTION ALLEGATIONS

**A.     UCL Class Allegations**

47.     With respect to the UCL claim, Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(a) and (b)(2) on behalf of itself and the following UCL Class:

> All business entities that earned revenue through the provision of pre-arranged limousine or chauffeur-driven ground transportation services for non-shared rides in California from September 10, 2014 to the present (the "UCL Class Period").

48.     For clarity, the UCL Class includes:  (1) business entities that provided limousine and chauffeur-driven ground transportation services within California; and (2) business entities outside of California that earned revenue from the provision of limousine or chauffeur-driven ground transportation services in California through affiliate relationships.

49.     Excluded from (and/or not a part of) the UCL Class are: (1) business entities that provided ground transportation services for non-shared rides in California and did not classify their drivers as employees; (2) passenger stage corporations (PSCs); (3) natural persons who earned income as drivers providing ground transportation services; (4) taxi medallion holders and business entities that earn revenue from the provision of taxi rides; (5) any Judge or Magistrate presiding over this action and members of their families; (6) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest, and their current and former employees, officers, and

---

[3] *LCT Magazine (Limousine, Charter & Tour)*, 2017-2018 Fact Book & Industry Guide (June 2018).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

directors; (7) counsel for Plaintiff and Defendants; (8) persons who have previously had claims similar to those alleged herein finally adjudicated or who have released their claims against Defendants; and (9) the legal representatives, successors, or assigns of any such excluded persons.

50.     The UCL Class seeks certification for injunctive relief under California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*

51.     **Numerosity**: The exact number of members of the UCL Class is unknown to Plaintiff at this time, but clearly exceeds 100, rendering individual joinder impracticable. Plaintiff estimates that the UCL Class includes several thousand members.

52.     **Commonality**: There are many questions of law and fact common to the claims of Plaintiff and the UCL Class including:

    a.    Whether Uber unlawfully classifies and pays its California drivers as non-employee independent contractors under California law;

    b.    Whether Uber unlawfully and/or unfairly gains a cost advantage over other ground transportation services providers;

    c.    Whether Uber violated the UCL by engaging in unlawful conduct;

    d.    Whether Uber violated the UCL by engaging in unfair conduct;

    e.    Whether Uber's conduct caused injury to the business or property of Plaintiff and members of the Class;

    f.    The appropriate form and scope of injunctive relief necessary to prohibit further and future injury to members of the Class from Uber's unlawful conduct;

    g.    The nature, form, and amount of the equitable relief necessary to restore the inequities now existing in Uber's favor and at the Class' detriment caused by Uber's anticompetitive, unlawful, and unfair conduct and business practices.

53.     **Typicality**: Plaintiff's claims are typical of the claims of all the other UCL Class members.  Plaintiff provided pre-arranged limousine or chauffeur-driven ground transportation services for non-shared rides in California during the Class Period.  Plaintiff and the UCL Class sustained substantially similar injuries as a result of Defendants' uniform wrongful conduct.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

54.     **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the other UCL Class members. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and its counsel are committed to vigorously prosecuting this action on behalf of the UCL Class and have the financial resources to do so. Neither Plaintiff nor their counsel has any interest adverse to those of the other UCL Class members.

55.     **Policies Generally Applicable to the UCL Class**: Defendants have acted and failed to act on grounds generally applicable to Plaintiff and the other UCL Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the UCL Class.

56.     Plaintiff reserves the right to revise the definition of the UCL Class based on further investigation, including facts learned in discovery.

**B.     UPA Class Allegations**

57.     With respect to the UPA claim, Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of itself and the following UPA Class:

> All business entities that earned revenue through the provision of pre-arranged limousine or chauffeur-driven ground transportation services for non-shared rides in California from September 10, 2015 to the present (the "UPA Class Period").

58.     For clarity, the UPA Class includes:  (1) business entities that provided limousine and chauffeur-driven ground transportation services within California; and (2) business entities outside of California that earned revenue from the provision of limousine or chauffeur-driven ground transportation services in California through affiliate relationships.

59.     Excluded from (and/or not a part of) the UPA Class are: (1) business entities that provided ground transportation services for non-shared rides in California and did not classify their drivers as employees; (2) passenger stage corporations (PSCs); (3) natural persons who earned income as drivers providing ground transportation services; (4) taxi medallion holders and business entities that earn revenue from the provision of taxi rides (5) any Judge or Magistrate presiding over this action and members of their families; (6) Defendants, Defendants'

subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest, and their current and former employees, officers, and directors; (7) counsel for Plaintiff and Defendants; (8) all persons who have previously had claims similar to those alleged herein finally adjudicated or who have released their claims against Defendants; and (9) the legal representatives, successors, or assigns of any such excluded persons.

60.     The UPA Class seeks certification for damages and ancillary injunctive relief pursuant to the California Unfair Practices Act, Cal. Bus. & Prof. Code §§ 17000 *et seq*.

61.     **Numerosity**: The exact number of members in the UPA Class is unknown to Plaintiff at this time, but clearly exceeds 100, rendering individual joinder impracticable. Plaintiff estimates that the UPA Class includes several thousand members.

62.     **Commonality**: There are many questions of law and fact common to the claims of Plaintiff and the UPA Class including:

      a.    Whether Uber has priced its services in California below their cost;

      b.    Whether Uber's below-cost pricing has allowed it to take market share from competitors;

      c.    Whether Uber's below-cost pricing has reduced the profit margins of its competitors;

      d.    The amount of market share Uber has gained from pricing below cost;

      e.    Whether Uber's below-cost pricing caused injury to the business or property of Plaintiff and members of the UPA Class;

      f.    Whether Uber's below-cost pricing was done with the purpose of injuring competition;

      g.    The scope, nature, and amount of damages to the UPA Class;

      h.    The appropriate form and scope of injunctive relief necessary to prohibit further and future injury to members of the UPA Class from Uber's below-cost pricing; and

      i.    The nature, form, and amount of the equitable relief necessary to restore the inequities now existing in Uber's favor and at the UPA Class' detriment caused by Uber's below-cost pricing.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

63.     **Typicality**: Plaintiff's claims are typical of the claims of all the other UPA Class members.  Plaintiff provided pre-arranged limousine or chauffeur-driven ground transportation services for non-shared rides in California during the Class Period.  Plaintiff and the UPA Class members sustained substantially similar injuries as a result of Defendants' uniform wrongful conduct.

64.     **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the other UPA Class members. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and its counsel are committed to vigorously prosecuting this action on behalf of the UPA Class members and have the financial resources to do so. Neither Plaintiff nor their counsel has any interest adverse to those of the other UPA Class members.

65.     **Superiority**: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The UPA Class seeks damages based on the overall market share obtained by Uber from its unlawful pricing, which may be reasonably calculated on a class-wide basis including lost profits.

66.     **Predominance:**  Common issues, as detailed above, predominate over individual issues applicable only to any individual member of the UPA Class.

67.     Plaintiff reserves the right to revise the definition of the UPA Class based on further investigation, including facts learned in discovery.

## CAUSES OF ACTION

### COUNT I:

### Violations of the California Unfair Competition Law

### (Plaintiff and the UCL Class)

68.     Plaintiff realleges each allegation contained in paragraphs 1 through 10 (Introduction), 16 through 23 and 25 (Parties), 26 through 56 (Jurisdiction and Venue, UCL Class Allegations), inclusive, above as if fully set forth herein.

**A.**    **Plaintiff Operates A Pre-Arranged Transportation Business That Relies Upon Employee Drivers**

69.    Because drivers are integral to Plaintiff's business, they are Plaintiff's employees. California law requires Plaintiff to ensure that its drivers earn a minimum wage. The California minimum wage is currently $11.00 per hour throughout the state and higher in most major cities. For example, the current minimum wage in Los Angeles for a business with 26 or more employees is $14.25 per hour. The current minimum wage in Oakland is $13.80 per hour, in San Jose is $15.00 per hour, and in San Francisco is $15.00 per hour. An employer is not allowed to require that an employee pay for business expenses out of these wages.[4]

70.    California law requires Plaintiff to pay a premium wage of 1.5 times a driver's regular rate of pay for all hours worked in excess of eight hours up to and including 12 hours in any workday, and for the first eight hours worked on the seventh consecutive day of work in a workweek. California law further requires that an employer pay double the employee's regular rate of pay for all hours worked in excess of 12 hours in any workday and for all hours worked in excess of eight on the seventh consecutive day of work in a workweek.[5]

71.    In calculating the hours for which it must pay drivers, Plaintiff is required to include short breaks during the day when the drivers are not working.[6]

72.    Plaintiff also bears substantial costs to protect its employees in the event they become unemployed or suffer a work-related disability. Plaintiff pays up to $427 per driver per year in unemployment insurance. Plaintiff must also pay workers' compensation insurance premiums.[7]

73.    Workers' compensation premiums are high in the for-hire transportation industry. For example, Plaintiff currently pays premiums of 15.20 cents for every dollar of wages paid to a driver.

---

[4] Cal. Labor Code § 2802.
[5] Cal Labor Code § 510.
[6] Cal. Code Regs., tit. 8 § 11090, subd. 12.
[7] Cal Labor Code § 3700 *et seq.*

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

74.     Plaintiff also helps provide employees with a safety net in retirement by paying a 6.2% social security tax (on the first $132,900 of wages per year) and a 1.45% Medicare tax.

**B.      Uber Operates A Prearranged Transportation Company While Avoiding Numerous Costs Through Violations of Employment Laws.**

75.     In 2009, Travis Kalanick and Garrett Camp launched UberCab in San Francisco, California.

76.     UberCab's investor deck marketed the company as a "fast & efficient on-demand car service." UberCab promised to use the "[l]atest consumer web & device technology" to "automate dispatch to reduce wait-time" and suggested that it could become "the ubiquitous 'premium' cab service."

77.     UberCab began operating its "'premium' cab service" without seeking a license, permit, or regulatory approval to operate a taxi service from the San Francisco Municipal Transportation Agency.

78.     UberCab also began operating without obtaining a TCP permit to operate a pre-booked livery service.

79.     On October 19 and 20, 2010, UberCab received cease and desist letters from the San Francisco Municipal Transportation Authority and the CPUC. In response, UberCab changed its name to Uber, but continued to operate in the same manner.

80.     Uber riders use a smartphone app to request service at the time of need and are notified of the wait time for a vehicle and their expected arrival time.

81.     Around July 2012, Uber launched "UberX," which offered transportation in less expensive, non-luxury vehicles driven by drivers without commercial licenses. Uber offered UberX as a lower cost alternative to its original service, which it subsequently renamed UberBLACK. At first, rates for UberX were similar to those of taxis and were 35% cheaper than UberBLACK, but Uber quickly lowered them.

82.     Around July 2012, Uber also launched "UberSUV" as a premium service for up to six passengers. And in May 2014, Uber launched "UberXL" as a "Low-Cost SUV Option."

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

1   83.     On November 13, 2012, the Consumer Protection and Safety Division of the

2   CPUC issued a citation alleging that Uber was violating sections of the Public Utilities Code

3   related to charter-party carriers.

4   84.     In January 2013, Uber settled with the CPUC and agreed that Uber would engage

5   in TCP operations that complied with a number of CPUC requirements. The CPUC later found

6   that, instead of abiding by all of the CPUC requirements, Uber evaded them by "licensing"

7   Uber's TCP operations and the Uber smartphone app to the wholly-owned entities that are listed

8   as Defendants in this complaint.

9   85.     In 2013, the CPUC created a new subcategory of charter-party carrier license for a

10   Transportation Network Company ("TNC"). A TNC is a type of transportation company that

11   dispatches its vehicles using a smartphone or other online application. Specifically, a TNC is

12   defined as any entity "that provides prearranged transportation services for compensation using

13   an online-enabled application or platform to connect passengers with drivers using a personal

14   vehicle." Pub. Util. Code § 5431(c).

15   86.     In 2014, Uber's wholly-owned subsidiary, Raiser-CA, LLC applied for and

16   obtained a TNC license from the CPUC to operate as a charter-party carrier.

17   87.     In 2017, Uber's wholly-owned subsidiary, UATC, LLC, obtained a TCP permit

18   from the CPUC to operate as a charter-party carrier.

19   88.     In May of 2018, the CPUC determined that Uber Technologies Inc. improperly

20   failed to register as both a TNC and a TCP and must register as a transportation company going

21   forward. Uber Technologies Inc. now has an active TCP permit and a pending TNC permit.

22   89.     The CPUC has never established the rates charged by Uber or other TNCs or

23   TCPs, and there are no regulations under which to do so.

24   **C.    Uber Misclassifies Its Drivers In Violation Of California State Laws.**

25   90.     Uber willfully misclassifies its California drivers as independent contractors, in

26   violation of California Labor Code § 226.8(a), when California law requires them to be paid as

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

1  employees. Uber fails to pay or provide benefits to its California drivers as employees, and

2  operate its business, as required by California labor, insurance, and other law.

3      91.      California applies an "ABC" test that presumptively treats all workers as

4  employees and will recognize them as independent contractors only if the employer carries its

5  burden of proving that *all* of the following factors are present:

6            A. The worker is "free from the control and direction of the hirer";

7            B. The worker "performs work that is outside the usual course of the hiring

8            entity's business"; and

9            C. The worker "is customarily engaged in an independently established trade,

10            occupation, or business" and "takes the usual steps to establish and promote his or

11            her independent business" separately from working for an employer.

12      92.      Uber drivers are employees under the ABC test.

13      93.      In the common lexicon, "getting an Uber" refers to hailing a ride.

14      94.      The CPUC has issued a rulemaking, which found that Uber Technologies Inc. is a

15  transportation company, both as a transportation network company (TNC) and charter-party

16  carrier (TCP).

17      95.      Uber advertisements have asserted that "Uber" is in the business of "moving

18  people" and provides the "safest rides on the road."

 

19

20

21

22

23

24

25

26      96.      Uber's website has encouraged consumers to "Start riding with Uber" because

27  Uber is "the best way to get wherever you're going" and provides "always the ride you want."

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

1

2

3

4

5

6

7



Always the ride you want
The best way to get wherever you're going

8      97.      Uber has advertised itself to businesses as "a better way to get there," noting that,

9   it offers, *inter alia*, "[a] ride to the airport" for business travel and "a car for [business] clients" to

10  ride in.

11

12  

13

14

15     98.      Uber requires that all drivers operating under its TNC license display Uber's trade

16  dress in two locations on their vehicles whenever signed onto the Uber app.

17     99.      This ensures that the work of Uber drivers is performed in service of Uber's brand.

18     100.     In short, since its inception as a "premium' cab service," Uber has been in the

19  business of selling rides.

20     101.     The drivers who provide Uber's rides operate in the usual course of Uber's

21  business.

22     102.     It is clearly *not* the case that the work done by Uber drivers has "no tangible

23  connection to [Uber's] business."

24     103.     Rather, Uber's drivers are integral to its business.

25     104.     Uber's executives have stated in a message to drivers, "simply put, Uber wouldn't

26  exist without you."

27     105.     Uber's drivers are also not free from Uber's control and have generally not taken

28  steps to establish a business independent of working for Uber.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

106.     In order to deliver a uniform brand, Uber dictates terms of its transportation service with a specificity that does not allow drivers the sort of discretion consistent with an independent business. Uber controls the precise manner in which the driver delivers *Uber's* service. Uber unilaterally decides the price that Uber charges for the driver's services, collects all money from riders, sets the compensation earned by the drivers, decides which rides are offered to drivers, and unilaterally chooses how to resolve customer complaints.

107.     Uber denies drivers information about the destination of the rides they will be performing until after the driver has accepted the ride and penalizes drivers who cancel rides after accepting them. Uber also prohibits drivers from soliciting riders for business outside of the Uber app. Drivers are therefore unable to make any entrepreneurial choice about which rides to perform and are unable to develop business goodwill by working for Uber, other than goodwill for Uber.

108.     The significant majority of Uber drivers invest minimal or no capital in, and take no steps to establish, an independent business. Rather, for many drivers, all that is required to start a "business" with Uber is to have a driver's license and pass a background check.

109.     The economics of driving for Uber confirm that Uber drivers bring little investment or skill to the job. As explained more fully below, a majority of full-time Uber drivers earn net pay that is well below the equivalent of minimum wage. Independent businesses that truly deploy investment capital and managerial skill do not typically produce average earnings below minimum wage.

110.     Uber therefore violates California law by failing to provide its drivers with the minimum protections owed to employees.

**D.      Uber's Unlawful Conduct Gives It A Substantial Competitive Advantage.**

111.     The California Supreme Court has emphasized the unfair competitive impact of businesses violating employment protections. *See Dynamex Operations W., Inc. v. Superior Court*, 4 Cal. 5th 903, 913 (2018), *reh'g denied* (June 20, 2018) (emphasizing that the definition of "employee" should be interpreted broadly to prevent "the unfair competitive advantage the

1   business may obtain over competitors that properly classify similar workers as employees and

2   that thereby assume the fiscal and other responsibilities and burdens that an employer owes to its

3   employees").

4    112. Uber saves a massive amount of money by evading the many responsibilities that

5   the law imposes on employers.

6    113. In California, State Industrial Welfare Commission Order 9-2001 and Labor Code

7   § 510, impose:

8   -  a minimum wage (currently $12.00 per hour for large employers throughout the state,

9    but $13.00 per hour or more in most large cities);

10  -  overtime of one and one-half times the regular hourly rate for hours worked in excess

11   of eight hours per day or 40 hours per week or the first eight hours of the seventh

12   consecutive workday of the workweek; and

13  -  payment of double the regular hourly rate for hours worked in excess of twelve hours

14   per workday or eight hours on the seventh consecutive workday of the workweek.[8]

15   114. In addition to circumventing minimum wage and overtime laws, Uber also avoids

16  numerous other costs associated with properly classifying its drivers as employees. First, Uber

17  fails to pay drivers for short breaks during their work day, as is required for employees.[9] Second,

18  Uber shirks significant tax obligations, including the 6.2% employer social security tax, the

19  1.45% employer Medicare tax, and unemployment insurance contributions. These expenses cost

20  thousands of dollars per year per driver. Third, Uber dodges significant worker's compensation

21  insurance costs.[10] Finally, pursuant to the Affordable Care Act, because Uber has 50 or more full-

22  time equivalent employees, it is required to provide health coverage to all full-time employees.

23  According to Kaiser, the average annual cost of employer coverage for an individual employee

24  was $6,690 in the 2017. Uber avoids paying these costs for its full-time drivers.

25   115. The economic effect of Uber evading these obligations is substantial.

---

[8] Minimum wage and overtime violations are unlawful and actionable under Cal. Labor Code § 1194.
[9] Cal. Code Regs., tit. 8 § 11090, subd. 12.
[10] Cal. Labor Code § 3700 *et seq.*

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

116.     A recent study estimated that the net pay earned by an *average* Uber driver, after deducting the expenses and other benefits Uber would have to pay if it properly classified drivers, is the equivalent of $9.21 an hour, which is already significantly below the statewide minimum wage in California and is far below the minimum in the urban localities in which most Uber drivers operate.[11]

117.     This study estimated the cost of workers' compensation insurance based on a surcharge collected by the Black Car Fund in New York City, which is significantly lower than the premiums charged by insurers in California. Many livery companies in California pay 15 to 25 cents of workers' compensation premiums for every dollar they pay to drivers.

118.     When adjusted for the substantial cost of workers' compensation insurance in California, Uber avoids an average of $9.07 an hour in business expenses and employee benefits that it would have to pay if it properly classified drivers as employees. As a result, Uber pays costs for the average driver that are equivalent to what an employer would bear if they (illegally) paid their W-2 employees $7.48 per hour.

119.     Due to high variation in pay, many drivers earn far less. Some earn the equivalent of $5 an hour. Some earn $3 an hour. Some even lose money. Thus, Uber is likely saving $5 or more for every hour a driver works.

120.     Uber recently stated that it had 148,000 active drivers in California at the end of 2017. Based on these numbers, Uber's violation of California law causes it to avoid roughly $250 million each year in compensation and benefits payments to just full-time, California drivers. Uber's total cost savings from misclassification in California may exceed $500 million each year. As a result of its lower cost base, Uber's misclassification of California drivers and resulting unfair competition for prearranged rides is a substantial factor in causing the harm to Plaintiff and the UCL Class alleged hereinabove.

121.     These avoided costs are material to Uber's business. Financial reports obtained by The Wall Street Journal indicate that Uber pays over 75 percent of gross bookings to drivers. And

---

[11] Lawrence Mishel, Uber and the labor market: Uber drivers' compensation, wages, and the scale of Uber and the gig economy, *available at* https://www.epi.org/files/pdf/145552.pdf.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

1    Uber's payments to drivers are over 7.5 times its gross profits. Accordingly, even a small

2    percentage reduction in Uber's payments to drivers makes a significant impact on Uber's bottom

3    line. For example, a 5% reduction in payments to drivers would result in a 37.5% increase in

4    gross profits to Uber.

5         122.    Uber is committing acts of unfair competition within the meaning of Section

6    17200 of the UCL by engaging in unlawful and unfair conduct.

7         123.    Uber has engaged in unlawful and unfair conduct within the meaning of the UCL

8    by, *inter alia*, systematically misclassifying its California drivers as "independent contractors"

9    and failing to pay them as employees, in violation of the California Labor Code, California

10   Unemployment Insurance Code, and California Insurance Code in order to reduce the company's

11   labor expenses and prices, which in turn harms competition.

12        124.    Violations of California law constitute unlawful and unfair business practices for

13   purposes of the UCL. *See Dynamex*, 4 Cal. 5th at 913 (stating that one reason to interpret

14   "employee" broadly is to prevent "the unfair competitive advantage the business may obtain over

15   competitors that properly classify similar workers as employees and that thereby assume the fiscal

16   and other responsibilities and burdens that an employer owes to its employees"); *id.* at 952

17   (noting that Wage Orders "are also clearly intended for the benefit of those law-abiding

18   businesses that comply with the obligations imposed by the wage orders, ensuring that such

19   responsible companies are not hurt by unfair competition from competitor businesses that utilize

20   substandard employment practices").

21        125.    This misclassification allows Uber to lower prices, which in turn has taken and

22   threatens to continue to take market share from Uber's competitors, including Plaintiff and the

23   UCL Class.

24        126.    Uber's unlawful and unfair conduct has harmed competition in the market for pre-

25   arranged limousine or chauffeur-driven ground transportation services for non-shared rides in

26   California. Such conduct threatens continuing and irreparable harm to competition if not

27   restrained. Uber's unlawful and unfair conduct also violates the policy or spirit of the antitrust

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

laws and threatens an incipient violation of antitrust law, including but not limited to

monopolization and/or attempted monopolization under Section 2 of the Sherman Antitrust Act.

127.     Plaintiff and the UCL Class have suffered injury and lost money and property as a direct and proximate result of Uber's unlawful and unfair business activities. Plaintiff and the UCL Class would not have suffered harm from unlawful and unfair practices had Uber appropriately classified and paid its California drivers as employees. Plaintiff and the UCL Class have suffered and continue to face the threat of, *inter alia*, loss of customers, loss of profits, and loss of goodwill, resulting from Uber's illegal cost advantage.

**COUNT II:**

**Violations of the California Unfair Practices Act**

**(Plaintiff and the UPA Class)**

128.     Plaintiff realleges each allegation contained in paragraphs 1 (Introduction), 11 through 22 and 24 through 25 (Introduction and Parties), 26 through 33 (Jurisdiction and Venue), 39 through 46 (Plaintiff's Business), 57 through 67 (UPA Class Allegations), inclusive, above as if fully set forth herein.

129.     Uber has priced its rides at a level that is far below the total average costs attributable to those rides with the purpose of injuring competition.

130.     Assessing Uber's pricing of rides is relatively straightforward, because the company essentially sells only one type of product: rides. Uber's financial statements report two kinds of revenue: "gross bookings," which come from rides, and "other revenue."[12] For example, the quarterly gross-revenue figure that preceded the filing of the complaint was $11.3 billion dollars. The contemporaneous other-revenue figure was only $47 million. That means that rides accounted for about 99.5% of Uber's revenue that quarter.

---

[12] *See* The Wall Street Journal recently published some of Uber's financial statements. Bensinger et al., Uber's Financials: An Inside Look, The Wall Street Journal (May 24, 2018).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

131.     Uber's financial data show that Uber has consistently lost massive amounts of money. That is, the revenue Uber obtains from its "gross bookings" is far below the costs Uber incurs in producing those bookings.

132.     Predatory pricing strategies have been a feature, not a bug, of Uber's business model. Plaintiff is informed and believes and thereon alleges that certain individuals, including Dara Khosrowshahi, Travis Kalanick, Garrett Camp, John Thain, Ursula Burns, Wan Ling Martello, Yasir Al Rumayyan, Matt Cohler, David Trujillo, Ryan Graves, Arianna Huffington, and Ronald Sugar, are or were officers or directors of Uber and participated in meetings and approved of Uber's long-term financial plans, business model, and pricing strategies that intentionally incurred sustained financial losses through below-cost pricing.

133.     Upon information and belief, and as explained by one industry expert:

> [I]n the year ending September 2015, Uber had GAAP losses of $2 billion on revenue of $1.4 billion, a negative 143% profit margin. The published reports of full year 2016 results indicated EBITDAR contribution of negative $2.8 billion on a $5.5 billion revenue base, meaning 2016 GAAP losses would easily exceed $3 billion. Thus, Uber's . . . operations in 2015 and 2016 depended on over $5 billion in subsidies, funded out of the $13 billion in cash its investors have provided. In the year ending in September 2015, Uber was only recovering 41% of its costs. Uber's growth was driven by its ability to capture market share from competitors who had to cover 100% of their costs from passenger fares.

Hubert Horan, *Will The Growth Of Uber Increase Economic Welfare?*, 44 Transp. L.J., 33, 44 (2017) ("*Growth of Uber*").[13]

134.     Uber's financials for 2017 showed a GAAP operating loss of $4.5 billion, and an operating margin of negative 61%.

135.     Because Uber loses massive amounts of money overall and because 99.5% of its revenue comes from one type of product, it is clear that this product is being priced at below its overall cost.

---

[13] *Available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2933177.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

136.     California is known as a state in which the costs of doing business are unusually high, especially fuel costs, a substantial input cost for most ground transportation. It is therefore reasonable to infer that Uber's operations in California are even further below cost than they are nationwide.

137.     These numbers and an analysis of the costs of rides demonstrates that Uber's business model is in fact fundamentally inefficient. Detailed cost data of traditional operators show that 58 cents of every gross passenger dollar (fares plus tips) went to driver take home pay and benefits, 9 cents went to fuel and direct fees, and 18 cents went to vehicle costs. Thus, 85 cents went to driver and vehicle expenses and the remaining 15 cents covered corporate overhead.

138.     Uber's model is structurally inefficient on every metric.

139.     Uber's overhead is substantially higher than that of traditional transportation providers. Upon information and belief, and as explained by one industry expert:

> Uber's costs are much, much higher; even though they provide less than half the service of traditional companies. The P&L data clearly show[] these charges come nowhere close to covering Uber's actual corporate expenses. . . . Uber fees need to cover the cost of global marketing, software development programs, branding and lobbying programs, the huge market development costs of Uber's expansion into hundreds of new cities and must also fund a return on the $13 billion its owners have invested.

Hubert Horan, *Can Uber Ever Deliver? Part Two: Understanding Uber's Uncompetitive Costs*.[14]

140.     The vehicle costs of Uber's transportation model are also substantially higher than those of traditional transportation providers. Upon information and belief, and as explained by one industry expert:

> It is inconceivable that hundreds of thousands of independent, poorly-financed Uber drivers could ever achieve lower vehicle ownership, financing, licensing and maintenance costs than professional fleet managers at traditional taxi/limo companies . . . Not only does shifting operating costs and capital risk from Uber's investors onto its drivers fail to eliminate them from the overall business model, but the shifting makes the costs and risks higher.

[14] https://www.nakedcapitalism.com/2016/11/can-uber-ever-deliver-part-one-understanding-ubers-bleak-operating-economics.html.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

1    *Growth of Uber*, 44 Transp. L.J., at 46.

2       141.    In order to lure drivers away from traditional transportation options, Uber was

3 forced (initially) to offer higher compensation.

4       142.    However, Uber responded to the unsustainable cost of its vehicle fleet and labor

5 force by shifting vehicle expenses onto its drivers and then deceiving drivers about their net

6 compensation:

7
> Uber . . . deliberately misrepresented gross receipts as net take-
8    home pay. [It] also failed to disclose the substantial financial risk its
> drivers faced since Uber could cut their pay or terminate them at
9    will, even if they were locked into long-term vehicle financing
> obligations. Uber claimed "[our] driver partners are small business
10   entrepreneurs demonstrating across the country that being a driver
> is sustainable and profitable" and that ". . .the median income on
11   UberX is more than \$90,000/year/driver in New York and more
> than \$74,000/year/driver in San Francisco," even though Uber had
12   no drivers with earnings anything close to these levels. After these
> claims were readily debunked, Uber aggressively publicized the
13   higher Uber driver pay reported by supposedly "academic" research
> (which Uber co-authored and paid for) without explaining that the
14   study made no attempt to deduct vehicle costs and risks from gross
> Uber pay that would be required-to calculate actual net earnings
15   and to provide a legitimate comparison of take home pay rates. . . .

16
> In mid-2015, after hundreds of thousands of drivers were locked in
17   to vehicle financial obligations, Uber eliminated driver incentive
> programs and reduced the driver share of each passenger dollar by
18   one-third. This transfer from Uber drivers to Uber investors
> produced the 2016 margin improvement . . . , but also eliminated
19   much (if not all) of the economic incentive that got drivers to
> switch to Uber in the first place.
20

21 *Id.* at 47-49.

22       143.    In short, Uber has consistently lost money on Uber rides.

23       144.    The economics of Uber also demonstrate that, unlike some startups, Uber has no

24 hope of using economies of scale to create margin improvements and "grow into profitability"

25 through additional cost savings.

26       145.    Upon information and belief, and as explained by one industry expert:

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

> [U]rban car service operators have never demonstrated significant scale economies, and Uber has not found any source of major margin improvements other than driver compensation cuts. No one in the history of urban car services has ever observed economies that drove high levels of concentration in individual markets or allowed individual companies to rapidly expand into other cities, much less the economies needed to expand globally.

*Id.* at 51.

146.    Uber could not reasonably expect to grow into profitability through economies of scale. The only rational purpose for Uber subsidizing rides as it has done and continues to do is to drive enough competitors out of business to be able to raise prices down the road. Massive subsidies for uneconomic prices are only a prudent investment if one believes that future profits and equity valuations will cover the cost of those subsidies. And the only way an inefficient producer can cover the costs of such subsidies is by driving enough competitors out of business that normal market forces will not preclude higher prices in the future.

147.    The magnitude of investment in Uber at the same time the company was hemorrhaging money likewise confirms that investors believed Uber could eventually drive competitors out of business and extract higher prices in the long run:

> [T]he staggering $13 billion in cash its investors provided is consistent with the magnitude of funding required to subsidize the many years of predatory competition required to drive out more efficient incumbents. Uber's investors did not put $13 billion into the company because they thought they could vanquish those incumbents under "level playing field" market conditions; those billions were designed to replace "level playing field" competition with a hopeless battle between small scale incumbents with no access to capital struggling to cover their [bare] bone costs and a behemoth company funded by Silicon Valley billionaires willing to subsidize years of multi-billion dollar losses.

Hubert Horan, *Can Uber Ever Deliver? Part Four: Understanding That Unregulated Monopoly Was Always Uber's Central Objective*.[15]

---

[15] *Available at* https://www.nakedcapitalism.com/2016/12/can-uber-ever-deliver-part-four-understanding-that-unregulated-monopoly-was-always-ubers-central-objective.html.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

148.     Stated differently, the world's most sophisticated investors did not invest billions of dollars in a company with huge operating losses and minimal economies of scale because they expect it to someday eek out modest profits in a highly competitive market with low margins.

149.     As one analyst reported: "[People] wonder why Uber keeps raising so much money. . . . The answer is that Uber is using cash as a competitive weapon. When a competitor enters an Uber market, one investor in an Uber-competitor says, Uber immediately and radically cuts its prices. Uber then happily loses money on each ride, knowing that the new competitor, with inferior scale, will lose even more money on each ride. Uber bleeds the competitor until the competitor realizes that Uber will do whatever it takes to crush it. The competitor then often gives up and withdraws — and Uber raises its prices again." Henry Blodget, *Meanwhile, Here's the Chatter about That Huge Financing Uber is Doing*, Bus. Insider (Nov. 20, 2014).[16]

150.     Uber's unlawful competition has allowed it to gain substantial market share with astonishing speed in the market for pre-arranged ground transportation services for non-shared rides in California and caused Plaintiff and the UPA Class substantial losses.

151.     As Uber's pricing strategy illustrates, price is a significant factor in consumer decisions regarding pre-arranged ground transportation services. While other factors may influence consumer choice as well, it is clear that Uber would not have obtained the same market share had it not priced below costs.

152.     In less than a decade, Uber's pricing has allowed it to ascend from a single city "premium cab service" to dominating the market for pre-arranged ground transportation services.

153.     According to Certify, a travel-management firm which handles corporate travel transactions, Uber controlled 55 percent of the ground travel expenditures of business travelers in the second quarter of 2017.

154.     Uber's below-cost pricing has caused the market share held by traditional ground transportation providers to plummet and is a substantial cause of the harm to Plaintiff and the UPA Class.

---

[16] *Available at* https://www.businessinsider.com/uber-raising-money-2014-11.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

155.    Uber sold, and continues to sell, transportation services below cost and on a loss leader basis in violation of Cal. Bus. & Prof. Code §§ 17043, 17044.

156.    The CPUC has never established the rates charged by Uber or other TNCs or TCPs for similar types of pre-arranged rides, and there are no regulations under which to do so.

157.    While the CPUC has issued rulemaking finding some Uber entities to be TNCs, as alleged hereinabove, Uber has appealed and no final determination of the matter has yet been made.

158.    In *O'Connor v. Uber Technologies et al.*, Case No. 3:13-cv-03826-EMC (N.D. Cal.), Uber has contended that it is a technology company and not a transportation company, owns no vehicles, employs no drivers, and instead partners with alleged independent contractors who are "transportation providers." *Id.*, Dkt. 251 at 4:9-14.

159.    In *O'Connor* and other matters, Uber tacitly and/or actually contended that it does not provide services that would render it a public utility within the meaning of Section 3 of Article 12 of the California Constitution which provides: "Private corporations and persons that own, operate, control, or manage a line, plant, or system for the transportation of people or property, the transmission of telephone and telegraph messages, or the production, generation, transmission, or furnishing of heat, light, water, power, storage, or wharfage directly or indirectly to or for the public, and common carriers, are public utilities subject to control by the Legislature."

160.    For purposes of stating facts sufficient to state a claim upon which relief can be granted under the Unfair Practices Act, it is unnecessary to plead a legal conclusion as to whether Uber is or is not a transportation company or a public utility within the meaning of and for purposes of the California Department of Industrial Relations Wage Orders, the California Labor Code, and Section 3 of Article 12 of the California Constitution. Uber is not exempt from the Unfair Practices Act whether it is or is not a transportation company or a public utility. Nonetheless, Uber should be judicially estopped from both denying that it is a transportation company or a public utility and simultaneously asserting that it is either or both of these for purposes of invoking a defense.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

161.    Plaintiff is informed and believes and thereon alleges that the directors and officers of Uber at the time of the above-referenced violations included the following persons: Dara Khosrowshahi, Travis Kalanick, Garrett Camp, John Thain, Ursula Burns, Wan Ling Martello, Yasir Al Rumayyan, Matt Cohler, David Trujillo, Ryan Graves, Arianna Huffington, and Ronald Sugar (chair). Additionally, Dara Khosrowshahi is the current CEO of Uber; Travis Kalanick is a co-founder of Uber, and formerly served as Uber's CEO; Garrett Camp is a co-founder of Uber.

162.    Uber performed the above-mentioned acts for the purpose of destroying competition and injuring Plaintiff and the members of the UPA Class.

163.    As a direct result of the above-mentioned acts by Uber, Plaintiff and the members of the UPA Class have been deprived of the patronage of a large number of their actual and potential customers.  Uber's conduct has directly and proximately caused damages to Plaintiff and the members of the UPA Class in an amount to be proved at trial. Plaintiff and the UPA Class would not have suffered harm, had Uber not priced its rides in California below cost or on a loss-leader basis.

164.    Unless restrained, Uber will continue to contract with riders on a below-cost or loss leader basis.

## PRAYER FOR RELIEF

165.    Plaintiff, on behalf of itself, the UCL Class, and UPA Class, requests that the Court enter an order or judgment against Defendants including the following:

(a)    That Uber's conduct be adjudged and decreed to violate the law as alleged in the Complaint;

(b)    That Uber be enjoined and restrained from in any manner continuing, maintaining, or renewing its unlawful, unfair, and anticompetitive conduct or adopting or following any practice, plan, program, or device with a similar purpose or effect;

(c)    That Plaintiff and the UPA Class be awarded damages and treble damages under the UPA.

(d)    That Plaintiff, the UCL Class, and the UPA Class be awarded reasonable attorney's fees and costs, including expert costs, as allowable under law; and

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY

1        (e)        All other relief to which Plaintiff, the UCL Class, and the UPA Class may be

2    entitled at law or in equity including injunctive relief as the Court may deem just and proper.

3

4    Dated: February 21, 2019

5
                                      /s/ Aaron M. Sheanin
6                                     Michael A. Geibelson
                                      Aaron M. Sheanin
7                                     **ROBINS KAPLAN LLP**
                                      2440 W. El Camino Real, Suite 100
8                                     Mountain View, California 94040
                                      Telephone:  (650) 784-4040
9                                     Facsimile:  (650) 784-4041

10
                                      *Counsel for Plaintiff and the Proposed Classes*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

2

3       I hereby certify that on February 21, 2019, I electronically filed the foregoing document

4    entitled **FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE**

5    **CALIFORNIA UNFAIR COMPETITION LAW AND THE CALIFORNIA UNFAIR**

6    **PRACTICES ACT** with the Clerk of the Court for the United States District Court, Northern

7    District of California using the CM/ECF system and served a copy of same upon all counsel of

8    record via the Court's electronic filing system.

9
                                                    */s/ Aaron M. Sheanin*
10                                                   Aaron M. Sheanin

11

12    61519209.7

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
SILICON VALLEY