MORGAN, LEWIS & BOCKIUS LLP
Kent M. Roger, Bar No. 095987
kent.roger@morganlewis.com
Brian C. Rocca, Bar No. 221576
brian.rocca@morganlewis.com
Sujal J. Shah, Bar No. 215230
sujal.shah@morganlewis.com
Minna Lo Naranjo, Bar No. 259005
minna.naranjo@morganlewis.com
One Market, Spear Street Tower
San Francisco, CA  94105-1596
Tel: (415) 442-1000
Fax: (415) 442-1001

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DIVA LIMOUSINE, LTD., individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>UBER TECHNOLOGIES, INC; RASIER, LLC; RASIER-CA, LLC; UBER USA, LLC; and UATC, LLC,<br><br>Defendants. | Case No. 3:18-cv-05546-EMC<br><br>**DEFENDANTS' RESPONSE TO COURT REQUEST FOR SUPPLEMENTAL AUTHORITIES** |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Case No. 3:18-cv-05546-EMC

DEFENDANTS' RESPONSE TO COURT REQUEST FOR SUPPLEMENTAL AUTHORITIES

1     Following the hearing on Defendants' motion to dismiss, the Clerk issued Civil Minutes

2  reflecting the following Order of the Court:

3        The parties shall submit by June 7, 2019 any authority that indicates whether the
         California Public Utilities Commission has the authority to establish, adjust, or
4        otherwise regulate the rates of public utility corporations by reference to
         considerations about anticompetitive behavior (e.g. predatory pricing).
5

6  ECF No. 123.

7     In response to the Court's instruction, Defendants provide the following materials in the

8  accompanying Appendix ("App.") of exhibits:

| Ex. | TITLE / CITATION | APP. PINCITE |
|---|---|---|
| A | Cal. Code Regs., tit. 20, § 4.1 (Rule 4.1) Who May Complain, Rules of Practice and Procedure, Public Utilities Commission | App. 002 |
| B | Pub. Util. Code, § 451 (Just and Reasonable Charges, Service, and Rules) | App. 005 |
| C | Pub. Util. Code, § 701 (Power of Commission) | App. 007 |
| D | *Re Regulation of General Freight Transportation by Truck*, 35 CPUC 2d 307 (Cal. P.U.C. No. 90-02-021 dated Feb. 7, 1990), also available at 1990 WL 10702760 | App. 029, 035 |
| E | *Re PT&T Co.*, 2 CPUC 2d 434 (Cal. P.U.C. No. 90919 dated Oct. 10, 1979), also available at 1979 WL 50299 | App. 125 |
| F | *Re PT&T Co.*, 3 CPUC 2d 49 (Cal. P.U.C No. 91121 dated Dec. 18, 1979), also available at 1979 WL 50927 | App. 142 |
| G | *Industrial Communications Systems, Inc. v. Public Utilities Com.* 22 Cal. 3d 572 (1978) | App. 151 |
| H | *California Trucking Assn. v. Public Utilities Com.*, 19 Cal. 3d 240 (1977) | App. 156-157 |

Dated: June 7, 2019                    /s/ *Brian C. Rocca*
                                       Brian C. Rocca

                                       MORGAN, LEWIS & BOCKIUS LLP
                                       *Attorneys for Defendants*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Case No. 3:18-cv-05546-EMC
DEFENDANTS' RESPONSE TO COURT REQUEST FOR SUPPLEMENTAL AUTHORITIES

# Exhibit A

---

Barclays Official California Code of Regulations Currentness
  Title 20. Public Utilities and Energy
    Division 1. Public Utilities Commission
      Chapter 1. Rules of Practice and Procedure
        Article 4. Complaints (Refs & Annos)

20 CCR § 4.1

§ 4.1. (Rule 4.1) Who May Complain.

(a) A complaint may be filed by:

(1) any corporation or person, chamber of commerce, board of trade, labor organization, or any civic, commercial, mercantile, traffic, agricultural or manufacturing association or organization, or any body politic or municipal corporation, setting forth any act or thing done or omitted to be done by any public utility including any rule or charge heretofore established or fixed by or for any public utility, in violation, or claimed to be in violation, of any provision of law or of any order or rule of the Commission; or

(2) any local government, alleging that a holder of a state franchise to construct and operate video service pursuant to Public Utilities Code Section 5800 et seq. is in violation of Section 5890; or

(3) a public utility that offers competitive services, for a finding by the Commission that condemnation of a property for the purpose of competing with another entity in the offering of those competitive services would serve the public interest, pursuant to Public Utilities Code Section 625.

(b) No complaint shall be entertained by the Commission, except upon its own motion, as to the reasonableness of any rates or charges of any gas, electrical, water, or telephone corporation, unless it be signed by the mayor or the president or chairman of the board of trustees or a majority of the council, commission, or other legislative body of the city or city and county within which the alleged violation occurred, or by not less than 25 actual or prospective consumers or purchasers of such gas, electric, water, or telephone service.

Note: Authority cited: Section 1702, Public Utilities Code. Reference: Sections 625, 1702 and 5890(g), Public Utilities Code.

### HISTORY

1. New article 4 heading and renumbering of former section 9 to new section 4.1, including amendment of section heading, section and Note filed 9-13-2006; operative 9-13-2006 pursuant to Government Code section 11351(a) (Register 2006, No. 37).

2. Change without regulatory effect amending section and Note filed 6-11-2007 pursuant to section 100, title 1, California Code of Regulations (Register 2007, No. 24).

3. Amendment of subsection (a)(2), new subsection (a)(3) and amendment of Note filed 5-9-2011; operative 6-8-2011. Submitted to OAL for limited review pursuant to Government Code section 11351 and Public Utilities Code section 311(h) (Register 2011, No. 19).

This database is current through 5/17/19 Register 2019, No. 20

20 CCR § 4.1, 20 CA ADC § 4.1

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

# Exhibit B

West's Annotated California Codes
    Public Utilities Code (Refs & Annos)
        Division 1. Regulation of Public Utilities (Refs & Annos)
            Part 1. Public Utilities Act (Refs & Annos)
                Chapter 3. Rights and Obligations of Public Utilities
                    Article 1. Rates (Refs & Annos)

West's Ann.Cal.Pub.Util.Code § 451

§ 451. Just and reasonable charges, service, and rules

Currentness

All charges demanded or received by any public utility, or by any two or more public utilities, for any product or commodity furnished or to be furnished or any service rendered or to be rendered shall be just and reasonable. Every unjust or unreasonable charge demanded or received for such product or commodity or service is unlawful.

Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities, including telephone facilities, as defined in Section 54.1 of the Civil Code, as are necesary [1] to promote the safety, health, comfort, and convenience of its patrons, employees, and the public.

All rules made by public utility affecting or pertaining to its charges or service to the public shall be just and reasonable.

**Credits**
(Stats.1951, c. 764, p. 2036, § 451. Amended by Stats.1977, c. 700, p. 2257, § 2.)

Footnotes

1        So in enrolled bill.

West's Ann. Cal. Pub. Util. Code § 451, CA PUB UTIL § 451

Current with urgency legislation through Ch. 5 of 2019 Reg.Sess

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit C

West's Annotated California Codes
  Public Utilities Code (Refs & Annos)
    Division 1. Regulation of Public Utilities (Refs & Annos)
    Part 1. Public Utilities Act (Refs & Annos)
      Chapter 4. Regulation of Public Utilities (Refs & Annos)
        Article 1. Generally (Refs & Annos)

West's Ann.Cal.Pub.Util.Code § 701

§ 701. Power of commission

Currentness

The commission may supervise and regulate every public utility in the State and may do all things, whether specifically designated in this part or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction.

**Credits**
(Stats.1951, c. 764, p. 2048, § 701.)

West's Ann. Cal. Pub. Util. Code § 701, CA PUB UTIL § 701
Current with urgency legislation through Ch. 5 of 2019 Reg.Sess

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit D

35 CPUC 2d 307, 1990 WL 10702760 (Cal.P.U.C.)

Re Regulation of General Freight Transportation by Truck

Decision 90-02-021
I. 88-08-046

California Public Utilities Commission

February 7, 1990

3. This limited rehearing shall be held at such time and place and before such Commissioner or Administrative Law Judge as shall hereafter be determined.

(Appearances are listed in Appendix A.)

By the COMMISSION:

### *OPINION*

### *Summary*

This decision finds that a workably competitive market exists in the general freight trucking industry and adopts a flexible regulatory program which allows the efficiencies of the market place to determine transportation rates. In addition to the flexible rate program a number of safeguards are adopted to ensure the public is provided safe, reliable service at reasonable, nondiscriminatory rates. These safeguards include some limitations on common carrier rates, a monitoring program, a minimum level of service requirement for common carriers, a requirement that all rates and associated discounts be filed and available for public inspection, and a toll free telephone number for verifying carrier operating authority.

We believe this approach provides the benefits of competition with the control of regulation only where needed. Carriers will be able to openly compete for customers, but common carriers will not be allowed to discriminate without justification. Shippers will be free to have service tailored to their needs, and the trucking industry will be able to respond to market pressures rather than regulatory mechanisms. We fully expect the dynamics of California's economy to be matched by the dynamics of general freight trucking, with the public the main benefactor of a more responsive and efficient industry. Safety will not be compromised in this achievement. Commission initiated and legislatively mandated programs will be in place to provide the public with direct regulation and enforcement of safety standards.

Under our flexible program, common carriers will be allowed rate freedom within a zone of reasonableness. The upper end of the zone is a 10% annual cap on rate increases; the lower bound is a minimum level of variable costs. Common carrier rate changes outside the adopted zone and collectively set rates require a formal application with appropriate justification. Contract carriers are not restricted by the adopted zone in establishing rates. To minimize direct competition between common and contract carriers, contract carriers are only authorized to enter into special contracts which provide for a special relationship between the carrier and the shipper or for service not normally provided under common carrier tariffs. All rates And contracts must be filed with the commission. however, common carrier rate changes not requiring an application are effective on 10 days' notice. Special contracts are effective after 20 days' notice.

Subhauling will be subject to a division of revenues (between prime carrier and subhauler) to be determined after additional hearings.

App-009

## Background

The issues raised in this proceeding were first addressed in Case (C.) 5436, et al., and later in Decision (D.) 90663, dated August 14, 1979. That decision set up a transition period leading to decreased rate regulation. (At about the same time, D.89575 (October 31, 1978) resulted in the initial opening of entry into the general commodities common carriage field for thousands of California permitted carriers.) With the passage of five years, I.84-05-048 was opened. That investigation included 26 hearing days, testimony from many segments of the transportation community, and an en banc oral argument. Finally, D.86-04-045, dated April 16, 1986, adopted the present regulatory program as represented in General Order (G.O.) 147-A. Before its adoption in D.86-12-102, G.O. 147-A was the subject of extensive workshops conducted by the Commission's Transportation Division staff.

G.O. 147-A implemented a system of carrier-made rates, a rate window, rate exempt dedicated equipment contracts, and the imposition of a Truck Freight Cost Index (TFCI) that impacts rates for common and contract carriers in California. Additionally, the decision set up a new procedure for future justification of reduced rates and the review of rate reductions that were granted during the transition period.

It should be clear to the trucking industry that the progression of our attempts to meet the changing situation in California intrastate transportation has been developing over an extensive period. Our movement toward relaxed rate regulation has not been easy, but the issues have been repeatedly addressed and the parties have had ample opportunity to assemble their evidence and develop the record.

Aside from the fact that this proceeding is only part of a continuing progression of investigations, this is not a proceeding that contemplates total deregulation. The proposals which have been presented are premised on the Commission retaining jurisdiction over the carriers operating in the State. This would be consistent with our treatment of various aspects of specialized transportation such as fresh fruits and vegetables and tank truck operations, which were released from rate regulation only.

## Procedural History

On December 16, 1987 an order was issued setting en banc hearings to consider the State's regulation of the for-hire trucking industry. This included consideration of all sectors in the trucking industry, not just general freight. En banc hearings were held in San Francisco on March 10 and 11, 1988 and in Los Angeles on March 18, 1988. At those hearings panels of experts and a parade of witnesses, including the Commission's Division of Ratepayer Advocates (DRA), expressed concerns about the regulation of the for-hire trucking industry.

On August 24, 1988, Order Instituting Investigation (I.) 88-08-046 an investigation into the regulation of general freight transportation by truck was issued. I.88-08-046 identified the Commission's regulatory objectives and invited a thorough re-examination of the current scheme of regulation. Prehearing conferences which established procedural rules were held on September 14, 1988 and October 17, 1988.

Fifty-four days of evidentiary hearings commenced on November 7, 1988 and concluded on February 24, 1989. Additionally, two public comment hearings were held, one in Los Angeles on December 5, 1988 and the other in San Francisco on December 12, 1988. The 56 volumes of transcripts totaled 7,286 pages.

The appearance list includes 59 individuals and organizations, 18 of which submitted briefs. One hundred six witnesses offered testimony including 19 rebuttal witnesses. A total of 186 exhibits and 13 reference items were received.

In accordance with § 311, the proposed decision of ALJ Ferraro was mailed on June 6, 1989. Comments were received from 16 parties. These have been reviewed and carefully considered by the Commission. Many changes induced by the comments and during our own deliberations have been incorporated into the final decision.

### Positions of the Parties

Below is a description of each party's position with respect to rate regulation. The parties strongly disagreed on the proper amount of rate regulation for the general freight trucking industry. Their positions spanned the continuum from total deregulation to rigid rate regulation. In addition to the main issue of rate regulation, parties also addressed the closely related issues of: collective ratemaking, subhauling, safety, and credit rules. Each issue is discussed in a separate section.

### California Trucking Association (CTA)

CTA is one of the largest and most active trucking organizations in the State, with about 2,500 members. CTA conducts programs on management and truck safety, has local and statewide committees which address important trucking issues, and engages in lobbying activities on behalf of its members.

CTA recommends increased economic regulation for a stable industry capable of meeting the state's needs. Additionally, CTA fears rate deregulation will cause rate discrimination, a reduction in service to small shippers and rural communities, increased highway accidents, and an increase in highway congestion and air pollution. If the market is allowed to set transportation rates, CTA argues that the Commission would give advantage to large volume shippers and high-volume traffic lanes.

According to CTA, during relaxed rate regulation (1980-1986) shippers, using market power, forced carriers to lower rates. This resulted in reduced carrier revenues and discouraged capital investment. General freight carriers suffered major losses of capital which manifested themselves in bankruptcies, exit from the industry, older equipment, and lower wages. The large number of bankruptcies and firms exiting the industry during this transition period resulted in poor quality service to some shippers and general instability in the industry. CTA states that lower trucking rates in the transition period: (1) increased shipper profits by nearly $1 billion, (2) were not passed through to consumers, and (3) continued until the current regulatory program was instituted.

CTA points out that in 1986 California carriers received a 10% rate increase, the first general rate increase in the Commission tariffs since 1980. This led to reinvestment in trucking equipment and employee drivers. To plunge these carriers back into cutthroat rate competition would cause disastrously low profit margins, impossible debt-to-asset ratios, and increase the difficulty of attracting new capital. Furthermore, market-set rates lead to overcapacity; carriers expand fleets and duplicate services in an attempt to increase market share. This results in an extra cost that society eventually pays for in pollution, congestion, and higher rates to shippers without market power.

CTA also asserts that the less-than-truckload (LTL) industry has large economies of scale which support predatory behavior. CTA points to the significant concentration in the interstate LTL industry since rate deregulation in 1980 as evidence of this behavior. Additionally, CTA cites examples of rate discrimination in rate deregulated markets by Interstate Commerce Commission (ICC) carriers and lost service and increased rates to rural shippers. CTA believes that: (1) secret rates and discounts prevalent under deregulation prevent shippers from making informed decisions and effectively bargaining for rates, and (2) service to rural areas does not always support multiple carriers, which without rate regulation will result in shippers paying monopoly prices.

According to CTA, highway safety has also suffered because of relaxed rate regulation. CTA claims reductions in rates have lead to the use of older and inadequately maintained equipment, lower driver wages, and inadequately trained and

emotionally unsuited drivers. CTA states that truck drivers are identified as the primary cause of over 90% of truck-at-fault accidents and argues that a direct connection exists between rate regulation and highway safety. Additionally, CTA believes that carriers in poor financial condition will delay needed maintenance, hire poor quality drivers, and operate in an unsafe manner.

In another area related to motor carrier infrastructure, CTA cites the recent enactment of SB 151 (Stats. 1987, Ch. 1301) which gave the South Coast Air Quality Management District (District) authority to restrict traffic within its jurisdiction. The law also provides for the formation of other jurisdictions throughout the state. Among the proposals being considered by the District are peak period fee assessment, traffic diversion, requiring carriers to retrofit equipment with engines which burn clean fuel, and outright bans. Additionally, the City of Los Angeles has proposed ordinances and the California Air Resources Board has adopted guidelines for restricting truck traffic to minimize air pollution. CTA claims this threatens free access to California's freight transportation infrastructure and recommends Commission action to reduce the involvement of local jurisdictions.

CTA's proposed regulatory program will require all common carriers to file rates through tariff bureaus granted Public Utilities (PU) § 496 antitrust immunity. Within the bureaus, individual carriers will have the right of independent action. Proponents of any change in a common carrier rate must either be a tariff bureau member carrier whose traffic is directly affected, or an affected freight bill payer. All bureau rate changes must receive Commission approval before publication. All common carriers must publish rates to all points and places in their service area. Cost justifications for rate changes shall include the costs of operating in compliance with all State and Federal laws including: the speed limit, hours of service limitations (including waiting or delay times), and compliance with weight regulations.

Contract carriers will be required to file contracts with the Commission. Rate increases may be filed on one day's notice and rate reductions must be filed on 30 days' notice, measured from the date of publication in the Commission's Transportation Calendar. Rate reductions must be cost-justified under the same rules as common carrier cost justifications. All contracts must include a provision which makes the shipper co-liable for all accidents arising from the carrier's performance for the contract shipper. A carrier would have no limit on the number of non-dedicated contracts it may enter.

Contract carriers will be limited to three dedicated contracts. To be eligible to use dedicated contracts a contract carrier must meet the following conditions: (1) only carrier employees or subhaulers paid in accordance with a cost-justified settlement schedule may be used, (2) balance sheet assets must be at least 1.4 times greater than current liabilities, (3) labor cost on the carrier's income statement must meet the labor ratio test, (4) at least 50% of the carrier's revenue must be earned from intrastate California transportation, and (5) a driver selection and training program, and an equipment maintenance, repair and replacement program must be in place.

Additionally, carriers wishing to use cost justifications and dedicated contracts must place, at an acceptable level, in a measurement device called a safety score. The safety score examines financial and operating data that CTA studies claim are correlated to highway-safety. An acceptable safety score is one in the top two-thirds of all motor carriers. Common or contract carriers who are ranked in the bottom third must provide a cost justification which demonstrates the reduced rate will measurably improve at least one of the four elements of the safety score. This improvement must be sufficient to move the carrier out of the bottom third. Contract carriers wishing to use dedicated contracts must have a safety score in the upper half of all carriers. More details on the safety score will be provided in the safety section.

The current programs for the TFCI, prevailing wage, rate window, and rules for meeting a competitor's rate remain unchanged. Subhauler rates would be regulated and subhaulers paid in accordance with a cost-justified rate schedule. More detail on CTA's proposals for subhauler regulation is contained in the subhauling section.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

### Ad Hoc Carriers Committee (Ad Hoc)

Ad Hoc, a coalition of motor carriers and others in the transportation industry, was formed for the purpose of participating in the investigation of general freight motor carrier regulation. Ad Hoc presented numerous witnesses including an accounting professional, equipment sales representatives, a subhauler, a prime hauler and several transportation consultants. The testimony offered covered a broad spectrum of economic and policy issues, but only two witnesses submitted specific recommendations.

Ad Hoc believes the issues addressed in this OII were adequately examined in prior proceedings, and general freight motor carriers have achieved a limited degree of stability and financial benefits under the current regulatory program. To seek major changes at this time is premature and the industry should be given a full opportunity to make the current program work.

Ad Hoc does recommend some fine tuning to the existing regulatory program in areas that have been identified as problems. In two instances, Ad Hoc witnesses differ on the modifications that should be made: rate window filings and competitive rate filings under G.O. 147-A. One recommendation for rate window filings would discontinue the filings because they are more of a burden than a benefit. The other recommendation would continue rate window filings without change because they are working satisfactorily for both carriers and shippers. There is also a conflict with Ad Hoc's recommendations for competitive rate filings. One continues the filings with no changes since the provisions contain several protections against abuse of the privilege, and the other continues the filings, but allows existing carriers to meet competitive rates without having previously handled the traffic.

Ad Hoc proposes that existing common carriers be allowed to lower rates to meet a competitor's generally applicable common carrier (GACC) rates without cost justification. This recommendation addresses the competitive advantage of new common carriers and existing contract carriers. These carriers can file any existing GACC rate without cost justification, while existing common carriers must cost-justify the same rate. Ad Hoc's proposal would eliminate this competitive advantage.

Ad Hoc also recommends that the TFCI, dedicated contracts, and cost justifications be retained with a sincere effort on the part of Commission staff and the industry to educate carriers and shippers on the requirements. Additionally, Ad Hoc requests an investigation into discounts because discriminatory and preferential discounts are illegal, improper, and contrary to the interests of consumers.

In support of its recommendations Ad Hoc concludes that deregulation will result in the following:

1. Lower rates to larger shippers and higher rates to smaller shippers.

2. An increase in total intrastate transportation costs.

3. Increased profits for major shippers.

4. A decrease in the ability of intrastate carriers to attract capital.

5. Drivers and subhaulers working excessive hours at illegal speeds.

6. Reduced expenditures for vehicle maintenance and safety.

7. An increase in the average age of equipment utilized by intrastate for-hire motor carriers licensed by this Commission.

8. Diminished availability and frequency of motor carrier services to small towns and rural areas.

Although Ad Hoc makes recommendations for changes or modifications to the current program, it does not specifically outline the steps that should be taken to effect the changes. Ad Hoc believes it is in the best interest of the State's economy to give the existing program a chance to work, and urges the Commission to address regulatory issues within the scope of the current program rather than adopting a new regulatory program.

### *California Teamsters Public Affairs Council (Teamsters)*

Teamsters supports the continuation of the current program, with some modifications, and specifically opposes less restrictive rate regulation. Teamsters believe large shippers have benefited from deregulation through lower shipping rates and greater market clout, but that those benefits do not balance the negative social and economic consequences. In its view both interstate deregulation and the period of relaxed rate regulation in California (1980 and 1986), caused enormous economic disruption in previously stable markets. This had particularly disastrous consequences for small shippers, highway safety, and industry employees.

Teamsters addresses the allegedly negative effects of lessened rate regulation, and argues that no evidence has been advanced to show the cost-justified rate system now in effect produces noncompetitive rates, "monopoly rents" for workers, or any of the other problems allegedly suffered by shippers prior to 1980. Teamsters states that labor (particularly union labor) shouldered much of the economic burden of deregulation. Many employees were forced to accept pay cuts, increased work hours, and a decline in working conditions. Workers who had been steadily employed for decades found themselves unemployed or underemployed while others lost health care or pension benefits for themselves and their families. This loss of benefits places additional burdens on taxpayer supported services, rather than carrier supported plans.

Teamsters also focused its attention on the relationship between economics, highway safety, and the impact of interstate deregulation. While freely admitting there is no simple correlation to be made between highway safety and deregulation, Teamsters argues the economic pressures brought on by deregulation have a definite impact on certain factors related to truck accidents. These impacts include: (1) delays in new equipment purchases, (2) deferred vehicle maintenance, (3) poor management and personnel practices, and (4) unsafe operating practices.

Teamsters proposes the current rate regulation program be modified in three areas. First, the TFCI should be updated more than once a year for labor and other fixed costs. Second, the Prevailing Wage Report should be revised to exclude carriers who pay drivers minimum wage and to include nondriver employees as a secondary labor cost. Finally, Teamsters advocates a fixed division of revenues between subhaulers and prime carriers, with prime carriers compensated only for their costs. Prime carriers would be required to pay subhaulers rates which are cost-justified using subhauler costs. Teamsters' recommendations for subhauling are discussed in more detail in the subhauling section.

### *Highway Carriers Association/Willig Freight Lines (HCA)*

Highway Carriers Association is an organization of approximately 600 small carriers, and Willig Freight Lines is a large LTL carrier with both interstate and intrastate operating authority.

HCA says this proceeding is unnecessary and should not have been undertaken because the current regulatory program is the result of a recent and extensive inquiry into the regulation of general freight. HCA believes the existing program contains defects, but maintains that the remedies are relatively simple and straightforward and do not warrant a complete overhaul. HCA advocates instituting the modifications to G.O. 147-A recommended by the Commission staff in November 1987. These recommendations would:

1. Allow generally applicable common carrier rates to be published by existing common carriers, not merely new common carriers and contract carrier competitors.

2. Remove the requirement that a carrier already be handling the traffic in order to meet the rates of a competitor.

3. Create a provision whereby carriers could make minor changes to tariffs without having to file a cost justification or a formal application.

An additional problem with the existing program occurred when carriers were required to transfer rates from transition tariffs (pre-1986) to individual publications or bureau tariffs. Many smaller carriers could not afford to file all former rates simultaneously and chose to file simplified tariffs. However, once an initial filing was made, subsequent changes required Commission authority. Unfortunately, many carriers did not become aware of this until after their actions limited their options.

HCA also recommends clarification of the TFCI. A literal interpretation has resulted in application of the LTL index to thousands of TL rates published on a "per unit" or "per mile" basis. HCA has also identified a number of technical refinements to the TFCI which should be addressed.

In response to the proponents of flexible rate regulation HCA argues that:

1. Shippers do not pay more in California than elsewhere.

2. Shippers are not moving out of California, they are moving into the State.

3. Consumers will not pay less when trucking rates decline.

4. Just-in-time production concepts have been in California for many years.

5. Flexible rate regulation would create inequities between competing classes and undermine the common carrier system.

6. Less rate regulation will have a significant detrimental effect on safety.

Finally, HCA urges a fine tuning of the existing program to allow the industry to continue on the course of establishing competitive, carrier-set, cost-based rates.

### *Parties Represented by Edward J. Hegarty (Hegarty)*

Hegarty represents the California Carriers Association and the California Dump Truck Owners Association. Hegarty raises numerous legal arguments in support of the existing regulatory program. These are addressed in the legal section below.

Additionally, Hegarty points out that the classification of freight as either general or dump truck is an issue in C.5437, OSH 323 and should not be litigated in this proceeding. We agree with Hegarty on this matter and will leave the classification of freight to be resolved in C.5437, OSH 323.

### *West Coast Freight Tariff Bureau (WCFTB)*

WCFTB supports the current regulatory program because it preserves rate stability and ensures a stable trucking industry. WCFTB says the trucking industry was financially hurt by the transition period and that small companies will be forced out of business by destructive and predatory pricing if rate regulation is significantly reduced or eliminated.

According to WCFTB, DRA's proposal is discriminatory and unfair to common carriers. Common carriers are required to file rates while contract carriers are not. This presents an unfair competitive environment between common and contract carriers.

Finally, WCFTB supports continuing the current regulatory program with the following modifications: (1) allow existing carriers to file new GACC rates, and (2) allow all carriers to meet the rates of competitors with a cost justification within 60 days. WCFTB also supports carriers having the choice of individual tariffs, agency tariffs, or subscribing to a tariff bureau which has antitrust immunity in accordance with PU § 496.


### Pacific Motor Tariff Bureau (PMTB)

PMTB represents approximately 300 carriers, the majority of which are small and file only intrastate rates. PMTB argues that the current program has been in effect only two years and should not be overhauled.

Furthermore, PMTB believes that large shippers and carriers which propose flexible or no rate regulation are motivated by self-interest. Under their proposals, large shippers will be in a superior bargaining position for preferential rates and large carriers will enter new markets intent on domination or destruction. In contrast, small family-owned carriers are interested in safeguarding their livelihood through rate regulation and small shippers without bargaining power seek Commission protection.

According to PMTB, the Commission has the responsibility to make a decision in the best interests of the public by ensuring a transportation system that is safe, efficient, and offers adequate service levels. With some minor adjustments, PMTB believes the current regulatory program meets these objectives. Since PMTB modifications to the current program parallel those of HCA, they will not be repeated.


### Cal-West Tariff Bureau (PWTB)

CWTB represents approximately 500 members which have operating authority from the Commission. CWTB: (1) advocates retention of the current system with some modifications, (2) believes the present system creates a competitive environment, is reasonable, and allows rate flexibility, and (3) asserts that regulatory change would adversely affect the industry and the public.

The testimony of CWTB describes the problems experienced by carriers during the period of rate flexibility, 1980 through 1986. Its witnesses recounted situations in which they were compelled to offer excessive rate reductions to retain business. One witness, who provides repair services to many carriers, testified that equipment is not being maintained properly because deregulation reduced revenues.

Furthermore, CWTB states that contract and common carriers currently compete for the same traffic, but economic deregulation of contract carriers would result in predatory pricing practices and prejudicial pricing in favor of large volume shippers. This would prevent common carriers from competing for favorable traffic and force the common carrier industry into bankruptcy.

CWTB supports a regulatory policy that will be uniform in its application and enforcement and will ensure adequate service without discriminatory rates. To accomplish this, CWTB believes the current rate regulation program must be

App-016

continued for both common and contract carriers. However, CWTB recommends the following steps to fine-tune the existing program:

1. Cost justifications applicable for only one year.

2. Common carriers allowed to reduce rates to meet other carrier GACC rates.

3. Elimination of the requirement that a carrier already handle traffic to meet the cost-justified rate of a competitor.

4. Published guidelines for cost-justifying rates.

5. Strict enforcement of the Commission rules and regulations.

6. Review of the regulatory program five months after this decision.

### National Motor Freight Tariff Association (NMFTA)

NMFTA is a Virginia based tariff association with approximately 7,000 participating carriers, 188 of which have intrastate operations in California. NMFTA publishes the National Motor Freight Classification, which it files with the Interstate Commerce Commission (ICC) and 42 state regulatory agencies, including this Commission.

The primary issues addressed by NMFTA are: (1) whether there is a link between economic regulation and motor carrier safety, and (2) the effect elimination of motor carrier rate regulation would have on the California trucking industry infrastructure. NMFTA states there is definite linkage between economic regulation and safety, with partial or complete elimination of motor carrier regulation resulting in a deterioration in highway safety. The elimination of interstate motor carrier regulation has also adversely affected the financial stability of the trucking industry, resulting in poor service and/or high rates to small shippers and communities. Shippers of difficult to handle commodities have been left with no public service. Undesirable freight has been shunned and/or used to subsidize the reduced rates obtained by the favorite few. Excessive competition has driven established carriers out of business and causes many carriers to operate at rates which do not meet their costs.

NMFTA argues that the interstate experience has taught that economic pressures, created by rate discounting and excessive competition, give rise to safety problems due to reduced maintenance expenditures, the inability to purchase new equipment, and reduced driver wages. Under the interstate system, published discounts are often below cost and do not indicate to whom they apply. Some shippers have pressured carriers to establish arrangements whereby the shippers are paid the published discount even though they do not pay the freight bill.

NMFTA submits that the interstate system has produced preferential and discriminatory rate practices and if California abandons rigid rate regulation it would experience similar effects. Regulatory control, economic and otherwise, over motor common and contract carriage is absolutely essential to the success of California's intrastate transportation system. NMFTA believes that while the current program may require additional fine-tuning, its regulatory objectives are sound. Further implementation and experience with this program should occur before the industry and the public are subjected to disruptive policy changes.

### Folger Athearn, Jr. (Athearn)

Athearn is a transportation consultant who appeared on behalf of himself and testified for Ad Hoc. Athearn argues that the federal experiment in transportation deregulation has resulted in a decrease in the availability of full service motor

common carriers, which are essential to small businesses and small rural communities. This conclusion was drawn from Athearn's analysis which determined the number of common carriers having authority to serve California's county seats declined by 48% from 1982 to 1988.

Athearn also states that full service motor carriers have been unable to resist the economic pressure to charge their major corporate customers lower rates or grant higher discounts while charging small business more for the same service. This discrimination has placed small businesses and small rural communities at a disadvantage that cannot be explained by differences in the cost of transportation service.

Finally, Athearn is opposed to common carriers publishing rates for specifically named customers or predicating rates on meaningless bill of lading certificates. Secret rates in confidential contracts are not in the public interest. Athearn believes that carriers should not be allowed to hold both common and contract authority and the only way to prevent discrimination is to require carriers to publish their rates.

### AcTran

AcTran is a consulting firm primarily involved with interstate and intrastate transportation rate analysis. AcTran supports the current regulatory program and identified a number of problems that exist in the interstate deregulated market. Among the specific ills are unsafe driving practices due to reduced rates and the use of rebates and kickbacks. Another serious problem is the filing of rates. Contract carriers are not required to file rates and common carrier filing requirements are not enforced. Finally, AcTran submitted a comparison of interstate and intrastate rates and expressed concern over a trend toward monopolization of the trucking industry.

### Parties Represented by Gary Haas (Haas)

Haas represents three carriers: Cooper Fine Line Transport, Dolo-Chem Transport, Inc., and Great American Transport. These carriers testified in support of rate regulation, but criticized the implementation of the current program. They also object to inadequate enforcement and oppose rules which favor large carriers over small carriers.

### Division of Ratepayer Advocates (DRA)

DRA is a separate division within the Commission assigned to investigate, develop, and promote policy positions for the public in general, and ratepayers specifically. As its name suggests, DRA represents the interests of those who pay the rates, including shippers, consignees, and ultimate consumers of the goods shipped. DRA is also interested in the welfare of the trucking industry, but wants the greatest value at the lowest price, consistent with safe, reliable service.

DRA states that general freight transportation is an essential service to commerce, industry, and the public at large. However, its tendency is not toward a natural monopoly and does not require unique access such as transmission lines. Historically, trucking regulation has differed from regulation of classic monopolies (gas, electric, telephone, and water utilities). The rates set by the Commission have been minimum rates rather than fixed rates, and this protected the industry rather than the consumer. Although the current system for general freight is not traditional minimum rate regulation, it still protects the industry.

Additionally, DRA claims the rationale for this protective regulation has been to avoid the negative effects of excessive competition, rather than the negative effects of insufficient competition. Those advancing rigid rate regulation assert two types of harm may result from less regulation: predatory pricing and destructive competition. The arguments for retaining this protective regulation come mainly from trucking companies. They seek four different kinds of protection:

1. Protection from themselves: truckers are incapable of calculating their own costs and/or unable to be restrained by market forces.

2. Protection from each other: truckers are so rapacious they will consume each other or drive each other out of business.

3. Protection from shippers: large shippers will be able to drive transportation prices below cost.

4. Protection for the public: consumers will ultimately pay higher prices, service will deteriorate, and the highways will be unsafe.

According to DRA, these protections are founded on unreasonable assumptions. The arguments espoused by those favoring rigid rate regulation are inconsistent with economic theory, practical experience, and common sense. Furthermore, rate regulation has never directly controlled, or adequately addressed safety and service.

DRA is convinced that economic regulation interferes with the efficient operation of market forces and imposes unwarranted regulatory costs on carriers which are passed on to shippers and ultimate consumers. The regulatory process also prevents prices and service from rapidly responding to changes in the market. Pricing based on average or representative carrier costs contributes to inefficiencies and prevents new entrants from exerting competitive pressure on existing carriers.

By contrast, DRA believes California consumers will enjoy substantial benefits if general freight rate regulation is relaxed. Relaxed regulation will encourage competition in the marketplace, creating strong incentives to minimize carrier costs and increase service options. Increased competition will reduce transportation prices through lower carrier profits, lower labor costs (more efficient deployment; not necessarily lower wages), and more efficient operations.

Other than pricing flexibility and service availability, safety on the highways is the primary concern of DRA. Proponents of rigid rate regulation argue that relaxed rate regulation will result in unsafe practices and greater risks on the highways for carriers, shippers, and the public at large. However, DRA states that rate regulation has never required direct expenditures on safety. Moreover, a review of the safety literature and the best available information does not support the claimed link between rate regulation and highway safety. This body of information indicates that direct enforcement of safety regulations has the greatest impact on highway safety.

DRA argues that motor carrier safety pays and responsible carriers seeking to operate profitably will operate consistent with this principle. The benefits of safety (greater profits) far outweigh the consequences of unsafe operations (financial losses and increased insurance rates). DRA concludes that direct safety enforcement is the most cost-effective method of protecting the public from irresponsible carriers.

DRA also asserts its proposed regulatory program will enhance competition in the trucking industry, reduce transportation rates and the cost of goods sold in California, and improve transportation service. The proposed program is a two-phase approach. The first or interim phase relaxes current rate regulations, and the final phase removes: (1) most controls over contract carriers, and (2) controls over common carriers, consistent with constitutional and statutory requirements.

The interim phase would return the carrier industry to the direction of the 1980 through 1986 transition period with additional rate freedom. Rates of common and contract carriers would be filed with the Commission. Rates lawfully on file with the Commission when the program is implemented would continue in effect. New carriers could establish rates to meet any other carrier's rates immediately upon filing, with the exception that common carriers could not meet contract rates. Common carrier rates on file could be increased and/or decreased once in a calendar quarter up to 5%,

effective on the date filed. Increases of more than 5% would require a formal application. Contract carrier rates could be decreased in the same manner as common carrier rates. There would be no limit on contract carrier increases.

Common and contract carrier rates could be decreased by more than 5% by filing the rates on 30 days' notice. These filings would be listed on the Commission's Transportation Calendar. All rates are subject to complaint by affected parties who bear the burden of proof. Rates in formal applications are subject to protest. The burden of proof for rates subject to protest rests with the proponent of the rates.

Collective ratemaking would continue pursuant to current statute and G.O. 154.

In the final phase, common carrier rates would be filed with the Commission. Contract carriers would be required to execute and maintain contracts, but would not be required to file them with the Commission. Contracts are subject to review by Commission staff as to their existence and to determine that carriers rates are valid. All carriers would be required to adhere to the rates and charges specified in their tariffs and/or contracts.

Common carrier rates could be established (new rates, or new carriers) at any level or reduced to any level on the date filed. Common carriers could increase rates on file up to 10% per calendar quarter, effective on the date filed. Common carrier rate increases greater than 10% would require a formal application.

Complaint and protest mechanisms remain the same as in the interim phase.

Collective ratemaking would continue pursuant to current statute and G.O. 154.

### *California Coalition for Trucking Deregulation and Viking Freight Systems, Inc.*

California Coalition for Trucking Deregulation (Coalition) is a nonprofit organization with a membership of approximately 150. While most members are shippers, the membership also consists of shipper organizations and several carriers. The primary purpose of the Coalition as stated by its policy witness is to seek:

. . . an end to economic regulation of carriage of general freight in California. And the objective — the genesis of that was an attempt to bring efficiency to the motor carrier industry as seen by the members of the Coalition.

Efficiency doesn't mean lower prices. Efficiency means, among other things, flexibility, the ability of carriers and shippers to engage in innovative and creative ways to solve joint problems, managerial certainty with regard to contracts entered into between two parties without the intervention of the government as a third-party, among other things." (TR 6086-6087.)

Viking Freight System, Inc. (Viking) operates as a LTL and truck-load (TL) general freight common carrier providing van and flatbed transportation services. Viking is the largest motor carrier operating within the State. As a member of both the Coalition and CTA, Viking supports the Coalition's position.

The Coalition claims that current rate regulation fails to permit the types of pricing and service flexibility achieved in competitive jurisdictions, thereby stifling innovation and decreasing the efficiency of intrastate transportation operations. Lack of rate and tariff flexibility prevents shippers from utilizing modern procurement practices. Lack of contract rate flexibility limits the ability of shippers to properly define their relationships with carriers.

According to the Coalition, there is substantial evidence that California's regulatory program has increased many motor carrier rates beyond normal competitive levels and has skewed rates away from appropriate levels. This is supported by rate comparisons which indicate that rates paid for California intrastate transportation services are higher than in

other jurisdictions. Furthermore, it can be inferred by the difficulty of the cost justification process that appropriate rate reductions have been discouraged. Finally, Viking's experience with write-in tariffs demonstrates the efficacy of intrastate economic deregulation.

The Coalition does not believe the arguments that price discrimination will occur in the absence of economic regulation. There are no valid empirical studies supporting claims of price discrimination or inadequate service in rate deregulated markets. Additionally, the current program provides little, if any, cross subsidies that lower rates to small and rural shippers. If it did, questions of equity would be raised.

Economic regulation, argues the Coalition, is not required to preserve the trucking industry. Strict economic regulation only benefits the inefficient, mismanaged carrier. Moreover, the increase in concentration of interstate LTL carriers does not necessarily mean less competition. It is not the number of carriers operating nationally, but the number of carriers operating within a particular market that is important. Since deregulation, carriers which had previously been prohibited from entering other carriers' markets became free to do so. As a result, there has been large-scale market entry by existing LTL firms invading each other's markets. Finally, to the extent interstate deregulation has decreased motor carrier profitability and the number of carriers, it accomplished a weeding out of unduly high rates of return and inefficient operations.

With respect to safety and rate regulation, the Coalition takes the position that the most effective means to promote truck safety is through rigorous enforcement of safety laws and regulations. First, the Coalition points out that CTA's testimony indicates that the citation rates of Commission regulated carriers was 20 times higher than all other commercial vehicles from mid-1987 to mid-1988. CTA's testimony also shows Commission regulated carriers involved in 36 times as many truck-at-fault accidents during the same period. From this and other safety data and the safety studies presented in the proceeding, the Coalition concurs with the testimony of the United States Department of Transportation (DOT) witness, which states:

I have been unable to find any link between economic deregulation and motor carrier safety. A far more plausible linkage exists between vigorous enforcement of safety laws and regulations and the enhancement of motor carrier safety." (Exh. 26 at 12.)

The Coalition also points to evidence that carriers have numerous incentives to operate safely. Viking's President explained his company's philosophy of how safety pays as follows:

. . . an awful lot of people feel like companies don't throw dollars at safety because it's a direct cost. But we look at safety as being a cost containment program. Since we are self-insured with a high dollar level that we retain ourselves, every dollar we throw in improving our safety means less dollars that we pay out for accidents and injuries. So we've had a very active safety program. And, if anything, our safety program is growing during the years since 1980." (TR 1932.)

This testimony was also mirrored by a number of small carriers.

As described below, the Coalition proposes a regulatory program where carriers are free to charge rates driven by market forces, without regulatory intervention. This program would be effective within 90 days from the date of this decision. The salient features of the program are as follows:

1. Contracts between contract carriers and their shippers must be in writing, and a copy must be maintained at the carrier's premises, but a copy need not be filed with the Commission. All existing Commission regulations governing contract carrier rates and practices would be repealed.

2. G.O. 147-A would be repealed in its entirety.

3. Common carriers would be able to independently file all rate increases, decreases, and changes in rules and regulations in tariffs. These would be effective on the date of filing with the Commission and remain in effect until withdrawn by the carrier or determined to be unlawful.

4. All independently filed common carrier tariffs would be presumed to be market-driven and, therefore, reasonable.

5. An expedited procedure, providing for final Commission action within 60 days, would apply to complaints against independently-filed common carrier tariffs. The grounds for finding any tariff unlawful would be limited to cases where the complainant establishes, by a preponderance of the evidence, that the rate complained of constitutes either predatory pricing or an abuse of market power within the meaning of antitrust laws.

6. Rate increases, decreases and changes in rules and regulations of common carriers filed by rate bureaus as a result of collective action pursuant to PU § 496 would not be allowed to take effect until the bureau has presented sworn evidence sufficient to enable the Commission to find that the proposed rate is market-driven, does not constitute predatory pricing, and does not constitute an abuse of market power.

7. Safety objectives would be accomplished through direct enforcement by the California Highway Patrol (CHP), with supportive action by the Commission through the exercise of its entry and revocation powers.

Finally, the Coalition presented a witness from Viking that addressed the use of electronic data interchange to exchange freight documentation, such as bills of lading, freight fills, rate quotes, delivery receipts, and trailer manifests with its shippers.

### Silver, Rosen, Fischer & Stecher, P.C. (Fischer)

Fischer represents three carriers: American National Can Company, Leaseway Transportation Corp., and Dirksen Transportation, Inc. Fischer stresses that this proceeding represents the latest step in a process which began 14 years ago when the Commission began to question the efficacy of the Minimum Rate System. During that time the Legislature and the Commission have considered the extent to which intrastate transportation should be regulated. Various aspects of specialized transportation such as fresh fruits and vegetables and tank truck operations were released from rate regulation, while the transportation of cement was placed under more rigid rate regulation.

Two issues are addressed by Fischer: economic deregulation of contract carrier rates and intrastate subhauler regulation. No position is taken with respect to intrastate common carrier rate regulation or bureau-made rates. Fisher supports relaxed rate regulation for contract carriers and cites the testimony of an Arizona carrier as an example that relaxed rate regulation works. The witness for the Arizona carrier testified that his company has experienced substantial growth since Arizona's deregulation, and that the expansion would have taken substantial amounts of time and money in a regulated environment. This witness did state that a number of large carriers had ceased to serve in Arizona since deregulation, but that their failure was probably due to their unresponsiveness to the market.

Finally, Fischer asserts that no convincing argument was offered to support continued rate regulation of contract carriers. Most parties opposed to relaxed rate regulation represented large established common carriers, which felt they could not operate without government protection. A number of carriers that do engage in contract carriage, such as Dirksen Transportation, Inc., support relaxed rate regulation. Fischer argues that the current regulatory program inhibits innovative rates, deters new service options, and makes coordination of intrastate and interstate rates all but impossible.

Specifically, Fischer recommends no rate regulation for contract carriers transporting general freight commodities and that contract carrier contracts be filed with the Commission and available for public review. Fischer's subhauling recommendations are addressed in the subhauling section.

## *California Manufacturers Association (CMA)*

CMA is an organization which represents the interests of businesses which process goods. CMA predicts drastic changes in California's population, industry, and technology and believes the trucking industry needs a regulatory program that provides carriers the flexibility to adapt to these changes. Because accurate predictions of these interactions with the trucking industry are difficult, if not impossible, CMA concludes that the marketplace will be a better provider of goods and services than government planning and price fixing. This has led CMA to propose a program of rate regulation similar to that of the Coalition: no restriction on increases or decreases in carrier-set rates.

CMA also takes exception to the safety data and conclusions presented by the parties that favor rigid rate regulation. According to CMA, solid data shows no significant connection between rate regulation and truck safety. Moreover, intelligently operated carriers operate safely because safety pays. Finally, there is no reason to use an ineffective regulatory program to affect safety when direct safety regulation and enforcement is more effective.

Implementation of the CMA proposal would have two significant differences from the ICC regulatory program. First, common carrier tariffs would be completely public and subject to change through a public process. Second, contracts would be private documents and all special rates available to a single shipper would be contracts. No carrier action with respect to rates and terms would be subject to regulatory action except complaint, where the burden of proof would be on the complainant. The shipper would have a signed legal contract, not a letter or waybill notation. All freight movement would be subject to a single charge: either the carrier's applicable posted tariff or the applicable contract rate.

Contracts would be signed documents enforced by the courts, bilateral, and represent a continuing relationship. Contracts effective for more than 30 days after this decision would be free of regulatory oversight. All existing approved contracts would remain in effect until their expiration dates.

Common carriers would file tariffs with the Commission and provide copies on request in return for reasonable reproduction costs. Discounts would normally be available to the public, but could conceivably be restricted to a single shipper. Rate increases would be effective five days after filing and decreases effective one day after filing. Rate increases would be subject to Commission staff surveillance. Common carrier tariffs could refer to any mileage table, or other distance establishing mechanism, which is publicly available. Existing common carrier tariffs could be retained.

Additionally, carriers engaged in unregulated operations would be relieved of filing financial reports with the Commission.

## *Center for Public Interest Law (CPIL)*

CPIL supports the ICC's deregulation policy and recommends the elimination of economic rate regulation in California. CPIL argues that deregulation translates to a decrease in consumer prices because the core rationale for rate regulation is to raise prices above market levels. If regulation merely mirrored market-set rates it would have little value and deregulation would have no impact on transportation rates. Accordingly, rate regulation exists solely to prop up prices, and when relaxed or removed, prices will decline. Studies conducted on the effects of deregulation at the federal level confirm that deregulation has resulted in lower trucking costs and lower consumer prices.

App-023

CPIL proposes a targeted approach to regulation. Such an approach supplies the two ingredients vital for any law or regulation: sharp definition of the precise problem requiring intervention and a rifle-like focus on a solution. CPIL's targeted approach would allow carriers easy entry into and easy exit from the market. The only barriers to entry would be directly related to safety or financial fitness. Carriers could raise or lower rates without restriction or approval. CPIL would target safety/minimum service levels, predatory pricing, and other market abuses. These are discussed in more detail in the monitoring section.

### National Small Shipments Traffic Conference, Inc. and Health and Personal Care Distribution Conference, Inc. (NSSTC)

National Small Shipments Traffic Conference, Inc. is a broad-based organization of approximately 225 large and small corporations with interests in small shipment traffic. Health and Personal Care Distribution Conference, Inc. is a trade association of approximately 70 corporations.

NSSTC believes the current program impedes the ability of buyers and sellers of transportation services to set rates. Cost justifications, the prevailing wage, and the Commission's participation as a third party are some of the impediments to market-set rates. NSSTC argues that the current regulatory program is not designed to reward efficient carriers. Rather, the program rewards the carriers adept at learning and using the regulatory rules. Additionally, NSSTC states that because entry is easy, predatory pricing and destructive competition are unlikely and should be left to antitrust laws.

Finally, NSSTC generally agrees with the Coalition's regulatory proposal, but recommends modifications for credit rules and collective ratemaking. Further details are included in those issue sections.

### Americans for Safe and Competitive Trucking (ASCT)

ASCT is a coalition of: (1) companies that operate trucks, (2) shipper and receiver associations, (3) public interest groups, and (4) various sized businesses. ASCT supports increased truck safety enforcement and less economic regulation of trucking, and believes California intrastate regulation should be no more restrictive than ICC regulation. Based on its analysis of business logistics costs, ASCT determined that under ICC deregulation moving and storing inventories have become more efficient, saving producers and consumers from $30 to $60 billion. From its study ASCT concluded that these savings resulted from relaxed rate and service regulation and substantial savings would occur in California if intrastate rate regulation is relaxed.

### United States Federal Trade Commission (FTC)

FTC asserts that it has a mandate to preserve competition and protect consumers from deception and unfair business practices. Interstate and intrastate trucking deregulation furthers this goal by lowering prices and increasing the quality of service to shippers. Furthermore, FTC argues that deregulation in other jurisdictions has not brought predatory pricing or the loss of service to small communities. Finally, FTC believes there is no connection between safety and economic regulation and relaxed economic regulation will result in significant benefits for California.

### United States Department of Transportation (DOT)

DOT supports flexible rate regulation and says it is unable to find a link between economic regulation and motor carrier safety. DOT asserts that service studies in deregulated jurisdictions do not indicate a deterioration in transportation services, even in rural and small communities.

### California League of Food Processors (CLFP)

CLFP is a nonprofit trade association of large shippers of general freight and agricultural products. CLFP believes the current regulatory program adversely affects the health of the State's economy, protects inefficient carriers, and creates excess capacity. CLFP recommends a program of no economic regulation.

### Analysis of Current Regulatory Program

[i] The current regulatory program for California's intrastate general freight trucking industry dates from March 1, 1987, the result of D.86-04-045 and D.86-12-102. The program replaced a transition regulatory program that allowed carriers much greater ratemaking freedom. A table that outlines the basic features of the present program is shown below.

### *334 TABLE 1

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

When the current program was established, continuity with previous programs was afforded by approval of generally applicable common carrier (GACC) rates. These rates were and are still based on the Commission's old minimum rate tariffs. Because the minimum rates were originally established in formal proceedings, GACC rates are considered reasonable and require no further cost justification.

With some exceptions, under the current regulatory program a common carrier rate increase must be filed as a formal application. Public notice is provided on the Commission's Daily Transportation Calendar, and there is a 30-day public protest period. If the applicant's showing is adequate and there are no protests or requests for hearings from either the public or the Transportation Division (TD) staff, then the increase may be granted by ex parte order of the Commission. Otherwise a public hearing is held, with the ensuing decision subject to Commission rules on a 30-day comment period. Rate increases are generally made effective five days from the effective date of the decision. In the best of circumstances this process takes 30 to 60 days from filing of an application to the date rates are effective.

Common carrier rate decreases do not require formal applications. Instead carriers must file "cost justifications" with the TD. Cost justification filings must: (1) demonstrate that the rate will generate sufficient revenue to contribute to the carrier's profitability, (2) be accompanied by a summary of financial data, (3) include the prevailing wage standard in the labor cost element, and (4) meet specific provisions governing the use of subhaulers. Cost justification filings are calendared after a 30-day staff review period, followed by a 30-day public protest period. If a filing is accepted by the TD, the revised rates are effective after the second 30-day period.

Regulations are set forth in G.O. 147-A, which contains several provisions that afford carriers a degree of rate flexibility. A rate window allows carriers to change rates a maximum of 5% above or 5% below their base rates. Carriers establish base rates by adopting GACC rates or cost justifying rates. Once established the base rates may not be changed without cost showings, except in the case of contract carrier increases.

Carriers are also allowed to make minor technical changes to tariffs or contracts. The changes may result in rate increases or decreases, but no cost justification or formal application is required unless the changes affect a carrier's annual revenues by more than 1%. The staff review process is, however, much like that for cost justifications.

[ii] Under the current program a carrier can temporarily reduce rates to meet the rates of a competing carrier if it currently handles the traffic. These are called "me-too" rates. Common carriers cannot meet the rates of contract carriers under this scheme. The reduced rates may be made effective on the date filed. The filing must cite the source of the rate being

met. Cost justifications for reduced rates must be filed within 60 days after their effective dates. However, new common carriers may file rates at GACC rate levels without cost justification.

[iii] G.O. 147-A also established the TFCI to measure annual industry-wide changes in carrier operating costs and adjust carrier base rates. All rates governed by G.O. 147-A, except dedicated contracts, must be adjusted by the change in the TFCI unless a separate filing is made to offset the change. Adjustments to base rates are mandatory if the change in the TFCI is greater than 1% (plus or minus) and permissive if less than 1%.

Contract carriers may enter into standard or dedicated contracts. Standard contract rate increases do not require approval by the Commission or TD staff and are effective on the date filed. Decreases are calendared, require that a cost justification be accepted by TD staff, and are effective on 30 days' notice.

Dedicated contracts, or exclusive use equipment agreements, offer contract carriers that dedicate equipment to one shipper the ability to charge any rate, subject to a profitability test. To pass the profitability test a carrier must: (1) have an expense ratio (expenses divided by revenues) of less than 100%, and (2) pay not less than the Commission's prevailing wage standard or demonstrate that its labor expenses compare favorably with the TFCI. These contracts must identify the dedicated equipment, be for a duration of not less than 30 days or more than one year, and contain a specific expiration date. Exclusive use is not strictly defined in G.O. 147-A, but is interpreted to exclude use of the carrier's equipment for other shippers. Dedicated contracts, whether calling for rate increases or decreases, are effective on the date filed. They are generally calendared, although this is not required by G.O. 147-A.

In testimony on the record in this proceeding Alfred Kahn succinctly summarizes the dynamics of the general freight trucking industry:

The truck is a wonderfully versatile medium of transportation which can be here or there depending upon the demand, and the demand changes. It differs from one time to the next, from one commodity to the next, from one place to the next, and the beauty of a market economy is that that will be automatically recognized in the market." (Tr. 47:6322.)

The dynamic nature of the trucking market requires a regulatory program that can respond in a similar manner. We initiated this proceeding because we seriously doubted the ability of the current program to meet this challenge. Many of our concerns have been borne out by the record.

Our first concerns are about the inherent inefficiencies in the current regulatory program, beginning with practical problems. Although our current program was not designed to inhibit efficiency, apparently it does. We heard from shippers that are frustrated over the current program's rigid requirements for the classification and rating of commodities. Their frustrations are not related to carrier compensation, but deal with carriers' inability to implement a simplified rating system and contract program, due to complexity of filing requirements. Simplified contracts and rating systems would provide some shippers the opportunity to more efficiently manage and monitor their transportation costs.

The current cost justification procedure is another area with practical problems. Even supporters of the present regulatory program believe that changes are needed. They testified that it is not uncommon for a cost justification to take three to four months to process, and if a filing is not exactly like previously accepted filings it will probably be rejected.

Other parties argue that it is difficult to predict the results of the cost justification procedure, and that the process:

1. Is subjective; requirements often vary.

2. Results in fictitious traffic studies for some carriers, which are then relied upon in cost justifications.

3. Can be manipulated by carriers to justify rates that are not really cost based.

4. Uses prevailing wage data instead of actual labor costs, thus driving rates away from a true cost basis.

The cost justification procedure was developed to provide carriers the opportunity to individually establish rates which reflect their costs of service. However, in trying to achieve this we appear to have developed a complex procedure that encourages carriers to manipulate their costs, uses proxies where actual data is available, and inconsistently evaluates carrier submittals. Such clumsy procedures by themselves discourage carriers from requesting reasonable rate changes that would respond to market conditions.

Such complex rate procedures allow knowledgeable carriers an advantage over less sophisticated carriers, which is to be expected in a competitive business. However, such efforts could be redirected toward improving service to the public rather than satisfying bureaucratic requirements.

The current authorization of dedicated contracts seems to have limited usefulness. Dedicated contracts offer some carriers and shippers the ability to negotiate rates without Commission approval. However, because of the exclusive use restriction, these contracts are usually not attractive. Even in situations where dedicated contracts are cost-effective, the exclusive use restriction often causes equipment to be used inefficiently.

The use of the TFCI has both practical and theoretical problems. The TFCI was developed to allow transportation rates to automatically adjust for industry-wide changes in costs. Proponents of less restrictive rate regulation (Flexible Rate Proponents) argue that these annual rate adjustments:

1. Are mandatory, forcing some carriers to make rate changes that would not have normally occurred.

2. Have a six-month time lag in the application of recorded data which makes it difficult to negotiate contracts or discounts with shippers.

3. Fail to achieve cost-based pricing; averages and proxies are used instead of individual carrier costs.

4. Are an administrative burden. Not only are carriers required to file indexed rate changes, but if a carrier wants to use the rate window to avoid the TFCI change an additional filing is required.

Other criticisms of the present regulatory program focus on barriers to competition, resulting in inequities and economic inefficiency. Ready access to information is a key element in competitive markets, and the current program's tolerance of write-in tariffs limits ready access. Write-in tariffs allow a shipper to write to a carrier to request a specific discount or rate which is less than the carrier's published rate. The shipper's request is not filed with the Commission.

This procedure is a defect in the current program. Write-in tariffs allow secret, shipper-specific rates. They prevent other shippers and carriers from knowing the rates they are competing against, and they place carriers without write-in tariffs at a competitive disadvantage. Since the discounts are secret, carriers can easily discriminate among customers.

Finally, the current regulatory program fosters unnecessary distinctions between present and new carriers of a given class of freight. A carrier that wants to match the reduced rate of a competitor must show that it already handles the traffic that applies to the reduced rate. If allowed to match the rate of a competitor, the carrier must then cost-justify its rate within 60 days, even if the competitor's rate is already cost-justified. Although this program element does offer a way for carriers to retain business, it does not allow carriers to effectively compete for new business. Before a carrier can compete for new business its reduced rate must be cost-justified; because this process can take months, it stifles competition.

In summary, the current program is clumsy and inefficient. Carrier efforts to comply with program rules can only increase costs that are passed along to shippers and the eventual receivers of the freight. Commission intentions to create a system that is both efficient and fair have failed.

### *Policy Considerations*

### *Goals of Truck Regulation*

Throughout this proceeding there has been considerable argument over the purpose of regulation in the trucking industry. Parties favoring continuation of the current relatively rigid rate regulation, or even increased economic regulation, (Rigid Rate Proponents) and Flexible Rate Proponents both cite the need to provide the public with safe, reliable service at reasonable and nondiscriminatory rates. While this ultimate goal is common to all parties, they differ on intermediate goals.

Rigid Rate Proponents generally believe that to achieve the ultimate goal the trucking industry must be protected from: (1) destructive competition — claimed to be caused by sustained prices at a level below the cost of providing safe, reliable service, (2) predatory pricing — lowering prices, as in a price war, in order to drive competitors out of business for the purpose of subsequently raising prices to extract monopoly profits, and (3) shipper clout — unfair competition by which large shippers exercise market power to drive the prices of shipping their goods below cost.

Additionally, Rigid Rate Proponents argue that the public must be protected from: (1) price discrimination, (2) unsafe drivers and equipment, (3) poor service, and (4) monopoly pricing Although these parties support additional safety regulation, they agree that the primary protection for both the trucking industry and the public is economic regulation.

Flexible Rate Proponents are also concerned with these issues, but believe the public will be adequately protected by a regulatory program that provides carriers with considerable rate flexibility. These parties advocate less or no rate regulation, strict safety regulation, and the monitoring of prices and service.

We believe that each of the individual proposals by the many parties to this proceeding falls short of providing safe, reliable service at reasonable and nondiscriminatory rates. Our concerns are these:

### *"Destructive Competition"*

Ad Hoc argues that without strict economic regulation we will return to the chaotic times of the late 1920s and early 1930s when destructive competition was rampant. No party disputes the destructive practices that occurred in that period. At that time the trucking industry was relatively young. Regular route carriers and railroads were economically regulated while contract carriers and carriers not operating between fixed termini or over regular routes were unregulated. During an era when jobs were scarce this led to the proliferation of unregulated carriers and fierce competition for the customers of regulated carriers and the railroads. The same economic factors that made jobs scarce also led to an oversupply of trucks. Reduced overall economic activity at that time, which we do not face today, could not support the capital stock of trucks, leading carriers to reduce rates below full costs. The intense competition from carriers with devalued equipment was harmful to the regulated industry, and eventually led to the regulation of contract and irregular route carriers. Rigid economic rate regulation for all carriers was one logical solution, but it was not the only answer then or today.

We see now that the most important factor contributing to the market disruptions of those times was the overall state of the economy. Because it is very unlikely that the economic conditions of the Depression will be repeated in the near future, we are reluctant to endorse any specific theory of "destructive competition". Rigid Rate Proponents believe that destructive pricing practices are a natural consequence of open competition and must be protected against. Flexible Rate Proponents believe that destructive competition is a misnomer; pricing below cost can be destructive, but it is not

due to competition. We agree with the latter position. Economic circumstances can cause destructive practices, but it cannot be said that competition by itself causes those practices. There is no evidence on this record that California's economic conditions will soon cause an oversupply of trucks and subsequent devaluation of capital sufficient to induce the destructive practices seen sixty years ago.

Although many changes have occurred since the mid-1930's, the general freight intrastate trucking industry in California still has relatively rigid rate regulation. Parties favoring the continuation of this regulation say that carriers with price flexibility will price below cost and destroy the trucking industry as we know it. On the other hand, the record shows that without economic regulation carriers in interstate markets and intrastate markets such as Arizona and Florida have continued to profit. We acknowledge that some carriers, given the freedom to do so, may price irrationally. If these carriers do so for any length of time, we expect them to go out of business. Business failures by ineffective competitors are inherent in a workably competitive market and can be expected in any industry where entry is relatively easy and inexpensive. [1] While this may be destructive to individual carriers, it is not destructive to the industry. The Arizona experience shows that the industry can survive without economic regulation. Efficient carriers that price according to their costs and provide safe, reliable service should not only survive, but prosper when allowed price flexibility and an equal opportunity to compete.

We conclude that specific regulatory protections against destructive pricing practices is not necessary, principally because the market conditions that induce such practices are extremely unlikely. As we will see, our adopted zone of reasonableness for common carriers will provide additional protections for the public, but those protections are incidental. Within the normal workings of competition in the trucking market rigid protections are not necessary. Absent extreme circumstances, a workably competitive trucking market does not require rigid protections. We will not adopt specific regulatory goals concerning destructive pricing practices, beyond general encouragement of cost-based rates.

### *Monopoly Pricing*

The principal reason for regulation of utility rates in general is to prevent monopoly pricing due to restriction of supply. If a utility market is workably competitive, rate regulation is not necessary to keep rates from rising above reasonable levels. If one provider tries to price its service too far above cost, other competing providers will offer the service at a lower and more reasonable rate. Because many elements of the trucking industry are naturally competitive, our goal is to assure that the adopted regulatory program maintains and promotes a workably competitive market.

Three conditions are sufficient to demonstrate workable competition in a market. First, there must be many buyers and sellers of the goods or services. The theoretical definition of perfect competition requires that no single buyer or seller has the market power to affect prices. Because no real market can be perfectly competitive, we rely on the subjective term "many" to describe workable, rather than perfect, competition. Second, entry and exit from the market must be easy. Third, the buyers and sellers must have access to sufficient information to make rational pricing and buying decisions.

If our adopted program allows these criteria to be met in the market, then no further regulatory rate restrictions are necessary to avoid monopoly pricing or encourage economic efficiency.

### *Predatory Pricing*

As defined above, predatory pricing is the lowering of prices to drive competitors out of business, and subsequent raising of prices to extract monopoly profits. In an industry where entry is extremely difficult, predatory pricing is a valid concern. This record has clearly established that entry in the intrastate trucking industry is not difficult. While the cost of equipment and facilities may prohibit carriers from entering the interstate trucking markets on a large scale, the record does not demonstrate the existence of substantial barriers to entry into intrastate markets. Because there are many

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

App-029

carriers in the California intrastate market and entry is not difficult, we do not believe it is realistic to expect predatory pricing. Although our adopted regulatory program will provide some incidental protections against predatory pricing, the workings of market competition do much of the work for us. No formal protections directed at predatory pricing are required.

### Shipper Pricing

There has been considerable testimony concerning the ability of large shippers to set transportation prices. Such shipper pricing is also known as shipper clout. The dangers of shipper pricing are that overall rates would be driven so low that carriers could not recover their costs, or that carriers would make up for losses induced by powerful shippers by charging higher rates to shippers with no market power. From an analytical perspective, the shipper pricing problem is similar to monopoly pricing. A monopoly market features a single or very few sellers of a product to many buyers. A monopsony market (shipper pricing) has a single or very few buyers from many sellers of a product.

The same market forces serve to protect against both situations. While large shippers may receive lower transportation prices, carriers that are not profitable at these rate levels will not remain in business or will decline to serve at the shipper's prices. (Carriers will not necessarily be forced out of business, because there are many shippers in the market.) Eventually, to receive reliable service, shippers will be forced to pay prices which cover a carrier's costs. In a competitive market we would expect large customers to drive the best bargain due to economies of scale. Likewise, in a competitive transportation industry, so long as economies of scale exist, large shippers should receive the lowest prices because of the number and size of their shipments.

Although we are concerned about discriminatory pricing, the economies of scale in serving large shippers is a natural force of a competitive market, and market power will be checked and controlled by market forces. We adopt no regulatory objective to artificially inhibit the natural market force which economies of scale allow for large shippers, as long as rates charged to those shippers are not discriminatory or do not cause price discrimination to other shippers. Those other shippers are protected from subsidies to large shippers as long as their own markets are workably competitive.

### Price Discrimination

No party supports discriminatory pricing, which is rate differences not justified by differences in costs or other conditions. We retain the goal of maintaining identical common carrier rates (by each carrier) for identical services. However, rate differences among shippers can be justified by differences in cost of service or other conditions. Article XII of the Constitution and PU §§ 453, 461.5 and 494 require nondiscriminatory common carrier rates. The standards for contract carriers are far less strict, as contract carriers can and do negotiate different rates for virtually identical service.

Rigid Rate Proponents imply that economic regulation and its system of cost justifications will prevent discrimination. Although we strive to achieve this goal, the complexity of the current system of economic regulation provides no assurances of success. One troublesome example of potential discrimination is write-in tariffs. Shippers can write in to carriers and request a discount, but these discounts are not evaluated for cost justification or discrimination. The terms for obtaining these discounts are not public information.

Parties recommending less or no economic regulation appear to be willing to let the market dictate fair, nondiscriminatory prices. Some claim that discrimination is not possible in a competitive market, on the theory that perfect information and the rational desire to maximize individual profits will keep all rates cost based. We do not share their complete confidence in the market and are unwilling to allow pricing freedom without safeguards. If we can determine that the market is workably competitive, public protections are still in order because shippers and carriers do

App-030

not have perfect information and do not always behave rationally. However, our intention is to provide only necessary protections, without restraining prices so much as to cause inefficiency. For common carriers, as long as rates are confined to a zone of reasonableness, formal cost justification is not a needed safeguard.

It is our goal to prevent discrimination among common carriers. We will do so in part by requiring common carriers to hold themselves out to serve the public. We will specifically disallow tariffs written to serve a single shipper, but no specific geographic limits beyond that will be imposed. We will also order a phased elimination of all existing write-in tariffs. We will address discrimination allegations as they arise, and in time we will change tariff limitations if other rules become necessary.

PU § 3662 orders that minimum, maximum or minimum and maximum rates for contract carriers be nondiscriminatory. As long as our adopted program for contract carriers orders no such rates, it will comply with this mandate.

### Service

There was considerable testimony concerning service to small and rural communities. Rigid Rate Proponents argue that interstate service to these communities has deteriorated under deregulation and that this would happen to intrastate service if deregulated. Flexible Rate Proponents dispute these claims and introduced evidence to support the conclusion that service will remain the same or improve if carriers are given pricing freedom.

No specific proposals concerning service were made, but Ad Hoc suggested that the Commission determine the division of revenues between carriers which interline, or transfer freight to other carriers for eventual delivery. The intent of this proposal is to increase the profitability of small carriers that serve small and rural communities.

The existence or nonexistence of economic regulation will not determine service levels to small and rural communities. It is not how rates are set, but whether they are compensatory at a given level of service, that determines carrier enthusiasm to serve a market segment. We continue to support adequate common carrier service as a regulatory goal. As discussed elsewhere in this decision, we will establish a minimum level of service for common carriers as a safeguard against inadequate and unreliable service.

### Safety

It is undisputed that public safety on the state's highways cannot be compromised by any regulatory program. That has always been the Commission's goal, and we reiterate it now.

Generally, proponents of rigid rate regulation believe carriers operate in a safer manner under economic regulation than in a deregulated system. Proponents of flexible rate regulation dispute this claim. Both made specific safety proposals, which are detailed elsewhere in this decision. Therein we find the most effective way to improve safety is through direct safety regulation and enforcement.

### Competition

The problems with the present regulatory program's ability to cope with today's transportation market are explained in the section entitled *Analysis of Current Regulatory Program*. These problems led us to consider a more flexible approach to rate regulation, on the notion that flexibility would reduce the complexities of current regulation. However, before turning our attention to the appropriate type of rate regulation we must address whether the general freight transportation market is workably competitive. In general, imperfect economic markets require closer regulatory attention than do competitive markets. In any regulated industry a basic goal is to mimic competition. If it can be

demonstrated that the intrastate general freight market is workably competitive, then a more flexible regulatory program is justified.

As discussed in the *Monopoly Pricing* section of this decision, three conditions are sufficient to demonstrate that a market is workably competitive: (1) there are many buyers and sellers in the market, (2) entry and exit from the market is relatively easy, and (3) buyers and sellers have ready access to relevant information.

The evidence presented by DRA and others, as well as the Commission's own statistics on certificated common carriers and permitted contract carriers, are clearly convincing that there are many buyers and sellers in the intrastate general freight market. For example, there are now more than 3000 intrastate common carriers in California (3,442 common carriers as of June 30, 1988). Only in the smallest market segments might there be so few carriers that competition would not drive rates toward costs, or so few shippers that service would be inadequate. These areas become candidates for regulatory protections not needed on major freight routes, if monitoring shows the need.

Quick, easy and inexpensive entry with small sunk costs required of competitors creates an ideal situation for competition, which will in turn enforce restraint upon pricing. Theoretically, a dominant firm will behave competitively if it fears entry by another firm with similar cost characteristics, even if the dominant firm has a very large market share. If the dominant firm does not react this way, other competitors will enter the market. In either case, customers have access to cost based rates. The record in this proceeding clearly indicates that entry into the intrastate general freight market and expansion into new areas are relatively easy and can involve relatively small capital costs. This is supported by the testimony of many parties (e.g. DRA, Coalition, CMA, FTC) and the number of entrants that receive operating authority from this Commission. From July 1, 1987 to June 30, 1988 there were 1,141 contract carriers and 260 common carriers receiving new authority.

Recovery of entry or expansion costs upon exit from the general freight market is not difficult. Exit costs depend on the extent to which investments can effectively be redeployed or sold in response to changes in market conditions. Transportation equipment and terminals have multiple uses and can be easily sold or transferred to new or existing carriers as well as other businesses. A competing firm or new entrant would likely purchase or lease an exiting firm's facilities, significantly decreasing the risk of losing entry investments. Ease of entry and exit is further demonstrated by the relatively small capital costs and minimal capital risks inherent in entering the trucking business.

Ready access to information is an element of competition that can be determined by regulation of market mechanics but is not dependent on regulation of rates. Without accessible rate information carriers may be able to discriminate against certain shippers and maintain higher rates than could be charged if shippers had accurate information about all carriers' and shippers' rates. Everyday business relationships produce much competitive information. However, any regulatory program should encourage rate competition by promoting open rates for both common and contract carriers. Secret rates and discounts promote discrimination and discourage direct competition.

Because the sufficient economic conditions are convincingly met or can be promoted by a minimum of regulatory constraint, we find that the intrastate general freight trucking market is workably competitive.

Workable competition will protect shippers against unreasonable rates. If rates are too high, other competitors will take the business. If rates are too low, the carrier will go out of business.

Typically, a workably competitive market does not warrant rate regulation to produce just and reasonable rates. However, the Legislature has enacted statutes providing that the use of public highways for the transportation of property for compensation is a business affected with a public interest and the Commission should ensure just and reasonable rates and adequate, dependable, and safe service. This legislative mandate requires the Commission to impose a regulatory program that meets the statutory objectives, whether by flexible or rigid rate regulation, or in the case of contract carriers

without rate regulation at all. For contract carriers the Commission has the authority to order no specific rates, so long as the statutory objectives are met.

In analyzing the current regulatory program we noted some major flaws that pose a significant barrier to maintaining reasonable rates and preventing discriminatory pricing. These flaws also inhibit the State's economy from fully benefiting from the services of a vital and vigorous for-hire trucking industry. If carriers are not allowed to respond to market conditions, they are prevented from operating efficiently, with the attendant risks of oversupply, waste of resources and stifling of innovation.

To better allow carriers to efficiently respond to market conditions and to meet the statutory objectives, we will adopt a regulatory program that recognizes the benefits of competition. Although we believe that a more flexible system will work, we will monitor how effective that competition is in driving prices toward costs. The adopted program will provide for both rate flexibility and a monitoring plan. For common carriers, consistent with legal precedent, rate flexibility will be confined to a zone of reasonableness. For contract carriers no rate restrictions are necessary. The monitoring plan is intended to offer a mechanism for detecting and correcting any failure of market forces.

Our response to competitive realities in the trucking industry will help us to achieve the regulatory objectives mandated by the statutes. We believe that the public interest will be better served by permitting carriers flexibility in rates in response to the demand and constraints of a competitive market. Price flexibility will provide carriers the freedom to align prices more closely with their costs and should enable well-managed and efficient carriers to earn a reasonable return on their investments. The current regulatory program is overly protective of inefficient carriers, allowing them to earn a return on their investments while forcing more efficient carriers to price their services above costs.

An effective regulatory program would allow efficient use of resources and timely response to demand for services. The current program provides the wrong incentives for efficiency, erecting unneeded hurdles which translate into higher rates for shippers and consumers. We continue to strive for rate regulation that is efficient and fair. If fairness and equity goals can be met, then less regulation is preferable to more regulation, because less regulation is economically more efficient.

Further, the record demonstrates that similar trucking markets in other jurisdictions function efficiently when subject to price flexibility or economic deregulation. The evidence in this proceeding is clear and convincing that consumers and the economy generally will benefit from the substitution of market-set rates for government efforts to fix prices.

We are convinced that the workings of competition will produce just and reasonable rates, and that monitoring protections and ready access to rate information will quickly identify any rates that are not just and reasonable. Therefore we will not require that individual carriers file formal applications to change tariff rates within the adopted zone of reasonableness or to change contract rates, because there is no need for individual findings to determine that such rates are just and reasonable. The workings of competition and the limits in the regulatory program adopted herein, along with our finding that the approved rates are just and reasonable, will suffice. This rate flexibility will be confined to a zone of reasonableness for common carriers, consonant with legal precedent.

When the Commission first began to require separate findings and orders in support of individual rate applications, that process was both necessary to remedy market imperfections and effective in regulation of relatively few carriers. Today conditions have changed. The market is workably competitive, and therefore case-by-case cost justification is unnecessary. As well, the large number of carriers makes individual litigation of rate applications burdensome and ineffective.

### *Legal Authority for a Flexible Rate System*

Rigid Rate Proponents argue that the Constitution of the State of California (Constitution) and the Public Utilities Code (PU) require rigid rate regulation. More specifically, Rigid Rate Proponents rely on Constitution Article XII, §§ 3 and 4, and PU §§ 451, 452, 453, 454, 455, 460, 461.5, 486, 491, 494, 726, 730, 731, 3662 and 3666. The full text of the applicable sections of the Constitution and the PU Code are attached as Appendix B to this decision.

Based on their interpretation of the these constitutional and statutory sections, Rigid Rate Proponents further argue that the Commission must provide a regulatory program for common and contract carriers that requires:

1. Commission approval prior to any change in common carrier and contract carrier rates.

2. Commission findings that common carrier and contract carrier rates are just and reasonable.

3. Thirty days' public notice prior to the effective date of common carrier and contract carrier rates.

4. Common carrier and contract carrier rates to be public documents filed with the Commission.

5. Common carriers and contract carriers to charge nondiscriminatory rates unless justified by the transportation conditions.

6. Common carriers to provide adequate service.

Rigid Rate Proponents contend that a regulatory program that does not meet the first four "requirements" above would not protect the public from poor service, unreasonable rates and discriminatory practices. Moreover, Rigid Rate Proponents argue that the Commission is prohibited by the above statutes from issuing a blanket-authorizing decision and must act upon individual carrier showings of justification.

Flexible Rate Proponents paint a very different picture. They believe that Rigid Rate Proponents are too narrow in their reading of Constitution, Article XII, § 4 and PU § 454 with respect to the flexibility the Commission has to decide on the showing and finding required by those sections. They argue that in setting a rate the Commission can choose its own criteria or methods, provided they are reasonable. Flexible Rate Proponents assert that the Constitution and the Public Utilities Code give the Commission wide latitude on precisely what kind of regulatory system it will impose and that the California Supreme Court has confirmed the Commission's considerable discretion in setting rates for the transportation of property, citing *California Trucking Association v. Public Utilities Commission* (1977)19 Cal. 3d 240, 246 & n.10, 247 (*CTA v. PUC*).

In addition, Flexible Rate Proponents point out that it is well established that a reasonable common carrier rate or charge in any given situation may be determined within a zone of reasonableness and cite the following:

There is a zone of reasonableness within which common carriers, so long as statutory restrictions are not transgressed, may and should exercise discretion in establishing their rates. The upper limits of that zone are represented by the level at which the rates would be above the value of the service, or be excessive. The lower limits are fixed, generally, by the point at which the rates would fail to contribute revenue above the out-of-pocket cost of performing the service, would cast an undue burden on other traffic, or would be harmful to the public interest." (50 CPUC 632.)

Flexible Rate Proponents argue that through the mechanism of a zone of reasonableness common carrier rates can be established without the need for an individual review of each increase or decrease. They contend that, instead, a rate zone can be preapproved by a finding that the zone is reasonable, is in the public interest, and fulfills the needs of commerce.

Flexible Rate Proponents contend that a zone of reasonableness for common carriers of general freight is consistent with PU § 454.2. That section provides for blanket authorization of rate changes for common carrier passenger stage corporations within a zone of rate freedom, based upon an advance finding that the service involved is competitive. Flexible Rate Proponents argue that, although general freight is not included in PU § 454.2, the implication is that the Constitution provides sufficient latitude to implement a regulatory procedure for common carriers that incorporates a zone of reasonableness. Flexible Rate Proponents therefore argue that because a zone of reasonableness is permissible under the constitutional language, it is also permissible under the substantially identical language of § 454.

According to Flexible Rate Proponents, the record in this proceeding shows that a flexible rate program is better suited to today's economic conditions in the trucking industry. Thus, Flexible Rate Proponents claim that the evidence in this proceeding constitutes a showing before the Commission that the proposed rate changes are justified. They assert that the evidence will support findings that: (1) the carriage of general freight is naturally competitive, (2) individual carriers cannot garner sufficient market power to exact unreasonably high or discriminatory prices, and (3) predatory pricing and destructive competition are unlikely to result. They therefore contend that the Commission can find that the proposed rate changes are justified and grant blanket authorization for individual carriers to raise and lower rates. A blanket authorization would eliminate the need for additional showings before or decisions by the Commission.

Flexible Rate Proponents argue that the Commission's complaint and protest procedures will act as further checks and balances against unreasonable rate changes. Flexible Rate Proponents also cite antitrust laws as additional controls to insure that the benefits of competition are preserved and promoted. Among the laws referenced are the Sherman Antitrust Act, Federal Trade Commission Act, Cartwright Act, Unfair Practices Act, and Robinson-Patman Act. Generally, these Acts provide that pricing below cost with the intent to reduce or eliminate competition is unlawful. The remedies are varied and potent. Both Federal and State authorities prosecute these violations. Violation is a criminal offense. Public prosecutors at the State level may bring an additional action providing for civil penalties, restitution and attorneys' fees. The recompense of these civil penalties, which can amount to millions of dollars, makes these actions particularly attractive to public authorities.

With respect to notice requirements before common carrier rates can become effective, Flexible Rate Proponents point out that under PU § 455 the Commission can grant authority for rate decreases to become effective less than 30 days after filing. In addition, Flexible Rate Proponents assert that an order in this proceeding can meet the requirements of PU § 491. That section permits the Commission for good cause to allow rate changes on less than 30 days' notice by an order which: (1) specifies the changes to be made, (2) identifies when the changes will occur, and (3) sets forth the manner in which changes shall be filed and published. We agree with Flexible Rate Proponents that we can issue an order making rates effective less than 30 days after filing.

We also agree with Flexible Rate Proponents that the Commission has considerable discretion in setting rates for highway contract carriers. In *CTA v. PUC* the California Supreme Court construed PU § 3662 which provides that "[t]he commission shall . . . establish or approve just, reasonable, and nondiscriminatory maximum or minimum or maximum and minimum rates to be charged by any highway permit carrier". The Court determined that this language vests the Commission with the discretion to set maximum or minimum rates, "*or no rate at all*." (19 Cal. 3d at 246 n.10, emphasis added.) The Court also held that PU § 726 implies the standard by which minimum rates are to be determined, but does not require that any such rates be set. (19 Cal. 3d at 247.)

We are also persuaded by Flexible Rate Proponents' arguments that the Constitution and the Public Utilities Code provisions cited above permit the Commission to authorize rate flexibility for common carriers within a zone of reasonableness, based upon a finding that workable competition exists and that serious problems in the areas of regulatory concern outlined above will not result. Both enactment of PU § 454.2 and the language of PU § 454 support this conclusion.

App-035

Article XII § 4 of the Constitution states in part, "A transportation company may not raise a rate or incidental charge except after a showing to and a decision by the commission that the increase is justified". Notwithstanding this language, PU § 454.2 permits blanket authorization of rate changes for common carrier passenger stage corporations within a zone of rate freedom, based upon an advance finding that the service involved is competitive. PU § 454.2 further provides that an adjustment in rates or charges within such a zone of rate freedom established by the commission is just and reasonable. Thus, PU § 454.2 clarifies the type of showing permitted by the Constitution.

PU § 454 provides, with certain exceptions (for example, where there is no rate increase), that "no public utility shall change any rate . . . except upon a showing before the commission and a finding by the commission that the new rate is justified." We agree with Flexible Rate Proponents that this language, insofar as it requires a showing and a Commission finding that rates are justified, is substantially identical to the constitutional language requiring a showing and a Commission decision that rates are justified. Thus we conclude that § 454's requirement of a showing and finding, like the constitutional provision, allows the Commission to grant blanket authorization for common carrier rate flexibility within a zone of reasonableness where there is a showing of competition.

This conclusion is further supported by the language of Constitution, Article XII, § 4 and PU § 454. Neither of those sections expressly requires individualized showings of justification. Rather, the gist of those sections is that common carrier rate increases require prior Commission authorization. Thus, we conclude that those sections permit the Commission to grant prior authorization for rate flexibility within a zone of reasonableness, where a showing justifying such rate flexibility has been made.

The California Supreme Court's decision in *CTA v. PUC* further confirms the Commission's considerable discretion in setting highway common carrier rates. That decision construed not only PU § 3662, applicable to highway contract carriers, but also § 726, applicable to highway common carriers, in such a way as to leave the Commission with considerable discretion in deciding how to regulate common carrier rates. [2]

In short, we conclude that: (1) the Commission is not restricted to a cost-of-service form of regulation, and (2) there is ample authority to establish an appropriate and effective form of flexible rate regulation.

### Contract vs. Common Carriage

An important element of the adopted regulatory program is the balance of incentives between common and contract carriage. We should not allow common and contract carriers to compete freely against each other because common carriers are held to higher standards for rates and service. We must separate these markets by identifying separate conditions of service. The balance parallels the classic policy balance of economic efficiency vs. fairness or equity among the participants in a market.

In promoting safe, reliable service at reasonable and nondiscriminatory rates we could emphasize service and price discrimination protections by providing incentives for common carriage, at the risk of loss of economic efficiency. Encouraging common carriage at the expense of contract carriage would improve consumer protections because all carrier obligations would be explicit in fixed tariffs, but it would prevent carriers and shippers from making private arrangements that might increase carrier efficiency and thus lower prices. On the other hand emphasis on low rates could be provided by incentives for contract carriage, at the risk of price discrimination and poor service to some market segments.

We have heard from shippers and carriers who are dissatisfied with their opportunities to set special, efficient rates in specific situations. In many such cases it is special shipper obligations which drive the efficiencies that allow lower rates.

App-036

In striking the balance we are restrained by law and sound public policy to maintain a viable, working common carriage system. We cannot know with certainty that a viable common carriage system will survive if all the incentives are in favor of contract carriage. Common carriage must work efficiently to serve customer demand, not merely exist as an empty set of rules built to satisfy legal requirements. The most ardent of flexible rate proponents claim that effective common carriage will always survive because there are many carriers that will choose common carriage as a marketing tool in serving small communities or market segments. However, the evidence does not convince us to make that finding, and the consequences of ordering such an experiment are too risky. We will allow greater freedom than is currently granted for contract carriage, but not without limits.

We will effect the balance of incentives for common and contract carriage in these ways: (1) by ordering different effective dates for the two types of carriage, and (2) by defining the applicability of contract carriage. These are the two controls that will in large part determine how much freight actually moves under common or contract carriage. Our choices in setting these controls will be discussed in the *Adopted Regulatory Program* section of this decision. The applicability of the zone of reasonableness to common carriers but not contract carriers is a distinction driven by legal precedent, not our inclinations in balancing incentives for two types of carriage. As will be discussed in the *Limits to Zone of Reasonableness* section, the restrictions of the zone do little to favor contract over common carriage.

### Zone of Reasonableness

The evidence in this proceeding strongly indicates that competition is effective, and market forces along with some protections to ensure fairness will maintain prices at reasonable levels. For contract carriers we will allow unlimited rate flexibility while ensuring that contract carriers do not provide common carrier service under the guise of contract carriage. The statutes and case law provide a more restrictive framework for regulating common carrier rates. See California Constitution, Article XII, Sec. 4, PU §§ 452 and 454. As we noted in the Legal Authority for a Flexible Rate System section:

There is a zone of reasonableness within which common carriers, so long as statutory restrictions are not transgressed, may and should exercise discretion in establishing their rates." (50 CPUC 632.)

We will establish a zone of reasonableness for common carriers, and for all carriers we will monitor markets to assure that competition is controlling market behavior.

To be useful to common carriers, the limits of the zone must be sufficient to permit a fair opportunity to raise or lower prices to respond to market conditions. There must be enough latitude to allow carriers to respond to changes in the economy such as increases and decreases in fuel prices. In addition to meeting legal requirements, the zone of reasonableness can be designed to provide incidental protections against claimed market abuses. These objectives can be achieved by setting a ceiling on the amount an individual rate can rise within a specified time, and by setting a floor price below which rates cannot be reduced. Increases greater than the ceiling or decreases below the floor can be requested by filing an application with appropriate justification. Naturally, if a general emergency occurred, the limits to the zone could be temporarily changed.

The limits to the zone are defined first by legal precedent. In order to realize additional protections against possible market problems, we will analyze the market inefficiencies that might be encountered. The claimed dangers are predatory pricing and the vaguely defined destructive competition.

The upper end of the zone will serve to stabilize rates and restrain predatory pricing. To succeed at predatory pricing a carrier must first drive competitors out of the market by lowering prices and subsequently raise prices above reasonable costs. A yearly percent increase limitation would: (1) allow carriers flexibility to track increases in costs, and (2) prevent the second step of the predatory pricing process, especially if the reduced price in the first step becomes the base price for

the increase limitation. There is no convincing evidence that predatory pricing has existed or could exist in the California intrastate market. In any event, the upper limit of the zone will preclude even this remote possibility in the common carrier market. The upper end of the zone will serve to restrain prices, but competition is most important in keeping rates at reasonable levels. Without an upper limit a carrier could raise rates in hopes of increasing profits, but in a competitive market that carrier will simply lose business as other carriers take the freight by charging lower, cost-based rates.

In setting the lower end of the zone we will rely on the terms of 50 CPUC 632-633 cited previously. The three limitations therein are that rates: (1) cover out-of-pocket costs, (2) do not unduly burden other traffic, and (3) are not harmful to the public interest. We will order that common carrier rates shall not fall below a floor price. The floor will be based on a minimum level of variable operating costs, excluding all capital and other fixed costs. As will be discussed in the *Safety and Entry Requirements* section below, we do not believe that safety is compromised by rate flexibility. However, the definitions of variable costs will be stretched to include insurance costs and as much safety costs as can reasonably be accommodated.

We have used "out-of-pocket" costs in the past, explicitly excluding overhead expense, other fixed costs and ownership costs such as depreciation, certain taxes and return on investment. In establishing our price floor, we choose to use a minimum level of variable costs because it will cover at least the legally required "out-of-pocket" costs and is consistent with our previous decisions. The fact that the general freight market is workably competitive precludes undue burden on other traffic. Although we do not endorse claimed theories that rate flexibility will cause market abuses, the adopted zone of reasonableness will provide incidental protections against public harm.

The lower end of the zone will provide some additional protection against predatory or destructive pricing below cost. Underpricing induced by severe economic circumstances or large scale irrational carrier behavior, which occurred during the Depression but which we do not now anticipate, might cause inadequate wages, poor maintenance or market instability, all of which are serious concerns.

For the present we will develop measures of variable cost using data from within the current TFCI. We will order hearings to investigate alternative measures of variable cost and to determine an updating procedure for future floor prices. The updating may be done by subsequent workshops and Commission resolution, or through the hearing process; we will decide this issue in the upcoming hearings.

Because the floor excludes all fixed costs we anticipate that it will not be used for rate indexing by carriers. We have learned elsewhere in the transportation industry that minimum rates set too high become de facto maximum rates as well, generating vigorous and largely unnecessary dispute. We hope that in the future calculation of floor prices will be less contentious.

In summary, the upper limit of the zone of reasonableness for common carriers is an annual percentage cap on rate increases, and the lower bound is a minimum level of variable costs. The zone of reasonableness meets legal requirements, provides pricing flexibility, and by allowing carriers to respond to market changes encourages rational carrier pricing. Carriers have strong incentives for cost-based pricing, and both shippers and carriers are provided incidental protections against the claimed market abuses of predatory pricing and irrationally low prices. Large common carrier rate changes that could be challenged as unreasonable require an application and case-by-case justification.

A zone of reasonableness is not required by law for contract carriers, nor is it necessary on policy grounds. There is currently no limit on contract carrier price increases, and we see no reason to impose one. The current requirement that contract rates and rate decreases be cost justified is not necessary. The present economic outlook and the workings of competition provide ample protection against claimed future destructive pricing and predatory pricing.

*Safety and Entry Requirements*

Prior to September 20, 1963 the Commission administered safety regulations for for-hire motor carriers. In 1963 this responsibility was transferred to CHP by legislative action. PU § 767 (now § 768) was amended to provide that "the commission shall not regulate the safety of operation of passenger stage corporations, highway common carriers, and petroleum irregular route carriers."

Following this jurisdictional transfer, the Commission assumed a supporting role in safety by suspending or revoking the operating authority of carriers which the CHP would identify as unsafe. In 1986 the Legislature amended PU § 768 to state, "The Department of the California Highway Patrol shall have the primary responsibility for the regulation of the safety of operations of passenger stage corporations, highway common carriers, and other motor carriers. The commission shall cooperate with the Department of the California Highway Patrol to ensure safe operation of these carriers." More recent legislation, discussed below, continues to stress the importance of the Commission's role in safety.

Because the positions and arguments of many parties are similar, we will segregate them into two groups — those who favor rate regulation to improve highway safety, and those who believe that direct safety enforcement is the best approach to improve highway safety.

*Parties Supporting Rate Regulation*

In its direct showing CTA presented four witnesses to address driver and truck safety issues. Based on their testimony, CTA's policy witness recommended that the Commission:

1. Develop a special task force of industry and government representatives to establish minimum driver training standards acceptable for the for-hire carrier industry.

2. Join the industry in proposing realistic drug testing qualifications for drivers.

3. Work with Air Quality Management Districts to decrease congestion through truck pricing practices.

4. Require carriers with low safety scores to demonstrate that requested rate reductions will measurably improve the carrier's safety score.

5. Require all contracts to include a provision which binds the shipper to the carrier and makes the shipper co-liable for all accidents arising from the carrier's performance for the contract shipper.

Additionally, CTA's policy witness testified that in conformance with AB 3490 (Stats. 1988, Ch. 1175) the Commission should establish regulations for new entrants which require them to:

1. Be financially and organizationally capable of conducting an operation within the rules and regulations of the CHP.

2. Be committed to observing the hours of service regulations for all employees and subhaulers operating vehicles under the applicant's operating authority.

3. Have a Commercial Vehicle Safety Alliance sticker for each vehicle and a preventive maintenance program that conforms with CHP regulations.

4. Participate in the DMV's driver pull notice program and in a program to regularly check the driving records of all employees and subhaulers operating vehicles which require a class 1 driver license.

5. Have a safety education and training program for all employees and subhaulers operating vehicles under the applicant's operating authority.

6. Pass a written test to ascertain the applicant's knowledge of vehicle maintenance standards.

Convinced that rate regulation and safety are related and that police enforcement cannot alone compensate for safety problems, CTA developed a safety score to predict carrier accident and citation rates from carrier income statements. CTA argued that safety performance is affected by a carrier's operating margin, driver labor as a percent of revenue and expenses, and purchased transportation as a percent of expenses. From this, CTA concluded that carrier safety performance could be predicted by the profitability and driver compensation practices of trucking firms. CTA claims that the safety scores developed from these factors have their greatest predictive accuracy at the extreme (e.g. carriers with the lowest scores present the most danger on the highways) and recommends limiting rate freedom for carriers that rank in the lower one-third.

Additionally, CTA notes that over 90% of truck-at-fault accidents are caused by driver error and attributes this to lower driver wages and deregulation.

Ad Hoc argues that less restrictive rate regulation places economic pressure on carriers which causes them to overwork drivers, reduce maintenance, and violate safety laws. Ad Hoc supports this argument by asserting that safety declined during the period of lessened rate regulation, 1981-1986. Finally, Ad Hoc does not support the contention that direct enforcement is the most effective means of providing safety to the public, and claims that rate regulation is needed to ensure safety.

WCFTB is convinced that unregulated carriers have a worse safety record than regulated carriers and rejects the evidence that a correlation does not exist between economic regulation and safety. WCFTB is also opposed to the regulatory proposals which increase rate flexibility, on the grounds that many carriers will experience extreme hardship and safety will deteriorate. These concerns combined with recent safety legislation cause WCFTB to recommend that the Commission conduct a more comprehensive investigation into the effects of DRA's proposal.

Teamsters, NMFTA and Hegarty argue that much of the trucking industry has not achieved a sufficient level of truck safety. These parties believe that flexible rate regulation would place downward pressure on rates and wages, cause carriers to reduce repair and maintenance expense, and make it difficult to replace aging equipment and attract well-qualified drivers. Additionally, these parties seriously doubt that direct enforcement alone will be sufficient to keep the highways safe.

*Parties Supporting Direct Enforcement*

DRA contends that a direct line between rate regulation and safety does not exist, and cites the lack of evidence which would correlate accident data with rate regulation to support this claim. DRA supports its claim with studies on the profitability of unregulated vs. regulated carriage during the 1980-1986 transition period, correlations between profitability and regulation, and the evidence presented by FTC in this proceeding.

DRA argues that direct safety enforcement is the most cost effective method of protecting the public from irresponsible carriers. Unsafe operations can cause unreliable service and result in higher rates for liability and worker's compensation insurance. DRA believes that carriers seeking to operate profitably will operate safely because safety pays. DRA supports safety programs that suspend or revoke carrier operating authority to ensure compliance with insurance requirements,

CHP's safety inspection standards and maintenance of safety related records. Finally, DRA concludes that safety enforcement is the most effective means for improving safety. DRA recommends the Commission enhance direct safety enforcement by:

1. Providing CHP yearly carrier mileage data for computing carrier accident and citation rates using CHP's MISTER records.

2. Working with CHP to develop a numbering system which allows intrastate regulated motor carriers to be identified in CHP's MISTER records by a single number in place of both a Commission and CHP number.

3. Augmenting the list of owner-operators, required by AB 2706, with carriers that receive subhaul only revenue, if necessary.

4. Working with CHP to implement recent legislation which requires joint action.

In response to CTA's research on highway safety DRA argues that the safety score methodology is flawed and at best only a preliminary indicator of safety. Specifically, DRA claims that CTA's research has severe database, variable and methodological problems that render the findings inaccurate and the conclusions invalid.

The Coalition supports direct enforcement as the most effective method of improving highway safety, and references recent safety legislation as being consistent with this position. The Coalition also believes that safety is cost-effective, citing carrier testimony that safety programs reduce insurance costs and help avoid CHP citations.

The Coalition has many of the same concerns with CTA's safety score methodology as DRA. First, the Coalition challenges CTA's logic which favors carriers that do not use subhaulers. Second, the Coalition identifies the application of inconsistent data (interstate and intrastate miles are used to compute accident and citation rates based upon intrastate-only accident and citation experiences). Third, CTA's statistical methodology is extremely sensitive to small variations in data. The Coalition concludes that CTA's safety score proposal and underlying studies are not supportable.

Fischer contends that there is no conclusive proof that flexible rate regulation will lead to financial distress sufficient to adversely affect safety. Similarly, Fischer argues that there is no convincing evidence that continuing the current program will have a positive effect on safety. Finally, Fischer provides the following quote from CTA's witness Garland Chow to support these conclusions:

The issue of how economic regulation impacts safety is still unanswered." (Exhibit 185, p. 4.)

CPIL also argues that there is not a direct correlation between rate regulation and highway safety. If such a correlation existed, CPIL concludes that carriers would have to receive excess profits to improve safety. CPIL proposes a targeted approach to safety regulation and recommends that the Commission work with other agencies to prevent regulatory overlap and optimize use of resources.

CMA, NSSTC and Mike Conrotto Trucking support direct enforcement as the best method of improving highway safety and argue that accident data shows little correlation between rate regulation and safety. Furthermore, these parties contend that safety is an enhancement to profits through lower insurance costs, lower CHP fines and lower risk.

Finally, CMA claims that the data base for CTA's safety score proposal has fundamental flaws and that the safety score is a poor predictor of accident and citation experience. CMA believes that the best predictor of a carrier's future safety record is the carrier's current safety record.

*Safety Legislation*

[iv] Recently enacted State legislation has significantly strengthened safety regulation. SB 2594 (Stats. 1988, Ch. 1509) put into effect commercial driver license requirements from the Federal Commercial Motor Vehicle Safety Act of 1986 (Title XII of PL 99-570). In compliance with this legislation DMV established more stringent testing and licensing requirements and increased sanctions for serious traffic violations.

AB 3490 (Stats. 1988, Ch. 1175) specifies additional entry requirements for new intrastate regulated motor carriers. This legislation mandates that new entrants and transferees must:

1. Be financially and organizationally able to conduct an operation that complies with the rules and regulations of the CHP.

2. Commit to observing the hours of service regulations.

3. Have a preventive maintenance program for its vehicles that conforms to CHP regulations.

4. Participate in a program to regularly check the driving records of all employees and subhaulers which operate vehicles requiring a class 1 driver's license.

5. Have a safety education and training program for all employee and subhauler drivers.

6. Maintain vehicles in a safe operating condition and in compliance with the safety provisions of the Vehicle Code and regulations in Title 13 of the California Code of Regulations.

7. File with the Commission a certificate of workers' compensation insurance coverage for employees or a Division of Industrial Relations certificate of consent to self-insure.

8. Provide the Commission with the address of an office or terminal where documents supporting these requirements can be inspected.

Another recently enacted safety law, AB 3489 (Stats. 1988, Ch. 916) as amended by AB 2097 (Stats. 1989, Ch. 1216), formalizes the CHP/Commission suspension process for carriers not meeting the State's safety requirements. This legislation also requires the Commission to submit to CHP and the carrier's insurer a list of each intrastate permit carrier's equipment from the preceding year. Carriers who have failed to obtain insurance for all their vehicles may be fined and/ or have their operating authority suspended.

Concerns about carrier safety were also addressed in AB 2706 (Stats. 1988, Ch. 1586) amended by AB 2097 (Stats. 1989, Ch. 1216). These statutes require commercial carriers to inspect their equipment at least every 90 days and to schedule a CHP terminal inspection at least every 25 months. An unsatisfactory terminal rating can result in suspension or revocation of the carrier's operating authority.

AB 2706 also requires the Commission to annually identify owner-operators and send a list of these carriers along with their commercial driver's license numbers to DMV. DMV must notify the Commission when an owner-operator's driver's license is suspended or revoked, and the Commission must act to suspend the carrier's operating authority.

Finally, under this legislation carriers must also participate in DMV's pull-notice program and check the driving records of all class 1 and 2 (class A and B if licensed after January 1, 1989) drivers at least once a year. Carriers are subject to fines and/or imprisonment for employing a driver without a valid commercial driver's license.

In addition to the legislation that strengthens safety standards, SB 2876 (Stats 1988, Ch. 1596) mandates that CHP: (1) perform additional annual roadside inspections of commercial vehicles, and (2) report on the feasibility of implementing an incentive program for commercial drivers with excellent records.

### *Agency Responsibilities*

[v] Although CHP has primary responsibility for motor carriers safety, other agencies have complementary roles. Generally, CHP is charged with enforcing the rules of the road, setting safety standards for commercial carrier operations, and inspecting carriers operations.

The Commission has responsibility to ensure that new carriers are financially fit and able to conduct safe operations. Additionally, the Commission coordinates with other agencies by suspending the operating authority of unsafe carriers and owner-operators without a valid driver's license and by providing safety related data.

DMV is responsible for licensing standards and procedures. This includes furnishing information to the Commission on the status of owner-operator driver's licenses and oversight of commercial driver training programs, including driving schools.

The Department of Health Services is charged with registering carriers of hazardous waste materials and enforcing special hazardous waste transportation rules. CHP also oversees hazardous material carriers. The table below identifies motor carrier safety programs and the responsible State agencies.

### *353 TABLE 2

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

### *Discussion*

The relationship between safety and rate regulation was one of the more heavily contested issues. Rigid Rate Proponents argue that rate regulation results in safer carriers and that financially healthy carriers spend more on safety. Stated differently, they argue that higher carrier revenues result in more dedication of those revenues to safety-related expenses.

This argument fails for several reasons. Rate regulation alone cannot ensure higher carrier revenues. To do so it must be accompanied by: (1) restricted entry to prevent overcapacity, and (2) rates that yield revenues higher than a workably competitive market. The rigid rate regulation proposals in this proceeding do not address the interaction between carrier revenues and capacity. Because higher rates will entice more entrants, rigid rate regulation without limited entry will do little for carrier revenues. Furthermore, the current and proposed rigid rate programs do not restrict entry and cannot prevent overcapacity if rates are set to provide higher revenues than a workably competitive market. From this analysis we conclude that the current and proposed rigid rate programs will not result in higher revenues or safety expenditures than those of a workably competitive market.

Rigid rate regulation is an imperfect approach to safety. Without carrier revenues in excess of competitive market revenues there is no increase in financial ability to make safety expenditures. Even if there were higher carrier revenues, carriers are not required to increase safety expenditures; carriers allocate operating revenues in their own best interest. Commissioner Calvo recognized this in his concurrence to D.86-04-045:

Regardless of what rates carriers charge, profits can always be increased by reducing costs through lower levels of maintenance and less rigid adherence to safe operating practices. Thus rate regulation is at best an imperfect tool to achieve safety goals."

Consistent with this logic, the credible evidence in this proceeding demonstrates that rigid rate regulation will not improve safety. Our safety efforts will be applied to direct enforcement programs.

We agree with Commissioner Calvo's statement, and believe the Legislature, by enacting tough safety requirements that provide for direct safety regulation and enforcement, also recognized that rate regulation is not the solution to safety problems. We commend and fully support the Legislature in this endeavor and will allocate our resources to enforce these new safety requirements.

We will actively participate in the safety task force established in response to Senate Concurrent Resolution 67. The task force is directed to study methods of improving heavy commercial vehicle and driver safety, including improved coordination among State agencies and commissions having jurisdiction and responsibility for trucking safety. Besides the Commission, the task force includes representatives of CHP, DMV, Office of Traffic Safety in the Business, Transportation and Housing Agency, Department of Transportation, labor organizations, various segments of the trucking and shipping industries, and motor vehicle owners' and operators' organizations.

Finally, we will act to protect the public safety in three additional ways. First, in conformance with AB 3490 we are establishing specific guidelines and criteria to ensure that new carriers are financially viable and operate in a safe manner. Although existing carriers are not impacted by AB 3490's entry requirements, we place the industry on notice that this subject will be addressed in a subsequent proceeding. We believe AB 3490 provides the public needed protection with respect to new carriers and that, where appropriate, existing carriers should meet similar standards.

Second, the Commission staff has an ongoing responsibility to investigate carrier operations for compliance with Commission requirements and in response to public complaints. Field offices are located throughout the State to fulfill this responsibility. We will direct the Commission staff in the course of these investigations to inspect new carrier driver education and training program records for compliance with State law. Where violations are found the Commission staff should take steps to ensure carrier compliance and recommend sanctions when necessary.

Third, the record reflects that some carriers continue to operate after the suspension or revocation of their operating authority. Although Commission records indicate which carriers hold valid operating authority, this information is not readily available to the public. We believe the public will be better served and protected if this information is easily accessible. Therefore, we will provide a toll free telephone number which the public can use to verify a carrier's operating authority.

### *Adopted Regulatory Program*

Our policy is to establish a regulatory program which ensures that carriers provide the public with competitive and nondiscriminatory rates, good service, and safe drivers and equipment. As explained above, we believe that the best way to implement this policy is through flexible rate regulation and stronger noneconomic regulation. Where regulation is not needed to achieve this policy, none will be provided. Consistent with this, the following regulatory program will be adopted:

### *Common Carrier Tariff Rates*

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

App-044

Common carriers may individually set rates within a zone of reasonableness without further Commission approval. The upper end of the zone of reasonableness is cumulative rate increases not greater than 10% over a 12-month period. The lower bound of the zone is a minimum level of variable costs.

Collective ratemaking under § 496 of the Public Utilities Code and authorization of rates outside the zone of reasonableness require a formal application.

Rates withdrawn or amended within 30 days shall have no effect on the 10% upward rate limitation.

All rates shall be filed with the Commission as Tariff Filings and, except those which require an application to be filed or unless suspended by the Executive Director, may become effective 10 days after appearing on the Commission's Daily Transportation Calendar.

The conditions of common carrier service and complete criteria to qualify for rates, including discounts, shall be contained in each carrier's tariffs. Common carriers must bill for services at the lowest applicable discounted rate.

Rates shall be nondiscriminatory. No secret codes, undisclosed discounts, or write-in tariffs shall be permitted. All discounts shall be identified and cross-referenced in the carrier's tariffs.

The freight bills of carriers which publish discounts, must contain: (1) a statement that discounts may be applicable, and (2) the carrier's phone number and address to obtain further information.

### *Common Carrier Contract Rates*

Contract carriers that also have common carrier authority may enter into contracts for common carrier service for a period of up to one year without Commission approval. Contracts may be effective 10 days after appearing on the Commission's Daily Transportation Calendar.

Common carrier contracts may only provide service at rates which are initially equivalent to the common carrier's tariff rates, but may lock in rates over the term of the contract or provide for upward adjustments tied to specified escalation factors.

All common carrier contracts must be filed with the Commission and are public documents.

### *Special Contract Rates*

Special contracts are only for service or under conditions which: (1) are not normally provided under common carrier tariff rates by any carrier, and/or (2) provide for a special relationship between the carrier and the shipper. Dedicated equipment is not required.

All permitted contract carriers can enter into special contracts, whether they hold common carrier certificates or not. There are no restrictions on contract rates.

Special contracts require Commission staff review to insure that a special relationship exists between the carrier and the shipper and/or service is not normally available under common carrier tariff rates. The definition of special relationship requires a continuing relationship of at least 30 days and a meaningful shipper obligation, which can be met by a minimum level of service or other special conditions.

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

App-045

Unless suspended by the Executive Director, special contracts may become effective 20 days after appearing on the Commission's Daily Transportation Calendar.

All special contracts must be filed with the Commission and are public documents.

### Suspension of Rates

The Executive Director may suspend common carrier tariffs, common carrier contracts or special contracts one time for an additional 30 days, after which they will become effective unless further suspended or denied by Commission order.

### Service

Every common carrier will be required to provide a minimum service level of one pickup or delivery per week for all points which are served under that carrier's filed tariffs, if service is requested by any shipper.

Common carriers which serve at the minimum service level are encouraged to also offer enhanced service, such as service on demand, to small and rural communities.

Commission staff will conduct surveys of service and reasonableness of rates for small and rural communities and other traffic lanes as necessary, and publish the results.

### Safety

Commission staff will monitor carrier driver education and training programs.

Safety related programs and data will be coordinated with other governmental agencies.

Commission staff will establish a toll free telephone number for verifying a carrier's operating authority.

Carrier entry requirements established in connection with AB 3490 will be extended, where appropriate, to existing carriers in a future proceeding.

Under this regulatory program, common carriers must hold themselves out to serve the general public by filing tariffs in accordance with PU §§ 486, 487, 488, and 493(a). All common carrier tariffs should describe accurately and fully the services offered to the public and provide the specific rate or the basis for calculating charges for the performance of those services, and show all related classifications, rules and practices. Tariffs should also be filed and maintained in a way that allows all users to determine the exact charges for any given shipment. All discounts shall be identified along with the qualifying criteria. We will enforce the PU Code prohibitions against common carrier tariffs which are shipper specific.

Common carriers that also hold contract carrier authority may enter into both special contracts, on the same terms as any contract carrier, and common carrier contracts. Common carrier contracts shall initially be at or equivalent to common carrier rates, but may thereafter lock in rates, be linked to specific escalation factors, and use alternate classification or rating systems. Common carrier contract rates need not track tariff rates during the contract term. However, any classification or rating system must be designed to initially produce the common carrier's tariff rates and shall require the carrier to be liable for loss and damage to the same extent it is liable under common carrier tariffs.

Contract carriers as such are not required to hold themselves out to serve the general public, but may enter into special contracts. Special contracts are for service or under conditions which: (1) are not normally provided under common

carrier tariffs by any carrier, and/or (2) provide for a special relationship between the carrier and shipper. Special contracts may be effective on 20 days' notice unless suspended.

Contract carriers that also hold common carrier authority may enter into either common carrier contracts at their filed common carrier rates or special contracts. Contract carriers may acquire common carrier authority once all common carrier requirements are satisfied.

The Executive Director may suspend a special contract prior to its effective date if it does not comport with the mandated criteria, or if further investigation is necessary, e.g. to study an unusual shipper obligation. The suspension procedures are similar for all types of carriage — common carrier tariffs, common carrier contracts and special contracts. Suspensions of either tariffs or contracts shall be for not more than 30 days and may be initiated either on the Executive Director's own motion or after protest as set forth in G.O. 147-B, attached as Appendix D to this decision. After the suspension period, the contract or tariff will become effective unless further suspended or denied by Commission order.

In D.89575, we specified the proper scope of Highway Contract Carrier operations. That decision states that "a contract carrier must generally have a continuing relationship with the shipper or shippers it serves" and that "a continuing relationship cannot be predicated upon a single shipment." The decision went on to state that "a continuing relationship requires that service be provided periodically over a period of time not less than 30 days in duration."

We do not intend to depart from the definition of common and contract carriage contained in D.89575, but we will further define the proper scope of contract carriage and specify the transportation characteristics and shipper responsibilities that identify a special contract.

Most simply put, special contracts will be authorized where: (1) the transportation services are not provided by any carrier under common carrier rates; or (2) there exists a continuing relationship between carrier and shipper, and the contracts provide for meaningful shipper obligations beyond the obligation to pay for services provided. Details are set forth in the *Special Contract Regulations* section.

Some commenters to the Proposed Decision restated arguments that all contracts be confidential, on the grounds that disclosure of contract terms unfairly releases proprietary information to the shipper's competitors. Contracts are not now confidential. Because ready access to information encourages competition and discourages discrimination we will not allow confidentiality. Contracts are public documents.

Subhaulers continue to be classified as contract and common carriers and afforded the same regulatory treatment as prime carriers. This is discussed in more detail in the *Subhaulers* section of this decision.

As is true for the present program, under the adopted program there will be no barriers to entry in terms of limiting operating authorities, commodities or areas of service. Carriers will be allowed to individually set rates without additional Commission approval. However, common carrier rate increases greater than 10% or cumulatively greater than 10% for the last 12 months, common carrier rates at less than a minimum level of variable costs and rates collectively set under PU § 496 will require formal applications.

To provide for an orderly conversion to our adopted regulatory program, we will grandfather under G.O. 147-B all rates and contracts which are governed by G.O. 147-A and in effect immediately prior to the effective date of G.O. 147-B. This will allow general freight contracts to remain in effect until their expiration date, which cannot exceed one year. However, within 90 days from the effective date of G.O. 147-B, all common carrier tariffs, except shipper specific tariffs and rates which include write-in tariffs, must conform to G.O. 147-B requirements. Shipper specific tariffs and rates which include write-in tariffs must conform to G.O. 147-B according to a 120 day phase-out schedule.

As previously discussed all parties agree with our primary goal of providing the public with safe, reliable service at reasonable, nondiscriminatory rates. Below we show how each of these criteria meshes with our adopted program.

### Safety, Service and Price Discrimination

The adopted program meets policy goals in these areas, as discussed previously. The program does not conflict with the Commission's safety goals, as discussed in the *Safety and Entry Requirements* section. Flexibility in setting rates will not compromise safety as long as direct enforcement activities are given full support.

We agree with the Rigid Rate Proponents that the trucking industry is unique in that it provides a service to the public over public roads. From this we conclude that common carriers should provide the public with a minimum level of service. To ensure adequate and reliable service to small and rural communities, we will require common carriers to serve, at least once per week, each point for which they have filed tariff rates. Service may be provided directly by the carrier or through arrangements with other carriers. Service need not be provided if none has been requested.

Additionally, we instruct the Commission staff to conduct studies of service to small and rural communities, and studies of rates in traffic lanes statewide. These surveys should be published and where problems exist recommendations made for corrective action.

Even though nondiscriminatory rates are a legal requirement for any common carrier rate program, price discrimination can exist with or without economic regulation. An economically regulated market can lead to opportunities for discriminatory pricing (witness current write-in tariffs that result in secret discounts to shippers) just as easily as one that is unrestrained. To minimize the potential for rate discrimination in our adopted program, as well as to encourage open competition, the following safeguards will be enforced:

1. All requirements for discount's must be contained in the carrier's filed tariffs.

2. Common carrier service can only be provided at common carrier filed tariff rates.

3. Common carriers must bill for services at the lowest discounted tariff rate applicable.

4. All common carrier contracts and special contracts must be filed with the Commission and available for public inspection.

5. All tariff and contract filings will be noticed in the Commission's Daily Transportation Calendar.

### Limits to Zone of Reasonableness

We have found that in a workably competitive market, rate flexibility within a zone of reasonableness provides reasonable common carrier rates.

The upper limit to the zone of reasonableness is a cap on rate increases set at 10% over the lowest rates in effect at any time within the previous 12 months. The DRA introduced testimony supporting a cap of 5% per quarter (up to 20% per year). We believe this figure is too high. After considering recorded changes in the costs included in the TFCI and likely fluctuations under normal market conditions, we find that a 10% ceiling on increases over a 12-month period should provide sufficient flexibility for the zone of reasonableness. The 10% ceiling allows a common carrier to increase any rate as often as it chooses within a 12-month period as long as the total of all increases for that rate does not exceed 10%. A common carrier will also be able to decrease any rate as often as it likes, but any decreased rate cannot subsequently

be increased by more than 10% within a 12-month period. We warn carriers that efforts to avoid the 10% cap on rate increases, for example by making cosmetic changes to tariff conditions then claiming that an increased rate is for different service, shall be monitored closely. We will reject tariff filings which attempt to subvert the intentions of the zone of reasonableness.

The TFCI was designed as a system to track cost changes for motor carriers of truckload and less-than-truckload general freight. The index, which is substantially as proposed by CMA and CTA in Application (A.) 83-11-049, was adopted in D.86-04-045 and went into effect July 1, 1987. Costs are aggregated into seven categories each with a surrogate to measure actual cost changes. With the exception of the labor and insurance categories various United States Department of Labor, Bureau of Labor Statistics producer price indexes (producer price indexes) are used as surrogates for all categories. The surrogate for labor is developed from the Commission's Highway Carriers Prevailing Wage Report (Prevailing Wage Report), and the surrogate for insurance is based on the California Automobile Assigned Risk Plan.

A review of Prevailing Wage Reports from 1980 and recorded changes in producer price indexes from 1961 indicates that yearly increases of 10% are not uncommon. Additionally, Exhibit 4 in A.83-11-049 (sponsored by CTA and adopted by CMA) calculated an 11.4% increase in the TFCI for 1981, had it existed at the time. While annual inflationary changes are usually less than 10%, we conclude from the recorded inflationary data and Exhibit 4 in A.83-11-049 that an annual ceiling of 10% provides sufficient pricing freedom for carriers to reflect normal inflationary variations.

Having shown that the 10% limit is sufficiently flexible, we also note that it helps to keep rates from becoming unreasonable and it provides incidental protection against possible market failures. Any upper limit to rates serves to protect against monopoly pricing and predatory pricing. Because entry into the market is relatively unrestricted, workable market competition by itself prevents monopoly pricing and unreasonably high rates. Competition also protects against predatory pricing; ease of entry allows many other carriers to quickly undercut rates imposed during the second step of a predatory pricing attempt. The upper limit provides added protection for common carriers and their customers. The 10% limit also provides incidental protection against predatory pricing, because in a predatory pricing attempt a price increase must follow a decrease designed to drive competitors out of the market, and that decrease itself lowers the base price to which the 10% is applied. This extra protection is not necessary for contract carriers because competition by itself adequately protects the public against the claimed dangers of predatory pricing.

Although today's stable economy and competition itself are sufficient protections against destructive pricing below cost, the lower bound to the zone of reasonableness adds incidental protections. There is no simple rule stating at what point pricing below full long run costs becomes destructive. A lower limit set at full costs would be overly protective, to the point of being economically inefficient. A full cost limit would work to support inefficient carriers; the benefits of competition would be lost and prices would rise.

In our judgment a lower limit of a minimum level of variable cost is consistent with prior cases which define the lower limit of the zone of reasonableness as "out-of-pocket" costs. That limit will also provide incidental protections against destructive pricing practices by common carriers. We realize that distinctions between fixed and variable costs depend on the time frame of the carrier. Economically, the very definition of the long term is when all costs become variable, which is an elegant way of saying that even long run fixed costs have to be paid sometime. For practical purposes a carrier's fixed costs are those assignable to capital investment and overheads. Variable costs are most closely related to day-to-day expenses such as driver labor, fuel, tires and maintenance. Thus a lower limit of a minimum level of variable costs will keep a carrier's revenues high enough to pay required wages, fuel and tire costs, maintenance, and insurance.

The chosen definition of minimum level of variable costs should also include as much of a carrier's safety expenses as is practical, not in support of any economic theory but to remove any implication that safety expenses are not emphasized. Actually the floor price will not serve as any incentive to alter carrier expense beyond achieving greater efficiency. Because the floor price is not used to index rates and in fact will likely be far below most rates, there is no detrimental incentive

to reduce wages, safety expenses or any other individual cost item. However, in response to possible public concerns, we will include insurance and maintenance as variable costs. We exercise little control over carriers, accounting conventions for safety-related training, maintenance and inspection costs. It is likely that these are found in accounting categories for both maintenance and overheads. However, we will not insist on including overheads within the adopted definition of variable costs solely to capture an uncertain fraction dedicated to safety.

Because the lower end of the zone of reasonableness includes only a minimum level of variable costs and does not include any capital costs, we believe that few if any rates will be as low as the floor price. This removes any incentive for carriers to index their own rates to the floor and creates an incentive for carriers to set cost-based rates.

### *Variable Cost Calculation*

We have determined that the minimum level of variable costs should include driver labor, fuel, tires, maintenance and insurance. It will not include capital costs and overhead.

We will order further hearings on the final form of the variable cost calculation and a procedure for updating the floor price. The scope of those hearings should cover alternate proposals for calculation of a minimum level of variable costs and comment on the interim calculation described below. The hearings will not revisit the decision to use variable costs as the basis for the floor price. Until those further hearings are completed we adopt the following interim floor prices, so that the new regulatory program can be implemented promptly.

We choose to make the floor prices uniform for all common carriers, distinguished only between truckload and less-than-truckload carriage. Although there are theoretical virtues to allowing individual carriers to use their own variable costs in the calculations, these benefits are outweighed by problems with allowing floor prices to vary among carriers. Individually set variable costs could cause problems for owner-operators and subhaulers, and could raise claims of discrimination from carriers with high labor rates.

For driver labor we will include only the legal minimum labor costs, including minimum wage and required wage adders. As an interim measure we will set other costs based on carrier annual report data previously used to determine the TFCI, which has been adopted by the Commission. In further hearings we will set floor prices for the remainder of 1990. Thereafter we will adopt new values annually, according to procedures to be determined in further hearings. Use of annual report data to set interim floor prices is more reasonable than delaying the entire program.

With every tariff filing that changes rates, a common carrier must file a completed "FLOOR PRICE CERTIFICATION" form, which is attached to G.O. 147-B.

The formula used to develop the form is based on minimum wage labor costs adjusted upward to cover legally required wage adders, plus an aggregate figure which includes industry-wide average costs for fuel, tires, maintenance and insurance. The interim formula is:

Floor Price ($/mile)

= (minimum wage, $/hour)

X (1 + adjustment factor for wage adders)

/ (average speed, miles/hour)

+ (fuel, tire, maintenance and insurance costs; $/mile).

The data used to calculate the interim floor prices is derived as follows:

The current minimum wage is $4.25 per hour. The factor used to increase the minimum wage to account for wage adders includes Social Security (FICA), Federal Unemployment Insurance (FUI), State Unemployment Insurance (SUI) and workers compensation. The FICA rate for 1990 is 7.65% up to $50,400 annual gross, which exceeds driver income at the minimum wage. FUI and SUI costs depend on annual income. The FUI rate is 0.8% of the first $7000. This must be adjusted for annual wages. The prevailing wage data for 1989 show that statewide line haul drivers of five or more axles average 1977.6 working hours per year, which at $4.25 per hour would generate $8404.80 annually. Thus the average FUI rate is 0.67%. The SUI rate varies, but staff cost engineers have consistently used 4.2%. It can be argued that for regularly employed drivers FUI and SUI are not variable costs at all, but we retain them for now to avoid any appearance of giving carriers incentives to avoid unemployment payments. Workers compensation rates vary quarterly and by industry; the rate for the first quarter of 1989 was 16.95% and we shall use it. Thus the total rate for the four legally required wage adders is 29.47%.

Although it would be simplest to use the same floor price for all common carriers, we recognize that TL and LTL carriers operate very differently. LTL carriers generally show slower average speeds due to their many stops. and added terminal time. For purposes of calculating interim floor prices we will use 48 miles per hour for TL carriers, a figure that has been used in dump truck deviation proceedings. For LTL carriers we will use 30 miles per hour as an average speed.

Data for other costs are taken from the same data set used to calculate the TFCI, modified to exclude those carriers that did not report vehicle miles in their annual reports. Average costs are shown in Table 3 below:

### TABLE 3

### CALCULATION OF OTHER COSTS

*Industry Average, in $/mile*

**Cost Element**

| | Truckload | Less-Than-Truckload |
|---|---|---|
| Fuel | 0.177 | 0.185 |
| Tires | 0.033 | 0.034 |
| Maintenance | 0.154 | 0.161 |
| Insurance | 0.102 | 0.092 |
| Total | 0.466 | 0.472 |

The difference between truckload (TL) and less-then-truckload (LTL) is barely 1% of the total. Although this difference is small, we will retain the distinction in calculation of TL and LTL floor prices.

Inserting the above values into the formula, the adopted interim floor prices are $0.581 per mile for TL carriers and $0.655 per mile for LTL carriers. These prices apply to all common carriers, including owner-operators and carriers using subhaulers.

App-051

If a carrier believes it can justify a rate below the floor price, it may demonstrate the reasonableness of rates below the standard floor price by formal application to the Commission. This type of application should be no more burdensome than the current process of cost justification, which further convinces us to begin the adopted program now rather than wait until completion of further hearings on the topic. When expressed in terms of dollars per mile, many existing LTL rates for small shipments would be below the floor price. However, we recognize that small LTL shipments are most often aggregated into larger loads, and the floor price applies only to the total load, not each small shipment. Thus for small shipments the floor price should be compared to rates which are prorated up to typical aggregated load size. Pending the outcome of the further hearings on floor prices, we will adopt 12,000 lb. as a typical LTL aggregated load. The proper LTL floor price comparison is shown by this example: A tariff rate for a certain commodity is $0.35 per mile for a 2000 lb. shipment. A 12,000 lb. load of that commodity would generate revenues of $2.10 per mile (12,000 / 2000 X $0.35), which is above the floor price of $0.655 per mile. LTL shipments above 12,000 lb. need not be prorated downward to 12,000 lb.

The current prevailing wage program for general freight was established in 1980. The Commission explained its purpose as follows:

[T]he primary use to which prevailing wage rates will be put will be in justifying rate increase and rate decrease filings, on the part of carriers, and in evaluating rate filings, subject to complaints or to petitions for investigation and suspension." (D.91265, 3 Cal. P.U.C. 2d 176, 179 (1980).)

At that time, as now, justifying rate changes required cost justifications which included labor costs of at least the prevailing wage. Under the adopted program for general freight, cost justifications will not normally be required. Any necessary cost justifications (e.g. in a formal application to exceed the upper end of the zone of reasonableness) should rely on actual carrier costs, not prevailing wages. Therefore, the prevailing wage program as it relates to general freight is unnecessary.

The use of the TFCI was ordered in D.86-07-019 and D.86-12-102, which required that carriers use the TFCI in setting general freight rates. Because the indexing of those rates will now cease, and because the floor price calculation will be determined in further hearings in this proceeding, there is no need to continue use of the TFCI program.

However, because it is possible that elements of the prevailing wage and TFCI programs could be retained in calculation of the common carrier floor price, we will defer rescinding the programs until after the further hearings on floor price calculation.

### Incentives for Common Carriage

We have determined that the two important controls for dividing incentives between common and contract carriage are the effective dates of each type of filing and the applicability of contract carriage.

To promote an effective common carriage system in California, we will allow tariff filings to become effective more quickly than special contracts. In his Proposed Decision the assigned ALJ recommended that tariffs be effective on the date filed. We agree with the ALJ that the needs of commerce require that rates become effective in less than the 30 days stated in § 491. Carriers must have the ability to respond to changes in costs and to meet competition. However, we will make tariffs effective 10 days after notice appears in the Daily Transportation Calendar. In this way the staff will have an opportunity to briefly analyze the filings and seek with the Executive Director suspensions before the effective dates, where appropriate. The requirements for suspension of an effective tariff are substantially more rigorous than during the 10-day protest period, and we must maintain protections against a proliferation of filed tariffs that are incorrect in format or content. The rejection rate for tariff filings under the current program is high enough that suspension of proposed tariffs must not be made unduly difficult.

We will maintain the incentive for common over contract carriage by ordering a 20-day effective date for special contracts. The ALJ recommended 30 days, but we believe that 20 days, which is 10 days more than for common carrier tariffs, more reasonably balances the incentives for the two types of service.

The effectiveness of a competitive common carriage market would be degraded by unnecessary rate and tariff complexity. For this reason we adopt discounting and billing rules that will encourage carriers to keep tariffs simple and understandable to shippers. Carriers should not be able to use arcane discounting rules to hide available discounts from shippers. Tariffs should be open and understandable, not so complicated that actual billed rates are determined by shipper savvy instead of the competitive forces that drive rates toward costs. Carriers have the burden to offer and bill service at the lowest applicable discounted rates. In any dispute over availability of discounts, shippers will not have the burden to find the best rate.

A number of parties in their comments suggest that common carriers be allowed to reduce rates on an experimental basis. Experimental rates would provide carriers the opportunity to return rates to their prior level within a 90-day window. Parties argue that rates are often reduced in expectation of traffic levels which may not materialize. Without the ability to return rates to their prior level carriers either will not risk making substantial rate reductions or will be required to operate at a loss.

Although we do not believe experimental rates are necessary to safeguard carriers, we will provide carriers with some flexibility in this area. An unrestrained experimental rate process could lead to a plethora of experimental rates and jeopardize the integrity of the adopted zone of reasonableness. However, we will relax the 10% upward limitation to allow that any change to a common carriage tariff may be withdrawn or amended within 30 days of its effective date without affecting the 10% ceiling.

Common carrier rate increase applications are now typically processed on an ex parte basis, with a decision issued within 60 days from the filing date. Common carriers can continue to use this procedure to request rate increases greater than 10%. Rate increase applications should contain a request for ex parte treatment, provide justification for the rate increase, and demonstrate that their actions are not predatory or otherwise non-competitive. This procedure, along with the 30-day withdrawal option, affords common carriers the opportunity to expeditiously return reduced rates to their prior level without compromising the zone of reasonableness.

To promote administrative efficiency we will allow common carriers to cancel at their option any tariff rates that have not moved traffic within one year or more, without being subject to the 10% limitation at the upper end of the zone of reasonableness. This allows cleanup of inactive rates while avoiding technical problems of implied rate increases, e.g. as theoretical shipments under inactive tariff rates might become subject to higher class rates, if there were any such shipments.

### *Common Carrier Contract Regulations*

As explained elsewhere in this decision and in the general orders, common carrier contracts will be available to carriers with dual authority. This flexibility will allow shippers and carriers with continuing relationships to make mutually beneficial agreements without the added obligations needed for special contracts. In exchange for the increased flexibility the parties agree to charge only rates based on tariff rates.

However, we are concerned about possible abuses of common carrier contracts. Without necessary restrictions, they could be written to allow rates substantially below tariff rates, for example by immediate reductions of rates driven by a declining index. This could in turn lead to unreasonable price discrimination without the discrimination protections inherent in common carrier tariffs. In order to avoid such discrimination we will order that common carrier contracts may not be amended or the rates therein adjusted below the rates in effect at the time the contract is filed. Thus common

App-053

carrier contract rates cannot fall below the tariff rates on which the contract is based. Common carrier contracts can be amended or extended as long as this restriction is met. Common carrier contracts do not require a floor price comparison, as the tariff rates themselves have already passed that test. Nor are common carrier contracts subject to the 10% increase limitation at the upper end of the zone of reasonableness, because there is no obligation to serve under such contracts.

Common carrier contracts are also subject to guidelines 3, 4 and 5 for special contracts shown below.

### *Special Contract Regulations*

Special contracts will be approved where no common carrier normally provides service or where a special relationship exists. A special relationship is one that is continuing and includes meaningful shipper obligations. Those obligations can be met by a specific minimum level of service or by other terms. The following guidelines apply:

1. A continuing relationship requires that service be provided over a period of not less than 30 days and include more than a single shipment. A continuing relationship cannot be predicated upon a single shipment.

2. The meaningful shipper obligation can be met by either of the following conditions:

A. A minimum of $1000 per month of delivered transportation services, or

B. Other obligations not described above but which call for a substantial shipper obligation of a type not found in common carrier tariffs. Examples are plant security arrangements; unusual scheduling agreements; guaranteed demand; services covering more than intrastate operations, such as interstate or exempt carriage; and so forth. We warn carriers that staff investigation of these unusual obligations may trigger 30-day contract suspensions by the Executive Director. Meeting the $1000 minimum will be easier to determine within the 20-day effective date period.

3. In a special contract a shipper can be either the consignee or consignor. Normally the shipper is regarded as the party who pays the charges for the transportation provided. However, the shipper may also be the party who controls the traffic, for example a manufacturer who ships freight collect to dealers of his product.

4. Carriers must keep copies of contracts at their offices for the terms of the contracts and for not less than three years after expiration.

5. Contracts shall be filed with the Commission and shall be public documents.

The guidelines to qualify special contracts insist on meaningful shipper obligations. Such obligations are necessary to distinguish contract carriage from common carriage. Otherwise contract carriers could selectively and unfairly compete against common carriers, who are held to higher standards of rates and service.

This still allows much flexibility, but not to the point that the contracts become substitutes for common carriage. Common carriers hold themselves out to serve the public. With that obligation come higher standards of protection against price discrimination, a protection not required of contract carriers. We intend to keep that distinction in mind in any future enforcement actions against contract carriers who actually will serve any shipper without a special relationship. We will set no artificial limits on numbers of contracts that can be held by a single contract carrier; that flexibility encourages us to enforce carefully the special relationship requirement.

We choose the service minimums that substantiate the special relationship with the intent to allow flexibility. For most contracts we expect that the shipper's obligation will be most easily met by the minimum service measure of $1000 per month. This limit is low enough to allow small carriers to participate while being large enough to guarantee more than

a single shipment on most routes. Other obligations can be used to meet the test when they are supported in the carrier's filing.

It is not our intent that the $1000 per month minimum create any "take-or-pay" obligations for shippers. However, failure by a shipper to take that amount of services will mean that the carrier no longer meets the requirements for special contract approval. As well, we will not insist that service be provided in every month, provided that the average level of service to date is greater than $1000 per month or the other meaningful obligations are continued. If the average is maintained through every month we will allow up to two consecutive months of service below the minimum before the contract would be out of compliance.

Our enforcement efforts for contracts that fall out of compliance will be directed at terminating, not suspending, the contracts. For contract carriers that also have common carrier authority, service can be continued only under applicable common carrier tariffs or upon filing of a new contract. For carriers without common carrier authority, service can be continued only by filing a new contract. Because the carrier will no longer have authority to deliver services under the old contract, the carrier will be in violation of the General Orders and subject to regular enforcement actions.

Under the current regulatory program contracts are limited to a one year term. We will retain that one year limit, but will allow annual extensions of contract terms by contract amendment as allowed by the General Orders, which requires approval of both shipper and carrier. This provision applies to common carrier contracts as well.

### *Monitoring*

We have discussed at length our preference for a regulatory program which provides carriers with rate flexibility. Although our adopted program includes a number of safeguards to ensure carrier rates are reasonable, we believe a monitoring program should also be established. A monitoring program will provide us the opportunity to identify and correct any market failures in a timely fashion.

DRA and CPIL are the only parties that address a monitoring program. Both recommend certain monitoring activities be adopted. CPIL suggests the following program to arm the Commission with information and expertise, but that we should intervene only when necessary to resolve a market flaw:

1. Continuous monitoring of the degree of competition within relevant product and geographic markets.

2. Sophisticated studies of cost factors for efficient carriers by type, size and volume.

3. Surveillance of rates charged, and evaluation of substantial deviations from prior rates.

4. Strict scrutiny of rates in sectors lacking competition.

5. Comparison of rates with cost-based rates.

6. Active investigation of rate levels for predation.

DRA also proposes an ongoing evaluation of market and industry conditions. Their proposal requires the Transportation Division to prepare and submit reports on the following:

1. Number and type of rate filings.

2. Direction and degree of rate movements.

3. Operating authority data and trends.

4. Cost and operational changes.

5. Truck-at-fault accident data.

6. Number, nature and disposition of complaints and protests.

DRA and CPIL have recommended a number of monitoring activities that are interesting in understanding the trucking industry, but do not directly influence our primary goal — safe, reliable service at reasonable, nondiscriminatory rates. The monitoring activities that we consider important to safeguard our goal are discussed below.

First, we will continuously monitor the degree of competition and quality of service within small and rural communities and other traffic lanes as necessary. Obviously, this activity is designed to spot potential market failures in the most vulnerable locations. The number and type of public complaints filed with the Commission should be used as a guide in determining which communities and traffic lanes to target. The current complaint procedures can provide valuable information in many areas such as poor or inadequate service, and discriminatory rate or service practices. Complaint data should give a strong indication where further investigation is needed.

Second, the reasonableness of rates in traffic lanes and communities statewide should be reviewed and recommendations made when corrective action is warranted.

Third, truck-at-fault accidents and other related safety data will be monitored to provide vital information concerning safety in the trucking industry.

The responsibility for this monitoring program will be assigned to the Commission staff.

We will not hesitate to modify or rescind this decision if changed circumstances cause rates to become unreasonable and compromise the responsibility of the Commission to ensure just and reasonable rates.

*Environmental Considerations*

There is no doubt that California's intrastate trucking industry has a significant impact on the environment. We are mindful of our duty to consider environmental issues, as required by Public Resources Code Sections 21000 and 21001, and in this decision we have considered the environmental impacts alleged by CTA.

Several CTA witnesses testified that truck emissions and traffic congestion caused by trucks are significant problems, and we agree. However, CTA claims that allowing unrestricted entry into the intrastate general freight market will have a significant impact on those problems. We cannot agree with that claim.

For our policy of unrestricted entry [3] to increase these environmental problems, it would have to cause an increase in the miles actually traveled by trucks on California's highways, or at least an increase in truck traffic on the more congested highways or at more congested times of day.

However, we have allowed unrestricted entry into the general freight business for a number of years. The adopted program does not change this policy. There are already thousands of carriers with statewide authority to transport general freight, and restrictions on entry only limit the number of trucking companies, not the number of trucks each company can operate. Thus, even if new authorities were to become totally unavailable, there would be no effective

regulatory limitation on the ability of existing firms to expand to meet market demands. We have no reason to believe that restricting entry would limit the number of miles traveled by trucks, or that continuing our policy of open entry will cause an increase in trucking mileage. Similarly, we see no relation between the number of firms with authority to operate and whether they choose to operate on the more congested highways or at more congested times of day. We see no reason to believe that continuing our present policy of unrestricted entry will cause an increase in pollution or traffic congestion.

However, we do have reason to believe that by allowing increased price competition our adopted program may actually have a beneficial effect on pollution and congestion problems. As we said in *Re: MRT's 6-B and 13*, 3 Cal. P.U.C. 2d 752, 785 (1980):

We expect increased price competition to produce increased operational as well as financial efficiency. Equipment utilization should be maximized, thereby reducing empty miles, excessive use of the highways, and unnecessary fuel consumption.

### Legal Authority for Adopted Program

### Contract Carriers

In *United States Steel Corp. v. Public Utilities Commission*, 29 Cal. 3d 603, 608 (1981), the California Supreme Court reiterated that PU § 3662, governing contract carriers, "vest[s] in the commission discretion to set minimum rates, maximum rates, or no rates at all." (Citing *CTA v. PUC*, 19 Cal. 3d at 246-48.) *U.S. Steel* further states:

that refusal to impose minimum rates [is] permissible when the record fail[s] to demonstrate 'an obvious or persuasive need in the public interest' or that 'the rates would not have a meaningful effect on the transportation involved.' In addition, . . . exemption from rates [can] be justified when 'the exemption would not lead to destructive rate practices.'

Our adopted regulatory program for contract carriers does not include either maximum or minimum rates. From a public policy perspective, the need for minimum rates can be reviewed by looking at the claimed dangers of: (1) monopoly pricing, (2) monopsony pricing, or shipper clout, (3) predatory pricing, (4) destructive pricing, (5) price discrimination, and (6) inadequate service. Clearly, in a workably competitive market no protections against monopoly pricing are necessary. The same factors protect against shipper clout and predatory pricing, as discussed in the *Shipper Pricing* and *Predatory Pricing* sections. As discussed in the *Destructive Competition* section, the severe economic conditions behind historical episodes of destructive pricing are extremely unlikely. This prospect and workable competition combine to adequately protect the public against the very unlikely danger of destructive rate practices. No protections against price discrimination for contract carriers are necessary. Contracts are the result of negotiations between willing parties, and price discrimination is of no concern. Incidental protections against price discrimination are provided by the adopted program because the contracts are public documents. Such ready access to information encourages competition and this discourages price discrimination. Inadequate service by individual contract carriers is irrelevant because they have no obligation to serve. Minimum rates are not necessary to ensure adequate service by contract carriers as a class, because of the unlikelihood of destructive pricing. Moreover, common carriers have an obligation to serve and are available statewide. In sum, minimum rate protections are not necessary. A rate exemption for contract carriers of general freight is justified because it will not lead to destructive rate practices.

Commission-set maximum rates are likewise not necessary for the contract carriage of general freight. Competition will restrain unreasonably high prices due to monopoly pricing. If a carrier's rates are too high, other competitors will take the business. Indeed, our current regulatory program for contract carriers of general freight already reflects this reality, as it likewise does not set any maximum rates. Neither would maximum rates provide any needed protections against predatory pricing or price discrimination, for the reasons discussed above in connection with minimum rates. Maximum rates would provide no protections against shipper clout or destructive pricing in any circumstances, and again

App-057

inadequate service by individual carriers is not relevant to contract carriage. In short, the record fails to demonstrate "an obvious or persuasive need in the public interest" for the setting of maximum rates.

Contrary to any claims that minimum or maximum rates are necessary, the record demonstrates that the public interest will be served by freeing carriers of general freight from unnecessary maximum and minimum rate requirements and instead allowing them to respond efficiently to market conditions. If carriers must respond to unnecessary regulatory requirements, rather than market demand for their services, they will operate inefficiently with the attendant risks of oversupply, waste of resources, and stifling of innovation.

In sum, we conclude that under the present circumstances we are justified in exercising the discretion we have under PU § 3662 to set neither maximum nor minimum rates for the contract carriage of general freight. This rate system is in the public interest and will not lead to market failures or to destructive rate practices.

### Common Carriers

While contract carriers are subject to PU § 3662, common carriers, with their obligation to serve the public in a non-discriminatory fashion, are subject to a somewhat different statutory and common law scheme. PU § 451 requires common carriers to charge just and reasonable rates. As this Commission has previously stated:

There is a zone of reasonableness within which common carriers, so long as statutory restrictions are not transgressed, may and should exercise discretion in establishing their rates. The upper limits of that zone are represented by the level at which the rates would be above the value of the service, or be excessive. The lower limits are fixed, generally, by the point at which the rates would fail to contribute revenue above the out-of-pocket [variable] cost of performing the service, would cast an undue burden on other traffic, or would be harmful to the public interest. Rates at the upper limits of the zone may be termed maximum reasonable rates; those at the lower limits of the zone may be termed minimum reasonable rates.

(*Investigation of Reduced Rates for Transportation of Bulk Cement*, 50 Cal. P.U.C. 622, 632-33 (1951).)

Our adopted program for common carriers includes a variable cost floor, which will ensure that their rates remain within this zone of reasonableness. Numerous cases establish that common carrier rates based on variable, or out-of-pocket, costs fall within the zone of reasonableness, and that a carrier-set rate is not unreasonable just because it does not recover fully allocated costs. Thus, in *Southern Pacific Co. v. Railroad Commission*, 13 Cal. 2d 89, 114-16 (1939), the California Supreme Court held that certain proposed common carrier rates were not unreasonably low where they would return to the carrier its "out-of-pocket cost of transportation." In *California Portland Cement Co. v. Southern Pacific Co.*, 42 C.R.C. 92, 104, 106, 116 (1939) this Commission approved rates at a level not far above "out-of-pocket costs" (equated with "direct costs"), even though those costs excluded items such as taxes and return on investment. In the *Bulk Cement* case quoted above, this Commission approved reduced rates based on out-of-pocket cost calculations, that separately figured the variable portion of maintenance expenses in order to determine the out-of-pocket costs. (50 Cal. P.U.C. at 628.) And in In D.58664, *Investigation of Reduced Rates* (June 23, 1959) (headnoted at 57 Cal. P.U.C. 229) (reprinted at 62 Cal. P.U.C. 259, 260-61) the Commission similarly approved rates based on "out-of-pocket costs" (defined as those costs which vary with changes in the traffic handled) even though those costs excluded depreciation, overhead expense, other fixed charges, certain taxes, and return on investment.

Moreover, rate decreases within this zone should not "cast an undue burden on other traffic." Competition will prevent a common carrier from decreasing some of its rates and then trying to charge other traffic unreasonably high rates to make up for the decrease. If the carrier tries to charge this other traffic unreasonably high rates, competitors will take away the business. Furthermore, as explained above, freeing highway carriers from unnecessary rate regulation will not harm the public interest, but rather serves the public interest by allowing carriers to respond efficiently to market conditions

and thus avoid problems of inefficiency, oversupply, waste of resources, and the stifling of innovation. Accordingly, we conclude that the less than maximum reasonable common carrier rates authorized by this decision are required by the needs of commerce and the public interest. We also find that the less than maximum reasonable common carrier rates authorized by this decision are justified by transportation conditions because: (1) of the workably competitive market for general freight transportation, (2) the unlikelihood of destructive rate practices under present economic conditions, and (3) our requirement that common carrier rates not fall below our variable cost floor. (*Cf.* PU § 452.)

Our adopted program for common carriers relies on both competition and the 10% limit to keep rates from rising to excessively high levels. If a common carrier tries to raise its rates to an excessive level, competitors will take the business away by offering more reasonable rates. In addition, our adopted program prohibits a common carrier from increasing a rate by more than 10% within any 12-month period, unless it files a formal application. The formal application process will ensure that the reasonableness of larger rate increases will be subject to more detailed scrutiny.

In short, we conclude that our adopted regulatory program for common carriers of general freight will keep their rates within the zone of reasonableness.

Looking at the policy concerns we have discussed previously, we see that competition protects against the dangers of monopoly pricing and shipper pricing in common carriage in the same way it protects contract carriers. Competition also adequately protects common carriers against predatory pricing, and the upper end of the zone of reasonableness adds to that protection. The variable-cost floor also provides incidental protection against destructive rate practices. This protection is over and above the principal protections against destructive pricing, which are the low risk of severe economic conditions and competition.

PU § 454 provides that no common carrier shall increase any rate or so alter any classification, contract, practice, or rule as to result in an increased rate, except upon a showing before the commission and a finding by the commission that the new rate is justified.[4] As outlined above, this proceeding has shown that common carrier rates under our adopted regulatory program fall within the zone of reasonableness. Accordingly, we find that the new and increased common carrier rates approved by this decision are justified.

Protections against price discrimination are more important for common carriers than for contract carriers, see, e.g., PU §§ 453, 461.5, and the adopted program provides the necessary protections. Those protections include: a prohibition of shipper-specific tariffs; a prohibition of secret rates and discounts, including write-in tariffs; and public notice of all tariff filings and a protest procedure. Protections against inadequate service are provided in the form of a minimum level of service, as well as incentives for cost-based rates.

Our adopted rate flexibility program allows common carrier rates to become effective 10 days after the carrier's filing appears on the Commission's Daily Transportation Calendar. As pointed out above, under PU §§ 455 and 491, for good cause the Commission can allow rate changes on less than 30 days' notice by an order which: (1) specifies the changes to be made, (2) identifies when the changes will occur, and (3) sets forth the manner in which changes shall be filed and published. Here, as explained in the section *Incentives for Common Carriage*, there is good cause for allowing these changes to become effective on less than 30 days' notice in order to allow common carriers to respond to market conditions as rapidly as possible, while still ensuring compliance with our regulatory requirements. As we have said before, all other things being equal, a system which permits carriers of general freight to respond to the demands and constraints of a competitive market is a better system. Our order meets the further requirements of § 491; G.O. 147-B (attached as Appendix D) identifies when rate changes can occur, specifies the changes that can be made, and sets forth the manner in which rate changes shall be filed and published.

The preceding discussion concerning common carrier rates and notice periods generally applies also to common carrier contracts. Although common carrier contracts can only be offered by common carriers that also possess contract carrier authority, common carrier contract rates are based on common carrier rates and are subject to a 10-day notice period.

### Subhauling

Although a number of parties commented on this issue the three most active parties were Lou Filipovich (Filipovich), Teamsters, and Fischer. Filipovich and Teamsters for different reasons recommend subhauler rate regulation through a division of revenues between the prime carrier and the subhauler. Fischer recommends a leasing program similar to the ICC's established. Other recommendations run the gamut from no change in the current program to cost-justified subhauler rate schedules. The positions of the parties are discussed below.

### Filipovich

Filipovich, an independent operator, is authorized to operate as a highway common carrier in California and has over 40 years' experience in transportation. Filipovich cites an extensive historical background of proceedings in which subhauling has been addressed without resolution and urges the Commission to act in this decision.

Filipovich believes the very nature of subhaulers as small businessmen with limited resources has caused them to be a traditionally underrepresented class. The parties with financial resources to participate in regulatory proceedings usually have no incentive to address subhauling. This results in an unregulated subhauling system in a regulated transportation industry. The solution Filipovich presents would require carriers that engage subhaulers to pay all revenue billed the shipper, consignee or party paying the freight bill, to the subhauler who performed the services.

### Teamsters

Teamsters argues that while there has always been a true entrepreneurial class of subhaulers, in the era of deregulation there has been a tremendous increase in the use of owner-operators working exclusively for one carrier. For the most part, these owner-operators provide nothing more than a low cost alternative to employee drivers. By using owner-operators, prime carriers can avoid such expenses as maintenance, insurance, fuel and Social Security taxes. They need not be concerned with investing in new equipment, purchasing fuel, maintaining costly safety programs, or covering owner-operators under workers compensation, unemployment, or disability insurance systems. Nor are they required to withhold income taxes from the compensation owner-operators receive.

Teamsters references DRA's subhauler study, Exhibit 14, produced for the March, 1988 en banc hearing on trucking regulation as the only empirical study of the financial condition of general freight subhaulers. This study paints a vivid picture of the evolution of a one-time small and viable class of entrepreneurs with a particular market niche into a large group of exploited drivers running permanently unprofitable operations.

The study found two distinct classes of subhaulers. Approximately 71% of subhaulers earned all revenues from subhauling and 50% of these worked exclusively for one prime carrier, while the remaining 29% engaged in subhauling to supplement their earnings as prime carriers. The study also compared prime carrier costs to those of subhaulers and found the latter to be much lower; likewise, the study found subhaulers earn much lower revenues:

Certain variable costs (fuel, tires, maintenance) of operating a truck make up the 'running cost'. These costs are roughly comparable for overlying carriers and subhaulers. Total costs, in contrast, are significantly different. . . When subhauler costs are adjusted to include compensation for driving labor, they are still 30-40% lower than the average overlying carrier cost. This difference is large enough to suggest that other significant costs are understated. Average revenues for

subhaulers are 37% less than average overlying carriers revenues. The size of this difference suggests that subhaulers' revenues may be less than their fully allocated (long-run marginal) costs." (Ex. 14, p. iii.)

Teamsters concludes from this that subhaulers must pay themselves less than the industry average for employee drivers, and at the very least are an inexpensive substitute for labor. Teamsters' witnesses testified that this lower wage level may be at or even below minimum wage, given the number of hours owner-operators must stay on the road to remain financially viable. Clearly, this has an impact on the labor market. Between 1978 and 1986 the percentage of total general freight hauled by subhaulers increased from 20% to 30%. Finally, Teamsters claims subhaulers have very limited bargaining power; rates are dictated to them on a take-it-or-leave-it basis.

Teamsters is convinced that subhaulers compete with employee drivers for work because prime carriers are able to shift their operating costs to subhaulers. Given that workers compensation insurance averages approximately 17% of payroll, employers' contribution to Social Security tax 7.5%, and unemployment insurance another several percentage points of gross income, the immediate incentive to use subhaulers is apparent. The incentive is so great that some carriers reach beyond what is lawful to designate employee drivers as independent contractors. Thus, subhaulers function to depress the wages and working conditions of employee drivers.

Teamsters believes that subhaulers should compete against other carriers, not against employees and the Commission should regulate them as it does other carriers. Its rules should mandate that the relationship be consistent with that of two independent business persons. Therefore, Teamsters suggests the following changes in the current regulatory program:

1. Require all carriers earning more than $50,000 in revenue to file annual reports.

2. Require all carriers seeking operating authority to demonstrate they have sufficient operating capital and cash flow to enable them to remain in business for at least 90 days.

3. Establish a cost-justified subhauler rate schedule which reflects a prevailing wage component, maintenance, fuel, taxes, insurance costs and overheads peculiar to subhauler operations.

4. Increase the bonding limit in G.O. 102-H to an amount proportional to the number of subhaulers a carrier employs, and increase the bonding claim period from 60 days to 6 months.

### CMA

CMA advocates treating subhaulers like any other contract carrier. To the extent that a prime carrier is not willing to enter into a true, fully contractual relationship with a subhauler, the prime carrier/subhauler relationship should be equivalent to a shipper/carrier relationship, or the subhauler should become an employee of the prime. This procedure would offer subhaulers a more stable and enforceable relationship with prime carriers. Subhaulers could also publish their own tariffs and operate as common carriers. CMA believes this proposal would widen the sales options and generally improve conditions for subhaulers.

### Fischer

Fischer states there is insufficient evidence on which to base any conclusions that would impose a Commission-set formula for sharing the revenue between a prime carrier and a subhauler. Fischer identifies two types of subhaulers. The first is a true subhauler; one who deals with a number of prime carriers and the public in an effort to build up business. Ultimately, that subhauler will reduce its subhauling activities and increase its direct service to the public.

Fischer characterizes the second type of subhauler as an owner-operator. The owner-operator contracts long term with a prime carrier, does not move from carrier to carrier, has no contact with the public and is controlled by the prime carrier. Operating authority is held by the owner-operator only because it is required by the Commission. Fischer contrasts this with the ICC where no authority is required for the owner-operator to enter into a long-term equipment lease with the prime carrier.

Fischer argues that the evidence in this proceeding shows owner-operators do not wish to be employees, nor do prime carriers wish them to be employees. However, consistency is needed between the interstate treatment and the intrastate treatment of the owner-operator/prime carrier relationship. Therefore, Fischer recommends:

1. The existing subhauler class of carrier be maintained, but redefined as an operation where the subhauler contracts with the prime carrier on a shipment-by-shipment basis and cannot enter into consecutive contracts with the same prime carrier for more than 30 days.

2. The leasing regulations found in G.O. 130 be amended to provide that a carrier can lease equipment from a noncarrier owner-operator with driver for not less than 30 days and the lessee takes the exclusive possession and control of the vehicle.

### Mike Conrotto Trucking (Conrotto)

Conrotto engages subhaulers exclusively and finds the current regulatory program burdensome and discriminatory for carriers that engage subhaulers. Cost justification procedures are difficult because subhauler cost data is almost impossible to collect; many subhaulers are small operators with inadequate records. This hinders Conrotto's ability to obtain reduced rates and results in lost traffic. Conrotto believes the current regulatory program should be abandoned.

### Southern California Motor Delivery Inc. (SCMD)

SCMD testified that the current regulatory program will not sustain a healthy motor freight infrastructure and lists the following specific problems with respect to subhaulers:

1. Inadequate compensation.

2. No guaranteed payment provisions.

3. Inability to establish rates.

4. Difficulty in obtaining workers compensation insurance.

SCMD predicts dire consequences for the industry unless the subhauler is recognized as a distinct class of carrier. To improve the situation, SCMD suggests the Commission require written agreements which provide subhaulers with: (1) an enforceable payment procedure, (2) a Commission established compensatory rate level, and (3) a wage higher than the prevailing wage level. SCMD also recommends a Commission-mandated policy for workers compensation coverage.

### CTA

CTA recommends establishment of cost-justified subhauler rate schedules which use prevailing wage data and require the prime carrier to pay according to the subhauler's rate schedule.

*DRA, Coalition and Dedicated Contract Carriage, Inc.*

These parties see subhaulers as stabilizing factors in the general freight sector and argue that the existing program provides adequate protection for the subhauler. Subhaulers balance operations, allowing prime carriers to adjust to the ebb and flow of demand without committing scarce capital to equipment that may sit idle during periods of low demand.

Additionally, Dedicated Contract Carriage, Inc. believes the current regulatory program works in the best interests of both carriers and the public. The public has access to safe, reliable service at reasonable rates. Subhaulers are protected against prime carrier abuses without the burden of economic regulation.

*Discussion*

The regulation of subhaulers (also known as owner-operators, independent contractors or underlying carriers) has been the subject of considerable controversy since the enactment of the Highway Carriers Act in 1935. At the center of this controversy has been the lack of certainty with respect to the operating authority required for performing subhauling services or the status of the carrier engaging a subhauler. A major part of the difficulty is that all types of subhauling are lumped together for regulatory purposes, even though there is a great diversity in practice.

G.O. 102 defines a subhauler as:

. . . any authorized carrier who renders service for a prime carrier (principal or overlying carrier), for a specified recompense, for a specific result, under the control of the prime carrier as to the result of the work only and not as to the means by which such result is accomplished. This term includes sub-subhaulers in appropriate cases."

D.91247 requires a California intrastate subhauler of general freight to hold operating authority issued by this Commission.

Subhaulers are subject to regulation under Division 2, Chapter I, of the Public Utilities Code." (D.91247.)

No distinction is made between subhaulers and prime carriers in securing or maintaining operating authority; both have the same regulatory requirements. Also, G.O. 130 requires a bona fide employer-employee relationship between the lessee and the driver or drivers of any leased motor vehicle when leasing between carriers.

No requirements equivalent to D.91247 or G.O. 130 exist for interstate commerce. Interstate carriers do not need operating authority to be engaged by another carrier, and can lease a motor vehicle and driver together without the driver having an employee-employer relationship with the lessee. However, the lessee (overlying/prime carrier) when operating in California must register, designate a process agent, and file evidence of insurance with this Commission.

The diversity of subhauling practices ranges from an occasional engagement to full-time subhauling. Typically, subhaulers work either on an irregular basis to supplement the prime carrier's fleet or permanently as a part of the prime's fleet.

Interestingly, little seems to have changed with respect to subhauling in over fifty years. The following excerpt from D.42647, dated March 22, 1949, is equally relevant today:

The record shows that there are many kinds of subhauling. Some operators are exclusively subhaulers; thousands of others perform subhauling occasionally or with parts of their fleets. Subhaulers may be owner-drivers, or may be large fleet owners. Subhauling may involve a complete transportation service, or may cover any portion of the service. All

of the witnesses were in agreement that subhauling provides a method whereby available vehicles and drivers may be utilized to advantage where needed. It was shown that the practice was well established prior to enactment of the Highway Carriers' Act and the City Carriers' Act in 1935, and that it has not diminished in importance." (D.42647, 48 CPUC 577)

There is a growing concern that the use of subhaulers working exclusively for one carrier is merely a low cost alternative to employee drivers. Teamsters and other parties presented testimony that prime carriers exploit subhaulers to avoid or reduce prime carrier costs for maintenance, equipment, insurance, fuel, Social Security taxes and safety programs. Teamsters argues that the savings from the avoidance of workers compensation insurance, unemployment insurance and Social Security taxes exceed 30% of payroll costs.

This leads us to the following policy consideration. Should the Commission provide rate regulation for subhaulers to protect subhaulers from exploitation by prime carriers, and/or protect employee drivers from competition?

Filipovich is the primary party supporting protection from exploitation for subhaulers. He proposes protection through the regulation of subhauler payments. Teamsters recommends a form of rate regulation for subhaulers, but to protect employee drivers from competition. Also, Teamsters proposes additional protection for the public and subhaulers by increasing the bonding requirements for prime carriers that engage subhaulers. Specifically, Teamsters proposes that prime carriers should have to obtain a bond for each subhauler that is used rather than the current system which requires only one bond regardless of the number of subhaulers used. Under Section 5 of G.O. 102-H, subhaulers must be paid within 15 days. Therefore, each subhauler may be extending credit to the prime carrier for that amount of time. Teamsters believes a single $15,000 bond is inadequate for a prime that may employ many subhaulers. Teamsters recommends the bonding requirement be proportional to the number of carriers used but not necessarily on a one-for-one basis.

In considering subhauler regulation we should not forget the Commission's legislative mandate to protect the public by ensuring safe, reliable service at reasonable, nondiscriminatory rates. Regulation of subhaulers clearly furthers this goal, and is appropriate. With the exception of revenues from transportation performed, our current regulatory requirements for subhaulers are the same as for prime carriers.

Although we share Filipovich's and the Teamsters' concerns over the plight of subhaulers and employee drivers, there is insufficient evidence to warrant their protection in all subhaul arrangements. This is consistent with our conclusion in prior sections that we should only protect the trucking industry if it furthers our goal to protect the public.

However, in the public interest, we are convinced that formulas to divide revenues between prime carriers and subhaulers under various conditions should be established so that subhaulers are assured adequate protection for the conduct of their operations in a reliable manner. The ALJ's proposed decision would have adopted a division of revenues which mirrored the system adopted by D.52388 and D.88440 for the dump truck industry. However, several parties commented that the general freight and dump truck industries have many dissimilarities. These parties recommend an independent investigation into this matter. We agree that further hearings are necessary to establish an appropriate division of revenues between subhaulers and prime carriers and will schedule additional hearings to address this issue. The further hearings will include consideration of exemptions or limitations for less-than-truckload carriage and other subhauler issues. With a division of revenues scheme in place we see no need for subhauler rate schedules as recommended by Teamsters.

We will also consider in the further hearings Fischer's recommendation that intrastate leasing requirements for equipment and drivers be aligned with the ICC requirements.

We will continue to classify subhaulers as either common carriers or contract carriers and require them to meet the same entry and filing requirements as prime carriers.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

App-064

This record shows that about one-third of subhaulers work exclusively for one prime carrier. Teamsters charges that this practice is nothing more than the prime using the subhauler as a low-cost alternative to employee drivers. Other parties see the practice as a stabilizing factor in the general freight business, a balancing of operations that might otherwise require prime carriers to invest in equipment that would have a low usage and thus raise rates and, ultimately, consumer prices. We will not interfere in this quite natural economic relationship between entrepreneurs, even though one side, the prime carriers, may have an advantage. We recognize that we cannot cover every conceivable base. Even if we try, past experience shows there is no end to the ingenious devices the carrier industry can come up with to thwart regulation.

Concerning the prime carrier's responsibility for making sure that a subhauler driver is qualified, we note that §§ 1063.5 and 3553 already require prime carriers granted operating authority after December 31, 1988 to "regularly check the driving records of all persons, whether employees *or subhaulers*, operating vehicles . . . requiring a class 1 driver's license." (Emphasis added).

On the issues of carrier demonstration of financial ability on application for a permit and decreasing the gross revenue level requirement for filing of annual reports, we find the present rules adequate. The present requirement that applicants for permits show 45 days of working capital and a 90-day profit and loss projection appears quite adequate, particularly if the applicant is a potential subhauler. This allows more persons to apply and thus furnish the industry with a larger pool of subhaul carriers. The present annual report cutoff of $500,000 gross operating revenue helps keep the Commission's paper work at a manageable level and yet provides us with the information and control needed to effectively monitor the industry.

A recommendation was made that subhaulers be considered contract carriers. We find this suggestion has no merit in view of our position on the need for subhauling as a stabilizing factor in the industry.

Finally, we see possible merit in reviewing subhauler bonding requirements for prime carriers and will direct the Commission's Transportation Division staff to issue a report within 180 days addressing the suggestions of the parties.

### *Collective Ratemaking*

The U.S. Supreme Court ruled in *Southern Motor Carrier Conference*, 471 U.S. 48 (1985) (Southern Motor), that private action is immune from federal antitrust laws if it is pursuant to a clearly articulated state policy and is actively supervised by the state. PU § 496 establishes the legal basis for allowing antitrust immunity in California. The Commission may approve collectively set rates and rules if they are fair and reasonable and not contrary to public policy. Collective agreements must allow for independent action by individual members, and cannot be used for both rail and truck transportation, except when setting joint or through rates. The pooling or division of traffic is forbidden unless it is in the interest of the public or fuel economy and will not unduly restrain competition.

In accordance with G.O. 154, collectively set rates and rules may only be filed by rate bureaus which are non-profit organizations. The rate bureau must file a formal application including the bylaws of the organization, a membership list, an organization chart, and a verified statement indicating whether or not the membership currently includes both rail and highway carriers. Currently, eight rate bureaus have authority from the Commission to collectively file rates.

### *DRA*

DRA recommends that collective ratemaking be retained for common carriers. DRA states that a consolidated effort reduces carrier costs for negotiating, calculating and setting rates, and preparing and filing tariffs. In a totally rate deregulated environment, DRA believes that collective ratemaking would be undesirable. Finally, although DRA

comments that collective ratemaking may stifle or hinder competition, it notes that the legal requirement of independent carrier action within a bureau reduces this concern.

### CTA

CTA proposes retaining the current program for approving collective rates. It also proposes requiring that all common carrier rates be filed through a rate bureau granted PU § 496 antitrust immunity. Carriers would retain the right to independent action. Within bureaus, proponents of rate changes must be either member carriers whose traffic is affected by the rate change or affected freight bill payers.

### Coalition

The Coalition does not support collective ratemaking, and recommends bureau functions be limited to administrative areas and record keeping. If not restricted to these functions, Coalition would require rate bureaus to show that a collectively set rate is market driven and does not constitute an abuse of market power. The burden of proof in a complaint involving a rate bureau should be on the rate bureau.

### CWTB

CWTB is a rate bureau approved by the Commission to perform collective ratemaking activities. CWTB is concerned that DRA's proposal to allow increased rate freedom will undercut its ability to make collective rates. Specifically, it is concerned that DRA's proposal will not provide the active supervision required in Southern Motor.

### CMA

CMA supports the current rate bureau policy based on the assumption that they can perform valuable functions for small carriers which compensates for their non-competitive effect.

### CLFP

CLFP believes collective ratemaking could lead to collusion. It suggests that the Commission end anti-trust immunity for rate bureaus. If collective ratemaking continues, rate bureaus should have the burden of proving that a collectively set rate is market driven.

### WMTB

WMTB is an authorized rate bureau. WMTB believes that complete deregulation would render collective ratemaking useless. However, if the Commission retains regulatory control, it requests that any new regulatory program articulate an active supervisory role by the Commission over collective ratemaking.

### NSSTC

NSSTC recommends that rate bureau increase applications be filed at least 30 days before the effective date of the rate. Rate increase applications would be accompanied by data justifying the increase. The Commission would retain the ability to approve, suspend or revoke an increase before it goes into effect.

App-066

### Discussion

We agree with DRA that there are administrative efficiencies associated with rate bureaus. We also find that independent carrier action within rate bureaus minimizes the adverse impact that collective ratemaking can have on competition. Therefore, we will retain the current collective ratemaking requirements including the requirement that all collectively set rates must be filed by formal application with appropriate justification.

### Credit Rule

G.O. 155 governs the collection of charges by common and contract carriers subject to G.O. 147-A. The current rule allows carriers to extend credit for up to seven days, excluding Sundays and legal holidays, following presentation of the freight bill. This provision of G.O. 155 was intended to prevent the manipulation of rates, e.g., no interest loans and discriminatory practices, and simplify shippers' and carriers' accounting practices.

The Coalition and CMA recommend eliminating the credit rule as an unnecessary requirement. They argue that carriers can be more efficient if allowed to set their own rules. DRA proposes that carriers be given the latitude to extend credit for a "reasonable period of time", but does not define the term "reasonable".

NSSTC supports the current credit rule because the wide variety of credit terms and policies offered by ICC carriers has led to confusion. NSSTC prefers uniform credit rules over a multitude of carrier payment plans. Several other parties support the entire current regulatory program, but none identified the credit rule as a separate issue.

In the interest of uniform payment procedures and simplified rates, we will maintain the current credit rule in G.O. 155, but extend the time within which carriers are required to present the freight bill from 7 to 15 days. The additional time is provided to allow sufficient time for the freight bill to be processed and received. However, for special contracts we will provide contract carriers the flexibility to modify the credit terms in G.O. 155. Contracts which do not specify credit terms will be governed by G.O. 155-A. With adequate justification individual carriers can request deviations from the uniform credit rule. Revised G.O. 155-A is attached as Appendix E.

We will entertain further testimony on credit rule effects on subhaulers in our upcoming subhauler hearings, should any party wish to raise the issue.

### Electronic Data Interchange

This issue was resolved on an experimental basis in D.89-04-049, dated April 12, 1989. We support the use of electronic data interchange as a means to improve efficiency in transportation markets. Our only concern in D.89-04-049 was that data necessary to verify the circumstances of a given shipment be retained in retrievable form. We will take no further action on the subject in this decision, except to suggest that the next convenient individual application for authority to use electronic data interchange be used to resolve generically the outstanding issues. The completeness of any upcoming applications and the availability of the Transportation Division report ordered in D.89-04-049 should determine which proceeding is appropriate. The staff report is due no later than February 11, 1990.

### Implementation Issues

Transition from the current regulatory program to the adopted program has been discussed in several places throughout this decision; we will summarize our actions here. New filings for common carrier tariffs, common carrier contracts and

special contracts can be made immediately on the effective date of the General Orders appended to this order. The revised General Orders will become effective March 15, 1990, to allow distribution to all carriers before their effective date.

All rates and contracts now in effect may continue in effect until their expiration. However, within 90 days of the effective date of the revised General Orders all common carrier tariffs must be revised, if necessary, to conform to new G.O. 147-B, except for shipper-specific tariffs and rates which include write-in tariffs.

The shipper-specific tariffs and rates which include write-in tariffs shall be phased out over a 120-day period. Every LTL carrier with 1988 California intrastate gross annual revenues (as reported in annual reports to the Commission) exceeding $10 million shall bring into conformance approximately one third of its problem rates and tariffs on a schedule of 30, 60 and 90 days from the effective date of the General Orders. Such rates and tariffs for all other carriers shall conform within 120 days. The Transportation Division shall within 15 days of the effective date of this decision notify all common carriers of the exact filing dates and other necessary details.

The current maximum term for contracts is one year. Under the new program the one year limit is retained, but contracts may be extended for subsequent one year periods.

As discussed in the *Variable Cost Calculation* section, further hearings will be ordered on the common carrier floor price.

Staff may hold workshops throughout the state to introduce the new regulatory program, at its discretion.

Inherent in the adopted program is some delegation of authority to staff. The delegated authority is reduced from delegations in the current program. Specifically, staff is not being delegated any authority to make judgments concerning the reasonableness of rates. Staff will, however, maintain its duties to check rate and tariff filings for correct format and for the few rate and service limitations being imposed. Staff will not have direct authority to suspend any filing, but must present such requests to the Executive Director, who has the authority to suspend filings for one 30-day period. Within that period staff must prepare and support Resolutions for formal Commission action on further suspensions or rejections. The procedures for investigation and suspension of rates in effect remain unchanged; the standards for such suspensions have changed, however, to comply with the adopted program.

As specified in the General Orders, public protests to any filings must follow the Commission's Rules of Practice and Procedure. We retain this protest procedure to allow due process to aggrieved parties. At the same time we recognize that the legal resources of transportation industry parties may often limit or discourage such protests. We therefore encourage staff to continue to work cooperatively with parties who make oral or informal inquiries about rate and tariff filings that affect their interests.

Because cost justifications are not included in the adopted program, there is no need to retain Rule 7.7 in G.O. 147-A, relating to technical changes to tariffs that have a revenue impact of less than 1% of carrier annual revenues. That rule will be eliminated. However, Article 7 of the Commission's Rules of Practice and Procedure (beginning with Rule 25) is not changed.

Finally, California Trucking Association's (CTA) brief addressed the admissibility of Exhibits 40 and 52. CTA argues that the ALJ erred in admitting these exhibits. While we stand behind the ALJ's ruling, it is important to note that this decision does not rely on the evidence contained in either exhibit.

We are convinced that, based on the record, our program is in the public interest, consistent with the provisions of the Constitution and the Public Utilities Code, and yields rates that are just and reasonable. G.O.'s 80-C, 147-B, and 155-A attached as Appendices C, D, and E, respectively, have been revised to reflect the adopted regulatory program discussed above. The following table outlines the ratemaking features of the adopted program.

*378  TABLE 4

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

*Findings of Fact*

1. On December 16, 1987 an order was issued which set en banc hearings to consider the State's regulation of the for-hire trucking industry.

2. En banc hearings for all sectors of the trucking industry were held in San Francisco on March 10 and 11, 1988 and in Los Angeles on March 18, 1988.

3. The Commission issued I.88-08-046 on August 24, 1988.

4. I.88-08-046 identified the Commission's regulatory objectives for the general freight trucking industry and invited a thorough re-examination of the current regulatory system.

5. Prehearing conferences which established the procedural rules for the proceeding were held on September 14, 1988 and October 17, 1988.

6. Fifty-four days of evidentiary hearings commenced on November 7, 1988 and concluded on February 24, 1989.

7. Two days of public comment hearings were held, one in Los Angeles on December 5, 1988 and the other in San Francisco on December 12, 1988.

8. D.86-04-045, dated April 16, 1986 adopted the present rate regulation program as represented in General Orders 80-B, 147-A, and 155.

9. G.O. 147-A implemented a system of carrier-made rates, a rate window, rate exempt dedicated equipment contracts, imposition of a Truck Freight Cost Index (TFCI), and a procedure for the cost justification of reduced rates.

10. Under G.O. 147-A common carrier general rate increases require a formal application to determine whether the carrier's financial condition justifies the request.

11. Common carrier rate increase applications typically are processed on an ex parte basis with decisions issued within 60 days from the filing dates.

12. Under G.O. 147-A rate decreases do not require formal applications. Instead carriers may file cost justification filing which: (1) demonstrate that the rates will generate sufficient revenue to contribute to the carrier's profitability, (2) are accompanied by a summary of financial data, (3) include the prevailing wage standard in the labor cost element, and (4) meet specific provisions governing the use of subhaulers.

13. G.O. 147-A provides a rate window which allows carriers to change rates a maximum of 5% above or 5% below their base rate. Base rate changes require a cost justification filing for decrease or a formal application for common carrier increases.

14. Under G.O. 147-A carriers are allowed to make minor changes in contracts and tariffs without cost justification or formal application.

15. Under G.O. 147-A a carrier can temporarily reduce rates, effective immediately, to meet the rates of a competing carrier if it currently handles the traffic. The reduced rates must be followed by a cost justification within 60 days.

16. Under G.O. 147-A a carrier that does not currently handle the traffic cannot meet the rate of a competing carrier. To accomplish this change the carrier must file a cost justification and receive approval prior to reducing the rate.

17. Under G.O. 147-A common carriers cannot meet the rates of contract carriers without an approved cost justification filing.

18. Under G.O. 147-A the TFCI measures annual industry-wide changes in carrier operating costs and adjusts carrier base rates. Adjustments to base rates are mandatory if the change in the TFCI is greater than 1% (plus or minus) and permissive if less than 1%.

19. Under G.O. 147-A contract carrier rate increases do not require justification or approval, and new common carriers may file rates at existing generally applicable common carrier (GACC) rates without cost justification.

20. Under G.O. 147-A dedicated contracts offer contract carriers that dedicate equipment to one shipper the ability to charge any rate, subject to a profitability test.

21. Under G.O. 147-A to pass the above profitability test a carrier must: (1) have an expense ratio (expenses divided by revenues) of less than 100%, and (2) pay not less than the Commission's prevailing wage standard or demonstrate that its labor expenses compare favorably with the TFCI.

22. Under G.O. 147-A common carrier rate filings and contract filings with rates below GACC rates, except for dedicated contracts, new rate filings, and rate window filings, are listed in the Commission's Daily Transportation Calendar.

23. Under G.O. 147-A the waiting periods for carrier-set rates to become effective are:

On the date filed — Rate window filings, me-toos, standard contracts at or above GACC rates, and dedicated contracts.

Ten days after filing — Initial tariff filings by new carriers.

Thirty days after calendaring — All other filings, unless protested.

24. Shippers are frustrated over the current regulatory program's rigid requirements for the classification and rating of commodities, and over their inability to implement a simplified rating system and contract program.

25. The current regulatory program inhibits the implementation of simplified contracts and rating systems which would provide some shippers the opportunity to more efficiently manage and monitor their transportation costs.

26. The current regulatory program first places the burden on the carrier to cost-justify its rates, and then on the Transportation Division staff to analyze and evaluate the carrier's justification. This is a costly and inefficient procedure.

27. Cost justifications often take three to four months to process.

28. Cost justifications are often rejected if they are inconsistent with previously accepted filings.

29. The cost justification procedure is difficult to predict, subjective, results in fictitious traffic studies, can be manipulated, and uses prevailing wage data instead of actual labor costs.

30. Knowledgeable carriers are able to exploit the current rate program to gain competitive advantage.

31. Authorization of dedicated contracts as a tool to allow rate flexibility has limited usefulness.

32. Exclusive use limitations on carrier equipment can cause equipment to be used inefficiently.

33. Current use of the TFCI forces mandatory rate increases that would not otherwise occur, inserts time lags which hinder negotiation of contracts and discounts, incorporates averages and proxies in place of available actual data, and is administratively burdensome.

34. Write-in tariffs allow secret, shipper-specific rates.

35. Write-in tariffs prevent free access to information which would foster competition if it were available to other shippers and carriers.

36. Many common carriers do not have or understand write-in tariffs.

37. Common carriers without write-in tariffs are at a competitive disadvantage.

38. Write-in tariffs are not evaluated for cost justification or discrimination and can result in unjustified discriminatory prices.

39. Carriers must now already handle the traffic before they can match another carrier's rates without cost justification. This restriction stifles competition.

40. The large number of intrastate carriers in California makes cost justification of individual rate filings burdensome and ineffective.

41. The current general freight program is clumsy and inefficient, contains some major flaws that pose barriers to maintaining reasonable rates, and inhibits the State's economy from fully benefiting from the services of a vital and vigorous for-hire trucking industry.

42. In a workably competitive market, if enough demand exists at prices which will compensate carriers for their costs, then carriers will serve that market.

43. Three conditions are sufficient to demonstrate that a market is workably competitive: (1) there are many buyers and sellers in the market, (2) entry and exit from the market are relatively easy, and (3) buyers and sellers have ready access to relevant information.

44. There are many buyers and sellers in the California intrastate general freight trucking market.

45. Carriers seeking authority from this Commission for the transportation of general freight by for-hire truck need only meet certain fitness and financial requirements and pay a $500 filing fee. Entry is not restricted based on the number or capacity of currently regulated carriers. Both the current program for general freight carriage and the program adopted by this decision provide for such open entry.

46. Entry into the intrastate general freight market and expansion into new areas are relatively easy.

47. The capital costs of entering the intrastate general freight market are relatively small, and capital risks are minimal.

48. Transportation equipment and terminals have multiple uses and can easily be sold or leased.

49. The costs of entry or expansion can be largely recovered upon exit from the general freight market.

50. Regular business relationships produce much relevant competitive information. Further access to information can be encouraged by regulatory program elements.

51. The intrastate general freight trucking market is workably competitive.

52. Antitrust laws help ensure that the general freight trucking market remains workably competitive.

53. Because the intrastate general freight trucking market is workably competitive, rate regulation is not necessary to keep rates from rising above reasonable levels. If one carrier tries to price its service too far above cost, other competing carriers will offer service at a lower and more reasonable rate.

54. Competition and rate flexibility provide sufficient protections against monopoly pricing.

55. Competition will restrain unreasonable shipper influence over pricing for the carriage of general freight; if a shipper is unwilling to pay reasonable prices for service, carriers can decline to serve. Carriers will not necessarily be forced out of business because there are many other shippers in the market.

56. Ultimately, to receive reliable service, shippers will be forced to pay prices which cover a carrier's costs.

57. The economies of scale in serving large shippers is a natural force of a competitive market, and market power will be checked and controlled by market forces.

58. Competition will prevent any rate decreases granted to certain traffic from casting an undue burden on other traffic.

59. Competition and rate flexibility provide sufficient protections against monopsony pricing, or shipper clout.

60. In a workably competitive market no further protections against monopoly pricing or unreasonable shipper clout are necessary.

61. Witnesses claimed that to be reasonable rates must protect against predatory pricing and destructive pricing below costs.

62. Predatory pricing is the lowering of prices to drive competitors out of business, and subsequent raising of prices to extract monopoly profits.

63. Because there are many carriers in the California intrastate market and entry is not difficult, it is not realistic to expect predatory pricing.

64. No convincing evidence was presented that predatory pricing will or could exist in the California intrastate market if carriers have pricing flexibility within a workably competitive market.

65. The adopted regulatory program provides sufficient protections against predatory pricing by: (1) imposing no new restrictions to entry or exit, thus leaving entry and exist relatively easy, and (2) imposing rules that promote ready access to information, thus ensuring the market will remain workably competitive.

66. A maximum percentage limit on price increases within a given time period will provide additional protection against predatory pricing by common carriers.

67. This record contains no useful definition of the term "destructive competition", because that term implies that competition itself causes practices destructive to the industry as a whole.

68. During the Depression of the late 1920s and 1930s the destructive pricing practices observed were caused by the economic conditions of the times, not competition itself. The destructive practices contributed to low wages, inadequate maintenance and market instability, which were harmful to both shippers and carriers.

69. In light of current economic conditions we do not expect the destructive rate practices of sixty years ago to recur.

70. Pricing below full costs by individual carriers is not necessarily destructive to the industry as a whole.

71. Business failures by individual carriers are not necessarily destructive to the general freight carriage industry as a whole.

72. In other jurisdictions without economic regulation the general freight carriage industry has survived, and there have been no demonstrated pricing practices destructive to the industry as a whole. Rather, such markets have functioned efficiently.

73. There is no demonstrated need to adopt specific regulatory protections against destructive pricing practices, beyond incentives that rates be cost based.

74. The adopted variable cost floor price for common carriers will provide additional protection against destructive pricing.

75. Due to: (1) the very low likelihood that severe economic conditions like those during the Depression will be repeated in the near future, (2) the workings of competition allowed under a flexible rate program, and (3) the variable cost floor price applied to common carriers, our adopted regulatory program provides sufficient protections against destructive pricing practices.

76. An exemption from Commission regulation of general freight contract carrier rates is justified because it will not lead to destructive rate practices.

77. Price flexibility provides carriers the freedom to align prices more closely with costs and enables safe, well-managed and efficient carriers to earn a reasonable return on investment.

78. With price flexibility, carriers that price their services too far above cost will not survive because other carriers will be able to take business from them. Carriers that price their services too far below cost will not survive because they will fail to earn a reasonable return on their investment.

79. Carrier failures due to poor management and irrational pricing are a natural consequence in a competitive market.

App-073

80. Efficient carriers that price according to their costs and provide safe, reliable service will not only survive, but prosper when allowed price flexibility and an equal opportunity to compete.

81. Consumers and the economy generally will benefit from the substitution of market-set rates for government efforts to fix prices.

82. Our current regulatory program for contract carriers of general freight does not set any maximum rates.

83. Commission-set maximum rates are not necessary for the contract carriage of general freight because competition will restrain unreasonably high prices.

84. If carriers must respond to unnecessary regulatory requirements rather than market demand for their services, they will operate inefficiently with the attendant risks of oversupply, waste of resources, and stifling of innovation.

85. Freeing carriers of general freight from unnecessary rate regulation, including maximum and minimum rate requirements, will not harm the public interest; rather it will serve the public interest by allowing carriers to respond efficiently to market conditions and avoid the risks of inefficient operations.

86. The record fails to demonstrate an obvious or persuasive need in the public interest for the setting of any maximum rates.

87. We are justified in exercising the discretion we have under Public Utilities Code § 3662 to set neither maximum nor minimum rates for the contract carriage of general freight. This rate system is in the public interest and will not lead to destructive rate practices.

88. It is reasonable to limit common carrier rate flexibility to a zone of reasonableness.

89. If a zone of reasonableness adequately protects shippers and carriers against unreasonably high or low common carrier rates then all nondiscriminatory rates within the zone are reasonable.

90. To be useful to carriers a regulatory program must permit raising or lowering of prices to respond to market conditions.

91. Recorded data indicate that annual increases of 10% would not be uncommon for the TFCI and producer price indexes.

92. A 10% upper limit on common carrier rate increases within any one year period reasonably balances the flexibility required to change rates in response to cost and market changes, and additional protections against monopoly and predatory pricing.

93. It is reasonable to adopt a ceiling which limits common carrier increases in any rate to no more than a total of 10% within any one year period.

94. Under our adopted regulatory program for common carriers, competition and the 10% limit will keep rates from rising to excessively high levels.

95. Rates above our adopted 10% upper limit may be reasonable if it can be shown by formal application that the rates will not cause monopoly pricing, predatory pricing or price discrimination.

96. Floor prices based on variable costs are reasonable for the lower end of a zone of reasonableness.

97. Our adopted program for common carriers includes a variable cost floor price to ensure that rates do not drop below reasonable levels.

98. A variable cost floor price for common carriers assures that they are compensated for legally required driver wages; required unemployment insurance, workers compensation and Social Security taxes; and fuel, insurance, tire and maintenance costs.

99. Use of the data set used to calculate the TFCI is reasonable for purposes of setting floor prices until a further record can be developed.

100. A variable cost floor price does not compromise highway safety.

101. Competition will prevent rate decreases permitted by our adopted regulatory program from casting an undue burden on other traffic.

102. The less than maximum reasonable common carrier rates permitted by this decision are required by the needs of commerce and the public interest.

103. The less than maximum reasonable common carrier rates authorized by this decision are justified by transportation conditions.

104. Common carrier rates below our adopted price floor may be reasonable if it can be shown by formal application that the rates will not cause predatory pricing, will not cause destructive pricing and will not be discriminatory.

105. Our 10% upper limit for common carrier tariff rate increases, along with our lower variable cost limit, interacts with incentives for carriers to set cost-based rates to create just and reasonable rates in a workably competitive market.

106. Because the market is workably competitive, case-by-case cost justification is unnecessary.

107. Our adopted regulatory program for common carriers of general freight will keep their rates within the zone of reasonableness. Rates outside the adopted zone may be authorized following a showing and finding of reasonableness by the Commission.

108. The new and increased common carrier rates approved by this decision are justified and are reasonable.

109. Due to the size and number of their shipments large shippers can often be served by carriers at lower cost than small shippers.

110. No party supports discriminatory pricing, which is rate differences not justified by differences in costs or other conditions.

111. If rates are confined to a zone of reasonableness, then individual cost justifications are not needed to prevent price discrimination by common carriers.

112. The adopted regulatory program provides necessary and sufficient protections against common carrier discriminatory pricing by: (1) prohibition of shipper-specific rates, (2) prohibition of secret rates and discounts, including

write-in tariffs, (3) requiring common carriers to bill for services at the lowest discounted tariff rates applicable, (4) public notice of rate filings, (5) adoption of a protest procedure, and (6) rate flexibility to encourage workable competition.

113. To prevent possible price discrimination it is necessary that common carrier contract rates not fall below the tariff rates in effect at the time the contract is filed.

114. Although the workings of competition will provide some protection, regulatory protections against price discrimination by contract carriers are not necessary because contract carriers do not hold themselves out to serve the public.

115. The complaint and protest procedures adopted in this decision will also act to prevent unreasonable rate changes.

116. The adopted regulatory program provides just and reasonable rates, and is reasonable.

117. Service to small and rural communities is affected by the level of rates carriers can charge.

118. Service to small and rural communities is not dependent on the existence or nonexistence of economic regulation. Whether rates are compensatory at a given level of service determines carrier enthusiasm to serve a market segment.

119. The adopted minimum level of common carrier service of one pickup or delivery per week upon request to any point covered by a tariff provides adequate service to market segments that might not be served otherwise. Such service may be provided directly by the carrier or through arrangements with other carriers.

120. Adoption of minimum levels of service for contract carriers is not necessary because contract carriers do not hold themselves out to serve the public.

121. The balance of incentives for common and contract carriage can be reasonably controlled by setting different effective dates for rates for the two types of carriage and by defining the applicability of contract carriage.

122. To prevent contract carriers from unfairly competing against common carriers it is necessary to require that contract shippers have special relationships with carriers, unless the service is not normally provided under common carrier tariffs.

123. The necessary and sufficient conditions to demonstrate a special relationship are a continuing relationship and a meaningful shipper obligation beyond the obligation to pay for services provided.

124. An agreement that extends at least 30 days and requires more than a single shipment sufficiently demonstrates a continuing relationship.

125. An obligation by a shipper to use at least $1000 per month of transportation services is a meaningful shipper obligation. Other substantial shipper obligations of a type not normally found in any common carrier tariffs may also meet this requirement.

126. It is reasonable to allow special contracts to continue in effect for up to two consecutive months without fulfilling the obligation to use $1000 per month of services, or without the other substantial obligation relied upon to qualify the special relationship. However, the average level of services since the contract became effective must continue to meet or exceed the $1000 per month obligation.

127. Allowing common carrier rates to become effective more quickly than special contracts, along with the adopted special contract eligibility rules, reasonably balances the flexibility required to change rates in response to cost and market changes, and incentives to maintain an effective, viable common carriage system in California.

128. Ten days notice is a reasonable time for review and protest of common carrier tariffs and common carrier contracts.

129. Twenty days notice is a reasonable time for review and protest of special contracts.

130. There is good cause to allow common carrier rate changes to become effective on less than 30 days notice, to meet the needs of commerce. The 10 day effective date will allow carriers to respond promptly to market conditions, while still ensuring compliance with our regulatory requirements.

131. It is reasonable to adopt interim common carrier floor prices of $0.581 per mile for truckload carriers and $0.655 for less-than-truckload carriers, pending further hearings.

132. It is reasonable to allow common carriers that also have contract carrier authority to enter into common carrier contracts that provide service at rates initially equivalent to the common carrier's tariff rates, but may lock in rates over the term of the contract or provide for upward adjustments tied to specified escalation factors.

133. The adopted common carrier contract regulations provide flexibility of service terms which increase market efficiency.

134. Public filing of common carrier rates is required by law. Public filing of all contracts as well as common carrier rates encourages competition and discourages price discrimination, and is therefore reasonable.

135. Under the adopted program: (1) all common carrier tariffs should describe accurately and fully the services offered to the public, provide the specific rate or the basis for calculating charges for the performance of those services, and show all related classifications, rules, and practices; (2) tariffs should be filed and maintained in a way that allows all users to determine the exact charges for any given shipment, including all available discounts; (3) all discounts should be identified in the tariffs, along with the qualifying criteria; and (4) freight bills of carriers which publish discounts should contain information about the availability of discounts.

136. The adopted regulatory program allows for public protests of all proposed rates and tariffs, and for formal complaints about all rates and tariffs in effect.

137. There are already thousands of carriers with statewide authority to transport general freight, and existing carriers can expand their trucking fleets without additional Commission authority.

138. There is no reason to believe that restricting the number of new carriers granted authority to transport general freight would limit the mileage traveled by Commission-regulated trucks.

139. There is no reason to believe that continuing to allow unrestricted entry into general freight trucking will cause an increase in pollution or traffic congestion.

140. A monitoring program is required so the Commission can identify and correct any market failures of the adopted program in a timely fashion.

141. The three-point monitoring program described below is sufficient to protect against unforeseen market flaws and is therefore reasonable.

142. First, Commission staff should conduct surveys and monitor the degree of competition and quality of service within small and rural communities and other traffic lanes as necessary. Staff should report its findings to the Commission and make recommendations for corrective action where warranted.

143. Second, Commission staff should review the reasonableness of rates in traffic lanes and communities statewide. Staff should report its findings to the Commission and make recommendations for corrective action where warranted.

144. Third, Commission staff should monitor truck-at-fault accidents and other related safety data.

145. Under the adopted regulatory program the Executive Director is delegated the authority to suspend for cause any rate, tariff or contract filing prior to its effective date. The suspensions shall be for no more than 30 days beyond the public notice period. No further authority over rates or rules is delegated.

146. Under the adopted regulatory program ultimate authority for approval of all rates remains with the Commission.

147. The adopted regulatory program does not unreasonably delegate authority to the Transportation Division or the Executive Director.

148. Recently enacted State legislation has significantly strengthened safety regulation.

149. SB 2594 (Stats. 1988, Ch. 1509) put into effect commercial driver license requirements from the Federal Commercial Motor Vehicle Safety Act of 1986 (Title XII of PL 99-570).

150. AB 3490 (Stats. 1988, Ch. 1175) specified additional entry requirements for new intrastate regulated motor carriers.

151. AB 3489 (Stats. 1988, Ch. 916) and AB 2097 (Stats. 1989, Ch. 1216) formalized the CHP/Commission suspension process for unsafe carriers.

152. AB 2706 (Stats. 1988, Ch. 1586) and AB 2097 (Stats. 1989, Ch. 1216) established schedules for equipment safety inspections and CHP terminal inspections and mandated certain commercial driver's license-related requirements.

153. SB 2876 (Stats. 1988, Ch. 159) mandated additional CHP roadside safety inspections and a report on an incentive program for safe drivers.

154. CHP is responsible for enforcing the rules of the road, setting safety standards for commercial carrier operations and inspecting carrier operations.

155. The Commission has responsibilities to ensure that new carriers are financially fit and able to conduct safe operations, and to coordinate safety enforcement with other State agencies.

156. DMV is responsible for licensing standards and procedures.

157. The Department of Health Services is responsible for registering carriers of hazardous waste materials and enforcing special hazardous waste transportation rules.

158. Because rigid rate regulation causes significant costs and adverse impacts in a workably competitive market, its retention is justified only if substantial safety benefits can be gained.

159. Carriers will not necessarily spend additional revenues on safety because each carrier allocates operating revenues in its own best interest.

160. The current and proposed rigid rate programs will not necessarily result in higher safety expenditures than those of a workably competitive market.

161. The Rigid Rate Proponents have not demonstrated that rigid rate regulation directly improves highway safety.

162. Direct enforcement action is more effective than rigid rate regulation in enforcing safety laws and good safety practices.

163. Commission staff in coordination with other State agencies will enforce recently enacted safety legislation.

164. Commission staff should take an active role in safety by monitoring required carrier driver education and training programs.

165. The Commission will consider the extension of the safety and financial entry requirements established by AB 3490 to all general freight carriers, where appropriate, in a future proceeding.

166. Some carriers continue to operate after suspension or revocation of their operating authority.

167. Transportation Division records which identify carriers holding valid operating authority should be made readily available to the public by establishing a toll free telephone number for public use to verify a carrier's operating authority.

168. Over the past few years there has been a significant increase in owner-operators working exclusively for one carrier.

169. A Commission staff report shows that 71% of subhaulers earn all revenues from subhauling, 50% of those work exclusively for one carrier, and another 29% engage in subhauling to supplement their earnings as prime carriers.

170. Between 1978 and 1986 the percentage of total general freight hauled by subhaulers increased from 20% to 30%.

171. Because of the large saving a prime carrier can make in employee contributions, there is a strong incentive to use subhaulers.

172. The practice of subhauling is a stabilizing factor in the general freight transportation industry which tends to keep the cost of transportation down.

173. All types of subhauling are lumped together for regulatory purposes, even though there is a great diversity in practice. This has caused lack of certainty with respect to operating authorities required.

174. D.91247 requires a California intrastate subhauler of general freight to hold operating authority from the Commission.

175. The requirements for operating authority in California are the same for prime carriers and subhaulers.

176. G.O. 130 requires a bona fide employer-employee relationship between the lessee and driver of any leased vehicle when leasing between carriers.

177. Regulation of leasing arrangements is different for carriers regulated by this Commission and those regulated by the ICC.

178. There is a growing concern that the use of subhaulers working exclusively for one prime carrier is a low cost alternative to employee drivers.

179. Some prime carriers exploit subhaulers in order to cut costs of operation and employee benefits.

180. Prime carriers who use subhaulers save more then 30% in payroll costs by not having to pay workers compensation insurance, unemployment insurance, and Social Security taxes.

181. If a division of revenue scheme were in place for prime carriers and subhaulers, there would be no need for subhauler rate schedules.

182. A formula to equitably divide revenues between prime carriers and subhaulers is necessary to insure that subhaulers have adequate protection for the conduct of their operations.

183. The present record does not provide enough facts on which to base a formula for the division of revenues between prime carriers and subhaulers.

184. The Commission's current rules and regulations concerning general freight subhaul operations should be continued pending further order of the Commission.

185. Further hearings should be held to consider possible rules on the division of revenues between prime carriers and subhaulers.

186. Further hearings should be held to consider amending Commission rules and regulations on leasing between carriers to determine if the rules and regulations could be patterned more closely to those of the ICC.

187. Under the PU Code, prime carriers granted operating authority after December 31, 1988, are required to check the driving records of all subhauler drivers who require a class 1 driver license.

188. Present Commission rules concerning financial information required to grant a permit and the revenue level at which an annual report must be filed by carriers are adequate for regulation of general freight transportation.

189. Present subhaul bond requirements for prime carriers may not adequately protect subhaulers.

190. The Transportation Division staff should be ordered to study and report within 180 days from the effective date of this decision on possible changes in prime carrier subhaul bonding requirements.

191. G.O. 155 provides a uniform credit rule for carriers.

192. To provide the public with reasonable, uniform payment procedures and simplified rates, the current credit rules should be retained. However, common carriers should be provided up to 15 days to present freight bills to shippers, and contract carriers should be provided the flexibility to modify the credit rule terms in G.O. 155 for special contracts.

193. PU § 496 authorizes the Commission to approve collectively set rates and rules if they are fair and reasonable and not contrary to public policy.

194. Rate bureaus should continue to file formal applications containing appropriate justification for approval of collectively set rates under PU § 496.

195. Independent carrier action within rate bureaus minimizes the adverse impact that collective ratemaking can have on competition.

196. Retention of current collective ratemaking practice will allow rate bureaus to perform valuable functions for small carriers without jeopardizing workable competition in the market.

197. D.89-04-049 adopted the use of electronic data interchange on an experimental basis. The Commission will consider using the next convenient individual application to use electronic data interchange to resolve the outstanding issues generically.

198. All rates and contracts governed by G.O. 147-A which are in effect immediately prior to the effective date of G.O. 147-B should be grandfathered into the regulatory program adopted in G.O. 147-B.

199. Because no currently approved contracts extend beyond one year, it is reasonable that contracts now in effect be allowed to continue until their expiration.

200. With the exception of shipper-specific tariffs and rates which include write-in tariffs, all common carrier tariffs can and should be made to conform with G.O. 147-B within 90 days of the effective date of G.O. 147-B.

201. Due to the complexity of the situation involving shipper-specific tariffs and rates which include write-in tariffs it is reasonable to schedule compliance of these tariffs with G.O. 147-B over a 120 day period.

202. A reasonable compliance plan is for LTL carriers with intrastate gross revenues exceeding $10 million to bring into conformance approximately one third of such rates and tariffs within 30, 60 and 90 days from the effective date of G.O. 147-B. All other carriers should conform within 120 days from the effective date of G.O. 147-B.

203. G.O. 147-B, attached as Appendix D to this decision, identifies when rate changes can occur, specifies which changes can be made, and sets forth the manner in which rate changes can be filed and published.

204. Under the adopted program, there is no need to retain Rule 7.7 in G.O. 147-A.

205. It is reasonable to hold hearings to investigate alternative measures of variable cost and to determine an updating procedure for floor prices.

206. The prevailing wage program as it relates to general freight is unnecessary and there is no need to continue use of the TFCI program. However, it is reasonable to defer formal rescission of these programs until after further hearings on the floor price program.

207. This decision does not rely on evidence in Exhibits 40 and 52.

208. The regulatory program set forth in this decision fulfills our responsibilities and the regulatory objectives mandated by the Constitution and statutes, and should be adopted.

***Conclusions of Law***

1. Under Public Utilities Code § 3662 the Commission has discretion to set maximum or minimum rates or no rates at all for highway contract carriers.

2. The Commission may refuse to impose minimum rates when the record fails to demonstrate an obvious or persuasive need in the public interest. Exemption from Commission regulation of rates can be justified when the exemption would not lead to destructive rate practices.

3. Public Utilities Code § 726 implies the standard by which minimum rates are to be determined but does not require that such rates be set.

4. Common carriers have an obligation to serve the public in a non-discriminatory fashion.

5. Public Utilities Code § 451 requires common carriers to charge just and reasonable rates.

6. There is a zone of reasonableness within which common carriers may and should exercise discretion in establishing their rates.

7. Public Utilities Code § 454.2 allows the Commission to authorize a zone of rate freedom for common carrier passenger stage corporations where it finds that there is sufficient competition. Thus, the provisions of California Constitution, Article XII, § 4, requiring Commission authorization for common carrier rate increases, permit the Commission to authorize rate flexibility within a zone of reasonableness where there is sufficient competition. The language of Public Utilities Code § 454, requiring Commission authorization for certain rate changes, is substantially identical to the language of California Constitution, Article XII, § 4, insofar as they both require a showing and a Commission finding or decision that rates are justified. Thus, § 454, like the Constitutional provision, permits the Commission to authorize rate flexibility for common carriers within a zone of reasonableness where there is a showing of sufficient competition.

8. The California Constitution and the Public Utilities Code permit the Commission to authorize rate flexibility for common carriers within a zone of reasonableness, based upon a finding that workable competition exists and that serious problems in areas of regulatory concern will not result.

9. Whether by flexible or rigid rate regulation, or in the case of contract carriers without rate regulation at all, the Commission must impose a regulatory program that meets statutory objectives, including just and reasonable rates and adequate, dependable, and safe service.

10. The Commission is not restricted to a cost-of-service form of rate regulation.

11. The Commission has ample authority to establish an appropriate and effective form of flexible rate regulation for highway carriers of general freight.

12. Common carrier rates based on variable, or "out-of-pocket", costs fall within the zone of reasonableness. Out-of-pocket costs exclude items such as depreciation, overhead, other fixed costs, and return on investment. A carrier-set rate is not unreasonable just because it does not recover fully allocated costs.

13. Under Public Utilities Code §§ 455 and 491, for good cause the Commission can allow rate changes on less than 30 days' notice by an order which: (1) specifies the changes to be made, (2) identifies when the changes will occur, and (3) sets forth the manner in which changes shall be filed and published. General Order 147-B meets these requirements.

14. Our adopted regulatory program complies with the relevant provisions of the Constitution and the Public Utilities Code.

***ORDER***

IT IS ORDERED that:

1. The regulatory program for the transportation of general freight by truck outlined in the body of this decision is adopted. General Orders (G.O.) 80-C, 147-B, and 155-A, which implement this program and are attached as Appendices C, D, and E to this decision, shall replace G.O.s 80-B, 147-A, and 155, respectively. The new general orders shall become effective on March 15, 1990.

2. All rates and contracts governed by G.O. 147-A and in effect immediately prior to the effective date of G.O. 147-B shall be grandfathered into the regulatory program adopted in G.O. 147-B. General freight contracts in effect prior to March 15, 1990 may remain in effect until their expiration dates.

3. Within 90 days from March 15, 1990, all common carrier tariffs, except shipper-specific tariffs and rates which include write-in tariffs, shall conform to the regulatory program adopted herein. However, common carriers need not refile existing rates for the purpose of meeting the floor price criterion in G.O. 147-B. Those rates may continue in effect according to Ordering Paragraph 2 above.

4. Shipper-specific tariffs and rates which include write-in tariffs shall be phased out over a 120-day period. Every less-than-truckload (LTL) carrier with 1988 California intrastate gross annual revenues (as reported in annual reports to the Commission) exceeding $10 million shall bring into conformance approximately one third of such rates and tariffs on a schedule of 30, 60 and 90 days from March 15, 1990. All other carriers shall bring such rates and tariffs into conformance within 120 days from March 15, 1990. The Transportation Division shall within 15 days of the effective date of this decision notify all common carriers of the exact filing dates and other necessary details.

5. Common carriers publishing discounts must bill for services at the lowest applicable discounted rate.

6. On request, common carriers shall serve at least one day per week each point for which they have filed tariff rates.

7. The Executive Director shall cause the Commission's staff to do the following:

Conduct surveys and monitor the degree of competition and quality of service within small and rural communities and other traffic lanes as necessary, and publicly report its findings. Where problems exist recommendations for corrective action should be made.

Review the reasonableness of rates in communities and traffic lanes statewide, and publicly report its findings. Where problems exist recommendations for corrective action should be made.

In cooperation with the California Highway Patrol, gather and monitor truck-at-fault accident data and other safety related data in the trucking industry.

Enforce recently enacted safety legislation.

Evaluate extending to all general freight carriers the safety and financial entry requirements established by AB 3490.

Monitor required carrier driver education and training programs.

Establish a toll free telephone number for public use, to verify a carrier's operating authority.

Issue a report within 180 days from the effective date of this decision addressing possible changes to subhauler bonding requirements for prime carriers.

8. Additional hearings will be scheduled to consider possible revisions to this decision's common carrier variable-cost floor price calculation and a procedure for updating the floor price. The scope of those hearings shall include comment on the interim floor price adopted in this decision and any alternate proposals for calculation of a minimum level of variable costs. Those hearings will not revisit either the determination to base the common carrier floor price on variable costs or the exclusion of special contracts from the floor price requirement.

9. Additional hearings will be scheduled to consider possible rules on the division of revenues between prime carriers and subhaulers.

10. Additional hearings will be scheduled to consider amending Commission rules and regulations on leasing between carriers to determine if the rules and regulations should be patterned more closely to those of the Interstate Commerce Commission.

11. The issue of extending the safety and financial entry requirements established by AB 3490 to all general freight carriers shall be addressed in a subsequent proceeding.

12. As soon after the effective date of this decision as is practical, but no later than March 15, 1990, the Executive Director shall serve all highway common carriers and highway contract carriers with a copy of this order.

This revised order is effective today.

Dated February 7, 1990, at San Francisco, California

G. MITCHELL WILKPresidentFREDERICK R. DUDASTANLEY W. HULETTJOHN B. OHANIANPATRICIA M. ECKERTCommissioners

    I will file a written concurring opinion.

    G. MITCHELL WILK

    President

## APPENDIX A

### *List of Appearances*

Interested Parties: Messrs. Skaff & Anderson, by *Ellis Ross Anderson*, Attorney at Law, for Skaff & Anderson; *Louis Asborno*, for T&T Trucking, Inc.; *Folger Athearn, Jr.*, for Athearn Transportation Consultants; Messrs. Rea, Cross & Auchincloss, by *John R. Bagileo*, Attorney at Law, for National Motor Freight Traffic Association, Inc.; Messrs. Handler, Baker, Greene & Taylor, by *Daniel W. Baker*, Attorney at Law, for Ad Hoc Carriers Committee; *Richard L. Bredeman*, for B. R. Garcia Traffic, Service; *Barry Broad*, Attorney at Law, and Gerald O'Hara, for California Teamsters Public Affairs Council; *Ronald C. Broberg*, for Highway Carriers Association and Willig Freight Lines; *Robert E. Burt*, for California Manufacturers Association; *Harold Culy*, for C-F & Associates, Inc.; *Scott J. Engers*, Attorney at Law, for Con-Way Western Express, Inc.; *Ron Ewan* and Arden Riess, for West Coast Freight Tariff Bureau, Inc.; *Larry Farrens*, for California Carriers Association; Robert Fellmeth and *James Wheaton*, Attorneys at Law, for Center for Public Interest Law; *Milton W. Flack*, Attorney at Law, for Cal-West Tariff Bureau; *James R. Foote*, for Associated Independent Owner Operators; *Roy G. Graham*, for Mike Conrotto Trucking; *R. S. Greitz*, for Pacific Motor Tariff Bureau; *Thomas*

*B. Guthrie*, for Guthrie & Associates; *Edward J. Hegarty*, Attorney at Law, for Bekins Moving & Storage, NACAL, Inc., Tri-Valley Transportation & Storage, Inc., Western Moving & Storage, Inc., California Carriers Association, California Dump Truck Owners Association, Marino Trucking Company, Inc., and Cherokee Freight Lines; *Eldon M. Johnson*, for Pacific Motor Tariff Bureau; *Ira Klein*, for Panther Line, Inc.; *Rich Matteis*, for California Grain & Feed Association; *Keith E. Miller*, for Miller Traffic Service, Inc. and Cal-West Traffic Bureau, Inc.; *Norman Molaug*, for J. C. Penney Company; *Diane Moore*, for Con-Way Western Express; *Milton W. Flack*, Attorney at Law, and M. J. Nicolaus, for Western Motor Tariff Bureau; *Frederick E. Dooley*, Attorney at Law, Ronald W. Phelon, and David M. Newman, for Federal Trade Commission; *Ann Pougiales*, Attorney at Law, for Viking Freight System, Inc. and California Coalition for Trucking Deregulation.; Messrs. Walsh, Donovan, Lindh & Keech, by *Michael S. Rubin*, Attorney at Law, for Leaseway Transportation Corporation; Messrs. Russell & Hancock, by *John C. Russell*, Attorney at Law, for Dedicated Contract Carriage, Inc.; *Richard W. Smith* and Daniel J. McCarthy, Attorneys at Law, and Paul Stephen Dempsey, for California Trucking Association; Armour, St. John, Wilcox, Goodin & Schlotz, by *James Squeri* and John L. Clark, Attorneys at Law, for California Coalition for Trucking Deregulation; Messrs. Silver, Rosen, Fischer & Stecher, by *Michael J. Stecher* and John P. Fischer, Attorneys at Law, for Silver, Rosen, Fischer & Stecher; *William H. Sterling*, for California League of Food Processors, Del Monte Foods, USA, and National Industrial Transportation League; *Daniel Sweeney*, Attorney at Law, for National Small Shipments Traffic Conference and Drug & Toilet Preparations Traffic Conference; *David R. Wallace*, for State of California, Department of General Services; *Jon P. Adams*, for TNT Bestway Transportation; *Joseph E. MacDonald*, for Computer Movers, Inc. and Bekins Moving and Storage; *James D. Martens*, for California Dump Truck Owners Association; *Tad Muraoka*, for IBM Corporation; *F. V. Phillips*, for Cal-Carriers Freight Rating Service; *R. M. Zaller*, for Continental Can Company, Inc.; *William S. (Stan) Aylmer*, for Southern California Motor Delivery, Inc.; *Don Carnahan*, for Associated Traffic Service; *Fred D. Preston*, for AcTran; Wexler, Reynolds, Harrison & Schule, Inc., by *William K. Ris, Jr.*, for Americans for Safe and Competitive Trucking (ASCT); and *Gene Carmody, Lou Filipovich, Gary E. Haas, Daniel Huffman, Armand Karp, O. F. Marcantonio, William J. Monheim, Frank Spellman, Leon H. Carrington*, and *D. G. Redlingshafer*, for themselves.

Division of Ratepayer Advocates: *Ira R. Alderson* and *Ira Kalinsky*, Attorneys at Law, and *Christine Walwyn*.

Transportation Division: *Kenneth K Henderson*.

## APPENDIX B

### (Revised pages 1-9)

### State of California Constitution

### *Article XII*

SEC. 3. Private corporations and persons that own, operate, control, or manage a line, plant, or system for the transportation of people or property, the transmission of telephone and telegraph messages, or the production, generation, transmission, or furnishing of heat, light, water, power, storage, or wharfage directly or indirectly to or for the public, and common carriers, are public utilities subject to control by the Legislature. The Legislature may prescribe that additional classes of private corporations or other persons are public utilities.

SEC. 4. The commission may fix rates and establish rules for the transportation of passengers and property by transportation companies, prohibit discrimination, and award reparation for the exaction of unreasonable, excessive, or discriminatory charges. A transportation company may not raise a rate or incidental charge except after a showing to and a decision by the commission that the increase is justified, and this decision shall not be subject to judicial review except as to whether confiscation of property will result.

SEC. 5. The Legislature has plenary power, unlimited by the other provisions of this constitution but consistent with this article, to confer additional authority and jurisdiction upon the commission, to establish the manner and scope of

review of commission action in a court of record, and to enable it to fix just compensation for utility property taken by eminent domain.

### *Public Utilities Code*

451. All charges demanded or received by any public utility, or by any two or more public utilities, for any product or commodity furnished or to be furnished or any service rendered or to be rendered shall be just and reasonable. Every unjust or unreasonable charge demanded or received for such product or commodity or service is unlawful.

Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities, including telephone facilities, as defined in Section 54.1 of the Civil Code, as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public.

All rules made by a public utility affecting or pertaining to its charges or service to the public shall be just and reasonable. (Former § 13; amended Stats. 1977, ch. 700.)

452. Nothing in this part shall be construed to prohibit any common carrier from establishing and charging a lower than a maximum reasonable rate for the transportation of property when the needs of commerce or public interest require. However, no common carrier subject to the jurisdiction of the commission may establish a rate less than a maximum reasonable rate for the transportation of property for the purpose of meeting the competitive charges of other carriers or the cost of other means of transportation which is less than the charges of competing carriers or the cost of transportation, except upon such showing as is required by the commission and a finding by it that the rate is justified by transportation conditions. In determining the extent of such competition the commission shall make due and reasonable allowance for added or accessorial service performed by one carrier or agency of transportation which is not contemporaneously performed by the competing agency of transportation. (Former § 13-1/2.)

453. (a) No public utility shall, as to rates, charges, service, facilities, or in any other respect, make or grant any preference or advantage to any corporation or person or subject any corporation or person to any prejudice or disadvantage.

(b) No public utility shall prejudice, disadvantage, or require different rates or deposit amounts from a person because of race, religious creed, color, national origin, ancestry, physical handicap, medical condition, occupation, sex, marital status or change in marital status. A person who has exhausted all administrative remedies with the commission may institute a suit for injunctive relief and reasonable attorney's fees in cases of an alleged violation of this subdivision. If successful in litigation, the prevailing party shall be awarded attorney's fees.

(c) No public utility shall establish or maintain any unreasonable difference as to rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

(d) No public utility shall include with any bill for services or commodities furnished any customer or subscriber any advertising or literature designed or intended (1) to promote the passage or defeat of a measure appearing on the ballot at any election whether local, statewide, or national, (2) to promote or defeat any candidate for nomination or election to any public office, (3) to promote or defeat the appointment of any person to any administrative or executive position in federal, state or local government, or (4) to promote or defeat any change in federal, state, or local legislation or regulations.

(e) The commission may determine any question of fact arising under this section. (Former § 19; amended Stats. 1976, ch. 1174.)

WESTLAW  © 2019 Thomson Reuters. No claim to original U.S. Government Works.

454. (a) Except as provided in Section 454.1 and 455, no public utility shall change any rate or so alter any classification, contract, practice, or rule as to result in any new rate, except upon a showing before the commission and a finding by the commission that the new rate is justified. Whenever any electrical, gas, heat, telephone, water, or sewer system corporation files an application to change any rate, other than a change reflecting and passing through to customers only new costs to the corporation which do not result in changes in revenue allocation, for the services or commodities furnished by it, the corporation shall furnish to its customers affected by the proposed rate change notice of its application to the commission for approval of the new rate. This notice requirement does not apply to any rate change proposed by a corporation pursuant to an advice letter submitted to the commission in accordance with commission procedures for this means of submission. The procedures for advice letters may include provision for notice to customers or subscribers on a case-by-case basis, as determined by the commission. The corporation may include the notice with the regular bill for charges transmitted to the customers within 45 days if the corporation operates on a 30-day billing cycle, or within 75 days if the corporation operates on a 60-day billing cycle. If more than one application to change any rate is filed within a single billing cycle, the corporation may combine the notices into a single notice if the applications are separately identified. The notice shall state the amount of the proposed rate change expressed in both dollar and percentage terms for the entire rate change as well as for each customer classification, a brief statement of the reasons the change is required or sought, and the mailing address of the commission to which any customer inquiries may be directed regarding how to participate in, or receive further notices regarding the date, time, or place of, any hearing on the application, and the mailing address of the corporation to which any customer inquiries relative to the proposed rate change may be directed.

(b) The commission may adopt rules it considers reasonable and proper for each class of public utility providing for the nature of the showing required to be made in support of proposed rate changes, the form and manner of the presentation of the showing, with or without a hearing, and the procedure to be followed in the consideration thereof. Rules applicable to common carriers may provide for the publication and filing of any proposed rate change together with a written showing in support thereof, giving notice of the filing and showing in support thereof to the public, granting an opportunity for protests thereto, and to the consideration of, and action on, the showing and any protests filed thereto by the commission.

(c) The commission shall permit individual public utility customers and subscribers affected by a proposed rate change, and organizations formed to represent their interests, to testify at any hearing on the proposed rate change, except that the presiding officer need not allow repetitive or irrelevant testimony and may conduct the hearing in an efficient manner. (Amended Stats. 1974, ch. 194; 1976, ch. 835; 1984, ch. 1498; 1988, ch. 108.)

454.2. Notwithstanding Section 454, the commission may, upon application, establish a "zone of rate freedom" for any passenger stage transportation service which the commission finds is operating in competition with another substantially similar passenger stage transportation service or competitive passenger transportation service from any other means of transportation, if the commission finds that these competitive transportation services will result in reasonable rates and charges when considered along with the authorized zone of rate freedom. An adjustment in rates or charges within a zone of rate freedom established by the commission is hereby deemed just and reasonable. The commission may, upon protest or on its own motion, suspend any adjustment in rates or charges under this section and institute proceedings pursuant to Section 491. (Added Stats. 1984, ch. 142.)

455. Whenever any schedule stating an individual or joint rate, classification, contract, practice, or rule, not increasing or resulting in an increase in any rate, is filed with the commission, it may, either upon complaint or upon its own initiative, at once and if it so orders without answer or other formal pleadings by the interested public utility or utilities, but upon reasonable notice, enter upon a hearing concerning shall not go into effect. The period of suspension of such rate, classification, contract, practice or rule shall not extend beyond 120 days beyond the time when it would otherwise go into effect unless the commission extends the period of suspension for a further period not exceeding six months. On such hearing the commission shall establish the rates, classifications, contracts, practices, or rules proposed, in whole or in part, or others in lieu thereof, which it finds to be just and reasonable.

App-087

All such rates, classifications, contracts, practices, or rules not so suspended shall become effective on the expiration of 30 days from the time of filing thereof with the commission or such lesser time as the commission may grant, subject to the power of the commission, after a hearing had on its own motion or upon complaint, to alter or modify them. (Former § 63(b).)

460. No common carrier subject to the provisions of this part shall charge or receive any greater compensation in the aggregate for the transportation of persons or of a like kind of property for a shorter than for a longer distance over the same line or route in the same direction, within this State, the shorter being included within the longer distance or charge anany greater compensation as a through rate than the aggregate of the intermediate rates. This provision does not authorize any such common carrier to charge or receive as great a compensation for a shorter as for a longer distance or haul.

Upon application to the commission a common carrier may, in special cases, after investigation, be authorized by the commission to charge less for longer than for a shorter distance for the transportation of persons or property, and the commission may from time to time prescribe the extent t which such carrier may be relieved from the operation and requirements of this section. (Former § 24(a).)

461.5 No discrimination in charges or facilities for transportation shall be made by any railroad or other transportation company between places or persons, or in the facilities for the transportation of the same classes of freight or passengers within this state. It shall be unlawful for any railroad or other transportation company to charge or receive any greater compensation in the aggregate for the transportation of passengers or of like kind of property for a shorter than for a longer distance over the same line or route in the same direction, the shorter being included within the longer distance, or to charge any greater compensation as a through rate than the aggregate of the intermediate rates.

Upon application to the commission such company may, in special cases, after investigation, be authorized by the commission to charge less for longer than for shorter distances for the transportation of persons or property and the commission may from time to time prescribe the extent to which such company may be relieved from the prohibition to charge less for the longer than for the shorter haul. The commission may authorize the issuance of excursion and commutation tickets at special rates.

Nothing contained in this section shall be construed to prevent the commission from ordering and compelling any railroad or other transportation company to make reparation to any shipper on account of the rates charged to such shipper being excessive or discriminatory, provided no discrimination will result from such reparation. (Added Stats. 1974, ch. 489.)

486. Every common carrier shall file with the commission and shall print and keep open to the public inspection schedules showing the rates, fares, charges, and classifications for the transportation between termini within this State of persons and property from each point upon its route to all other points thereon; and from each point upon its route to all points upon every other route leased, operated, or controlled by it; and from each point on its route or upon any route leased, operated or controlled by it to all points upon the route of any other common carrier, whenever a through route and a joint rate has been established or ordered between any two such points. If no joint rate over a through route has been established, the schedules of the several carriers in such through route shall show the separately established rates, fares, charges, and classifications applicable to the through transportation. (Former § 14(a), 1st 2 sents.)

487. The schedules shall plainly state the places between which property and persons will be carried, and the classification of passengers or property in force, and shall state separately all terminal charges, storage charges, icing charges, and all other charges which the commission may require to be stated, all privileges or facilities granted or allowed, and all rules which may in any wise change, affect, or determine any part, or the aggregate of, such rates, charges, and classifications,

or the value of the service rendered to the passenger, shipper, or consignee. Schedules shall be plainly printed, and copies thereof shall be kept by every such carrier at such stations or offices of the carrier and subject to such conditions as the commission may determine and prescribe by order or rule. (Former § 14(a), 3rd and 4th sents; amended Stats. 1963, ch. 2121.)

488. Subjects to such rules as the commission may prescribe, the schedules of carriers shall be produced and made available for inspection upon the demand of any person. The form of every such schedule shall be prescribed by the commission and shall conform, in the case of common carrier subject to the Interstate Commerce Act and the act amendatory thereof and supplementary thereto, as nearly as possible to the form of schedules prescribed by the Interstate Commerce Commission. (Former § 14(a), last 3 sents; amended Stats. 1963, ch. 2121.)

491. Unless the commission otherwise orders, no change shall be made by any public utility in any rate or classification, or in any rule or contract relating to or affecting any rate, classification, or service, or in any privilege or facility, except after 30 days' notice to the commission and to the public. Such notice shall be given by filing with the commission and keeping open for public inspection new schedules stating plainly the changes to be made in the schedule to schedules then in force, and the time when the changes will go into effect. The commission, for good cause shown, may allow changes without requiring the 30 days' notice, by an order specifying the changes so to be made, the time when they shall take effect, and the manner in which they shall be filed and published. When any change is proposed in any rate or classification, or in any form of contract or agreement or in any rule or contract relating to or affecting any rate, classification, or service, or in any privilege or facility, attention shall be directed to such change on the schedule filed with the commission, by some character to be designated by the commission, immediately preceding or following the item. (Former § 15.)

493. (a) No common carrier subject to this part shall engage or participate in the transportation of persons or property, between points within this state, until its schedules of rates, fares, charges, and classifications have been filed and published in accordance with this part.

494. No common carrier shall charge, demand, collect, or receive a different compensation for the transportation of persons or property, or for any service in connection therewith, than the applicable rates, fares, and charges specified in its schedules filed and in effect at the time, nor shall any such carrier refund or remit in any manner or by any device any portion of the rates, fares, or charges so specified, except upon order of the commission as provided in this part, nor extend to any corporation or person any privilege or facility in the transportation of passengers or property except such as are regularly and uniformly extended to all corporations and persons. (Former § 17(a)2.)

496. (a) For purposes of this section —

(1) The term "carrier" means any common carrier subject to regulation under this part.

(2) The term "antitrust laws" means the provisions of Chapter 2 (commencing with Section 16700) of Part 2 of Division 7 of the Business and Professions Code, relating to combinations in restraint of trade.

(b) any carrier which is a party to an agreement between or among two or more carriers relating to rates, fares, classifications, divisions, allowances, or charges (including charges between carriers and compensation paid or received for the use of facilities and equipment), or rules and regulations pertaining thereto, or procedures for the joint consideration, initiation or establishment thereof, may, under such rules and regulations as the commission may prescribe, apply to the commission for approval of the agreement, and the commission shall by order approve any such agreement, if approval thereof is not prohibited by subdivision (d), (e), or (f), if it finds that the agreement and rules, regulations, and procedures provided for the operation thereof are fair and reasonable and not contrary to public policy; otherwise the application shall be denied. The approval of the commission shall be granted only upon such terms

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

and conditions as the commission may prescribe as necessary to enable it to grant its approval in accordance with this subdivision.

(c) Each conference, bureau, committee, or other organization established or continued pursuant to any agreement approved by the commission under the provisions of this section shall maintain such accounts, records, files, and memoranda and shall submit to the commission such reports, as may be prescribed by the commission, and all such accounts, records, files, and memoranda shall be subject to inspection by the commission or its duly authorized representatives.

(d) The commission shall not approve under this section any agreement between a carrier by highway and a carrier by rail unless it finds that the agreement is of the character described in subdivision (b) and is limited to matters relating to transportation under joint rates or over through routes.

(e) The commission shall not approve under this section any agreement which it finds is an agreement with respect to the pooling or division of traffic, service, or earnings, unless the commission finds that the agreement will be in the interest of better service to the public or of economy of operation resulting in efficient utilization of fuel and will not unduly restrain competition.

(f) The commission shall not approve under this section any agreement which establishes a procedure for the determination of any matter through joint consideration unless it finds that under the agreement there is accorded to each party the free and unrestrained right to take independent action either before or after any determination arrived at through such procedure.

(g) The commission may, upon complaint or upon its own initiative without complaint, investigate and determine whether any agreement previously approved by it under this section, or any term or condition upon which the approval was granted, is not in conformity with subdivision (b), or whether any such term or condition is not necessary for purposes of conformity with subdivision (b). After the investigation, the commission may by order terminate or modify its approval of such agreement if it finds such action necessary to insure conformity with subdivision (b), any may modify the terms and conditions upon which the approval was granted to the extent if finds necessary to insure conformity with subdivision (b) or to the extent it finds the terms and conditions unnecessary to insure such conformity. The effective date of any order terminating or modifying approval, or modifying terms and conditions, may be postponed for such period as the commission determines is reasonably necessary to avoid undue hardship.

(h) No order shall be entered under this section except after interested parties have been afforded reasonable opportunity for hearing.

(i) The parties to any agreement approved by the commission under this section and other persons are, if the approval of the agreement is not prohibited by subdivision (d), (e), or (f), hereby exempted from the antitrust laws with respect to the agreement under the terms and conditions prescribed by the commission.

(j) Any action of the commission under this section in approving an agreement, or in denying an an application for such approval, or in terminating or modifying its approval of an agreement, or in prescribing the terms and conditions upon which its approval is to be granted, or in modifying such terms and conditions, shall be construed as having effect solely with reference to the applicabilit of subdivision (i). (Added Stats. 1973, ch. 908; amended Stats. 1980, ch. 1063.)

701. The commission may supervise and regulate every public utility in the State and may do all things, whether specifically designated in this part or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction. (Former § 31.)

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

App-090

726. It is the policy of the State in rate making to be pursued by the commission to establish such rates as will promote the freedom of movement by carriers of agricultural commodities, including livestock, at the lowest lawful rates compatible with the maintenance of adequate transportation service.

In any rate proceeding where more than one type or class of carrier, as defined in this part or in the Highway Carriers' Act, is involved, the commission shall consider all such types or classes of carriers, and, pursuant to the provisions of this part or the Highway Carriers' Act, fix as minimum rates applicable to all such types or classes of carriers the lowest of the lawful rates so determined for any such type or class of carrier. This provision does not prevent the commission from granting to carriers by water such differentials in rates as are permitted under other provisions of law. (Former § 32(d).)

730. The commission shall, upon a hearing, determine the kind and character of facilities and the extent of the operation thereof, necessary reasonably and adequately to meet public requirements for service furnished by common carriers between any two or more points, and shall fix and determine the just, reasonable, and sufficient rates for such service. Whenever two or more common carriers are furnishing service in competition with each other, the commission may, after hearing, when necessary for the preservation of adequated service and when public interest demands, prescribing uniform rates, classifications, rules, and practices to be charged, collected, and observed by all such common carriers. (Former § 32(c).)

731. Whenever the commission, after a hearing, finds that any rate or toll for the transportation of property is lower than a reasonable or sufficient rate and that the rate is not justified by actual competitive transportation rates of competing carriers, or the cost of other means of transportation, the commission shall prescribe such rates as will provide an equality of transportation rates for the transportation of property between all such competing agencies of transportation. When in the judgment of the commission a differential is necessary to preserve equality of competitive transportation conditions, a reasonable differential between rates of common carriers by rail and water for the transportation of property may be maintained by such carriers, and the commission may by order require the establishment of such rates. (Former § 32-1/2.)

3662. The commission shall, upon complaint or upon its own initiative without complaint, establish or approve just, reasonable, and nondiscriminatory maximum or minimum or maximum and minimum rates to be charged by any highway permit carrier for the transportation of property and for accessorial service performed by it.

In establishing or approving such rates, the commission shall give due consideration to the cost of all of the transportation services performed, including length of haul, any additional transportation service performed, or to be performed, to, from, or beyond the regularly established termini of common carriers or of any accessorial service, the value of the commodity transported, and the value of the facility reasonably necessary to perform the transportation service. (Added Stats. 1951, ch. 764.)

3666. If any highway carrier other than a highway common carrier desires to perform any transportation or accessorial service at a lesser rate than the minimum established rates, the commission shall, upon finding that the proposed rate is reasonable, authorize the lesser rate for not more than one year. (Added Stats. 1951, ch. 764; amended Stats. 1959, ch. 1566; 1986, ch. 336.)


### APPENDIX C

### (Revised pages 1-12)

### GENERAL ORDER 80-C

### PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

## RULES GOVERNING THE CONSTRUCTION AND FILING OF TARIFFS BY HIGHWAY COMMON CARRIERS, FREIGHT FORWARDERS, EXPRESS CORPORATIONS, AND SCHEDULES FILED BY CERTAIN HIGHWAY CONTRACT CARRIERS

Adopted February 7, 1990. Effective March 15, 1990.

Decision 89-10-039, as modified by Decision 90-02-021 in I.88-08-046.

## RULE A APPLICATION AND SCOPE

A.1 This General Order governs the construction and filing of:

a. Tariffs by highway common carriers, freight forwarders and express corporations; and

b. Schedules by highway contract carriers for transportation subject to General Order 147 Series.

A.2 Tariffs and contract rate schedules, filed on or after the effective date of this General Order shall be constructed and filed in conformity with the rules herein established.

A.3 Tariffs filed prior to the effective date of this General Order need not be reissued because of the issuance of this General Order. Supplements, amendments or revised pages filed on or after the effective date of this General Order, however, shall be constructed and filed in conformity with the rules herein established.

## RULE 1 DEFINITIONS

Carrier means a highway common carrier, a highway contract carrier, a freight forwarder, or an express corporation.

Common carrier means a common carrier subject to this general order.

Contract carrier" means a highway contract carrier subject to this general order.

Contract Rate Schedule" (schedule) means the publication of a highway contract carrier which includes the rates, routes, distances, classifications, etc., including supplements, amendments or revised pages, or reissues, and which is on file with the Commission.

Governing Publication(s)" means those publications which govern the application of a common carrier tariff or contract carrier rate schedule. Each governing publication shall be on file and authorized for use for the concerned carrier by this Commission. Examples of such publications are:

Distance Table 8 and/or the Optional All Points to All Points Table for Distance Table 8 issued by the Commission, and amendments or reissues thereto;

Hazardous Materials Tariff ATA, 111-G (Cal. PUC 17 of American Trucking Association, Inc., Agent), including supplements and reissues;

National Motor Freight Classification NMF 100-M (CAL. PUC 24 of National Motor Freight Traffic Association, Inc., Agent), including supplements and reissues (also referred to as the "Governing Classification").

Rate bureau means each conference, bureau, committee or other organization approved by the Commission under Public Utilities Code (Code) Section 496 and authorized to engage in collective ratemaking.

Tariff means the publication of a highway common carrier, freight forwarder or express corporation containing rates and rules, operating rights, routes, distances, classifications, etc., including supplements, amendments or revised pages, or reissues, and which is on file with the Commission.

Tariff or Contract Rate Schedule Publishing Agent" means an individual or corporation authorized by a common carrier, freight forwarder or express corporation to publish tariffs on its behalf or a contract carrier to publish schedules on its behalf.

## RULE 2 EXCEPTIONS

The provisions of this General Order do not apply to transportation by independent contractor subhaulers when such transportation is performed for other carriers. However, when there is a unity of ownership, management or control between the principal carrier and the consignor, consignee or debtor, subhaulers engaged by a principal carrier shall be paid 100% of the rate of the prime carrier.

## RULE 3 REFERENCE TO PUBLIC UTILITIES CODE PROVISIONS

3.1 Unless the Commission otherwise orders, or provisions of another General Order (for example, General Order 147 Series) apply, a rule or rate in a tariff or contract rate schedule shall not go into effect on less than 30 days' notice.

3.2 The carrier shall observe all pertinent sections of the Code. This General Order's requirements are in addition to and supplementary to those Code provisions regarding the preparation, construction and filing of tariffs shown in the Code.

3.3 General Order 147 Series and the Commission's Rules of Practice and Procedure are applicable to the filing of formal applications for rate and tariff changes before the Commission.

## RULE 4 FILING

Filing — Tariffs and schedules shall be filed with the Commission in duplicate in one package, and shall be delivered or addressed to:

California Public Utilities Commission

Tariff File Room — 2nd floor

505 Van Ness Avenue

San Francisco, California 94102

A receipt can only be obtained by enclosing a duplicate of the carrier's letter of transmittal with the request for a receipt which will then be stamped and returned as a receipt. A stamped, self-addressed envelope shall be included.

## RULE 5 AUTHORITY AND RESPONSIBILITY

5.1 Authority — All tariffs, schedules, and their amendments and supplements, including any rate item changes, shall cite the authority from the Commission for their publication, except as otherwise provided below.

A contract carrier may file a rate schedule that contains rates some of which, or all, are not referenced in any contract. These rates will be accepted only if the contract rate schedule includes the following statement:

Rates in this contract rate schedule apply only when they are specifically referenced in a contract which (carrier's name) has filed with the Commission."

The contract rate schedule shall clearly indicate which rates in the schedule are referenced in a contract the carrier has filed with the Commission.

5.2 Responsibility — It shall be the responsibility of the carrier to maintain tariffs and schedules at all times in a current condition.

## RULE 6 FORM OF TARIFFS AND SCHEDULES

6.1 Form — Tariffs and schedules shall be filed in book (pamphlet) or loose-leaf form. Tariffs and schedules shall be plainly printed, mimeographed, typewritten or reproduced by other durable process on paper of good quality. Dot matrix printed pages shall be of sufficient contrast to be easily readable and readily reproducible by ordinary commercially marketed copy machines.

6.2 Permissive Alternative — Rules 6.1, 6.5(b) and (c), 6.6(b), (c) and (d), 6.7(a), (b), (c), and (d), 6.8, 7.1, 7.2, 7.3 and 7.4 may be waived only on tariffs which contain both interstate and California intrastate rates. Such publications may be prepared in conformity with the regulations of the Interstate Commerce Commission in Title 49 Code of Federal Regulations Part 1312, providing orders of this Commission are complied with.

6.3 Size — Tariffs and schedules shall be not less than 8 by 10-1/2 inches nor more than 8-1/2 by 11 inches in size.

6.4 California P.U.C. Number — Each carrier shall file tariffs and schedules under its own consecutive numbers beginning with CA.P.U.C. No.1 for its tariffs and CA.P.U.C. No.1 for its schedules. An agent shall file under its own series of CA.P.U.C. numbers beginning with CA.P.U.C. No. 1 for its tariffs and CA.P.U.C. No. 1 for its schedules. Separate tariffs or schedules shall bear separate CA.P.U.C. numbers. The assigned CA.P.U.C. number in the series of the carrier, bureau, or agent initially issuing the tariff or schedule shall be retained throughout the life of each type of publication.

6.5 Title Page — The title page of each tariff or schedule shall show:

(a) The CA.P.U.C. number of the tariff in either the upper left-hand corner or upper right-hand corner and immediately thereunder the CA.P.U.C. number of any tariffs or schedules canceled thereby.

(b) The name of the issuing carrier, bureau or agent, and the name and address of the issuing officer or agent.

(c) A statement indicating the kind of tariff, i.e., whether it is a tariff of rates, classifications, distances, scope of operations, etc.

(d) A carrier's individual tariff or schedule shall show its CA. "T" No., as well as any designated identification contained in the National Motor Freight Association's "Directory of Standard Multi-Modal Carrier and Tariff Agents Codes."

(e) The date on which the tariff or schedule will become effective in the lower right-hand corner.

6.6 Loose-Leaf Tariff or Schedule — Each page or supplement of a loose-leaf tariff or schedule shall show:

(a) The assigned CA.P.U.C. number of the tariff or schedule in neither the upper left-hand corner or the upper right-hand corner.

(b) The name of the issuing carrier, bureau, or agent; and the name and address of the issuing officer or agent.

(c) The page number; e.g., "Original Page 1," "Original Page 2," "Third Revised Page 3," etc.

(d) The date on which the page will become effective (or appropriate reference thereto), in the lower right-hand corner.

(e) On an original tariff or schedule which has not yet been accepted for filing by the Commission staff the effective date need only be shown on the Original or Revised Title Page. Each subsequent Original Page which is submitted as part of the original filing shall show reference to the Title Page for the effective date of the tariff.

6.7 Contents of Tariff or Schedule — A Schedule shall contain only those provisions shown in Rules 6.7(a), (c), (d), and (g). A tariff shall contain all of the following:

(a) A Table of Contents.

(b) The name of each participating carrier when a bureau or agency tariff is involved.

(c) Reference to other publications which govern the application of the tariff or schedule, such as: classification, distance table, and scope of operations.

(d) An alphabetically arranged index of all articles or generic groupings upon which commodity rates are named or ratings provided with reference to the items or pages where rates or ratings are placed.

(e) Tariffs naming rates or distances shall contain a complete description of each carrier's certificated operative rights. Governing scope of operations which are properly cross-referenced to the other tariffs of the carrier in accordance with Rule 6.7 (h) will satisfy this requirement.

(f) When routes are required for purposes of rates or charges, the routes or named points shall be clearly described and defined in the tariff. Point-to-point rates shall show the route or named points over which intermediate application is available or cite the authority granting relief from Code Sections 460 and 461.5.

(g) Each tariff or schedule shall have the following rule in its entirety:

Whenever a class rate and a commodity rate are named between specified points, the lower of such rates is the lawful rate."

In the event two or more rates, including applicable discounts, are named in a tariff, tariffs, or schedules of the carrier for the same transportation, the lowest shall apply."

In the event that a combination of rates makes a lower aggregate through rate than a single rate, the lower combination shall apply. The carrier shall immediately publish the lower combination rate.

(h) Except for governing publications such as a Distance Table, Classification, or Hazardous Materials Tariff, all tariffs which a carrier issues or in which it participates or concurs shall be cross-referenced. Carriers may use a named governing tariff such as a scope of operations tariff for listing all of their filed tariffs. All bureaus, agencies and individuals shall cross-reference those tariffs of related application which the carrier has on file with the Commission.

6.8 Amendments —

(a) Book (pamphlet) tariffs shall be amended by filing supplements constructed generally in the same manner and arranged in the same order as the tariff being amended, and referring to the page, item, or index of the tariff or previous supplement which it amends.

(b) Loose-leaf tariffs or schedules shall be amended by filing new pages on which changes are made as consecutively numbered revisions of the previous pages e.g., "First Revised Page 10 cancels Original Page 10." A loose-leaf tariff may be cancelled by supplement.

(c) Uniform symbols shall be used to indicate changes as follows:

Letter (A), (a), or <> to indicate increases.

Letter (R), (r), or *k(kappa) to indicate reductions.

Letter (C), (c), or Delta to indicate a change resulting in neither increase nor reduction.

(d) The following symbols shall be used only for the purposes indicated:

* to show new material added to the tariff.

+ to show "Applicable to intrastate traffic only."

*i(iota) to indicate "Applicable to interstate traffic only."

to indicate reissued matter.

• to indicate no change, as provided in Rule 6.8(e).

(e) When changes of the same character are made in all or substantially all rates in a tariff, schedule, supplement or loose-leaf page, that fact and nature of the change may be indicated on the title page, supplement, or the top of a loose-leaf page of the tariff or schedule. In this event, the symbol """ shall be used to indicate a rate to which no change has been made. Any other change not indicated in the general statement shall bear the appropriate symbol(s) in Rule 6.8(c) or (d).

## RULE 7 ADOPTION OF TARIFFS

7.1 Adoption Notice — When operative rights of either a common or contract carrier are transferred from the operating control of one company to that of another, the succeeding carrier shall issue an adoption notice in the form of a one-page document, 8-1/2 by 11 inches in size, in which the successor company accepts and establishes as its own all the affected tariffs, schedules, and other instruments issued by or on behalf of the predecessor company in accordance with the Commission order authorizing the transfer of the operative rights. Three copies of the adoption notice shall be filed with the Commission.

7.2 Copies to Agents and Carriers — Concurrently with the filing of an adoption notice with the Commission, a copy of the adoption notice shall be furnished to each agent and each carrier publishing tariffs or schedules containing rates or other provisions in which the predecessor carrier participates.

7.3 Supplements — In addition to the adoption notice required by Rule 7.1, the successor carrier shall supplement or reissue each tariff or schedule by the predecessor company indicating that the tariff or schedule has been adopted by the successor company, such filing to be made in accordance with Commission orders authorizing the transfer.

7.4 Change of Name — When a carrier changes its legal or fictitious name, without transfer of control from one company to another, it shall immediately amend tariffs or schedules issued by it to show the new name of the company. The carrier shall also immediately inform, in writing, all agents of other carriers issuing tariffs in which it participates of the change in name, and such agents or carriers shall promptly amend such tariffs to show the change in name. The tariff or schedule amendments shall show the new name of the carrier and its former name, for example: "ABC Transportation Co. (formerly XYZ Trucking Co.)," and shall show that they are filed under authority of this rule.

## RULE 8 POWERS OF ATTORNEY AND CONCURRENCES

8.1 Issuance.

(a) Each carrier shall issue a power of attorney to each agent publishing an agency tariff in which the carrier participates.

(b) Each carrier shall issue a concurrence to each other carrier which publishes a tariff in which the former carrier participates.

8.2 Filing — Powers of attorney, concurrences, and revocations of powers of attorney and concurrences shall be made available upon request from the Commission or its staff.

8.3 Revocation by Carrier — Powers of attorney and concurrences may be revoked by the carrier by furnishing to the tariff publishing agent a revocation notice specifying the effective date of such revocation. The notice shall be sent by certified or registered mail at least 60 days before the effective date of revocation.

## RULE 9 REVOCATION OF CARRIER PARTICIPATION BY TARIFF AGENT

9.1 Procedure — A carrier's participation in any agency tariff may be cancelled by the tariff agent issuing such tariff without the request or consent of the carrier, providing the procedures specified in Rule 9 are followed precisely.

9.2 Prior Notice — Tariff publishing agents proposing to terminate their agency, relationship with any carrier, and to cancel the carrier's participation in any agency tariff, shall give notice in writing to the carrier and to the Commission not less than 90 days before the proposed date of termination and cancellation. The Cancellation Notice shall be in the form provided in Rule 9.5.

9.3 Tariff Filing — Unless the Cancellation Notice is rescinded as provided in Rule 9.4, the cancellation of the carrier's participation in the agency tariff shall be made effective on the precise effective date specified in the Cancellation Notice, by an appropriate tariff amendment filed with the Commission not less than 30 days prior to said effective date.

9.4 Rescission of Notice — If the tariff publishing agent desires to rescind the Cancellation Notice, the agent shall give notice in writing to the carrier and to the Commission not less than 30 days prior to the scheduled date of termination and cancellation of the agency relationship. The Rescission of Cancellation Notice shall be in the form provided in Rule 9.6.

9.5 Form of Cancellation Notice — The Cancellation Notice specified in Rule 9.2 shall be on paper 8-1/2 by 11 inches in size, and shall be in a form substantially as follows:

## CANCELLATION NOTICE

To _____

**(Name of Carrier)**

Date of Notice _____

You are hereby notified that the agency created by the Power of Attorney issued by you to the undersigned is terminated on the effective date shown below.

Your participation in tariff(s) issued by the undersigned, as identified below, will be cancelled on the effective date shown.

You are cautioned that cancellation of your participation in such tariffs will leave you without rates on file with the California Public Utilities Commission. It is your responsibility to arrange for the filing with the California Public Utilities Commission of tariffs required by Section 486 of the California Public Utilities Code.

Name and Cal. P.U.C. Numbers of Tariffs:_____ _____

Effective Date of Termination of Agency and Cancellation of Rates _____*

Instructions: This Notice shall be furnished by the agent to the carrier by registered mail at least 90 days before the effective date of termination and cancellation. A true copy of this Notice shall be filed with the Public Utilities Commission of the State of California, Truck Tariff Section — 2nd floor, 505 Van Ness Avenue, San Francisco, California, 94102, at least 90 days before said effective date.

9.6 Form of Rescission of Cancellation Notice — The Rescission of Cancellation Notice specified in Rule 9.4 shall be on paper 8-1/2 by 11 inches in size, and shall be in a form substantially as follows:

To _____ _____

(Name of Carrier) (Date)

The Cancellation Notice issued to you by the undersigned on _____ to terminate the agency created by the Power of Attorney issued by you to the undersigned, is hereby rescinded.

Your participation in tariff(s) issued by the undersigned, as identified below, will not be canceled.

Name and Cal. P.U.C. Numbers of Tariffs. _____

By_____ (Tariff Agent)

Instructions: This Rescission shall be furnished to the carrier by the Tariff Agent by registered mail at least 30 days before the effective date of the scheduled termination and cancellation stated in the "Cancellation Notice" which it rescinds.

App-098

A true copy of this Rescission shall be filed with the Public Utilities Commission of the State of California, Tariff File Room — 2nd Floor, 505 Van Ness Avenue, San Francisco, California 94102, at least 30 days before said effective date.

Approved and dated February 7, 1990, to become effective March 15, 1990, at San Francisco, California.

PUBLIC UTILITIES COMMISSIONOF THE STATE OF CALIFORNIABY Wesley FranklinActing Executive Director

## APPENDIX D

### (Revised pages 1-17)

### GENERAL ORDER 147-B

### PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

### RULES GOVERNING TARIFF FILINGS BY COMMON CARRIERS
### AND CONTRACT FILINGS BY CONTRACT CARRIERS

Adopted February 7, 1990. Effective March 15, 1990.

Decision 89-10-039, as modified by Decision 90-02-021 in I.88-08-046.

| INDEX | | | PAGE |
|---|---|---|---|
| RULE | 1 | Application and Exceptions........................................................................ | 403 |
| RULE | 2 | Departures............................................................................................... | 404 |
| RULE | 3 | Definitions.............................................................................................. | 404 |
| RULE | 4 | Filing Procedures.................................................................................... | 405 |
| RULE | 5 | Tariff Filings by Common Carriers........................................................... | 406 |
| RULE | 6 | Contract Filings by Contract Carriers...................................................... | 406 |
| RULE | 7 | Requirements for Rate Changes and Rate Establishment........................ | 408 |
| RULE | 8 | Tariff and Contract Filings — Public Notice — Effective Dates................ | 409 |
| RULE | 9 | Protests and Suspension of Rates............................................................ | 409 |
| RULE | 10 | Complaints............................................................................................ | 410 |
| RULE | 11 | Uniform Rules....................................................................................... | 410 |
| Rate Filing Transmittal | | | 411 |
| Floor Price Certification Form | | | 412 |

## RULE 1 — APPLICATION AND EXCEPTIONS

1.1 Tariffs, contracts, and contract rate schedules, supplements, amendments, or revised pages filed to become effective on or after the effective date of this General Order shall conform with the rules herein established.

1.2 When provisions of this General Order are in conflict with the Commission's Rules of Practice and Procedure, the provisions of this General Order shall apply.

1.3 Except as otherwise provided, the carriers listed below are subject to this General Order:

(a) Highway common carriers as defined in Public Utilities Code (Code) Section 213;

(b) Highway contract carriers as defined in Code Section 3517.

1.4 The provisions of this General Order do not apply to transportation by independent contractor subhaulers when such transportation is performed for other carriers. However, when there is a unity of ownership, management, or control between the principal carrier and the consignor, consignee or debtor, subhaulers engaged by a principal carrier shall be paid 100% of the rate of the prime carrier.

1.5 The provisions of this General Order do not apply to rate exempt transportation by highway common carriers or highway contract carriers, nor do they apply to transportation performed by individual carriers which have been specifically exempted by Commission order.

1.6 The provisions of this General Order do not apply to transportation governed by General Orders 149 Series, 150 Series, or 151 Series.

## RULE 2 — DEPARTURES

Departure from the provisions of this General Order may be granted upon formal application to the Commission and after the Commission finds that such departure is reasonable and necessary.

## RULE 3 — DEFINITIONS

For the purpose of this General Order and when used in tariffs, contracts, or contract rate schedules filed under this General Order, the definitions for the following terms shall apply:

3.1 "Base Rate" means the lowest rate legally on file within the last 12 months, unless that rate was effective for less than 30 days. Refer to Rule 7 for requirements on changes to base rate.

3.2 "Carrier's Equipment" means any motor truck, tractor or other highway vehicle, trailer, semitrailer, or any combination of such highway vehicles, operated by the carrier or its subhauler.

3.3 "Commission" means the Public Utilities Commission of the State of California.

3.4 "Common Carrier" means every highway common carrier described in Rule 1.3(a). Pursuant to Commission Order, common carriers subject to this General Order shall serve at least one day per week each point for which they have filed a tariff, if service is requested.

3.5 "Common Carrier Contract" means a contract for common carrier service filed by a contract carrier that also holds common carrier authority. A common carrier contract must be designed to yield rates equivalent to the carrier's tariff rates in effect at the time the contract is filed.

3.6 "Contract" means a bilateral agreement in writing which binds both contract carrier and the consignor, consignee, or other party to good faith performance. Contract duration shall be limited to one year. For terms of contract, see Rule 6.

3.7 "Contract Carrier" means every highway contract carrier described in Rule 1.3(b)

3.8 "Contract Rate Schedule" means a publication containing the rates and charges of contract carrier(s), including rules, regulations, and provisions governing the service(s) of the carrier(s). This includes supplements, amendments, revised pages, or reissues of the publication filed by contract carriers.

3.9 "Equivalent Rate" means a common carrier contract rate which, when filed, produces the same charge as does the common carrier's tariff rate applied to the same shipment or shipments.

3.10 "Floor Price" means the lower bound of the zone of reasonableness. The floor price is established by the Commission and is based on variable costs. There are separate floor prices for truckload and less-than-truckload carriage.

3.11 "Governing Publication(s)" means those publications which govern the application of a common or contract carrier rate. Examples of such publication are:

Distance Table 8 and/or the Optional All Points to All Points Table for Distance Table 8 issued by the Commission, and amendments or reissues thereto;

Hazardous Materials Tariff ATA, 111-I (Cal. PUC 19 of American Trucking Association, Inc., Agent) including supplements and reissues; and

National Motor Freight Classification NMF 100-P (Cal. PUC 28 of National Motor Freight Traffic Association, Inc., Agent), including supplements and reissues (also referred to as the "Governing Classification").

3.12 "Independent Contractor/Subhauler" means any carrier who renders service for a principal carrier, for a specified recompense, for a specified result as to the work only and not as to the means by which such result is accomplished. This term includes sub-subhaulers when such carriers are engaged by other subhaulers.

3.13 "Less-than-truckload rate" means any rate not subject to the "truckload rate" minimum weight.

3.14 "Point" means a particular city, town, community, extended area, metropolitan zone, or other area which is described or named in a tariff or contract rate schedule for the application of rates.

3.15 "Rate" means the figure stated in cents, dollars and cents, or their fractions, including the charge, and also, the minimum weight or volume and rules or conditions governing the application of the rate, and any accessorial charges to be used in computing the charge on the property transported.

3.16 "Rate Bureau" means each conference, bureau, committee, or other organization established or continued under any agreement approved by the Commission under the provisions of PU Code Section 496.

3.17 "Rate Exempt Transportation" means transportation of commodities or transportation within the geographic areas described in the most recent Commission publication, including any revisions, entitled "Commodities and Geographic Areas Exempt From Rate Regulation".

3.18 "Special Contract" means a contract for service or under conditions which meet either of the terms (a) or (b) below:

(a) The contract provides services over a period of not less than 30 days and includes more than a single shipment, and meets either of the terms (1) or (2) below:

(1) The carrier earns a minimum of $1,000 per month for delivered transportation services, or

(2) The contract calls for substantial shipper obligations not normally provided under common carrier tariff rates by any carrier.

(b) The contract provides services not normally provided under common carrier tariff rates by any carrier.

3.19 "Tariff" means a publication containing the rates and charges of common carrier(s) including operating rights (scope of operations), rules, regulations, and provisions governing the service(s) of the carrier(s) including supplements, amendments, or revised pages or reissues. Refer to General Order 80 Series for rules governing construction and filing of tariffs.

3.20 "Truckload rate" means any rate which requires a minimum weight of 12,000 pounds or greater.

3.21 "Zone of Reasonableness" means a zone within which common carriers may individually set rates without further Commission approval. The upper end of the zone is cumulative rate increases not greater than 10% over a 12-month period. (Refer to Rule 7.2.) The lower bound of the zone is the floor price, which is based on variable costs and is set by the Commission. (Refer to Rule 7.4.)

## RULE 4 — FILING PROCEDURES

4.1 Two copies of tariff, contract, and contract rate schedule filings, including any supplements or amendments, shall be delivered or mailed to:

California Public Utilities Commission

Tariff File Room — 2nd floor

505 Van Ness Avenue

San Francisco, CA 94102

4.2 Rate Filing Transmittal and Date Filed

(a) All tariff, contract, and contract rate schedule filings shall be accompanied by the Rate Filing Transmittal form, attached to this General, Order, which shall provide: (1) the carrier's name as it appears on the carrier's operating authority; (2) the carrier's T-number; (3) the tariff and item number(s), the contract number, or the contract rate schedule number of the tariff, contract or contract rate schedule filing; and (4) the shipper's name as it appears on the contract.

Re Regulation of General Freight Transp. by Truck, 35 CPUC 2d 307 (1990)

(b) If a receipt for the filings is desired, the transmittal shall be sent in duplicate with a self-addressed stamped envelope. One copy will be stamped and returned as a receipt.

(c) The date stamped "received" will reflect the date the document is filed with the Truck Tariff Section in San Francisco. Once stamped received, such rate filings shall be listed on the Commission's Daily Transportation Calendar within 3 working days after the date filed. Tariffs, contracts, contract rate schedules, and supporting documents shall be filed in a single package which shall also include the transmittal required to accompany the filing.

4.3 All contracts and tariffs filed will be available for public inspection at the Commission's office in San Francisco.

## RULE 5 — TARIFF FILINGS BY COMMON CARRIERS

5.1 Common carriers shall file tariffs in accordance with the requirements of Division 1 of the Code and General Order 80 Series.

5.2 Nothing in this rule shall prohibit carriers from publishing their own tariffs, or from joining in tariffs issued by rate bureaus or tariff publishing agents.

5.3 Common carrier tariffs shall not be designed to be shipper specific.

5.4 All common carrier tariffs shall describe accurately and fully the services offered to the public, provide the specific rate or the basis for calculating charges for the performance of those services, and show all related classifications, rules, and practices. Tariffs should be filed and maintained in a way that allows all users to determine the exact charges for any given shipment, including all available discounts. Discounts shall be identified in the tariffs, along with the qualifying criteria. Freight bill information is covered by General Order 155 Series.

5.5 Common carrier tariffs may become effective as provided in Rule 8.1.

5.6 Every common carrier shall maintain and keep open for public inspection a copy of its tariffs, and any revisions or supplements in accordance with General Order 122 Series.

## RULE 6 — CONTRACT FILINGS BY CONTRACT CARRIERS

6.1 No contract carrier shall perform any transportation or accessorial service until it has on file and in effect with the Commission two copies of an executed binding contract for such service.

6.2 Contract carriers shall strictly observe, as their exact rates, the rates and provisions of their contracts.

6.3 Contracts shall contain a specific termination date. Contract service shall not be made effective for more than one year. All contracts may be renewed by filing an amendment with the Commission.

6.4 Every contract, carrier shall keep and maintain for the Commission's inspection all contracts for a period of three years after the termination date of each contract.

6.5 Every contract carrier shall maintain and keep open for public inspection a copy of its contracts and contract rate schedules, and any revisions, amendments, or supplements in accordance with General Order 80 Series and 122 Series.

6.6 Every contract shall contain:

(a) The name, address, signature, and "T" file number of the carrier.

(b) The name, address, and signature of the shipper.

(c) The date the contract was executed, the effective date, and the duration of the contract.

(d) The geographic area involved in performance, such as the route(s) and/or points.

(e) A description of all services to be provided, the commodities involved, and the projected tonnage (or other appropriate unit of measurement) to be transported.

(f) The compensation to be paid and received. Rates shall be stated in their entirety as part of the contract, unless reference is made to rates in the tariff provisions which govern the carrier's highway common carrier operating authority, in the carrier's contract rate schedule, or any governing publication filed with the Commission by that carrier. (Exception: A contract carrier may refer to official publications of the Commission without filing those documents.)

(g) A provision specifically acknowledging the tariff and item number, contract rate schedule or governing publication containing the rates to apply in the contract and the date of the rates to apply by reference, including a statement that the rate will not change unless an amendment to the contract is filed, or a statement clearly indicating the circumstances under which the rates to apply by reference will change without further amendment to the contract.

(h) The conditions, if any, under which changes in compensation or other terms of the contract may be made by the parties.

(i) Such explanatory statements as are necessary to remove all reasonable doubt as to its proper application.

6.7 Contracts shall be plainly typed, or prepared by other similar durable process, on letter-size (not less than 8 X 10-1/2 inches nor larger than 8-1/2 X 11 inches) paper of good quality and shall be clear and legible.

6.8 Each carrier shall issue contracts under the "T" file number assigned to it by the Commission with a suffix number beginning with the number 1. Subsequent contracts shall bear consecutive suffix numbers. The contract number shall appear on every page in the following manner:

**CONTRACT NUMBER CAL T-000-1"**

6.9 A contract or an amendment which is required or authorized to be filed by a Commission decision shall refer to that decision in connection with the item or supplement which incorporates the change resulting from the decision, or shall refer to the appropriate provision of this general order permitting or requiring the change.

Contracts may be amended by filing a supplement or by filing new pages on which changes are made. Revised pages shall be identified as consecutively numbered revisions of the previous page, e.g., "First Revised Page 2 Cancels Original Page 2."

6.10 A contract supplement or amendment to a contract shall contain:

(a) Those requirements set forth in Rule 6 necessary to clearly and effectively identify and amend the original contract.

(b) Reference to the item number, page number, and/or previous supplement number which it amends.

(c) The signatures of both the shipper and the carrier.

(d) The effective date of the amendment or supplement.

6.11 When a carrier, changes its name as shown in the Commission's records, without transfer of control from one company to another; or when a shipper with which the carrier has a contract changes its name, whether or not control is transferred from one company to another, the carrier shall immediately amend all affected contracts it has issued to reflect the change. The required amendment to each contract in effect may be accomplished by filing a supplement containing a provision that "whenever the name (enter the old name) appears it shall be construed as meaning (enter the new name)."

6.12 The Commission shall be notified in writing when a contract is cancelled prior to the expiration date contained in the contract. Unless an amendment is filed with the Commission extending the duration of the contract, it shall be considered cancelled on the expiration date.

6.13 Common carrier contracts may only be filed by contract carriers which also hold common carrier authority. Common carrier contracts must initially provide service at rates equal or equivalent to the common carrier's tariff rates in effect at the time the contract is filed. Common carrier contracts may become effective as provided in Rule 8.1. Common carrier contracts may lock in rates over the term of the contract, or rate changes over the term of the contract may be based on the common carrier's filed tariff rates or economic factors identified in the contract. However, rates may not be lower than the common carrier's tariff rates in effect at the time the contract is filed. Common carrier contracts may be effective for up to one year, and may be renewed by amendment, subject to the terms of Rule 7.

Common carrier contracts shall require the carrier to be liable for loss and damage to the same extent it is liable under common carrier tariffs.

6.14 Special contracts are for service or under conditions defined in Rule 3.18. Special contracts may be filed by contract carriers whether or not they also are common carriers. Contract carriers that do not also have common carrier authority may only file special contracts. Special contracts may be effective for one year, may be renewed by amendment, and must specify an expiration date

## RULE 7 — REQUIREMENTS FOR RATE CHANGES AND RATE ESTABLISHMENT

7.1 Establishing Rates

(a) Common carriers shall establish rates in their tariffs by filing the appropriate tariffs accompanied by the Floor Price Certification form required by Rule 7.4, attached to this General Order.

(b) Contract carriers shall establish rates in common carrier contracts by filing rates at or equivalent to the carrier's own common carrier tariff rates in effect at the time the contract is filed.

Common carrier contracts must cite the source of the carrier's equivalent tariff rates by tariff and item number(s).

Contract carriers may provide for an automatic adjustment to the rates in a common carrier contract, and must specify the method by which and at what points in time the rate adjustment(s) will occur.

Rates in common carrier contracts may be published by reference to the carrier's own tariff, and must comply with Rules 6.6(f) and 6.13.

Case 3:18-cv-05546-EMC   Document 124   Filed 06/07/19   Page 108 of 160

Re Regulation Of General Freight Transp. By Truck, 35 CPUC 2d 307 (1990)

(c) Contract carriers shall establish the rates in special contracts by filing such contracts with the Commission in accordance with the terms of this General Order. No Floor Price Certification is required.

7.2 Common Carrier Rate Changes Within Zone of Reasonableness

(a) Except as provided in Rule 7.3(c) and 7.3(g), common carriers may increase rates in their tariffs in compliance with Rule 4, provided that the increased rate is not more than ten percent above the carrier's base rate. Common carrier rate filings which increase rates within the zone of reasonableness shall cite as a footnote on the tariff page the tariff page, item number, and the effective date of the base rate. (Refer to Rules 3.1 and 3.21 for definitions.)

(b) Common carriers may decrease rates in their tariffs in compliance with Rules 4 and 7.1(a). Rates below the lower end of the zone of reasonableness require a formal application to the Commission.

7.3 Rate Changes

(a) Common carrier rate changes outside the zone of reasonableness (i.e. increases greater than ten percent or cumulatively greater than ten percent over base rates for the last 12 months, or for rates lower than the floor price), and common carrier rates collectively set under Code Section 496 require a formal application to the Commission.

(b) Except as provided in Rule 7.3(a), rates filed under this rule may be filed by a common carrier or a tariff publishing agent through independent action only.

(c) If a common carrier cancels or amends any rate within 30 days of the effective date, then that rate shall not become a base rate for the purpose of defining the upper end of the zone of reasonableness.

(d) Contract carriers may increase rates in special contracts already in effect by filing an amendment. Amendments need not be filed for automatic adjustment of contract rates provided for in the original contract.

(e) Contract carriers may decrease rates in special contracts already in effect by filing an amendment.

(f) Common carriers contracts may be amended or renewed by amendment according to Rule 6.10, except that the amended contract rates at the time the amendment becomes effective must equal or be equivalent to the carrier's own common carrier tariff rates in effect at the time the amendment is filed.

(g) common carriers may, in lieu of formal rate application, cancel obsolete tariff rates by filing the cancellation in accordance with Rule 8.1. The rate filings canceling obsolete rates shall be accompanied by: (1) a statement that the cancelled rates have not moved traffic for at least one year, and (2) a certification under penalty of perjury that the foregoing statement is true and correct to the best of the carrier's knowledge.

7.4 Floor Price

Common carrier rates established or decreased pursuant to Rules 7.1(a) or 7.2 (b) shall be accompanied by the Floor Price Certification form attached to this General Order. The carrier shall state, under penalty of perjury, that: (1) each of the truckload rates filed is no lower than the floor price established by the commission, and/or (2) that each less-than-truckload rate for shipments of less than 12,000 pounds is no lower than the floor price when the rate is prorated upward to a 12,000 pound load.

## RULE 8 — TARIFF AND CONTRACT FILINGS — PUBLIC NOTICE — EFFECTIVE DATES

8.1 common carrier tariff and common carrier contract rates filed pursuant to Rules 6.13, 7.1(a), 7.1(b), 7.2(a), 7.2(b), 7.3(c), 7.3(f) and 7.3(g) may be effective not earlier than 10 days after listing on the Commission's Daily Transportation Calendar.

8.2 Special contract rates filed pursuant to Rules 6.14, 7.3(d) and 7.3(e) may be effective not earlier than 20 days after listing on the Commission's Daily Transportation Calendar.

## RULE 9 — PROTESTS AND SUSPENSION OF RATES

9.1 Protests shall be filed in accordance with the Commission's Rules of Practice and Procedure.

9.2 If a protest is filed or for other good cause, the Executive Director may, prior to the effective date of a rate filing, temporarily suspend the rate filing or any of its provisions for a period not to exceed 30 days after the requested effective date.

The Commission may: (1) deny the protest, (2) deny the requested rate filing, (3) permit the suspension to lapse, which would allow the rate filing to become effective, or (4) further suspend the rate filing and set the matter for hearing.

If the Commission further suspends the effective date of the rate filing or any of its provisions, and sets the matter for hearing, the period of suspension shall not extend more than 120 days beyond the date the rate filing would otherwise go into effect, unless the Commission extends the period of suspension for a further period not exceeding six months.

If the Commission does not act on the protest or take any further action on a rate filing suspended by the Executive Director, the rate filing will become effective the day after the suspension ends, and any protest shall be deemed denied.

9.3 Notice of any rate suspension shall be provided in the Commission's Daily Transportation Calendar.

9.4 If the Commission suspends the effective date of a filing or any of its provisions, and sets the matter for hearing, the burden of proof rests with the proponent of the filing.

## RULE 10 — COMPLAINTS

Commission review of any tariff or contract rate which is in effect may be initiated by filing a formal complaint in accordance with the Commission's Rules of Practice and Procedure. The burden of proof in the complaint shall be upon the complainant.

## RULE 11 — UNIFORM RULES

11.1 Common carrier tariffs shall contain a specific provision acknowledging that the handling of claims for loss or damage of property is governed by General Order 139 Series.

11.2 Common carrier tariffs shall contain a specific provision acknowledging that the processing, investigation, and disposition of claims for overcharge or duplicate payment are governed by General Order 148 Series.

11.3 Carriers shall expressly state in their tariffs and contracts or contract rate schedules whether collect-on-delivery (C.O.D.) services as defined in General Order 84 Series will be provided and, if C.O.D. services are provided, the tariff, contract, or contract rate schedule shall contain a complete description of and an acknowledgement that General Order 84 Series governs the C.O.D. service to be provided.

11.4 Carriers shall provide in their tariffs and contracts or contract rate schedules: (1) a complete description of any services which apply to transportation involving more than one commodity or transportation between more than two points (e.g., mixed shipments, split pickup and/or delivery, and stop-in-transit); and (2) a description of the method by which distance shall be computed (if distance is part of the calculation of the transportation charge).

11.5 Carriers shall rate shipments separately, unless otherwise provided in their tariffs, contracts, or contract rate schedules.

11.6 Carriers shall not accept for transportation hazardous materials as described in and subject to the Hazardous Materials Tariff of the American Trucking Association, unless at the time of or prior to the transportation the carrier has complied with the requirements of the Hazardous Materials Tariff, and state and federal regulations that apply to the transportation of hazardous materials.

Approved and dated February 7, 1990 to become effective March 15, 1990, at San Francisco, California.

PUBLIC UTILITIES COMMISSIONSTATE OF CALIFORNIABy Wesley FranklinActing Executive Director

**\*411  Revised Page 15**

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

**APPENDIX E**

**(Revised pages 1-6)**

**GENERAL ORDER 155-A**

**PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

**RULES GOVERNING ISSUANCE OF DOCUMENTATION
AND COLLECTION OF CHARGES BY HIGHWAY CARRIERS**

Adopted February 7, 1990. Effective March 15, 1990.

Decision 89-10-039, as modified by Decision 90-02-021 in I.88-08-046.

**RULE 1 — APPLICATION AND SCOPE**

A. This General Order is issued to provide rules to govern issuance of shipping and related documents and collection of charges by highway carriers as defined in Public Utilities Code (Code) Section 3511.

B. When the provisions of this General Order are in conflict with the Commission's Rules of Practice and Procedure, the provisions of this General Order shall apply. If the provisions of a Minimum Rate Tariff or General Orders 147, 149, 150, or 151 Series conflict with this General Order, the Minimum Rate Tariff or General Orders 147, 149, 150, or 151 Series shall apply.

## RULE 2 — DEFINITIONS

Commission means the Public Utilities Commission of the State of California.

Debtor means person obligated to pay freight charges, whether consignor, consignee or other party.

Hazardous Materials means articles described in the Hazardous Materials Tariff ATA 111 series of the American Trucking Associations, Inc., Agent.

Highway Common Carrier means every highway common carrier as defined in Code Section 213.

Highway Contract Carrier means every highway contract carrier as defined in Code Section 3517.

Rate Exempt Transportation means transportation of commodities or transportation within the geographic areas described in the most recent Commission publication, including any revisions, entitled "Commodities and Geographic Areas Exempt from Rate Regulation." Also included is transportation exempted for specific carriers by Commission decision.

Shipment means a single consignment of one or more pieces from one consignor at one time from one origin address in one lot, moving to one consignee at one destination address, except as otherwise provided in the carrier's tariff.

Vehicle Unit Rates means rates based upon an agreement between the carrier and the shipper for specifically identified units of equipment engaged for specifically identified periods time (e.g., hourly, daily, weekly, monthly, or yearly basis).

## RULE 3 — DEPARTURES

Departure from the provisions of this General Order may be granted upon formal application to the Commission and after the Commission finds that such departure is reasonable and necessary. Previously authorized departures from the Commission's documentation requirements are continued in effect.

## RULE 4 — REQUIREMENTS FOR ISSUANCE OF DOCUMENTS

4.1 Issuance of Bill of Lading

Highway Common Carriers shall issue a Bill of Lading at the time of or prior to the receipt or pick-up of the shipment. The Bill of Lading form and its use shall conform to the provisions of the National Motor Fright Classification, filed with the Commission by National Motor Freight Traffic Association, insofar as such provisions pertain to issuance of bills of lading. Issuance and use of the Bill of Lading shall conform to the California Uniform Commercial Code, Div. 7.

4.2 Issuance of Receipt/Shipping Order

Highway Contract Carriers shall issue an appropriate receipt to each consignor, at the time of or prior to pick-up, for each shipment to be transported. This receipt may be combined with a shipping order.

## RULE 5 — ISSUANCE OF FREIGHT BILL AND RELATED DOCUMENTS

5.1 Issuance of Freight Bill

Each carrier shall issue to the debtor a freight bill for each shipment or transaction. The freight bill may be in individual or manifest form and, as a minimum, shall show the following information:

a. Name of carrier, its current address (including ZIP code), telephone number (including area code) and Cal-T number.

b. Date of freight bill and freight bill number.

c. Date(s) of shipment or transaction.

d. Name of consignor, name of consignee, and name of debtor.

e. Point of origin and point of destination.

f. Weight of the shipment or other factor or unit of measurement upon which rates and charges are based.

g. Description of shipment or transaction in sufficient terms to permit an accurate determination of the correct rate and charge or, in the case of rate-exempt transportation, to permit an accurate determination that the shipment or transaction is exempt from rate regulation.

h. Rate and charge assessed.

i. If discounts are filed, a statement that discounts may be applicable and the carrier's phone number and address to obtain further information.

j. Other information as may be necessary to make an accurate determination of the applicable rate and charge.

5.2 Issuance of Accessorial Service Document

When a carrier provides a service not included in the transportation rates, the carrier shall issue an accessorial service document to the party who ordered the service and shall show the following information:

a. Type of accessorial service involved.

b. Time for which equipment was ordered, if any, and time of actual or constructive placement.

c. Address where the accessorial service is performed.

d. Time loading or unloading begun and completed.

e. Free time allowable.

5.3 Additional Requirements For Issuance of Documents In Connection With Transportation Subject To Vehicle Unit Rates

When transportation is performed pursuant to an agreement based on vehicle unit rates, the carrier shall provide the following information in its billing to the debtor, when applicable:

a. Type and period of transaction (e.g., hourly, daily, weekly, monthly, yearly).

b. Name and address of carrier and shipper.

c. Identification (by license number or Vehicle Identification Number) and type of equipment.

d. Effective date of transaction.

e. Base vehicle unit rate.

f. Number of hours and rate per hour.

g. Miles operated and rate per mile.

h. Number of premium pay hours and rate per hour.

i. Number of excess hours and rate per hour.

j. Number of helper hours and rate per hour.

k. Dates service performed on Saturday, Sunday, or holidays and rates for same.

l. Rate for temperature control service.

m. Explanation of any additional charges (forklifts, etc.).

## RULE 6 — COLLECTION OF CHARGES

A. This rule applies to transportation subject to General Order 147 Series. However, it shall apply to special contracts as defined in General Order 147 Series only when the special contracts do not specify credit terms.

B. Transportation and accessorial charges shall be collected by the carrier from the debtor prior to relinquishing possession of the property, unless the carrier has taken sufficient precautions to insure payment. Upon taking such precautions the carrier may extend credit as provided in this rule.

1. Freight bills for all transportation and accessorial charges, including vehicle unit rate freight bills, shall be presented to the debtor within 15 calendar days from the first 12 o'clock midnight following delivery of the freight. Vehicle unit rates for periods in excess of one month shall be billed within 15 days from the end of each month, corresponding to the date service commenced.

2. Carriers may extend credit to the debtor for a period of seven days, excluding Sundays and legal holidays. The credit period will begin from the first 12 o'clock midnight following presentation of the freight bill.

3. The United States mail may be used for billing and collection. The postmark will be used to record the date.

## RULE 7 — OTHER REQUIREMENTS

7.1 Retention of Records

Each carrier maintaining an office or place of business within the State of California shall keep therein all documentation, including any bills of lading, freight bills, accessorial service documents, weighmaster's certificates or any other written instructions, requests, agreements or documents which support the rates and charges assessed in connection with each shipment or transaction for at least three years from the date transportation was performed. Carriers which do not maintain an office or place of business within the State of California shall keep all documentation as described above for at least three years from the date transportation was performed, and shall make such documentation available to the Commission at its request in conformance with Code Section 3701.

7.2 Hazardous Materials Transportation

a. Before transportation of any hazardous materials, substances or wastes, a carrier shall insure that it has complied with documentation requirements of all governmental agencies charged with protection of the public or the environment in connection with transportation of these materials, substances, or wastes. A carrier shall note on its freight bill any circuitous routing or separation of commodities required by these.

b. Before accepting any hazardous material for transportation, a carrier shall review shipper-prepared documents for compliance with Title 40, Part 262.20, and Title 49 Parts 171.8, 12.200-172.205, Code of Federal Regulations, including any amendments or reissues. This requirement shall not be construed as relieving a shipper of any responsibility for issuance or accuracy of these documents. The carrier shall retain one copy of each document: in accordance with Rule 7.1, above.

Approved and dated February 7, 1990, to become effective March 15, 1990, at San Francisco, California.


PUBLIC UTILITIES COMMISSIONSTATE OF CALIFORNIABy Wesley FranklinActing Executive Director

**APPENDIX F**

**(Revised pages 1 & 2)**

*LIST OF ACRONYMS*

| | |
|---|---|
| A. | Application |
| AB | Assembly Bill |
| Ad Hoc | Ad Hoc Carriers Committee |
| ALJ | Administrative Law Judge |
| ASCT | Americans for Safe and Competitive Trucking |
| C. | Case |
| CHP | California Highway Patrol |
| CLFP | California League of Food Processors |
| CMA | California Manufacturers Association |
| Coalition | California Coalition for Trucking Deregulation |
| CPIL | Center for Public Interest Law |

| CTA | California Truckers Association |
| CWTB | Cal-West Tariff Bureau |
| D. | Commission Decision |
| DMV | California Department of Motor Vehicles |
| DOT | United States Department of Transportation |
| DRA | Division of Ratepayer Advocates |
| FTC | Federal Trade Commission |
| GACC | generally applicable common carrier |
| G.O. | General Order |
| HCA | Highway Carriers Association |
| I. | Commission Order Institution Investigation |
| ICC | Interstate Commerce Commission |
| LTL | less-than-truckload |
| NMFTA | National Motor Freight Traffic Association |
| NSSTC | National Small Shipments Traffic Conference, Inc. |
| OII | Commission Order Instituting Investigation |
| PMTB | Pacific Motor Tariff Bureau |
| PU | California Public Utilities Code |
| SB | Senate Bill |
| SCMD | Southern California Motor Delivery, Inc. |
| Teamsters | California Teamsters Public Affairs Council |
| TFCI | Truck Freight Cost Index |
| WCFTB | West Coast Freight Tariff Bureau |

G. MITCHELL WILK, Commissioner, concurring:

After further review, I am convinced that current statutes permit the degree of contracting flexibility embodied in the revised order.

G. MITCHELL WILK, Commissioner
  February 7, 1990
  San Francisco, California

## Order Modifying Decision 89-10-039

### Opinion

Footnotes

1    Pursuant to Commission policy and Rule of Practice and Procedure 87, the Assistant General Counsel in charge of reviewing applications for rehearing, for good cause shown, granted NSSTC permission to file its reply after the period provided for in Rule 86.2 had expired.

2    Rather than including in this decision line-by-line modifications to the original Decision, we are attaching to this decision a complete version of D. 89-10-039 as modified today (the Modified Decision). This consolidated document will make it easier for all those affected to understand our new general freight program.

3    We are making the General Orders that implement our new program effective March 15, 1990, to allow sufficient time for printing and distribution of the Modified Decision and the General Orders.

4    PU § 454 states that "*[e]xcept as provided in Section . . . 455*, no [common carrier] shall change any rate or so alter any classification [etc.] as to result in a new rate except upon a showing before the commission and a finding by the commission" (emphasis added). However, § 455 permits rate schedules, classifications, contracts, practices, and rules not increasing or resulting in an increase in any rate to go into effect without any such showing or finding. Thus, § 454 only requires such a showing and finding where there is a rate increase.

     Constitution, Article XII, § 4, contains a substantially identical requirement.

*    The agent shall not insert a date less than 90 days after the date the Notice is received by the Commission.

1    DRA testified that from 1983 to 1985, a period of lesser rate regulation in California, the trucking industry turnover rate was comparable to that of other small businesses in the country.

2    *Pacific Telephone and Telegraph Company v. Public Utilities Commission*, (1965) 62 Cal. 2d 634, 647 similarly reflects the Commission's considerable discretion in ratemaking:

     Thus the responsibility for rate fixing, insofar as the law permits and requires, is placed with the commission, and unless its action is clearly shown to be confiscatory the courts will not interfere."

3    By "unrestricted entry" we mean that there are no Commission-set limits to the number of operating authorities that can be granted, the commodities that may be hauled, or the areas that may be served. We continue to require that all new entrants meet statutory requirements, including the new entry requirements discussed in the *Safety Legislation* section.

---

**End of Document**                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit E

🟨 KeyCite Yellow Flag - Negative Treatment
Distinguished by In re Telmatch Telecommunications, Inc., Cal.P.U.C., June 27, 2002

2 CPUC 2d 434, 1979 WL 50299 (Cal.P.U.C.)

Order modifying D 90642 (PT&T Co.) and granting partial rehearing.

Decision No. 90919
Application No. 58223
OII Nos. 21, 33

California Public Utilities Commission

October 10, 1979

Before Bryson, President, and Sturgeon, Gravelle and Grimes Jr., Commissioners.

BY THE COMMISSION:

 **\*1** This opinion and order is the result of our further review of the evidence with respect to Application No. 58223 of The Pacific Telephone and Telegraph Company (Pacific) for a rate increase of approximately $470 million. On July 31, 1979, we ordered Pacific's rates reduced by $42.2 million. We have carefully reviewed the contentions of the various parties to these proceedings raised in their respective applications for rehearing, and further analyzed the evidence in light of those contentions; and we conclude that Pacific is entitled to a rate increase of approximately $1.3 million; $26.6 million of this difference results from our correcting a mathematical error in the calculation of Pacific's revenue requirement. Also, we have determined that the evidence available concerning Pacific's cost of long-term debt and preferred stock is inadequate in that it may not be reflective of costs Pacific will incur during the future period for which we are setting rates. Accordingly, these proceedings are reopened and further evidence will be received on the limited and specific issue of Pacific's cost of capital; thereafter, another order will issue which could further increase rates, depending on our analysis of the evidence presented.

The change in our conclusions on Pacific's revenue requirement from a rate decrease of $42.2 million to an increase of $1.3 million means we find Pacific has an additional revenue requirement of $43.5 million from that which we found reasonable in our original decision in these matters, issued July 31, 1979.

Our goal in rate making is to determine a utility's revenue requirement--or rate level--based on a normal year of operation, intended to be reflective of conditions it will operate under during the future period for which rates are set. Accordingly, the modifications we make to our original decision, based on further assessment of the evidence, are made keeping foremost in mind the goal of adopting a reasonable and fair revenue requirement--and underlying rate levels--for Pacific and its customers. Critical to the establishment of a reasonable revenue requirement is to set rates that enable a utility to provide the good utility service Californians have come to expect and which they deserve: This means rate levels that allow Pacific to compete in the marketplace for capital as it issues debt and stock, and obtains needed capital for improving and extending its utility service at a reasonable cost. But, just as important, it means balancing the needs and desires of the utility with those of consumers in the interest of insuring that consumers have the lowest possible telephone rates consistent with the ability for the utility to be able to attract capital, render good utility service, and provide its management with reasonable opportunity to realize a fair return for the investor. Essentially, it is by balancing these interests that we follow the legislative mandate set forth in the Public Utilities Code (Section 451) to set utility rates at a level that "shall be just and reasonable". This balancing test, as applied in this opinion assessing Pacific's request for a $470 million rate increase, has been historically applied by this Commission and is the test by which we will continue to assess rate increase requests by California utilities.

The most significant modification we make that affects Pacific's rate level is the correction of a mathematical error made in calculating the revenue requirement in our original July 31, 1979 decision; correction of that error results in an additional revenue requirement for Pacific in the amount of about $26.6 million.

We find upon reexamination that Pacific will incur an additional estimated expense of $6.5 million for purchased power (electricity); Pacific is subject, as are all other consumers, to escalating electricity costs caused by oil price increases.

Upon further review, discussed at length herein, we find that Pacific has raised valid points with respect to expense levels for operator salary and related costs (e.g., training expense and the impact of productivity gains stemming from technological advances). Accordingly, we have increased these expenses by $23.3 million.

The additional revenue required by Pacific as a result of these expense changes is $16.9 million, after recognition of allocations to interstate operations and intercompany settlements.

The rate modifications authorized to generate Pacific's additional revenue requirement are as follows:

1. An additional increase of $21.2 million to business service push button or key telephones added to the $26.1 million increase previously ordered.

2. Institution of a new charge of 25¢ for each time a customer requests an operator to verify a busy line condition or interrupt a conversation; the charge means those who require this service and contribute to Pacific's costs will bear at least a portion of these special costs. This charge will generate $6.7 million in annual revenue.

The Commission has received six petitions for rehearing of Decision No. 90642, from The Pacific Telephone and Telegraph Company (Pacific); Toward Utility Rate Normalization (TURN); the Cities of San Francisco, Los Angeles, and San Diego (Cities); the General Telephone Company (General); the California Interconnect Association (CIA); and the Deaf Counseling, Advocacy, and Referral Center (DCARA). We have considered each and every allegation of error raised in these petitions and have reviewed the extensive evidentiary record already developed. As a result of that consideration and review, we are of the opinion that there is persuasive evidence supporting Pacific's position with respect to several areas in which we made adjustments to its expenses. Accordingly, we will modify those adjustments to more closely reflect that evidence. In addition, there is good reason to believe that dramatic changes in economic conditions affecting Pacific's interest rates may have taken place since the staff's estimates were prepared. That belief warrants granting a limited rehearing for the purpose of receiving additional evidence on Pacific's capital costs.

Those items of Pacific's results of operations which should be modified to reflect the weight of the evidence are discussed below.

Adopted operating revenues, operating expenses and taxes, balance net revenues, rate base, and rate of return are shown for the test year 1979 at present rates in Table II (Modified).

The modifications in the adopted results herein versus the adopted results in Decision No. 90642 result in total operating expenses and taxes increasing from $3,733,076,000 to $3,768,803,000, an increase of $35,727,000. The adopted revenues at present rates are increased from $4,616,078,000 to $4,624,588,000, an increase of $8,510,000. These amounts represent the sum total of the modifications in revenue and expense. Further comparison can be made by inspection of Table II of Decision No. 90642 (mimeo page 41) and Table II (Modified).

*Total Company Operations*

| Line No. | Item | Staff Estimate | Utility Estimate | Adopted | Intrastate Adopted |
|---|---|---|---|---|---|

|   |   | (A) | (B) | (C) | (D) |
|---|---|---|---|---|---|
|   |   | **(Dollars in Thousands)** |   |   |   |
| 1 | Operating Revenue.......................... | $4,712,965 | $4,705,615 | $4,670,512 | $3,618,039 |
| 2 | Uncollectibles.................................. | 46,051 | 44,170 | 45,924 | 35,200 |
| 3 | Revenues After Uncollectibles.......... | 4,666,914 | 4,661,445 | 4,624,588 | 3,582,839 |
| 4 | Total Operating Revenues................ | 4,666,914 | 4,661,445 | 4,624,588 | 3,582,839 |
| 5 | *Operating Expenses* |   |   |   |   |
| 6 | Maintenance..................................... |   |   | 1,009,630 | 747,934 |
| 7 | Traffic............................................. |   |   | 339,194 | 270,066 |
| 8 | Commercial...................................... |   |   | 467,009 | 397,425 |
| 9 | Revenue Accounting........................ |   |   | 61,826 | 53,523 |
| 10 | Bal. G&O Sal. & Exp...................... |   |   | 180,620 | 140,197 |
| 11 | Operating Rents............................... |   |   | 33,875 | 27,002 |
| 12 | Gen. Service & Lic........................... |   |   | 56,357 | 43,260 |
| 13 | Relief & Pensions............................ |   |   | 420,091 | 326,075 |
| 14 | Bal. Other Opr. Exp......................... |   |   | 20,632 | 15,837 |
| 15 | Subtotal........................................... |   |   | 2,589,234 | 2,021,319 |
| 16 | Depreciation Expense...................... |   |   | 637,062 | 489,518 |
| 17 | Prop. & Other Taxes........................ |   |   | 118,571 | 91,015 |
| 18 | Payroll Taxes................................... |   |   | 93,652 | 72,693 |
| 19 | State Income Tax.............................. |   |   | 51,612 | 39,165 |
| 20 | Federal Income Tax.......................... |   |   | 287,645 | 219,135 |
| 21 | Affiliated Interest Adj...................... |   |   | (8,973) | (6,760) |
| 22 | Net Operating Expenses................... | 3,693,734 | 3,955,282 | 3,768,803 | 2,926,085 |
| 23 | Net Operating Revenues................... | 973,180 | 706,163 | 855,785 | 656,754 |
| 24 | *Rate Base* |   |   |   |   |
| 25 | Account 100.1................................... |   |   | 12,179,802 | 9,349,216 |
| 26 | Account 100.3................................... |   |   | 6,140 | 4,875 |

| | | | | | |
|---|---|---|---|---|---|
| 27 | Materials & Supplies........................ | | | 52,850 | 40,710 |
| 28 | Working Cash.................................... | | | 157,010 | 120,521 |
| 29 | Less: Depr. Reserve.......................... | | | 2,496,581 | 1,898,151 |
| 30 | Less: Def. Tax Reserve..................... | | | 1,049,475 | 803,688 |
| 31 | Subtotal........................................... | | | 8,849,746 | 6,813,483 |
| 32 | Affiliated Interest Adj...................... | | | (78,144) | (59,983) |
| 33 | Total Rate Base............................... | 8,809,455 | 8,828,656 | 8,771,602 | 6,753,500 |
| 34 | Rate of Return................................. | 11.05% | 8.00% | 9.76% | 9.72% |

(Red Figure)

The calculation of the gross revenue increase necessary to produce a rate of return on rate base of 9.73 percent adopted herein is set forth below:

| | |
|---|---|
| Authorized Rate of Return | 9.73% |
| Adopted Rate of Return, Present Rates | 9.72% |
| Increase in Rate of Return Required | 0.01% |
| Adopted Intrastate Rate Base | $6,753,518,000 |
| Net Revenue Increase | $675,000 |
| Net-to-Gross Multiplier | 1.894 |
| Gross Revenue Increase | $1,300,000 |

The Cities argue that our adopted rate of return and return on equity are unsupported by our language in Decision No. 90642, which instead sets forth the reasons why Pacific should not be granted an increase. We disagree. Decision No. 90642 discusses the relevant evidence at length; it then explains in some detail why we did not believe that Pacific's proposed increases in return on equity and rate of return were justified. However, we are not bound by the staff's estimates, particularly with respect to setting the return on common equity. This determination necessarily involves the exercise of our judgment, in which we are guided by broadly stated judicial guidelines, by our own concepts of fairness, and by common sense.

It was and remains our judgment that the evidence of record in this proceeding fully supports our determination that a return on common equity of 12.25 percent will protect the interests of the ratepayer while adequately compensating the investor. Our decision to grant rehearing for the purpose of reevaluating Pacific's cost of debt was made, in part, to help ensure that Pacific has the opportunity to earn our adopted return on equity.

In Decision No. 90642, the Commission adopted a return on common equity of 12.25 percent which resulted in a rate of return of 9.73 percent. The 12.25 percent return on common equity was applied to the following capital structure proposed by the staff and adopted by the Commission:

| | Capital Ratios | Cost Factors | Weighted Costs |
|---|---|---|---|
| Long-Term Debt........................ | 50.04% | 7.62% | 3.81% |
| Preferred Stock........................... | 4.24 | 7.51 | .32 |
| Common Equity........................ | 45.72 | 12.25 | 5.60 |
| Total.......................................... | 100.00% | | 9.73% |

The Commission recognizes that since the time that the staff's estimate of the cost of debt and preferred stock was issued on September 15, 1978, changes in economic conditions have resulted in interest rates being significantly higher than originally estimated. For example, the Commission notes that recent debt offering of public utilities having the same "A" bond rating as Pacific have been issued at interest rates in excess of 10 percent, which are appreciably higher than the debt costs assumed in the capital structure adopted in Decision No. 90642.

The increase in interest costs over those originally adopted by the Commission adversely affects the ability of Pacific to earn the return on equity found reasonable by the Commission.

It is the opinion of the Commission that the rapid rise in interest rates warrants a further review to determine the effect on Pacific's ability to earn its authorized return on common equity.

Several of the petitioners have raised the issue of inconsistent treatment of the interest allocated to Pacific from American Telephone and Telegraph Company. The staff had recommended that this interest be treated as an income tax deduction to Pacific for rate-making purposes; therefore, an allocated interest adjustment from AT&T of $34,313,000 was included in the computer run to produce the Commission staff's presentation in Exhibit No. 43-F. However, Decision No. 90642 at page 96 (mimeo) deferred the decision on the issue of imputed interest expense to Order Instituting Investigation No. 24. To properly reflect this deferral, the adjustment should have been removed from the computer run when adapting it to develop Table II at page 41 of the decision. This was not done. Consequently, the adopted rate of return at present rates shown on Table II was higher than it should have been. Correction of this error would have produced a rate of return of 9.86 percent instead of the 10.06 percent shown in Table II of Decision No. 90642.

It is necessary to correct this error in the instant decision. Table II (Modified) herein reflects this correction, as well as the other adjustments discussed.

The Cities raise the issue of the propriety of deferring this issue to OII-24, in view of the Commission's responsibility to consider all relevant evidence when setting rates. The Cities argue that at a minimum the Commission should set rates subject to refund, pending the outcome of OII-24.

We disagree that we have acted improperly in deciding to defer this issue until a generic proceeding has been completed. This case is fully consistent with other recent general rate cases wherein we have declined to change our traditional methods of estimating various taxes to the utility pending the outcome of OII-24. See Decision No. 89710 (December 12, 1978); Decisions Nos. 89315 and 89316 (S.F. No. 23964, writ denied July 25, 1979); Decision No. 89711 (S.F. No. 24008, writ denied August 15, 1979). This OII will allow all of these issues to be explored and addressed in a statewide investigation, with all relevant respondents present. Our rationale for this position has been well stated in these previous decisions.

As recognized in Decision No. 90834, issued September 25, 1979, a reduction in license contract expense in the amount of $61,000 for the test year 1979 is necessary and is incorporated in the adopted results herein.

TURN contends that despite our lengthy discussion of separations testimony and issues, our position cannot be determined because we have deferred these issues to another decision, in connection with Application No. 55492. That decision has now been issued (Decision No. 90861, issued September 25, 1979). TURN can, of course, exercise its right to seek rehearing of that decision, should it believe that the Commission has committed legal error.

We affirm our conclusions reached in Decision No. 90642 as to operating revenues. However, the amounts must be adjusted because of inter-company settlement effects, to be consistent with the revised expenses adopted herein. Total operating revenues adopted are as follows:

|  | *(Dollars in Thousands)* |
|---|---|
| Local Service........................................................... | $1,847,847 |
| Miscellaneous........................................................... | 217,472 |
| Intrastate Toll........................................................... | 1,648,701 |
| Interstate Toll........................................................... | 1,050,793 |
| Uncollectibles........................................................... | 46,574 |
| Total Operating Revenue Before Adjustments................... | 4,718,239 |
| Proposition 13 Adjustment................................. | (93,651) |
| Total Operating Revenues................................. | 4,624,588 |

(Red Figure)

Pacific's petition for rehearing alleges that in several areas of maintenance and traffic expenses, the decision adopts the adjustments recommended by the Commission staff (staff) in an arbitrary manner, without fully considering all of the evidence. Pacific also contends that the findings related to these areas of expenses are inadequate.

Under the law, the Commission must exercise discretion in the area of determining reasonable costs and expenses to be allowed to a utility. Our evaluation must take into account the interests both of ratepayers and of shareholders; this task can in the long run have an equitable result only when sufficient evidence is presented by all parties in our rate proceedings. Our thorough reassessment of the record in response to the petitions for rehearing made it clear to us that in many instances, Pacific's claims of arbitrariness were merely attempts to disguise the inadequacy of their own showing. This also seems to have been the motivation for Pacific's argument that we should reopen the record in this proceeding in order to receive into evidence Pacific's annualized cost data for the first six months of 1979. We emphasize that we have in no way reviewed or relied on Pacific's 1979 data in coming to our present decision. Where revisions to our original decision are fair, reasonable, and supported by the evidence, we have made them, as set forth in this order.

After a thorough review of the record, we conclude that Pacific's arguments lack merit with respect to the Phone Center, main frame, traffic--Accounts 621-35 and 36 ("right to use" expenses), commercial expense adjustment (national yellow pages), and general services and licenses adjustment. However, we agree that some of our findings in these areas do not adequately reflect the evidence which we considered, and we modify the findings accordingly, as set forth below. Moreover, we have decided that in the area of electric power costs and in several of the areas of traffic expenses, Pacific's arguments have merit. We conclude that modifications to the estimates adopted in Decision No. 90642 are justified, as follows.

In Decision No. 90642, we accepted the staff's estimate of electric power costs in the test year in the amount of $34,537,000, a difference of $12,063,000 from Pacific's estimates of $46,600,000. Pacific and the staff did not differ as to the estimated energy usage of Pacific but only as to the estimated level of energy rates. The staff's calculations were based on an estimated increase in electric power rates from 1978 to 1979 of 0.32 percent. We are still convinced of the correctness of the staff's development of its power cost estimate, which was prepared in mid-1978. However, we recognize that certain extraordinary events have taken place subsequent to the receipt of evidence on this issue. For example, in May of 1979, the Organization of Petroleum Exporting Countries (OPEC) dramatically increased the price of oil produced and sold by its members by approximately 50 percent. As a result of this and other causes, we authorized two significant electric rate increases (Southern California Edison--Decision No. 89711, $124,000,000, increase effective January 1979; Decision No. 90488, $69,000,000, increase effective July 1979). We also take official notice of Decision No. 90869, signed this day, granting the Pacific Gas and Electric Company a $128 million revenue increase resulting from authorized increases in the ECAC elements of its electric rates (Applications Nos. 58468, 58891). In view of the increases already granted, the possibility of additional significant increases in the near future, and the fact that the telephone rates fixed herein will not become effective until near the end of 1979, we are no longer convinced that our adopted adjustment for the test year is realistic. An increase in the adopted electric power cost to $41,000,000 is reasonable for the purpose of fixing telephone rates for the future.

The staff reduced Pacific's estimate by $870,000 based on its analysis of increased on-line technology and concomitant reduced personnel requirements. However, Pacific has pointed out that the staff failed to allow for 19 additional personnel which will be required at the new Sacramento and San Jose TSPS offices. We agree with this modification in the staff's recommended adjustment. Thus we find reasonable an adjustment to Pacific's estimate in the amount of $452,000.

The staff concluded that Pacific's estimate was based on projections of nonrecurring events such as course development expenses and therefore recommended amortization of these expenses over a 10-year period, resulting in a recommended adjustment of $240,000. We agree with the staff that these expenses appear to represent nonrecurring events, and that costs associated with them should not be fully recognized in a test year. However, amortization over a 10-year period appears excessive. A three-year amortization period seems more just. Accordingly, we find an adjustment of $80,000 is reasonable.

Consistent with the adjustment in Subaccounts 621-11, 21 and 31--No. Region, Pacific's estimate is reduced by $40,000.

In addition, our review of the record disclosed one other area of general traffic supervision expense which we believe requires revision, although Pacific did not protest our adopted estimate. Pacific estimated one-year salary increases for the above subaccounts in the range of 10.6 to 15.2 percent, without justifying such a large increase. Pacific did indicate to the staff that 7-8 percent was a reasonable figure. The staff employed, and we adopted, a rate of increase of 5.8 percent. With inflation running at a rate well in excess of 10 percent, we find upon reconsideration that an assumption of a salary increase rate of 8 percent is reasonable. Accordingly, we find that a reduction of $100,000 in Pacific's estimate for this item approximates an 8 percent salary increase.

In total the adopted expense for general traffic supervision is $2,930,000 less than urged by Pacific and $808,000 higher than staff.

The staff's recommended adjustment for operator wages amounts to $8,627,000 based on its analysis that Pacific needed 735 fewer operators in the test year. The staff's force reduction was related to three areas--(1) the assumed transfer of certain toll service functions in 1979 from Pacific to General, (2) the effect of conversion of 124,000 main stations to dial toll service, and (3) the reduced work load resulting from expansion of automated intercept service.

Concerning the toll function transfer to General, Pacific's witness testified that most of the transfer would not take place until some time in 1980 and that in any case the reduction in expense would be greatly offset by toll settlement reductions.

Based on this evidence, we conclude that much of these operator savings will not be realized in the test year and therefor reduce the staff's recommended adjustment by $4,109,000.

As to the second component of the operator wages adjustments, Pacific's witness testified that the 124,000 stations were not converted from manual to dial toll service but from operator to automatic number identification with a force saving of only 18 operators. This has the effect of reducing the staff adjustment by $1,256,000.

Thirdly, Pacific's witness stated that most savings from automated intercept service have been achieved and that intercept call volume is continuing to increase. However, he did state that a progressive reduction in operators for the 714 numbering plan area, from 107 to 23 by the end of 1979, was not included in Pacific's estimate. On reconsideration we find this testimony persuasive, thus reducing the staff's adjustment by $1,092,000.

Based on all of the foregoing, we find that a reasonable adjustment to Pacific's estimate for operator wages is $2,170,000.

An adjustment in this account must be related to and consistent with our adjustment for operator wages. We find an adjustment in this account of $328,000 to be reasonable and consistent with our treatment of operator wages.

The staff's adjustment was based on its conclusion that the number of record clerks per employee projected by Pacific had increased in 1979 over prior years. Pacific's witness testified that this is not correct; the ratio of employees per clerk has gone from 40 in 1975 to 45.4 projected for 1979, a 14 percent improvement. Pacific's witness also testified that central office is realtively unaffected by the new automation changes planned by Pacific. In view of all of this testimony, we adopt Pacific's estimate as reasonable.

The staff's adjustment was based on the assumption that the Northern Region could perform this function with the same number of clerks that the Southern Region employs, namely, 32 clerks. However, Pacific's witness testified that the North handles 24,000 orders per month compared to the South's 16,000 orders per month. In addition, it appears that taken as a whole, the Northern system is less efficient than the Southern system. While we find Pacific's revised estimate of 67 clerks for the Northern Region and 32 clerks for the Southern Region to be reasonable, we fully expect Pacific to expend the effort necessary to correct these differences in efficiency. Our adopted figure of $339,000 adjusts Pacific's estimate in accordance with the above discussion.

As a result of the adjustments adopted above, it is necessary to adjust Pacific's wage overlay estimate. The appropriate reduction in Pacific's estimate becomes $453,000.

The staff reduced Pacific's Northern Region training expense estimate by $300,000 on the basis that the training needs should be no more than they were in 1978. Pacific's witness testified that this view ignores the fact that there were no TSPS conversions in 1978, whereas the Sacramento TSPS conversion will take place in 1979. We recognize that this conversion will require considerable amounts of supplemental training. Therefore, we adopt Pacific's estimate of operator training expense.

As we stated in Decision No. 90642, the staff's position was based primarily on the fact that Pacific failed to provide any specific justification for the doubling of this expense from 1974 to 1976. Pacific's rebuttal witness did state in generalized terms that the rapid increase from 1974-1976 was due to an overall significant increase in mechanization of traffic operations, and that continued progress in mechanization is helping to keep down the costs of total traffic expenses. While this testimony was not nearly as specific as it should have been, we find on balance that Pacific's estimate of increases, which is less than 9 percent a year from 1976 to 1979, is more reasonable than the staff's, which reduced this expense for 1979 to an amount below that expended in 1976.

Payroll taxes, pension and employee benefit expenses are directly related to levels of operating expenses. Consistent with the modifications in maintenance and traffic expense adopted herein, we have made the following changes from those adopted in D-90642: payroll taxes are increased $1,106,000, relief and pension expense are increased by $2,622,000 and medical and other benefits expense are increased by $1,572,000.

The following tabulation summarizes traffic expense adjustments to Pacific's estimates:

| Item/Ac. | Staff | D-90642 X 1000 | Adopted Herein |
|---|---|---|---|
| *Gen'l Traffic Sup.* | | | |
| 621-11,31-G.A. | $293 | $293 | $100 |
| 621-11,21,31-N.Reg. | 870 | 870 | 452 |
| 621-15,16,35,36 | 240 | 240 | 80 |
| 621-25,26-N.Reg. | 902 | 902 | 902 |
| 621-35,36 | 875 | 875 | 875 |
| 621-15,16-N.Reg. | 77 | 77 | 40 |
| Transf. to Const. | 114 | 114 | 114 |
| Network Adm. | 367 | 367 | 367 |
| Subtotal. | 3,738 | 3,738 | 2,930 |
| *Operators' Wages* | | | |
| Operators | 8,627 | 8,627 | 2,170 |
| Network Adm. | 1,302 | 1,302 | 328 |
| Records Clerical | 1,060 | 1,060 | |
| Intercept Records | 778 | 778 | 339 |
| Transf. to Const. | 58 | 58 | 58 |
| Wage Overlay | 2,136 | 2,136 | 453 |
| Subtotal | 13,961 | 13,961 | 3,348 |
| Lunchroom | 83 | 83 | 83 |
| Operator Training | 300 | 300 | |
| Printing, House Serv. | 212 | 212 | 212 |
| Miscellaneous | 5,949 | 5,949 | |
| Serv. Inspection | 2,299 | | |
| ACTS | 11,415 | | |
| Subtotal | 20,258 | 6,544 | 295 |
| Total | 37,957 | 24,243 | 6,573 |

The revision of the revenue requirement as discussed above will require revisions to the rate design ordered in Decision No. 90642. After full consideration of the alternatives available on this record we have determined the increase should be fixed in two areas: (1) institution of a charge for request by a calling party for verification of a busy line condition and/or interruption of a conversation in progress; and (2) consistent with the high priority we have placed on setting rates and charges which will achieve full cost for competitive items of terminal equipment, an increase in the rates and charges for key telephone equipment in addition to the increases authorized in Decision No. 90642. The revised rate design adopted herein will also correct certain errors, primarily of mathematical nature, which were made in the development of the rate design and the associated revenue effects adopted in Decision No. 90642.

Pacific proposes to apply a 50¢ charge for verification of a busy line condition and/or interruption of a conversation in progress at the request of the calling party. The staff concurred with the concept of such a charge but disagreed with the charge level and the applicability of such a charge. Both Pacific and the staff propose that the charge for verification/ interrupt be applicable to all local calls and all intrastate messages with the exception that the staff would exempt from the proposed charge such requests for verification/interrupt when such requests originate from a public or semipublic telephone.

We believe, based on the record in this proceeding, that a charge for verification/interrupt requests is necessary in order to place the cost burden associated with Pacific's operators who must handle such requests on the customers causing such costs. A charge for verification and/or interruption requests is also warranted as a means of curbing the apparent excessive use of the present free verification/interrupt service for other than emergency calls.

The staff's proposed charge of 25¢ for each call when verification and/or interruption is requested by the calling party is reasonable. Pacific's proposed charge of 50¢ per call for such requests appears to be excessive now. However, if in the future the large volume of such verification and/or interruption requests is not reduced as both Pacific and the staff predict, we suggest that both Pacific and the staff make other proposals as to how such excessive use of the verification/ interrupt service for other than emergency calls can be curbed. We will adopt the staff's proposal, which will increase Pacific's revenues by $6.7 million.

In Decision No. 90642, we adopted rates and charges for key telephone service which will result in an increase in annual revenues of $26.1 million. We will rely on a further increase in key service to contribute a substantial portion of the increased revenue requirement adopted herein.

As we stated in Decision No. 90642 (mimeo p. 136) to adopt full cost-based rates and charges for key telephone service would yield an increase in annual revenues in excess of $93 million. Due to the constraints of the revised overall revenue requirement authorized herein, we cannot authorize full cost-based rates and charges for key telephone service. Again, we are cognizant of the fact that both the present rates and charges and the rates and charges adopted herein do not cover the full costs of providing service.

We are also cognizant of our responsibilities under *Northern California Power Agency v. PUC* (1971) 5 C.3d 370, to consider possible anticompetitive impacts of our decisions. *NCPA* allows us to authorize actions having possible anticompetitive effects if we find that an overriding public interest justifies such authorization. We find here, as we have previously (see Decision No. 88232, December 13, 1977), that the public interest is best served by a partial increase in these rates and charges, rather than a one-time increase to a full cost basis. A partial increase lessens the economic burden placed on affected ratepayers by avoiding an immediate and substantial rate increase. However, we hereby place customers on notice that further increases are in order and will be considered in Pacific's next major rate application. The rates and charges for key telephone service adopted herein follow the same basic principles set forth in Decision No. 90642.

In Decision No. 90642, we indicated the revenue effect of the authorized revisions in service connection charges to be an increase of $7.3 million in the 1979 test year. The $7.3 million revenue effect of the authorized revisions is in error. The correct revenue effect of the revisions in service connection charges authorized in Decision No. 90642 is an increase of $14.5 million in the 1979 test year.

In Decision No. 90642, we indicated the revenue effect of the authorized revisions to be an increase of $21.8 million in the 1979 test year. The $21.8 million revenue effect of the authorized revisions is in error. The correct revenue effect of the revisions in rates and charges authorized in Decision No. 90642 is an increase of $27.4 million in the 1979 test year.

The following summaries the revenue effect of the revised adopted rates and charges for Pacific:

|  | *Revenue Effect* |
|---|---|
|  | **(Dollars in Millions)** |
| Foreign Exchange Service.................................................. | $1.2 |
| Extended Area Service...................................................... | 2.5 |
| Extensions, Premium Sets and Interior Wiring................... | 27.4 |
| Over-Allowance Lifeline (1MQ).......................................... | .3 |
| Mileage............................................................................. | 4.7 |
| Key Telephone Service...................................................... | 47.3 |
| Service Connection Charges.............................................. | 14.5 |
| Private Line Service.......................................................... | 1.7 |
| Message Toll Service........................................................ | (.2) |
| Zone Usage Measurement Plan........................................... | (105.0) |
| SMRT Implementation D-83162......................................... | (5.2) |
| Services for the Handicapped............................................. | (12.0) |
| Verification/Interruption.................................................... | 6.7 |
| Net Settlement Effect of General's Increases in Exchange Rates.................................................................................. | 2.8 |
| Centrex [a1] .......................................................... | 14.6 |
|  | 1.3 |

(Decrease)

The settlements between Pacific and General for joint extended area service result in Pacific receiving increased settlement payments whenever the exchange rates of General are raised. The reverse is also true. Thus, the exchange rates of General must be further increased by the amount of Pacific's added settlement in order to keep General whole. The rate design

proposed by General is approved herein, but with modifications to track with Pacific's higher level of rates compared with those in Decision No. 90642.

The rates and charges adopted herein will result in the following effects on General:

| | *1979 Annual Revenue Effect* |
| --- | --- |
| | **(Dollars in Millions)** |
| ZUM Rates and Billings.................................................... | $(24.8) |
| Exchange Rates (Other)...................................................... | 3.9 |
| Private Line........................................................................ | (.4) |
| Message Toll...................................................................... | .2 |
| Total.................................................................................. | (21.1) |

(Decrease)

To offset a decrease in revenue of $21.1 million, General's billings must be increased by $24.0 million based upon the following considerations:

| | *1979 Annual Revenue Effect* |
| --- | --- |
| | **(Dollars in Millions)** |
| General Billings.................................................... | $24.0 |
| Uncollectibles........................................................ | (.1) |
| Net Settlement Effect of General's Increases in Exchange Rates........................................................................ | (2.8) |
| Total.................................................................................. | 21.1 |

(Decrease)

The following is a summary of the increased rates and charges for General which have been revised to reflect the revisions herein authorized for Pacific:

| | *1979 Annual Revenue* |
| --- | --- |
| | **(Dollars in Millions)** |
| Service Connection Charges.................................................. | $4.6 |
| Private Branch Exchange Service........................................ | 3.1 |
| Key Telephone Service......................................................... | 9.0 |
| Extensions.......................................................................... | 4.3 |
| Premium Sets...................................................................... | 1.4 |

| Touch Calling Sets............................................................ | 1.6 |
| Total................................................................................ | 24.0 |

In their petition for rehearing the Cities urged that the ZUM plan should not be adopted at the present time but rather the Commission should reduce rates in some other manner. While the Cities support the concept of the ZUM plan, they apparently feel that inadequate study has been made with respect to implementing it in the Los Angeles and San Francisco East Bay areas. In reaching this conclusion, however, the Cities misinterpreted the thrust of the statement on mimeo page 123 of Decision No. 90642, wherein the ZUM plan is referred to as residually priced. The paragraph of concern sets forth the reasons why ZUM is not being extended to other areas of the state at this time. The statement of residual pricing in no way negates the finding of a $105 million reduction in revenues resulting from the ZUM plan. The $105 million reduction is a differential cost effect with respect to multi-message unit and local service, both of which are residually priced. Our review of the record discloses that the staff witness utilized the $105 million figure to develop a proposed rate design, and that the figure itself was derived from a model which used assumptions as to the impact of ZUM. The limited implementation of ZUM which we are adopting will permit development of data to evaluate the feasibility of the statewide expansion of ZUM.

On our further review of the record we are concerned that our original schedule of 90 days for implementation of ZUM may be too short. We are particularly concerned with the possibilities of deterioration of service as pointed out in the testimony of General Telephone. As indicated in the record, the reduced rates of the ZUM plan will cause a stimulation of traffic over that existing on MMU routes. If adequate facilities are not available after the introduction of ZUM, circuit blockages and a general deterioration of service could result. Because of our concern for the quality of service, we will extend the cutover period for ZUM to 180 days after the effective date of this order. During this time we will expect Pacific and General to engineer and provide the necessary circuits to handle the anticipated ZUM traffic.

The ZUM plan provides attractive off-peak discounts in order to encourage customers to make calls at other than the business day peak hours when most blockages might be expected to occur. It is particularly important that Pacific's customers be informed of the ZUM plan rates and off-peak savings. We will also require that Pacific and General notify each of their affected customers as to the effects of the ZUM plan within 60 days before the introduction of ZUM.

In its petition for rehearing, DCARA contends that rehearing should be granted on the following bases: (1) special equipment should be provided to disabled persons at the basic exchange rate; (2) certification should be expanded to include the public school system and other agencies serving the disabled; (3) Pacific should base its TDD costs on 20,000 units the first year instead of 2,000 to 5,000 units; (4) input from the disabled community should be required; and (5) Pacific should be required to provide amplifiers and TDD in some phone booths, all equipment should be compatible with hearing aids, TDDs should be listed in directories as TDD numbers, and untimed 1MR service should be provided to the deaf.

Subsequent to issuance of Decision No. 90642 on July 31, 1979, the Legislature passed SB 597, which was signed by the Governor on September 28, 1979 to become Chapter 1142 of the Statutes of 1979. This bill enacted a new section of the Public Utilities Code as follows:

> 2831. The commission shall design and implement a program whereby each telephone corporation shall provide a telecommunications device capable of servicing the needs of the deaf or severely hearing impaired, together with a single party line, at no charge additional to the basic exchange rate, to any subscriber who is certified as deaf or severely hearing impaired by a licensed physician, audiologist, or a qualified state agency. The commission shall phase-in this program, on a geographical basis, over a four-year period ending on January 1, 1984. The commission shall establish

a rate recovery mechanism to allow telephone corporations to recover costs as they are incurred under this section.

This legislation, which is limited to service for the deaf, parallels the goal indicated by the Commission on page 151, as follows:

> "We agree that it should be the goal of this Commission to provide supplemental equipment and ancillary services to all handicapped persons on the same basis and at a cost included with the cost of the telephone service selected by these persons."

The legislation, together with the requirements imposed on Pacific for rate revisions, studies and surveys, will obviously require additional hearings by this Commission in the near future. Accordingly, the questions DCARA raises in its petition regarding certification, cost studies, and provision of additional services and equipment will most appropriately be dealt with in those subsequent proceedings. DCARA obviously represents that group of customers most directly affected, and we expect DCARA to be a full participant in those proceedings. It is our intention to approve a program fulfilling the requirements of SB 597 only after full consideration of the views of all parties. Meanwhile we shall direct Pacific to proceed, within the scope of the $12 million we have set aside, to plan for the expansion of the operations of the Handicapped Assistance Points, to proceed toward the institution of the special monthly rates for equipments for the handicapped other than the deaf, and to contract for the study of the communications needs of the handicapped. We shall not at this time allocate any portion of these funds toward toll rate reductions.

As Pacific notes in its petition, Decision No. 90642 adopts the normalization method of accounting for rate-making purposes with respect to accelerated depreciation and rateable flow-through with respect to investment tax credit (ITC) pending final disposition of court litigation. The decision further provides at page 99:

> "If the Commission decision relating to the ratemaking treatment of accelerated depreciation and ITC (Decision No. 87838, dated September 13, 1977) withstands judicial review, refunds and further rate reductions will follow."

Pacific, the Cities and TURN all disagree with the Commission's treatment of accelerated depreciation and ITC, but for different reasons. In addition to its petition for rehearing, Pacific on October 4, 1979, filed a supplemental memorandum of points and authorities in support of its petition for rehearing. Responses have not yet been received.

On August 20, 1979, Pacific filed its Motion for Order Approving Refund Plan and Rate Reductions (Motion) required by Decision No. 87838. Responses to Pacific's Motion were received from several parties.

Pacific's filing indicates a total rate reduction, as of June 1, 1979, should be $80,034,000. Included in that amount, as shown in Exhibit C attached to the Motion, is the portion of gross revenue rate reductions attributable to investment tax credit amounting to $41,270,000. On October 5, 1979, Pacific addressed a letter to the Commission indicating the $41,270,000 reduction for ITC should not have been included and the total reduction is thus $38,249,000. We agree that Pacific's calculation in its Motion does not reflect today's decision. The rates authorized herein in effect include the $41,270,000 gross revenue rate reduction included in Pacific's filing. Accordingly, within three days following the effective date of this order Pacific shall file an amendment to its Motion and reduction plan to reflect the correct amount.

In view of the substantial differences among the positions of the parties as to the appropriate procedure for refunds and rate reductions pursuant to Decision No. 87838, the Commission believes brief further consideration of these issues to be in order. For this purpose we will set a prehearing conference and oral argument for October 22, 1979, before Administrative Law Judge Tomita. The parties should be prepared to address both the proper disposition of the refund and rate reduction proposals contained in Pacific's Motion, and whether further hearings are necessary. If hearings are necessary, the parties should be prepared to proceed immediately. The arguments of the parties herein with regard to accelerated depreciation and ITC, including Pacific's supplemental memorandum and any responses thereto, will be considered at that time. In the meantime, the rates authorized by this decision shall continue to be collected subject to refund.

1. The findings of fact on results of operation stated in Decision No. 90642 are affirmed except as modified below. (Abbreviated references are to results of operation findings as numbered in D-90642, e.g., R.O. 7.)

a. R.O. 1 is revised to read as follows: The total California rate base is $8,771,602,000.

b. R.O. 2 is revised to read as follows: The total intrastate rate base is $6,753,500,000.

c. References to Table II in R.O. 6, 17 and 19 are revised to be referenced to Table II (modified).

d. R.O. 7 is modified to read as follows: Given the adopted test year results of operation (set forth on Table II (Modified)) and the return on rate base found reasonable, Pacific's jurisdictional revenue requirement should be increased by approximately $1.3 million annually.

e. R.O. 24 is revised to read as follows: The staff's estimate for electric power cost is correctly developed but we will increase it to $41,000,000 in recognition of recent extraordinary increases in electric rates, manifested in part in several recent decisions of this Commission, and of the fact that the rate changes authorized herein will not take effect before late 1979.

f. R.O. 25 is revised to read as follows: The staff estimated maintenance expense by reason of Phone Center activity to be $11,789,000 less than Pacific's estimate. The staff estimate recognizes reduced labor expenses to Pacific as necessary service visits to customers' premises become less frequent; it also recognizes that Pacific will be able to meet an increased number of commitments.

g. R.O. 26 is revised to read as follows: The staff's estimate of the effect of Pacific's main frame program is $37,832,000, which was not included in Pacific's estimate. We find the staff's estimate to be more reflective of maintenance expenditures by Pacific in the test year. The staff based its estimate on a conservative view of the savings in maintenance hours Pacific should experience as its many technological modernization and efficiency programs are put into operation.

h. R.O. 28 is revised to read as follows: The staff's estimate for general traffic supervision is reasonable if increased by $808,000. This adjusted estimate reflects reasonable salary increases, necessary increases in personnel to staff new TSPS offices, and a more reasonable amortization of nonrecurring training expenses associated with the general traffic supervision subaccounts.

i. R.O. 29 is revised to read as follows: Pacific's estimate for operators' wages and related expenses, reduced by $3,348,000, is reasonable. Pacific's estimate overstates the expense effect of salary increases and insufficiently recognizes known changes in operating procedures that will reduce such expense. However, the staff overestimates the impact on force levels of certain technological changes, and does not sufficiently account for differences in work load volume in different locations.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

j. R.O. 31 is revised to read as follows: Pacific's estimate for operator training expenditures is reasonable, because it reflects supplemental training expenses associated with the new TSPS offices scheduled to begin operation in the test year, whereas the staff's estimate did not include these expenses.

k. R.O. 33 is revised to read as follows: Pacific's estimate for miscellaneous traffic expense, which represents a less than 9 percent increase annually from 1976 to 1979, is a realistic reflection of increased data processing and similar charges. It is not reasonable to reduce this estimate to a level below the expenditures incurred in 1976, as the staff proposed.

l. R.O. 54 is revised to read as follows: The staff's adjustment for national yellow pages directory expenses is reasonable. It reflects the fact that Pacific is discontinuing sales of National Yellow Pages at the beginning of test year 1979. Consequently, the staff's adjustment discontinues associated personnel expenses.

m. R.O. 59a is added as follows: Pacific has been working with American on an ongoing basis to develop a schedule for implementing teleprocessing.

n. R.O. 59b is added as follows: Teleprocessing will not be substantially implemented during the test year.

o. R.O. 60a is added as follows: If Pacific commences implementation of teleprocessing as directed above, the staff's proposed expense reduction effect can be fully considered in the next general rate proceeding.

p. R.O. 62 is revised to read as follows: The staff's adjustment increasing Pacific's estimate of law department expenses made use of more recent data than did Pacific and hence is more reflective of the increased level of law department activity expected in 1979. We consider the staff's estimate to be reasonable and will adopt it.

q. R.O. 65 is revised to read as follows: The staff's adjustment increasing the rate-making deduction for legislative advocacy expenses beyond the magnitude of adjustment required by previous Commission decisions was not reasonable and will not be adopted.

r. R.O. 73 is revised to read as follows: Based on the evidence of record, if the interest accrual rate applied to Pacific's pension funds was set above 5 percent, it would be based on considerable speculation as to economic conditions and earnings level. The staff-recommended 5.5 percent rate appears to be in conflict with the basic premises utilized by enrolled actuaries.

s. R.O. 74 through 78 are affirmed except that employee taxes, pensions, and employee benefits are revised consistent with the expenses adopted herein.

t. R.O. 83 is revised to read as follows: The staff's proposed adjustment for interest expense allocated from American to Pacific will not be adopted in this proceeding but deferred until completion of Order Instituting Investigation No. 24. Table II of Decision No. 90642, which erroneously included the staff's adjustment, has been corrected consistent with the above (see Table II (Modified)).

u. R.O. 85 is deleted.

v. R.O. 87 is revised to read as follows: In Decision No. 90316, issued May 22, 1979 in Order Instituting Investigation No. 33, it was ordered that Pacific's and independent companies' ratepayers would receive the benefit of the net reduction in the federal corporate tax rate from 48 percent to 46 percent.

1. The findings of fact on rate design and other issues stated in Decision No. 90642 are affirmed except as modified below. (Abbreviated references are to rate design findings as numbered in D 90642, e.g., R.D. 7.)

a. R.D. 5 is revised to read as follows: The rate design which we have adopted in this proceeding for Pacific is set forth in summary form in the rate design section of this decision.

b. R.D. 14 is revised to read as follows: It is practical for Pacific and General to convert the MMU routes to the ZUM plan within 180 days of the effective date of this order, in order to ensure that adequate facilities will be available, except that General will not be required to implement the timing of local calls under Zone 1 of the ZUM plan by reason of its present lack of facilities to do so.

c. R.D. 23 is revised to read as follows: Competitive services offered by Pacific are not now priced to recover full costs of providing the services. The rate design adopted herein provides for significant increases in the rates for such competitive services within the framework of an overall net increase in annual revenues of $1.3 million.

d. R.D. 52 is revised as follows: Because of settlements between General and Pacific, the adopted rates and charges for Pacific will result in reduced revenues of $21.1 million to General in the 1979 test year. It is reasonable to recognize the reduced revenues to General by authorizing the filing of tariffs providing for increases in rates and charges for services provided by General in harmony with the rate design action we take in this proceeding.

e. R.D. 57 is revised as follows: As increases in directory advertising rates will not be consistent with our 180-day implementation period for the ZUM plan, we will anticipate the rate relief to be granted to General to be in the areas of competitive items and service connection charges.

f. R.D. 59 is revised as follows: We will authorize General to file increases in rates and charges as set forth in summary form in the rate design portion of this decision.

g. R.D. 88 is revised to read as follows: Because of the constraints of the overall revenue requirement authorized by this order, we cannot authorize increases in rates and charges for key telephone equipment to the levels recommended by either Pacific or the staff. Key telephone service rates are increased for a revenue effect of $47.3 million. Any anticompetitive effects of pricing this service below cost are outweighed by the overriding public interest in increasing these rates gradually to avoid undue customer disruption.

h. R.D. 128 is revised as follows: It is reasonable to offset the reduced revenues to General of $21.1 million by permitting General to file by advice letter increases in rates and charges for services provided by it, subject to Commission authorization by resolution action. General should provide notice to all its subscribers affected by such proposed changes.


2. The charge for verification and/or interruption of busy calls is consistent with our general policy of pricing the cost for certain services upon the cost causative parties and is warranted as a means of curbing unnecessary and excessive use of the service for other than emergency calls.

3. Mathematical errors in our calculation of the revenue effects of charges for service connections, extensions, premium sets and inside wiring are corrected herein.

4. Pacific's Motion for Order Approving Refund Plan and Rate Reductions filed pursuant to Decision No. 87838 includes $41,270,000 gross revenue reduction, relating to the year-to-year growth in the annual amount of ratable flow-through of investment tax credit, including the year 1979, consistent with the procedure set forth in Finding No. 4 of Decision No. 87838.

5. Hearing should be held with regard to the proper disposition of the refund and rate reduction proposals contained in Pacific's Motion for Order Approving Refund Plan and Rate Reduction.

6. Arguments concerning the issues of accelerated depreciation and investment tax credit raised in the petitions for rehearing should be held in conjunction with the hearing on Pacific's Motion for Order Approving Refund Plan and Rate Reduction.

7. Hearing on the limited issue of Pacific's cost of long-term debt and preferred stock should be held.

8. The capital ratios and return on common equity adopted in Decision No. 90642 are reasonable and are not subject to rehearing.

9. License contract expenses must be reduced by $61,000, consistent with our finding in Decision No. 90834 (September 25, 1979) that the factor utilized in computation of these expenses was in error.

1. Conclusion of Law No. 2 of Decision No. 90642 is revised to read as follows:

> Pacific's gross revenue requirements should be increased by $1.3 million pursuant to OII No. 21 and based upon the test year 1979.

2. Conclusion of Law No. 3 of Decision No. 90642 is revised as follows:

> Rates and charges of Pacific should be modified and changed in accordance with Appendix A attached hereto pursuant to the application and Order Instituting Investigation.

3. Conclusion of Law No. 5 of Decision No. 90642 is revised as follows:

> Pacific's rates and charges authorized herein by Appendix A are just and reasonable. Any other rates applied after the rates in Appendix A are in effect are unjust and unreasonable.

4. Decision No. 90642 is affirmed in all respects except as it is modified herein.

IT IS ORDERED that:

1. The Commission's orders in Decision No. 90642 are affirmed except as modified herein.

2. The Pacific Telephone and Telegraph Company (Pacific) is directed to file with this Commission, within fifteen days after the effective date of this order and in conformity with the provisions of General Order No. 96-A, revised tariff schedules with rates, charges, and conditions modified as set forth in Appendix A. The effective date of the revised tariff sheets shall be five days after the date of filing. The revised tariff schedules shall apply to service rendered on and after the effective date of the revised schedules, and the charges shall be collected subject to refund pending final determination of appeals with respect to the rate-making treatment of accelerated depreciation in Decision No. 87838 in determining a reasonable allowance for federal income tax expense.

3. General Telephone Company of California (General) may file with this Commission, after the effective date of this order and in conformity with the provisions of General Order No. 96-A, advice letters and revised proposed tariff

App-133

schedules with rates, charges, and conditions modified as set forth in Appendix B, subject to approval of the Commission by resolution action. The effective date of any revised tariff sheets shall be coincident with the implementation of the Zone Usage Measurement Plan or as otherwise authorized by Commission resolution. The revised tariff schedules shall apply to service rendered on and after the effective date of the revised schedule. At or prior to the time of filing said advice letter, General shall notify all affected customers of the proposed rate changes specified therein.

4. Ordering Paragraph 3 of Decision No. 90642 is revised to read as follows:
General and Pacific shall provide written notice of the conversion of all present free local calling routes to Zones 2 or 3 under the Zone Usage Measurement Plan or message toll service to all customers affected by said conversions within ninety days after the effective date of this order and again within ninety days prior to implementation of said conversions as said conversions are ordered herein. General and Pacific shall provide written notice to affected customers of all other ZUM plan changes within sixty days prior to implementation of such changes.

5. Ordering Paragraph 5 of Decision No. 90642 is revised to read as follows:
Pacific is authorized to implement Single Message Rate Timing in the exchanges and on the schedule set forth in Exhibit No. 34 (pages 11 through 33).

6. Ordering Paragraph 9 of Decision No. 90642 is revised to read as follows:
Pacific shall collect, analyze, and report to the Commission on a quarterly basis all pertinent data gained from actual experience with the Zone Usage Measurement Plan in the San Francisco-East Bay and Los Angeles Extended Areas. The format of the quarterly reports shall cover the period from date of implementation of the Zone Usage Measurement Plan to September 30, 1980 and shall be filed on November 30, 1980. Quarterly reports shall be filed for each calendar quarter thereafter within sixty days after the end of the quarter covered by each report.

7. Ordering Paragraph 23 of Decision No. 90642 is revised to read as follows:
Pacific and the telephone corporations listed in Appendix B of OII-33 shall, within thirty days of the effective date hereof, compute and submit to the Executive Director for his review and approval a computation of the appropriate amount of negative surcharge, consistent with the opinion and order in Decision No. 90316, to be applied to customers' bills in order to pass through any over-collection in revenues for the period from January 1, 1979 to the effective date of rates ordered herein. Upon approval by the Executive Director, Pacific and the telephone corporations listed in Appendix B of OII-33 shall proceed forthwith to apply said negative surcharge to customers' bills.

8. Ordering Paragraph 15 of Decision No. 90642 is revised to add subparagraph 15(c) as follows:
(c) Pacific shall prepare current cost studies together with rates based thereon for all tariff items intended for use by the handicapped, which have not been repriced within the three years preceding the date of this decision.

9. Ordering Paragraph 19 of Decision No. 90642 is revised to read as follows:
Pacific shall contract for the conduct of a survey to determine on a current basis the special needs of the handicapped population of California in using the telephone network. Particular attention shall be given to developing a reliable estimate of the number of handicapped and their communications requirements in each particular category of disability. The study shall address at least the topics covered in the study performed for Pacific by Firing & Associates in 1976 and 1977. A report shall be submitted to the Commission presenting the findings no later than nine months from the effective date of this order.

10. Public hearing on the limited issue of Pacific's cost of long-term debt and preferred stock shall be held before Administrative Law Judge Tomita in San Francisco starting on October 31, 1979. A prehearing conference shall be held on this matter at 10:00 a.m. on October 22, 1979 in San Francisco, before Judge Tomita.

11. Except as otherwise indicated herein, rehearing of Decision No. 90642 is denied.

The effective date of this order and of Decision No. 90642 as modified by this order is the date hereof.

Dated October 10, 1979, at San Francisco, California.

Commissioner Claire T. Dedrick, being necessarily absent, did not participate in the disposition of this proceeding.

Footnotes

a1    The $14.6 million represents the increase in revenue to Pacific resulting from the rates and charges authorized by the Commission in Decision No. 90309.

End of Document    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit F

3 CPUC 2d 49, 1979 WL 50927 (Cal.P.U.C.)

On rehearing of D 90642 (PT&T Co.) applicant granted additional
36.6 million dollar rate increase. (Comr. Dedrick not participating.)

Decision No. 91121
Application No. 58223, et al.

California Public Utilities Commission

December 18, 1979

APPEARANCES: *Sidney J. Webb*, for himself, interested party. *James D. Pretti* and *Dean J. Evans*, for the Commission staff.

Before Bryson, President, and Sturgeon, Gravelle and Grimes Jr., Commissioners.

BY THE COMMISSION:

 **\*1**  This opinion and order is the result of a rehearing of Decision No. 90642 on the limited and specific issue of The Pacific Telephone and Telegraph Company's (Pacific) cost of long-term debt and preferred stock pursuant to Ordering Paragraph 10 of Decision No. 90919 with respect to Application No. 58223 for a rate increase of approximately $470 million. Decision No. 90642 dated July 31, 1979 found that Pacific's jurisdictional revenue requirements should be reduced by approximately $42.2 million annually. Decision No. 90919 dated October 10, 1979 modified Decision No. 90642 by finding that a $1.3 million increase in Pacific's revenue requirements was reasonable instead of a reduction of $42.2 million.

Based on the additional evidence introduced in the reopened hearings, we find that Pacific's rate of return should be increased from 9.73 percent to 10.25 percent to reflect increased long-term debt and preferred stock costs on average year 1980 balances as shown below.

| Component | Capital Ratios | Cost Decision No. 90642 | Weighted Cost |
|---|---|---|---|
| Long-Term Debt.................... | 50.04 | 7.62 | 3.81 |
| Preferred Stock...................... | 4.24 | 7.51 | .32 |
| Common Equity.................... | 45.72 | 12.25 | 5.60 |
| Total...................................... | | | 9.73% |
| | | *Adopted* | |
| Long-Term Debt.................... | 50.04 | 8.64 | 4.32 |
| Preferred Stock...................... | 4.24 | 7.90 | .33 |
| Common Equity.................... | 45.72 | 12.25 | 5.60 |
| Total...................................... | | | 10.25% |
| | | Increase | .52 |

The revised adopted cost of capital is .52 percent higher than the 9.73 percent rate of return figure found reasonable in Decision No. 90642 and will require an additional increase in revenues of $36.6 million. The rate modifications authorized to generate Pacific's additional revenue requirements are as follows:

|  | *Annual Revenue (Dollars in Millions)* |
|---|---|
| Key Telephone Service......................................................... | $17.6 |
| Multi-Element Service Connection Charges........................ | 4.6 |
| Message Toll Service............................................................ | 15.1 |
| Settlement Effect of General's Decreases in Exchange Rates................................................................................... | (0.7) |
| Total....................................................................................... | $36.6 |

**\*2**  Prehearing conference on the reopened hearings was held on October 22, 1979 before Administrative Law Judge K. Tomita in San Francisco. Hearings were held on October 31, November 1, and 2 in San Francisco with the matter submitted on November 2, 1979 after oral arguments. The matter is now ready for decision.

The key issues in this proceeding are:
1. Should the Commission consider increased cost of debt and preferred stock for only 1979, or should it consider 1980 costs as well?

2. If 1980 debt and preferred costs are considered, should it be on an average year cost basis or on an end-of-year cost basis?

3. How should the increased revenue requirement be spread to offset the increased capital costs?

Pacific's treasurer, Robert M. Joses, testified for Pacific in support of and additional revenue requirement of $45,952,079 to give recognition to the increased cost of debt and preferred stock financing experienced or expected to be experienced in 1979 and 1980. In arriving at his computation, Mr. Joses stated that he used the capital ratios and return on common equity adopted in Decision No. 90642 and made the following calculations:
1. The cost of preferred stock was adjusted to reflect the cost of preferred stock actually outstanding at the present time. This results in a composite cost of 7.82 percent.

2. In determining the estimated cost of debt, the actual cost of debt at October 1, 1979 was the starting point. This cost was reduced by the cost of the issue that matures at November 15, 1979.

3. The planned issue of $300,000,000 of debentures in November 1979 is projected at 12½ percent cost.

4. The balance of short-term debt of $489,000,000 estimated to be outstanding at the end of 1979 is assumed to be converted to long-term debt at 12½ percent.

5. With respect to the 1980 financing, the assumed financings include 25 million shares of common stock and $191 million of maturing debt.

6. Three 1980 debenture issues of $287,450,000 each were assumed to have been issued at a cost of 12 percent, 11.5 percent, and 11 percent, respectively, with a resulting embedded cost for debt at year end 1980 of 8.93 percent.

The following tabulation compares the rate of return adopted in Decision No. 90642 with witness Joses' revised recommended rate of return, which Pacific considers will be reflective of costs Pacific will incur during the future period for which rates are being set.

|  | Capital Ratios | Decision No. 90642 | | Pacific's Recommended | |
|---|---|---|---|---|---|
|  |  | Cost | Weighted Cost | Cost | Weighted Cost |
| Long-Term Debt............................... | 50.04% | 7.62% | 3.81% | 8.93% | 4.47% |
| Preferred Stock.................................... | 4.24 | 7.51 | .32 | 7.82 | .33 |
| Common Stock.................................... | 45.72 | 12.25 | 5.60 | 12.25 | 5.60 |
| Total.................................... |  |  | 9.73% |  | 10.40% |

**\*3** Mr. Joes testified that inclusion of 1980 interest costs are reasonable as rates are being set for the future, and if Pacific is to have an opportunity to recover increased cost of debt and preferred stock in 1980, the overall rate of return must recognize 1980 costs. Mr. Joses further testified that although he assumed an equity offering during the first quarter of 1980, as a practical matter, such offering will not be possible unless substantial rate relief is obtained over and above the amount requested herein.

Mr. Ronald R. Banducci, Interservices staff director, testified on Pacific's rate spread proposal to produce $46 million additional revenue to Pacific after settlements. He recommended increases to the following:

| Key Telephone Service........................................................................... | $20.6 million |
|---|---|
| Multi-Element Service Connection Charges............................................. | 4.7 |
| Message Toll Services............................................................................ | 20.7 |
| Total....................................................................................... | $46.0 million |

Witness Banducci testified that although his first preference was to pass the entire increase to Key Telephone Service (KTS) since present rates do not fully cover all of the costs associated with KTS, he felt that Decisions Nos. 90642 and 90919 expressed concern about too abrupt a change in rates; therefore, he limited the increase to KTS to $20.6 million in recognition of the abrupt rate change rationale contained in the decisions.

For Multi-Element Service Connection Charges, Pacific proposes increasing the Premise Visit Charge and the Central Office Line Charge by $1.00 each to $6.00 and $9.00, respectively. The Premise Visit Charge increase is proposed to recover a greater portion of the costs of travel to a customer's premise to install or change telephone service, and the Central Office Line Charge increase is proposed to recover a greater portion of the costs incurred in establishing a central office connection.

Pacific also proposes to increase Message Toll rates as a move to reducing the rate disparity with the Interstate Message Toll Schedule by increasing Dial Day rates by one cent between 26 and 30 and 41 to 150 miles for the initial period and by one cent between 31 and 130 miles for the additional minute rates. Increases in coin rates over 20 miles are also proposed. These changes will increase total toll revenues by $20.7 million or 1.4 percent.

Pacific's witness further testified that should the Commission authorize an increase less than the $46 million additional revenue requested by Pacific, it recommends that the first $20.6 million be obtained by increasing KTS rates, the next $4.7 million by increasing Multi-Element Service Connection Charges, and finally any additional revenues authorized by increasing rates for Message Toll Services. Should the full $46 million increase be authorized, Pacific estimates that Settlements to Independent Companies will increase by $7.5 million.

**\*4**  Staff financial examiner Mowrey's adjusted rate of return after considering increased debt and preferred stock costs to Pacific was 10.25 percent compared to Pacific's 10.40 percent computation. The staff witness differed from Pacific's presentation in that he assumed Pacific's external requirements will be derived in the same proportion as the capital ratios found reasonable in Decision No. 90642 and by calculating the embedded cost of debt and preferred stock based on average year 1980 balances rather than on the end of year 1980 cost basis used by Pacific.

Mr. Mowrey justified his methodology by stating that Decision No. 90642 concluded that the capital ratios proposed by the staff in the original hearings in which the capital ratios were developed by imputing a capital structure consisting of common stock issues in place of debt instruments were reasonable. He further testified that his methodology in allocating Pacific's new money requirements for 1980 in the same proportion as reflected in the capital ratios adopted in Decision No. 90642 was being consistent with such decision.

Mr. Mowrey justified the use of average-year interest costs instead of costs based on end-of-year 1980 balances in this rehearing since Pacific had announced its plan to file for rate relief in November 1979 using a 1980 test year and, in addition, indicated that Pacific will be filing for general rate relief under the Commission's Regulatory Lag (NOI) Plan utilizing a 1981 test year. It was Mr. Mowrey's opinion that the use of average year balances, in such situations, will more accurately reflect Pacific's 1980 interest costs.

Mr. Mowrey's presentation was predicated on a three-year refund plan under the remand case to be comparable with Mr. Joses' calculations and also assumed no additional rate relief in 1980. Using Mr. Mowrey's methodology, the additional revenue requirement is calculated to be $36.6 million or $9.4 million less than using Pacific's methodology.

The staff's rate design proposals were made by David M. Shantz. The staff proposal is designed to produce a $17.6 million increase in KTS revenues, a $4.6 million increase in Multi-Element Service Connection Charges, and a $15.1 million increase in Message Toll Service or a $36.6 million increase after deducting $0.7 million for the settlement effect of General Telephone Company of California's (General) decreases in exchange rates.

The increases proposed by the staff in KTS rates generally followed Pacific's proposals but were of slightly lower magnitude. The increase in Multi-Element Service Connection Charges are identical, and the increases in Message Toll Service rates were basically similar to Pacific's proposal except for a one cent lower rate for Initial Period, Station, Dial, one minute Day Rate for 26-30 rate mileage, and a one cent lower rate for Each Additional Minute for 31-40 rate mileage.

**\*5**  Since changes in rates and charges for Pacific have an effect on General, the staff recommends that General's rates be increased by $18.2 million to offset the effect of revenue decreases resulting from Decision No. 90642, Decision No. 90919, and the $36.6 million the staff recommends Pacific's rates be increased in this rehearing.

Appendix B attached to Exhibit No. 156 is deisgned to produce the following increases for General.

|  | *Annual Billings (Dollars in Millions)* |
|---|---|
| Service Connection Charges................................................. | $1.7 |
| Private Branch Exchange Service........................................ | 3.0 |
| Key Telephone Service....................................................... | 8.7 |

Case 3:18-cv-05546-EMC   Document 124   Filed 06/07/19   Page 143 of 160

| | |
|---|---|
| Extensions........................................................................... | 4.3 |
| Premium Sets...................................................................... | 0.5 |
| Touch Calling Sets.............................................................. | - |
| Total................................................................................... | $18.2 |

The proposed rates and charges for General are considered by the staff to be consistent with the increases in rates and charges authorized for General as an offset in Decisions Nos. 90642 and 90919 and are also consistent with achievement of the staff goal of raising rates and charges for competitive services toward full cost levels.

City of San Francisco's (City of SF) position with respect to increased capital costs is that the Commission should only recognize increased interest and preferred dividend costs for 1979 and not adopt 1980 costs. Should the Commission decide that 1980 costs are to be used, the City of SF supports the adoption of witness Mowrey's average method. The City of SF also takes the position that capital costs incurred for the purpose of making refunds should be disallowed since they resulted from Pacific's imprudent actions.

In the area of rate design, the City of SF's position is that no further increase should be placed on KTS, as the Commission's findings in Dicision No. 90919 indicate that the Commission went about as far as it possibly could go in authorizing the massive increases to KTS in that decision. The City of SF further argues that in adopting a rate design in this proceeding the Commission must give consideration to the directory advertising increase authorized previously, as well as the timing effect of the deferral of Zone Usage Measurement Plan (ZUM) to May 1, 1980.

   **\*6**  California Interconnect Association (CIA) supports Pacific's use of end-of-year 1980 cost of capital figures. CIA also recommends that as a condition precedent to granting any increases in rates, Pacific be required to withdraw, or, in the alternative, the Commission reject Advice Letter 13352 which requests a reduction in rates for Dimension 2000 service and that Advice Letter 13381, seeking approval to market the "Horizon" at a capital cost of $5.5 million, be denied. If the Commission concludes that additional revenues are warranted, CIA recommends that the increases be made in the same proportions as recommended by the two rate design witnesses.

Mr. Webb argued that he interpreted Decision No. 90919 as contemplating the use of December 31, 1979 figures and should not involve short-term debt costs as used by Pacific and the staff. Under Mr. Webb's methodology, a rate of return of 9.96 percent with a $29,357,000 increase in gross revenues would be justified. He also agrued that no further debt should be authorized for Pacific until it issues additional common equity capital to improve its equity ratio.

Decision No. 90919 did not address itself as to whether the Commission was going to consider increased capital costs for only 1979 or whether 1980 costs should also be considered in this rehearing. Since this rehearing was held so late in 1979, we concur with both Pacific and the staff that it is appropriate to consider 1980 capital costs if Pacific is to have an opportunity to recover increased costs of debt and preferred stock in 1980. We do not, however, agree with Pacific's methodology as being appropriate in light of its announcement that a rate filing using a 1980 test period would be filed in November [1] and, furthermore, its announced intention to file a further application for additional rate relief in the first quarter of 1980 under the NOI procedure using a 1981 test year. Under such conditions, we agree with the staff that the use of average year 1980 debt costs will enable Pacific to recover the estimated increased capital costs it will expect to incur in 1980. We also agree with staff witness Mowrey's methodology in allocating 1980 capital requirements in the same

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

capital ratios found reasonable in Decision No. 90642 as being consistent with our language in Decision No. 90919 in which we stated that the capital ratios and the return on common equity adopted in Decision No. 90642 are reasonable. The City of SF argues that any increase in capital costs should not include increased financing necessary to make refunds, as such refunds were the result of managerial imprudence. The staff witness disagreed with the City of SF and stated that Exhibit No. 155 followed the dictates of Decision No. 90919. We agree with staff witness Mowrey and point out that the discussion on pages 32 through 35 related primarily to consideration of various risks claimed by Pacific as justifications for increasing the return on common equity to the level requested by Pacific. It is obvious that if Pacific is required to make refunds pursuant to Decision No. 87832 in the remand matter, such refunds would reduce the amount of internally generated funds available for capital expenditures and thereby necessitate additional external financing. We are of the opinion that it is appropriate to consider such costs in this proceeding.

 **\*7**  The issues raised by the City of SF in connection with directory advertising increases, as well as the revenue effect of the ZUM deferral, are matters that relate to the petition for stay and rehearing filed by the Cities of San Francisco, Los Angeles, and San Diego, which is currently under review by the Commission and should be addressed in a future order on such petition.

Mr. Webb argues that no further debt issues be authorized for Pacific unless it issues additional common stock. Our use of a theoretical capital structure in Decision No. 90642 together with language contained in Decision No. 90884 in Application No. 59090 concerning Pacific's most recent request for authorization to issue $300 million of debentures clearly sets forth this Commission's position that additional common equity offering in the immediate future is considered critical by this Commission if Pacific expects favorable action by the Commission on its various requests.

Both Pacific and staff witnesses offered rate design proposals that were quite similar, except as to revenue requirement. We do not agree with the City of SF's contention that Decision No. 90919 precludes the spreading of any additional increase authorized in this decision to KTS. Revised Rate Design Finding 88 in Decision No. 90919 states:

> "Because of the constraints of the overall revenue requirement authorized by this order, we cannot authorize increases in rates and charges for key telephone equipment to the levels recommended by either Pacific or the staff. Key telephone service rates are increased for a revenue effect of $47.3 million. Any anticompetitive effects of pricing this service below cost are outweighed by the overriding public interest in increasing these rates gradually to avoid undue customer disruption.

The additional revenue requirement authorized in this decision now enables us to adopt a rate design which will enable us to further increase those rates and charges which are provided below cost. We can still justify our action in not increasing such rates to fully cover costs by stating that overriding public interest in increasing these rates gradually to avoid undue customer disruption outweighs any anticompetitive effects of pricing below cost.

We do not adopt CIA's position that any increase in rates to Pacific be conditioned on Pacific's being required to withdraw or the Commission's rejecting Advice Letter 13352, which requests a reduction in rates for Dimension 2000 service and that Advice Letter 13381 seeking approval to market the "Horizon" be denied. It is proper to handle the advice letters separate from this decision based on the merits of the respective proposals.

Based on the additional evidence received in the rehearing of Decision No. 90642, we find:

 **\*8**  1. The following cost and weighted cost reasonably reflect capital costs which Pacific can be expected to experience in the year 1980:

| Component | Capitalization Ratios | Cost | Weighted Cost |
|---|---|---|---|
| Long-Term Debt............................ | 50.04% | 8.64% | 4.32% |
| Preferred Stock.............................. | 4.24 | 7.90 | .33 |
| Common Equity............................. | 45.72 | 12.25 | 5.60 |
| Total............................................. | | | 10.25% |

2. A rate of return of 10.25 percent, as compared to the 9.73 percent rate of return found reasonable in Decision No. 90642, will enable Pacific to have an opportunity to realize the 12.25 percent return on common equity found reasonable by Decision No. 90642, given the demonstrated higher cost of debt and preferred stock for 1980.

3. The additional revenue requirement resulting from the modified rate of return of 10.25 percent we find reasonable in this decision compared to the 9.73 percent rate of return found reasonable in Decision No. 90642 is $36.6 million.

4. It is reasonable to use average year 1980 cost of debt and preferred stock figures in arriving at our adopted rate of return in this decision as Pacific has announced its intention to file for a rate increase under the NOI procedure using a 1981 test year in the first quarter of 1980.

5. We will adopt as reasonable, the staff rate design proposal set forth in Appendix A of this decision. The adopted rate design is designed to yield a $36.6 million increase to Pacific and will result in changes in the following services:

| | Annual Revenue (Dollars in Millions) |
|---|---|
| Key Telephone Service......................................................... | $17.6 |
| Multi-Element Service Connection Charges........................ | 4.6 |
| Message Toll Service............................................................ | 15.1 |
| Settlement Effect of General's Decreases in Exchange Rates.................................................................................... | (0.7) |
| Total.................................................................................... | $36.6 |

Decrease

**\*9** 6. It is reasonable to adopt a rate design which spreads the additional revenue requirement to rates and charges for key telephone equipment as such service is still priced below cost.

7. Current premises visit and central office connection elements of Multi-Element Service Connection Charges are priced below the cost of providing these services.

8. It is reasonable to increase charges for premises visit element and central office connection element of Multi-Element Service Connection Charges to recover a larger portion of the costs associated with each element.

9. There will be less likelihood for customer confusion if the toll rate disparities between interstate and intrastate toll rates for similar distances are reduced.

10. It is reasonable to increase message toll rates particularly in the intermediate mileage range to more closely match the interstate message toll schedule.

11. The adopted rates and charges for Pacific in Decision Nos. 90642, 90919, and this decision will result in reduced revenues to General of $16.0 million because of settlements between General and Pacific. It is reasonable to recognize the reduced revenues to General by authorizing the filing of tariffs providing for $18.2 million increase in rates and charges for General which will provide General with $16.0 million additional revenues after uncollectibles and net settlement effect of increases in exchange rates. The staff-recommended rate design, which will find as reasonable, is set forth in Appendix B to this decision and is estimated to produce the following increases in annual billings:

|  | *Annual Billings ( Dollars in Millions)* |
|---|---|
| Service Connection Changes................................................. | $1.7 |
| Private Branch Exchange Service........................................ | 3.0 |
| Key Telephone Service........................................................ | 8.7 |
| Extensions........................................................................... | 4.31 |
| Premium Sets...................................................................... | 0.5 |
| Touch Calling Sets.............................................................. | - |
| Total.................................................................................... | $18.2 |

12. It is reasonable to offset the reduced revenues to General of $16.0 million by permitting General to file by advice letter increases in rates and charges for services provided by it, subject to Commission authorization by resolution action. General should provide notice to all its subscribers affected by such proposed changes.

13. The issues raised by the City of SF in connection with directory advertising increases, as well as the revenue effect of the ZUM deferral, are matters that relate to the petition for stay and rehearing filed by the Cities of San Francisco, Los Angeles, and San Diego, which is currently under review by this Commission and will be addressed in the future order on such petition.

 *10  14. In order that the ratepayers will be notified of the rate increases authorized herein, Pacific should place advertisements in newspapers of general circulation at least ten days prior to the rates becoming effective.

15. The effective date of this order should be the date hereof, as this order is intended to provide Pacific an opportunity to recover in rates the increased cost of debt and preferred stock it expects to incur in 1980.


Based on additional evidence offered in the partial rehearing of Decision No. 90642 as to the cost of long-term debt and preferred stock we conclude that:

1. Pacific's gross revenue requirements should be increased by an additional $36.6 million based on test year 1979 but reflecting expected increased long-term debt and preferred stock cost for 1980.

2. Rates and charges of Pacific should be modified and charged in accordance with Appendix A, attached hereto.

3. Pacific's rates and charges authorized herein by Appendix A are just and reasonable and present rates and charges, insofar as they differ from those prescribed herein, are for the future unjust and unreasonable.

4. Decisions Nos. 90642 and 90919 are affirmed in all respects except as it is modified herein.


IT IS ORDERED that:
1. The Pacific Telephone and Telegraph Company (Pacific) is authorized to file with this Commission, within fifteen days after the effective date of this order and in conformity with the provisions of General Order No. 96-A, revised tariff schedules with rates, charges, and conditions modified as set forth in Appendix A. The effective date of the revised tariff sheets shall be five days after the date of filing. The revised tariff schedules shall apply to service rendered on and after the effective date of the revised schedules, and the charges shall be collected subject to refund pending final determination of appeals with respect to the ratemaking treatment of accelerated depreciation in Decision No. 87838 in determining a reasonable allowance for federal income tax expense.

2. General Telephone Company of California may file with this Commission, after the effective date of this order and in conformity with the provisions of General Order No. 96-A, advice letters and revised proposed tariff schedules with rates and charges, and conditions modified as set forth in Appendix B, subject to approval of the Commission by resolution action. The effective date of any revised tariff sheets shall be coincident with the implementation of the Zone Usage Measurement Plan or as otherwise authorized by Commission resolution. The revised tariff schedules shall apply to service rendered on and after the effective date of the revised schedule. At or prior to the time of filing said advice letter, General Telephone Company of California shall notify all affected customers of the proposed rate changes specified therein.

 **11**  3. Pacific shall place advertisements in newspapers of general circulation that detail the rate increases authorized herein at least ten days prior to the effective date of the rates.

4. All motions in these proceedings not heretofore ruled on are denied.


The effective date of this order is the date hereof.

Dated December 18, 1979, at San Francisco, California.


Commissioner Clare T. Dedrick present but not participating.


Footnotes

1    Application No. 59269 filed November 13, 1979.

End of Document          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit G

22 Cal.3d 572

Supreme Court of California, In Bank.

INDUSTRIAL COMMUNICATIONS
SYSTEMS, INC., et al., Petitioners,

v.

PUBLIC UTILITIES COMMISSION, Respondent;
GENERAL TELEPHONE COMPANY OF
CALIFORNIA, Real Party in Interest.

S.F. 23581.
|
Oct. 27, 1978.
|
Rehearing Denied Nov. 30, 1978.

**Synopsis**

Three radio telephone utilities requested review of Public Utilities Commission's decision to permit telephone company, real party in interest, to institute proposed rates for one-way radio-paging service permitting customer in transit to be contacted by someone at stationary telephone. The Supreme Court, Newman, J., held that: (1) the Commission had earlier exceeded its authority in permitting real party in interest to provide, without certification, extensive two-way mobile service outside wireline exchange boundaries so that proposed one-way service in the same area as the two-way service would also be unlawful unless it were certified, and (2) approval of the one-way radio-paging service was unlawful because Commission did not consider and make findings concerning possible anticompetitive effect of alleged agreement between real party in interest and another telephone company not to compete in the area in which the service was to be provided.

Decisions annulled.

West Headnotes (3)

**[1]  Telecommunications**
  👉 Territory to Be Served

Under statute requiring telephone corporation before beginning construction of system or extension thereof to secure certificates of public convenience and necessity from Public Utilities Commission, except for extension which is within or to territory already served by it and which is necessary in ordinary course of its business, lawfulness of existing service should be shown before exception may be applied. West's Ann.Public Util.Code, § 1001.

1 Cases that cite this headnote

**[2]  Telecommunications**
  👉 Radio Paging

Public Utilities Commission exceeded its authority in permitting telephone company to provide, without certification of public convenience and necessity, extensive two-way mobile service outside wire line exchange boundaries; thus proposed one-way service in the same area as the two-way service would also be unlawful unless it were certified. West's Ann.Public Util.Code, §§ 489, 491, 1001, 1756, 1757.

1 Cases that cite this headnote

**[3]  Telecommunications**
  👉 Radio Paging

In absence of Public Utilities Commission's considering and making findings concerning anticompetitive effect of alleged agreement between two telephone companies not to compete in an area, approval of one telephone company's one-way radio-paging service in that area was unlawful. West's Ann.Public Util.Code, §§ 489, 491, 1001, 1756, 1757.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*574 \*\*\*14 \*\*864** Warren A. Palmer, San Francisco, for petitioners.

Janice E. Kerr, Hector Anninos, Scott K. Carter, Sheldon Rosenthal and Philip Scott Weismehl, San Francisco, for respondent.

WESTLAW  © 2019 Thomson Reuters. No claim to original U.S. Government Works.

*575 Albert M. Hart, H. Ralph Snyder, Jr., and Kenneth K. Okel, Santa Monica, for real party in interest.

**Opinion**

NEWMAN, Justice.

In May 1974, pursuant to Public Utilities Code sections 489 and 491,[1] General Telephone Company of California (General Telephone) filed with the Public Utilities Commission (Commission) certain changes in its tariffs for mobile telephone service. Rates were proposed for one-way radio-paging service in the Redlands/San Bernardino area. General Telephone previously had not offered that service in the area.[2]

[1] Section 489 provides that "every public utility other than a common carrier shall file with the commission . . . schedules showing all rates . . . to be collected or enforced. . . ."
Regarding changes, section 491 provides: "Unless the commission otherwise orders, no change shall be made by any public utility in any rate . . . except after 30 days' notice to the commission and to the public. Such notice shall be given by filing with the commission and keeping open for public inspection new schedules stating plainly the changes to be made . . . ."

[2] General Telephone already provided one-way paging in the adjacent Pomona/Ontario area; the Redlands/San Bernardino service would be coordinated with that one, so that a customer could be paged in both areas simultaneously. General Telephone also provided two-way mobile service in the Redlands/San Bernardino area and wireline service in much of both areas.

Involved here is a one-way radio-paging technique that permits a customer in transit to be contacted by someone at a stationary telephone. The stationary individual dials into the paging terminal an assigned, four-digit code number. A signal is transmitted by radio to the transiting person, who receives it as a tone emitted from a portable receiver. Two-way mobile service, which General Telephone already was providing in the area, also uses radio transmissions. It permits two-way voice communication rather than the simpler, one-way tone paging involved in General Telephone's proposed tariff modifications here.

***15 Protests against the proposed modifications were filed with the Commission by **865 two radiotelephone utilities (RTUs).[3] They provided *576 similar service in the area, and they requested that General Telephone's one-way service not be allowed to go into effect. The Commission suspended the new tariffs and instituted an investigation.[4] After several days of hearings, the Commission decided to end the investigation and to permit General Telephone to institute the proposed rates for its one-way paging (Dec. No. 86402, Case No. 975 (1974) —- Cal.P.U.C. —-). It denied rehearing and reconsideration in Decision No. 86706 ( ) —- Cal.P.U.C. —-.

[3] When first ruling, in 1961, that radiotelephone utilities are subject to its jurisdiction the Commission stated:
"For administrative purposes, to differentiate between those telephone utilities conducting a general wire line business within the State of California and those utilities conducting such business principally or exclusively by radio, the latter group will be referred to hereinafter as radiotelephone utilities." (Dec. No. 62156 (1961) 58 Cal.P.U.C. 756, 759.)

[4] The Commission stated it was investigating to determine "whether said tariff sheets are unreasonable or unlawful in any particular and to issue any order or orders that may be lawful and appropriate in the exercise of the Commission's jurisdiction in the premises."

Three RTUs requested review here. They allege (1) that the Commission's decision is unlawful because it permits General Telephone to extend its service without certification, and (2) that the Commission exceeded its authority when it investigated but did not adequately consider the anticompetitive aspects of the proposed service.[5] We agree with the complainants as to both contentions.

[5] Public Utilities Code section 1756 contemplates Supreme Court review "for the purpose of having the lawfulness of the original order or decision . . . inquired into and determined." Section 1757 provides: "The review shall not be extended further than to determine whether the commission has regularly pursued its authority. . . ."

I. Certification

Public Utilities Code section 1001 provides that, before a telephone corporation "begin(s) the construction of . . . a line, plant, or system, or of any extension thereof," the Commission must certify that "the present or future public convenience and necessity require or will require such construction."

General Telephone's proposed service requires (1) expansion of its terminal facilities in Pomona to accept up to 1,000 pager numbers (compared with the present 770 capacity), (2) installation of a new transmitter in Redlands, and (3) two foreign exchange lines for access to the Pomona terminal. The Commission found that "relatively little additional plant is required in order to institute the new service." The minimal construction needed for expansion apparently is peculiar to radiotelephone service. (See **577** Loperena v. Fresno Mobile Radio, Inc. (1970) 71 Cal.P.U.C. 645, 649: "It is technically practicable for an RTU offering selective two-way mobile communication to add one-way paging service throughout its two-way service area without any necessary additions to its transmitting equipment. . . .")

The RTUs contend that, even with minimal construction, General Telephone must obtain certification before offering the new service in Redlands/San Bernardino. Unless certificated, they say, the new service would be unlawful. General Telephone answers that the new service is exempted by these words of section 1001: "This article shall not be construed to require any such corporation to secure such certificate . . . for an extension within or to territory already served by it, necessary in the ordinary course of its business."

**[1]**   The Commission found that General Telephone now furnishes two-way mobile service throughout the Redlands/San Bernardino area where one-way service is proposed. It concluded that no certificate was needed because, under section 1001, the new service would constitute an "extension within or to territory already served . . ., necessary in the ordinary course of . . . ***16** (General Telephone's) business." [6] The **866** RTUs respond that certification nonetheless is necessary because the existing two-way service has never been certificated and thus itself is unlawful. Before the exception in section 1001 may be applied the lawfulness of the existing service should be shown.

[6]   In Loperena v. Fresno Mobile Radio, Inc. (1970) 71 Cal.P.U.C. 645 the Commission held that signaling

service concentric with existing, lawful two-way service requires no further certification because it is an extension "necessary in the ordinary course of business." The public interest thus is enhanced because mobile and paging services use the same equipment and personnel, resulting in lower costs and more efficient choice of service. (Id., at p. 650.)

At oral argument Commission counsel stated that General Telephone's two-way service in the area has been certificated. If so the company does lawfully provide that service and, under section 1001, may provide the new service without further certification. (Loperena, supra.) But nothing in the Commission opinion, record, or briefs indicates that the two-way service has been certificated; and, though we asked, the Commission has not provided us with a copy of any certification. We therefore examine the question of lawfulness assuming, as the Commission apparently did in its own opinion, that the two-way service never was certificated.

*578**   The Commission decided here that certification was not required for the two-way service because it covered territory already served by General Telephone's wirelines. [7] It found that "(t)he word 'territory' as used in that part of section 1001 of the Public Utilities Code reading '. . . extension within or to territory already served by it, necessary in the ordinary course of its business . . .' can and should denote, for mobile radiotelephone service by a land line telephone utility, that service area delineated by an appropriate signal strength contour which provides reasonable coverage of its pertinent exchanges And such adjacent area as necessary to provide a rational contour." (Italics added.) [8]

[7]   In Malis v. General Telephone Co. (1961) 59 Cal.P.U.C. 110 the Commission decided that mobile service by a wireline company within territory already served by wirelines did not require certification under section 1001.

[8]   The contour of a radio signal defines the area in which the signal can be received. The Commission has adopted the Federal Communications Commission (FCC) standard that locates the contour where a signal can be received at a certain strength (Dec.No. 62156 (1961) 58 Cal.P.U.C. 756, 760, approving the standard in FCC Rules part 21.504; Dec.No. 88513 (1976) —- Cal.P.U.C. —- (pp. 8-9), adopting the revised FCC standard in part 21.504 (47 C.F.R. s 21.504)). The size and shape of the area so defined vary with such factors as the location, elevation, and

585 P.2d 863, 150 Cal.Rptr. 13

power of the transmitter and the geography of the area (see, e. g., Industrial Communications Systems, Inc. v. R. L. Mohr (1972) 79 Cal.P.U.C. 110, 119, 122).

Using that definition the Commission concluded that General Telephone's uncertificated mobile service is lawful, even though the signal covers not only part of its own wireline area but also part of several Pacific Telephone and Telegraph Company exchanges. The Commission explained that "radio signals . . . cannot be arbitrarily confined to the fixed boundaries of telephone exchanges" and that section 1001 was "designed for classes of utilities with fundamentally different physical and operating characteristics than those of utilities in the radio communications field."

Because no special statutory scheme has been devised for radiotelephone communications, the Commission applies statutes not tailored to the new technology. Loperena, supra, 71 Cal.P.U.C. 645, was a case in which the Commission struggled to find a way to accommodate the physical and economic characteristics of radiotelephone service to the words of section 1001. Because it found the statute inadequate to provide uniform regulation of two-way radiotelephone expansion into one-way service, it applied the words in such a way as to remove completely such expansion from any regulation. In this case the Commission again adopted an interpretation that removes radiotelephone expansion from *579 regulation. But the reasons the Commission cited for its Loperena interpretation do not apply here. There, when mobile service expanded to include concentric paging service, ***17 additional construction would not always be necessary. Further, efficiency and **867 economy would be furthered by having the same supplier offer both services, using the same equipment and personnel. In contrast, when a wireline service expands to include mobile service, construction is typical rather than atypical; and the same equipment and personnel are not necessarily used. Also, Loperena concerned a new service concentric with and entirely within the existing service area, while the mobile service area here is quite different in size and shape from the original service. The Commission's interpretation here appears to exempt from certification an indefinite amount of radiotelephone expansion by wireline companies. It permits uncertificated expansion into "such adjacent area as necessary to provide a rational contour" but does not indicate any limit to the size of a "rational contour." Complainants state that the radio

contour area here is three times larger than General Telephone's wireline area.[9] The ratio of a radio contour area to a wireline area apparently could depend on the shape and size of the wireline exchange and the location of the transmitting tower within it, as well as the shape and size of the contour itself (see fn. 8, Ante.) Without limits on "a rational contour" the Commission's definition seems to be not an interpretation but rather a contradiction of the words of section 1001, resulting in partial deregulation (Cf. Pacific Tel. & Tel. Co. v. So. Pacific Communications Co. (1974) 78 Cal.P.U.C. 123, 126-128).[10]

[9]     A map in the exhibits seems to show a lesser but still significant difference.

[10]    Radio signals cannot be confirmed exactly to the shape of a wireline exchange. We note, however, that the Commission has authorized radiotelephone service contours that, unlike this one, include only minor variations from otherwise required boundaries (e. g., "a nonessential portion," Dec.No. 85955 (1974) —- Cal.P.U.C. —- (p. 5); "approximately co-terminus with the boundaries of the (wireline exchanges)," Industrial Communications Systems, Inc. v. Pomona Radio Dispatch Corp. (1973) 75 Cal.P.U.C. 433, 438).

The Commission emphasizes that wireline boundaries cannot accurately describe or confine a radiotelephone service area. We disagree with the Commission's conclusion that therefore all General Telephone's radiotelephone service area exceeding its wireline boundaries should be treated for certification purposes as if it were within those boundaries. On the contrary, new service to a large area that is more than incidentally outside the authorized service boundaries should be considered an extension by the wireline company into territory not already served by it. Otherwise, as this case illustrates, new service will be permitted in *580 previously unserved territory without certification, in contradiction of the clear mandate of section 1001.[11]

[11]    This decision concerns only radiotelephone service by wireline companies and does not address the Commission's earlier ruling that an RTU's radiotelephone service area should not be described or restricted by the boundaries of a wireline company's exchange (Radio Dispatch Corp. (1974) —- Cal.P.U.C. —- (Dec.No. 84819)).

To require certification for wireline utilities' initial radiotelephone extension into new territory does not reject

the Commission policy of fostering limited competition
between wireline utilities and RTUs. (Malis v. General
Telephone Co., supra (1961) 59 Cal.P.U.C. 110, 115-116;
see also Dec.No. 85356 (1976) 79 Cal.P.U.C. 404, 457-458;
the FCC's Guardband Proceeding (1968) 12 F.C.C.2d
841, recon. den. 14 F.C.C.2d 269, affirmed Sub nom.,
Radio Relay, Corp. v. F. C. C. (2d Cir. 1969) 409 F.2d
322.) But the competition should be allowed only after
a commission determination of public convenience and
necessity. In making that determination the Commission
would consider factors related to the beneficial effect of
competition (e. g., adequacy of existing service). (Dec.No.
85356 (1976) 79 Cal.P.U.C. 404, 428; Silver Beehive
Telephone Co. (1970) 71 Cal.P.U.C. 304, 307.) Indeed,
as we discuss below, the Commission is required in
certification proceedings to consider competition as an
element of the public interest.

In this case the Commission's approval of the tariffs did
seem to resemble a certification ***18 decision. While it
did not make a finding of or issue a certificate of public
**868 convenience and necessity, it did find the service to
be in the public interest after discussion of several factors
that also would be required in making a certification
decision.

Complainants maintain, though, that by avoiding a
certification proceeding General Telephone avoided "the
procedural and substantive guidelines prescribed by
the Commission." One significant difference between a
certification proceeding and this one is that in the former
determination of public convenience and necessity is
required. Here, though, the Commission analyzed facts
that happen to be relevant to certification only because
a complaint by competitors led to an investigation.
Further, in a certification proceeding the burden is on
the applicant to show that the public convenience and
necessity require the proposed service.[12] Here the burden
was on complainants. In addition, the Commission's rules
require that a certification application include *581
information that was not included in the tariff letters
here because certification was not requested (names
of prospective competitors, maps, facts showing public
convenience and necessity, etc.; see Cal.Admin.Code, tit.
20, s 18).

[12]     Decision No. 85356, Supra, 79 Cal.P.U.C. 428.

[2]     We conclude that the Commission exceeded its
authority by permitting General Telephone's tariff
changes. Because the extensive two-way mobile service

outside the wireline exchange boundaries is unlawful
without certification, the proposed one-way service in the
same area without a certification hearing also would be
unlawful.

## II. Issues as to Competition

Complainants contend that the Commission improperly
excluded evidence of a regional plan, agreed to
by General Telephone and Pacific Telephone, to
provide paging service jointly and separately throughout
southern California. They offered the evidence to show
possible antitrust and anticompetitive effects of General
Telephone's new service.

"It is no longer open to serious question that in
reaching a decision to grant or deny a certificate of
public convenience and necessity, the Commission should
consider the antitrust implications of the matter before
it." (Northern California Power Agency v. Public Util.
Com. (1971) 5 Cal.3d 370, 377, 96 Cal.Rptr. 18, 23, 486
P.2d 1218, 1222.) Even if the matter were not treated as
a certification proceeding, the Commission agrees that
it had a duty to consider anticompetitive factors as an
element of the public interest affected by the new service.
By excluding evidence of a plan the Commission here
seems to have failed to fulfill that duty.

[3]     Complainants sought to introduce evidence of the
regional plan to show that Pacific Telephone and General
Telephone had agreed to supply radiotelephone service
jointly in some areas and to divide other areas between
them. The Redlands/San Bernardino area at issue here
allegedly was among the areas to be divided.

The Commission offers several reasons for excluding
the evidence. First, it relies on Commission and FCC
policies to favor competition between wireline companies
and RTUs. (Malis v. General Telephone Co., supra,
59 Cal.P.U.C. 110.) Malis, however, did not imply
that competition between wireline companies and RTUs
should be promoted by eliminating *582 competition
between the wireline companies themselves. Second, the
Commission explains that the plan here is too broad
to be relevant because (1) this proceeding is limited
to a small geographical area; (2) the paging service
would not be provided jointly with Pacific Telephone
but only by General Telephone; and (3) there is no
evidence of an agreement that Pacific Telephone would

Industrial Communications Systems, Inc. v. Public Utilities Com..., 22 Cal.3d 572 (1978)

585 P.2d 863, 150 Cal.Rptr. 13

refer its customers in the area to General Telephone. That reasoning ignores the possibility that General Telephone's exclusive presence in the Redlands/San Bernardino market is the result of an agreement to divide the market. Finally, the Commission ***19 contends that the evidence should have been introduced in another case pending at **869 the time, involving the Los Angeles area, where anticompetitive factors were material issues. That those issues may have been material in another case does not justify excluding the evidence here. The agreement allegedly concerned the entire southern California paging market. That the other case involved a larger area and a joint service does not explain refusal to consider the plan in reference to a smaller area where allegedly the plan stated that only one wireline company would provide service.

We note that Northern California Power, supra, requires consideration of antitrust issues where "a close nexus exists" between the construction to be approved by the Commission and an agreement presenting antitrust problems. (5 Cal.3d at p. 380, 96 Cal.Rptr. 18, 486 P.2d 1218.) In line with that decision the Commission in other cases has limited the scope of investigation (to avoid delays in needed facilities) by excluding "antitrust implications (that) have only tangential impact on the primary matter before the Commission." (Dec.No. 81186 (1973) 75 Cal.P.U.C. 101, 114, mod. in Dec.No. 81422 (1973) 75 Cal.P.U.C. 227.) While some evidence offered here may have been tangential, the evidence of an agreement including the Redlands/San Bernardino area does seem closely related to General Telephone's expansion into that area.

As for evidence on the joint plan that was admitted, the Commission's opinion does not analyze the issues raised. This court stated in Northern California Power, supra, 5 Cal.3d at 379, 96 Cal.Rptr. at 24, 486 P.2d at 1224, "The task of the Commission extends far beyond the passive role of a sounding board. The Commission cannot discharge its duty by merely taking 'cognizance (of the evidence)' without evaluating (its) effect upon the interests of the public. It must weigh the opposing evidence and arguments in order 'to determine whether the rights and interests of the general public will be advanced by the prosecution of the enterprise which it is proposed to **583

carry on for the service of the public.' (Oro Electric Corp. v. R. R. Commission (1915) 169 Cal. 466, 475, 147 P. 118.)" The Commission must also make findings of fact and conclusions of law relevant to all material issues. (5 Cal.3d at p. 380, 96 Cal.Rptr. 18, 486 P.2d 1218.)

Here the Commission looked only for evidence as to practices by General Telephone in the Pomona/Ontario/Redlands/San Bernardino area, and it ignored the regional plan issue. While the plan itself was excluded, two internal General Telephone memos on the proposed service in the limited area were admitted (one stating, "Deviation from the Personal Signaling Service Fundamental Plan for the Southern California Region has not been concurred in by PT&T"; the other noting that "it will be necessary to negotiate a revision to the Personal Signaling Fundamental Plan which depicts frequency allocation and is presently concurred in by both PT&T and General Companies"). A material issue as to anticompetitive effect in the Pomona/Ontario/Redlands/San Bernardino area seems clearly raised by such evidence, but the Commission did not fulfill its duty to address that issue. Its discussion of the overall, beneficial effects of competition between RTUs and General Telephone did not take into account how that competition might be affected by the regional plan.

We hold that the record here does not support the Commission's interpretation and application of the "territory already served" exception in section 1001. Further, approval of General Telephone's paging service was unlawful because the Commission did not consider and make findings on the anticompetitive effect of any agreement not to compete in that area. However, we express no opinion as to whether such an agreement in fact would have an anticompetitive effect or whether notwithstanding that effect the proposed service would still be in the public interest.

The decisions are annulled.

BIRD, C. J., and TOBRINER, MOSK, CLARK, RICHARDSON and MANUEL, JJ., concur.

**All Citations**

22 Cal.3d 572, 585 P.2d 863, 150 Cal.Rptr. 13

---

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit H

California Trucking Assn. v. Public Utilities Com., 19 Cal.3d 240 (1977)

561 P.2d 280, 137 Cal.Rptr. 190

🚩 KeyCite Yellow Flag - Negative Treatment

Declined to Extend by In re Order Instituting Rulemaking, Cal.P.U.C., March 15, 2006

19 Cal.3d 240, 561 P.2d 280, 137 Cal.Rptr. 190

CALIFORNIA TRUCKING
ASSOCIATION, Petitioner,

v.

PUBLIC UTILITIES COMMISSION, Respondent

S.F. No. 23473.

Supreme Court of California

March 24, 1977.

**SUMMARY**

An association, representing trucking companies subject to regulation by the Public Utilities Commission, sought review in the Supreme Court of orders of the commission exempting the transportation of flattened automobile bodies from minimum rate schedules and canceling minimum rates for the transportation of empty sea vans. The association, on being invited to comment in advance on such proposed orders, had responded with written objections to the ex parte handling of the matter suggested by the commission and to the "public interest" assertions by its staff, but the commission had refused the association's demand for a hearing and denied its petition for reconsideration. The Supreme Court held that under existing statutes, including Pub. Util. Code, §§ 726, 3662, the commission was not required to set, or to keep in force, minimum rates for such carriers but that Pub. Util. Code, § 1708, relating to the amendment of its orders, is not satisfied merely by giving a party the opportunity to submit written objections; if the party requests a hearing, it must at the very least be permitted to prove the substance of its protest as prescribed in Pub. Util. Code, § 1705, pursuant to which parties are entitled to be heard and to introduce evidence. In the instant case, therefore, Pub. Util. Code, § 1708, had been violated by the commission, and the Supreme Court annulled the commission's orders accordingly.(Opinion by Mosk, J., with Tobriner, Acting C. J., Clark and Richardson, JJ., Sullivan, J., [*] and Draper, J., [†] concurring.) **241

**HEADNOTES**

**Classified to California Digest of Official Reports**

(1a, 1b, 1c)

Public Utilities § 10--Public Utilities Commission-- Fixing and Modifying Rates--Specialized Carriers--Demand for Hearing.

Though under existing statutes, including Pub. Util. Code, §§ 726, 3662, the Public Utilities Commission is not required to set minimum rates for the transportation of flattened automobile bodies or empty sea vans, the commission's orders exempting such carriers from, and canceling, minimum rates previously established by the commission were, under the circumstances, invalid and therefore subject to annulment. After an association, representing trucking companies subject to regulation by the commission, had responded to the proposed orders by written objections to the ex parte handling of the matter suggested by the commission and to the "public interest" assertions by its staff, the commission, in violation of Pub. Util. Code, § 1708, had refused the association's request for a hearing to permit proof of the substance of its protest, and denied its petition for reconsideration of its orders.

(2)

Public Utilities § 16--Public Utilities Commission-- Orders--Demand for Hearing.

Regardless of consistent administrative construction to the contrary, Pub. Util. Code, § 1708, providing in part that the Public Utilities Commission "may at any time, upon notice to the parties, and with opportunity to be heard as provided in the case of complaints, rescind, alter, or amend any order or declaration made by it," is not satisfied merely by giving a party the opportunity to submit written objections to proposed orders. If the party requests a hearing, it must at the very least be permitted to prove the substance of its protest as prescribed in Pub. Util. Code, § 1705, pursuant to which parties are entitled to be heard and to introduce evidence and the commission must issue process to enforce the attendance of witnesses.

[See Cal.Jur.2d, Public Utilities and Services, §§ 114, 120; **Am.Jur.2d,**Public Utilities, § 266.]

(3)

Case: 3:19-cv-05546-EMC   Document 124   Filed 06/07/19   Page 157 of 160

Public Utilities § 10--Public Utilities Commission--Fixing and Modifying Rates--Carriers--Minimum Rates.

Pub. Util. Code, § 3662, providing in part that the Public Utilities Commission "shall ... establish or approve just, reasonable, and nondiscriminatory maximum or minimum or maximum and minimum rates to becharged *242 by any highway permit carrier for the transportation of property ..." does not mandate the commission to set minimum rates under all circumstances, nor does it mandate the setting of maximum rates where minimum rates are inappropriate. The commission may set either type of rate, or no rate at all.

(4)

Public Utilities § 10--Public Utilities Commission--Fixing and Modifying Rates--Carriers.

Pub. Util. Code, § 726, providing in part that in any rate proceeding where more than one type or class of carrier is involved the Public Utilities Commission "shall consider all such types or classes of carriers, and ... fix as minimum rates ... the lowest of the lawful rates so determined for any such type or class of carrier ..." does not mandate the commission to set such rates, or to retain them once they have been set. The statute merely sets forth the test to be applied when they are set.

COUNSEL

Richard W. Smith, Paul Biancardi and Arlo D. Poe for Petitioner.

Richard D. Gravelle, J. Calvin Simpson and John S. Fick for Respondent.

**MOSK, J.**

In a proceeding initiated by the Public Utilities Commission (commission), minimum rates which had been previously set for the transportation of certain commodities were cancelled. Prior to that action, parties affected by the proposed ruling were afforded the opportunity to comment thereon. California Trucking Association [1] requested a hearing on the matter, but the commission refused. California Trucking asserts that the commission was required to grant its request for a hearing and is required by statute to maintain minimum rates for transportation of the commodities in question. *243

On September 12, 1976, the commission issued a "white paper" which contained a proposal from its staff that the transportation of flattened automobile bodies by motor carrier be exempted from minimum rates previously established by the commission. The announced reasons for the recommendation were that there was only a limited demand for such transportation, that few carriers were engaged in hauling flattened automobile bodies, and that the exemption proposed would not lead to disruptive rate practices.

A copy of the report was sent to various "interested parties," including California Trucking, with a letter soliciting comments and suggestions, and declaring that in the absence of substantial objection, but subject to possible modifications suggested by the parties, it would be recommended to the commission that the revision be adopted as an ex parte order. California Trucking protested in writing that the commission was required by law to set minimum rates, and objected to the "suggested ex parte handling" of the matter and to "the public interest representations of the staff." Subsequently the commission, in Decision No. 85585, adopted the exemption recommended by its staff.

Substantially the same procedure was followed with respect to the exemption from minimum rates of empty sea vans. The exemption was recommended on the ground that the transportation characteristics of such vans differ considerably from those of general commodities. California Trucking objected to the proposed exemption on the same grounds it had previously advanced with respect to flattened automobile bodies, and demanded a hearing. In Decision No. 85584, the commission adopted the proposal and ordered that the rates be cancelled. [2] Thereafter, it denied California Trucking's petition for reconsideration of the orders cancelling minimum rates.

**I**

() We consider first whether, in cancelling the rates previously set, the commission was required to hold a hearing at the request of California Trucking.

() The determination of this issue turns upon the construction of the statutes governing the authority of the commission. Section 1708 provides in part, "The commission may at any time, upon notice to the *244 parties, and with opportunity to be heard as provided in the case of complaints, rescind, alter, or amend any order or decision made by it. ..." [3] The commission asserts that a "trial type hearing" is not required, and that the

opportunity to comment upon a proposal of the staff satisfies the command of section 1708 that a prior order be altered only after "opportunity to be heard."

We cannot agree with this contention. The phrase "opportunity to be heard" implies at the very least that a party must be permitted to prove the substance of its protest rather than merely being allowed to submit written objections to a proposal. The recommendation to cancel the rates was based upon factual determinations made by the staff of the commission, i.e., the peculiar characteristics of the transportation of the commodities in question and the need for regulation of their rates. The challenge of California Trucking to the conclusions of the staff report included an objection to "the public interest representations of the staff." Under these circumstances equation of permission to merely protest in writing with the requirement of section 1708 that there be afforded an "opportunity to be heard" clearly cannot be rationalized. [4] In a case involving a virtually identical Colorado statute, it was held that the opportunity to file a protest did not comport with the statutory requirement for an "opportunity to be heard." (*Consolidated Freight. Corp. of Del. v. Public U. Com'n.* (1965) 158 Colo. 239 [406 P.2d 83, 90].) [5]

Moreover, section 1708 provides that when the commission alters or rescinds a prior order the opportunity to be heard must be afforded "as provided in the case of complaints." The procedure applicable to **\*245** hearings on complaints filed by the commission on its own motion, as occurred here, is prescribed in sections 1701-1706. Section 1705 requires a hearing at which parties are entitled to be heard and to introduce evidence, and the commission must issue process to enforce the attendance of witnesses. [6]

The commission points out that it has modified minimum rates many times in the past without a trial-type hearing, and relies upon the general proposition that consistent administrative construction of a statute is entitled to great weight and will not be overturned unless clearly erroneous. (*City of Los Angeles v. Public Utilities Com*. (1975) 15 Cal.3d 680, 696 [125 Cal.Rptr. 779, 542 P.2d 1371].) The commission cites a number of its decisions in this connection, but it does not indicate whether in those matters a hearing was requested by any of the parties asked to comment on proposed actions by the

commission. If no party seeks to challenge a proposed order except by merely submitting written comments on its merits, the commission is not required to hold a hearing. In any event, the statutory provisions in section 1708 are so clear as to the necessity for a hearing that the commission's consistent failure to grant hearings in prior cases cannot be deemed determinative. [7] In view of this conclusion, it is not necessary to consider the assertion of California Trucking that it was entitled to a hearing under the due process guarantees of the federal and state Constitutions.

California Trucking also contends that it was deprived of notice by the "white paper" procedure adopted by the commission. Its real complaint in this regard does not appear to be that it failed to receive notice of the proposed change but that other carriers which might have been interested in the proceeding were not notified by publication or otherwise. Since California Trucking had notice of the proposed action, **\*246** we need not decide whether the notice was defective as to other parties who are not before us with a claim that they were improperly deprived of notice. [8]

## II

() We consider next the argument of California Trucking that the commission must maintain minimum rates in effect under the provisions of section 726. That section provides in part, "In any rate proceeding where more than one type or class of carrier ... is involved, the commission shall consider all such types or classes of carriers, and ... fix as minimum rates ... the lowest of the lawful rates so determined for any such type or class of carrier. ..." [9]

() Section 3662 provides, "The commission shall ... establish or approve just, reasonable, and nondiscriminatory maximum or minimum or maximum and minimum rates to be charged by any highway permit carrier for the transportation of property ...."

California Trucking appears to concede that under the provisions of section 3662, the commission is vested with discretion to determine whether or not to establish minimum rates to be charged by highway permit carriers. Since the section provides that the commission may set either maximum *or* minimum rates, it cannot be said that it mandates the commission to set minimum rates under all circumstances. [10]

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:18-cv-05546-EMC  Document 124  Filed 06/07/19  Page 159 of 160

() But, insists California Trucking, the terms of section 726 are mandatory in character, requiring the commission to set minimum rates whenever more than one type or class of carrier is involved in a rate proceeding. Therefore, since the cancelled rates involve more than one type of carrier, section 726 is applicable and the commission must promulgate or retain minimum rates for flattened automobile bodies and *247 empty sea vans. The commission, on the other hand, interprets section 726 as merely setting forth the test to be applied when minimum rates are set, rather than as requiring the commission to set such rates.

In our view, the commission's construction of section 726 is correct. The provision that the commission shall fix "as" the minimum rate the lowest of the lawful rates implies the standard by which minimum rates are to be determined rather than the requirement that such rates be set. California Trucking provides no policy justification for interpreting the section so as to require the setting and maintenance of minimum rates in all circumstances. In the present proceeding, for example, if, as the report of the commission's staff indicates, the exemption of flattened automobile bodies would not lead to destructive rate practices, there seems little justification to require the commission to set minimum rates for the transportation of such commodities. (See *Cal. Mfrs. Assn. v. Public Utilities Com.* (1954) 42 Cal.2d 530, 534 [268 P.2d 1].)

Prior decisions of the commission are consistent with its present position. Thus, in the very proceeding in which statewide minimum rates for highway common carriers were first established, some commodities were exempted from the regulations "due to the peculiarities attending the transportation thereof." (Establishment of Minimum

Rates (1938) 41 C.R.C. 671, 708.) In other decisions the commission has refused to establish minimum rates because the record failed to demonstrate "an obvious or persuasive need in the public interest" and the establishment of such rates would not have a meaningful effect on the transportation involved (Minimum Rate Tariff No. 16 (1966) 65 Cal. P.U.C. 730, 740), or because the public interest did not require the establishment of minimum rates (*Highway Carriers Association v. Public Utilities Com.* (1972) Dec. No. 80134).

The contention of California Trucking that these decisions are distinguishable because they involve the refusal by the commission to establish minimum rates for a particular commodity rather than, as here, the cancellation of rates previously established, is without merit in interpreting section 726. If, as California Trucking argues, the commission has a mandatory duty to set minimum rates under the section, then that duty would apply equally to the initial establishment of rates and their cancellation.[11] *248

() We conclude that the commission, under existing statutes, is not required to set minimum rates for the transportation of flattened automobile bodies or empty sea vans. However, the commission erroneously denied California Trucking an opportunity to be heard as required by law.

The orders of the commission are annulled.

Tobriner, Acting C. J., Clark, J., Richardson, J., Sullivan, J.,[*] and Draper, J.,[†] concurred.

---

Footnotes

[*]   Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

[†]   Assigned by the Chairman of the Judicial Council.

[1]   The association (hereinafter California Trucking) is a nonprofit corporation the membership of which includes companies engaged in the for-hire transportation of property and subject to regulation by the commission.

[2]   These decisions were implemented in part by Decisions Nos. 85586 and 85587.

[3]   All statutory references in this opinion are to sections of the Public Utilities Code.

[4]   At oral argument, the commission cited *Phillips Petroleum Co. v. Federal Power Com'n.* (10th Cir. 1973) 475 F.2d 842, 848-851, which holds that, although the Natural Gas Act requires the Federal Power Commission to hold a hearing in fixing rates, a rule by that agency which allows a party only the opportunity to submit written material does not violate the act. The court relied primarily upon a decision of the United States Supreme Court which emphasized the necessity of streamlining administrative methods in rate fixing and allowed the determination of rates through group or class

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

proceedings. The decision does not squarely meet the contention of the petitioner that a "hearing," as required by the act, means a proceeding at which a party may appear and exercise such rights as the opportunity for cross-examination, but merely assumes under certain circumstances that these rights may be dispensed with. In any event, *Phillips* is concerned with a federal act and is thus not persuasive authority.

5    The issues in that case were remarkably similar to those involved here. There, also, the public utilities commission cancelled prior rates without a hearing, and the issues were whether the statutes required the commission to retain minimum rates and whether a hearing was required prior to the cancellation of rates. The court held that under the statutes applicable there, minimum rates were mandatory.

6    Section 1707 authorizes the commission to hear a complaint ex parte if the complaint is filed by a public utility, but, as stated above, since the present proceeding was instituted by the commission, the provisions of sections 1701 to 1706 are applicable and 1707 is inapposite.

7    The commission asserts that a holding that a hearing is only required if one is requested would mean that the Legislature has delegated the right to require trial-type hearings to private litigants. However, there is nothing remarkable in the concept that one who is entitled to a hearing may waive his right thereto by failing to assert it.

Another contention of the commission is equally unmeritorious. It implies that if we hold that section 1708 requires a hearing where one is requested prior to the modification of a minimum rate previously promulgated, prior orders of the commission modifying such rates without hearing would be rendered unlawful. It is obvious, however, that the failure of parties to request a hearing or to seek review of the commission's refusal to grant that right waives any error in this regard, and that decisions of the commission which are now final are not affected by our holding.

8    Nor is it necessary to consider the argument of California Trucking that the notice afforded to it by the commission was defective in various respects. These assertions were either not raised before the commission in the petition for reconsideration or the deficiencies alleged will be substantially corrected by our holding that section 1708 requires the commission to hold a hearing in the circumstances presented here.

9    The commission does not dispute the assertion of California Trucking that more than one type of carrier is involved in the transportation of flattened automobile bodies and empty sea vans.

10   Nor can it be argued that the provision requires the setting of maximum rates where minimum rates are inappropriate. The thrust of the section is to allow the commission to set either type of rate, or no rate at all.

11   California Trucking also relies upon a statement in *Cal. Mfrs. Assn. v. Public Utilities Com., supra,* 42 Cal.2d 530, 534, that sections 726, 3662, and other provisions of the Public Utilities Code, considered together, establish "a pattern of rate regulation guaranteeing to all carriers the right to compete with each other on equal terms but subject to minimum rates developed for the type or class of carrier best suited economically to perform a particular service." That case was concerned with whether the commission had employed the proper method in calculating a minimum rate, and it did not discuss whether the commission was compelled to set such a rate.

*    Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

†    Assigned by the Chairman of the Judicial Council.

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.