United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DIVA LIMOUSINE, LTD.,

               Plaintiff,

       v.

UBER TECHNOLOGIES, INC., et al.,

               Defendants.

Case No.  18-cv-05546-EMC

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS, AND DENYING WITHOUT PREJUDICE PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Docket Nos. 33, 113

     Plaintiff Diva Limousine ("Diva"), a licensed provider of livery services in California, brings this putative class action on behalf of providers of pre-arranged ground transportation services against Uber Technologies and its subsidiaries ("Uber").  Diva alleges that Uber secures unlawful cost savings by misclassifying its drivers as independent contractors instead of employees.  In doing so, Uber takes business and market share from competitors like Diva who operate their businesses in compliance with the law.  Diva also alleges that Uber, armed with cash from investors, prices its services below cost in order to drive out competitors.  Diva asserts that Uber's actions violate the California Unfair Competition Law ("UCL") and the California Unfair Practices Act ("UPA").

     Pending before the Court are Uber's motion to dismiss Diva's First Amended Complaint and Diva's motion for partial summary judgment on the issue of driver misclassification.  *See* Docket Nos. 33, 113.  For the reasons discussed below, Uber's motion to dismiss is **GRANTED in part** and **DENIED in part**, and Diva's motion for partial summary judgment is **DENIED without prejudice**.

# I.   **BACKGROUND**

A.   Factual Background

The First Amended Complaint alleges the following.  Diva is a licensed provider of limousine and chauffeur-driven ground transportation services in California.  Docket. No. 106 ("FAC") ¶ 39.  Diva maintains affiliate relationships with limousine companies outside of California.  *Id.* ¶ 44.  These out-of-state affiliates refer clients who are looking to book rides in California to Diva and receive a fee or commission for the referral.  *Id.*

Uber is a company that "provides prearranged transportation services for compensation using an online-enabled application or platform."  *Id.* ¶ 4.  According to Diva, two aspects of Uber's business unlawfully undermine competition and cause harm to Diva.  First, "Uber willfully misclassifies its California drivers as independent contractors" in violation of the California Labor Code.  *Id.* ¶ 90.  Diva alleges that Uber drivers should properly be classified as employees under California law because the drivers are integral to Uber's business and Uber "controls the precise manner in which the driver delivers Uber's service."  *Id.* ¶¶ 69, 106 (emphasis removed).  By misclassifying its drivers, Uber avoids paying minimum and overtime wages and providing benefits to its drivers as employees, saving it "a massive amount of money" and allowing it to lower prices, taking market share from competitors like Diva.  *Id.* ¶¶ 90, 112, 125.

Second, Uber prices its rides "at a level that is far below the total average costs attributable to those rides with the purpose of injuring competition."  *Id.* ¶ 129.  Because Uber charges less for rides than the costs of providing the rides, it has "consistently lost massive amounts of money." *Id.* ¶ 131.  Uber is able to continue operating at a loss because of substantial influxes of cash provided by investors.  *Id.* ¶ 147.  "The only rational purpose for Uber subsidizing rides as it has done and continues to do is to drive enough competitors out of business to be able to raise prices down the road."  *Id.* ¶ 146.

As a result of these practices, since Uber began operating in Los Angeles, Diva has lost corporate and retail client business, and has been compelled by Uber's lower prices not to raise its own rates in line with expenses.  *Id.* ¶¶ 41–42.  It has also received fewer referrals from its out-of-state affiliates.  *Id.* ¶ 43.  Diva asserts two causes of action: a claim under the UCL, premised on

2

1    Uber's alleged misclassification of its drivers, *id.* ¶ 127, and a claim under the UPA, premised on

2    Uber's alleged loss-leader pricing, *id.* ¶¶ 162–63.  Diva seeks injunctive relief under the UCL and

3    damages and injunctive relief under the UPA.  *Id.* ¶¶ 50, 60.

4         Diva seeks to certify two classes of Plaintiffs.  The UCL class includes "[a]ll business

5    entities that earned revenue through the provision of pre-arranged limousine or chauffeur-driven

6    ground transportation services for non-shared rides in California from September 10, 2014 to the

7    present." *Id.* ¶ 47.  The UPA class is defined identically, with the exception that the class period

8    runs from September 10, 2015 to the present.  *Id.* ¶ 57.

9    B.   Procedural Background

10        Diva filed its class action complaint on September 10, 2018.  Docket No. 1.  It then filed a

11   motion for partial summary judgment on a "single issue": whether Uber drivers are properly

12   classified as independent contractors or employees under the California Supreme Court's recent

13   ruling in *Dynamex Operations W. v. Superior Court*, 416 P.3d 1 (Cal. 2018).  Docket No. 33 ("PSJ

14   Mot.").  Uber requested that the pending PSJ motion "be held in abeyance subject to a further

15   scheduling order" or "denied without prejudice as premature under the one-way intervention rule."

16   Docket No. 48.  The Court ordered briefing on the one-way intervention issue.  Docket No. 98.

17        Uber moved to dismiss Diva's original complaint in January 2019.  Docket No. 100.  Diva

18   responded by filing the FAC.  Docket No. 106.  Uber then moved to dismiss the FAC under

19   Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).  Docket No. 113 ("Mot.").  The motion to

20   dismiss and the one-way intervention question on the PSJ motion are currently before the Court.

21                          **II.      LEGAL STANDARDS**

22        Under Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss for lack of

23   subject matter jurisdiction.  When subject matter jurisdiction is challenged, "the party seeking to

24   invoke the court's jurisdiction bears the burden of establishing that jurisdiction exists." *Scott v.*

25   *Breeland*, 792 F.2d 925, 927 (9th Cir. 1986).  A Rule 12(b)(1) motion will be granted if the

26   complaint, considered in its entirety, fails on its face to allege facts sufficient to establish subject

27   matter jurisdiction. *See Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 (9th Cir.

28   2003).

United States District Court
Northern District of California

United States District Court
Northern District of California

1     Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint

2  for failure to state a claim.  To overcome a Rule 12(b)(6) motion to dismiss, a plaintiff must plead

3  "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v.*

4  *Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads

5  factual content that allows the court to draw the reasonable inference that the defendant is liable

6  for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility

7  standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a

8  defendant has acted unlawfully."  *Id.* (internal quotation marks omitted).

9     On a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true

10  and construe[s] the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St.*

11  *Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  The Court need not, however,

12  "assume the truth of legal conclusions merely because they are cast in the form of factual

13  allegations."  *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (internal

14  quotation marks omitted).  Thus, "a Plaintiff's obligation to provide the 'grounds' of his

15  'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the

16  elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*,

17  478 U.S. 265, 286 (1986)).

18               **III.**    <u>**UBER'S MOTION TO DISMISS**</u>

19  A.   <u>Subject Matter Jurisdiction</u>

20     Diva asserts that this Court has subject matter jurisdiction over the claims in this case

21  under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).  FAC ¶ 26.  CAFA "vests

22  the district court with 'original jurisdiction of any civil action in which the matter in controversy

23  exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in

24  which' the parties satisfy, among other requirements, minimal diversity."  *Abrego Abrego v. The*

25  *Dow Chem. Co.*, 443 F.3d 676, 680 (9th Cir. 2006) (quoting 28 U.S.C. § 1332(d)).  Minimal

26  diversity exists where "any member of a class of plaintiffs is a citizen of a State different from any

27  defendant."  28 U.S.C. § 1332(d)(2)(A).

28     The FAC alleges that Uber is incorporated in Delaware and headquartered in San

United States District Court
Northern District of California

1   Francisco.  FAC ¶¶ 17–21.  For diversity purposes, then, Defendants are citizens of Delaware and

2   California.  *See* 28 U.S.C. § 1332(c)(1) ("[A] a corporation shall be deemed to be a citizen of

3   every State and foreign state by which it has been incorporated and of the State or foreign state

4   where it has its principal place of business . . . .").  Each of the two putative classes in this action

5   are a combination of "limousine and chauffeur-driven ground transportation services *within*

6   California" and "business entities *outside of* California" that have affiliate relationships with in-

7   state Plaintiffs.  FAC ¶¶ 48 (UCL class), 58 (UPA class) (emphases added).  The in-state Plaintiffs

8   are not diverse from Uber; they have California citizenship in common.  Thus, the CAFA minimal

9   diversity requirement is only met if at least one out-of-state affiliate within each putative class is a

10  citizen of a state other than Delaware or California.

11          Diva alleges that these affiliates are, indeed, "not citizens of California."  *Id.* ¶ 27.  The

12  FAC recites a statistic that 84 percent of the approximately 17,300 limousine and chauffeur-driven

13  ground transportation companies in the United States have their principal place of business in

14  states other than California, and that "the overwhelming majority of these companies . . . are also

15  incorporated in states other than California."  *Id.* ¶ 28.  As a result, Diva submits that it can be

16  "reasonably estimated" that there are out-of-state affiliates in each putative class that are not

17  citizens of California.  *Id.* ¶ 29.  These allegations are insufficient to establish minimal diversity.

18  "Absent unusual circumstances, a party seeking to invoke diversity jurisdiction should be able to

19  allege affirmatively the actual citizenship of the relevant parties."  *Kanter v. Warner-Lambert Co.*,

20  265 F.3d 853, 857 (9th Cir. 2001) (citation omitted).  The FAC does not identify any specific out-

21  of-state affiliates or their states of citizenship.  Nor does the FAC expressly allege that the out-of-

22  state affiliates are not citizens of Delaware.

23          Diva attempts to remedy its pleading deficiency by supplying supplemental facts relevant

24  to jurisdiction with its opposition brief.  A declaration from Diva's Chairman, Bijan Zoughi,

25  identifies at least thirteen limousine companies with which Diva has had affiliate relationships

26  within the last four years; none of the affiliates is based in California or Delaware.  *See* Docket

27  No. 114-2 ¶¶ 5–7.  In addition, public records show that each of the thirteen affiliates is

28

5

incorporated in and has its principal place of business in a state other than California or Delaware.[1]
*See* Docket No. 114-4, Exhs. A–N.  These facts, if considered, would establish minimal diversity
because they demonstrate that multiple members of the putative classes are citizens of states
different from Uber.  Uber does not dispute this; its reply merely urges the Court to order Diva to
amend its complaint to properly allege these facts instead of allowing Diva to establish them in via
extrinsic submissions.  *See* Docket No. 117 at 3.

The Ninth Circuit has articulated the general framework for determining when a court may
consider extrinsic evidence to resolve a jurisdictional challenge:

> A Rule 12(b)(1) jurisdictional attack may be facial or factual.  In a
> facial attack, the challenger asserts that the allegations contained in a
> complaint are insufficient on their face to invoke federal
> jurisdiction.  By contrast, in a factual attack, the challenger disputes
> the truth of the allegations that, by themselves, would otherwise
> invoke federal jurisdiction. . . .  In resolving a factual attack on
> jurisdiction, the district court may review evidence beyond the
> complaint without converting the motion to dismiss into a motion
> for summary judgment.

*Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (citations omitted).  Under
this framework, a plaintiff would ordinarily be permitted to submit evidence beyond what it
alleged in its complaint when the defendant mounts a factual attack on jurisdiction.  *See id.*  Here,
however, Uber is arguing that the allegations in the FAC are insufficient, even if taken as true, to
establish minimal diversity—a facial attack.  "[C]ourts do not consider evidence outside the
pleadings when deciding a facial attack."  *United Poultry Concerns v. Chabad of Irvine*, No.
SACV1601810ABGJSX, 2017 WL 3000019, at *1 (C.D. Cal. Jan. 20, 2017); *MVP Asset*
*Management (USA) LLC v. Vesbirk,* No. 2:10-cv-02483-GEB-CMK, 2011 WL 1457424, *1 (E.D.
Cal. Apr. 14, 2011) (same).

---

[1] Diva requests judicial notice of these public records.  The Court can properly take judicial notice
of these documents because they are public records provided by government agencies and their
authenticity is not disputed.  *See* Fed. R. Evid. 201 (allowing a court to take judicial notice of a
fact "not subject to reasonable dispute in that it is . . . capable of accurate and ready determination
by resort to sources whose accuracy cannot reasonably be questioned"); *Daniels-Hall v. Nat'l
Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) ("It is appropriate to take judicial notice of this
information, as it was made publicly available by government entities . . . , and neither party
disputes the authenticity of the web sites or the accuracy of the information displayed therein.").
The Court, however, cannot take judicial notice of the facts in the Zoughi declaration.

United States District Court
Northern District of California

1    Because the FAC on its face does not allege sufficient facts to establish subject matter

2    jurisdiction, Uber's Rule 12(b)(1) motion to dismiss is **GRANTED**.  Diva may amend its

3    complaint within 30 days of the date of this Order to incorporate the new facts establishing

4    minimal diversity.  Notwithstanding the dismissal on jurisdictional grounds, the parties agreed at

5    the hearing that the Court must still address Uber's arguments for dismissing Diva's claims on the

6    merits, since resolution of those arguments informs the potential futility and scope of any

7    amendment.  The Court therefore proceeds to determine the viability of Diva's UPA and UCL

8    claims.

9    B.    UPA Claim

10    The UPA makes it "unlawful for any person engaged in business within this state to sell

11    any article or product at less than the cost thereof to such vender, or to give away any article or

12    product for the purpose of injuring competitors or destroying competition."  Cal. Bus. & Prof.

13    Code § 17043.  Diva alleges that Uber's practice of offering rides as a loss leader[2] with the intent

14    of driving competitors out of the market violates the UPA.  FAC ¶¶ 162–63.  Uber argues that

15    Diva's UPA claim fails as a matter of law because a statutory provision exempts Uber from UPA

16    liability.  The UPA expressly exempts two categories of services, articles, or products from its

17    coverage:

18          Nothing in this chapter applies:

19          (1)   To any service, article or product for which rates are established
20                under the jurisdiction of the Public Utilities Commission of this
                State and sold or furnished by any public utility corporation, or
21                installation and repair services rendered in connection with any
                services, articles or products.

22          (2)   To any service, article or product sold or furnished by a
                publicly owned public utility and upon which the rates would
23                have been established under the jurisdiction of the Public
                Utilities Commission of this State if such service, article or
24                product had been sold or furnished by a public utility
                corporation, or installation and repair services rendered in
25                connection with any services, articles or products.

26

27   _____

28   [2] The UPA defines "[l]oss leader" as "any article or product sold at less than cost . . . [w]here the
     effect is to divert trade from or otherwise injure competitors."  Cal. Bus. & Prof. Code § 17030(c).

7

United States District Court
Northern District of California

Cal. Bus. & Prof. Code § 17024.

Uber believes it falls within the first exemption. Diva disagrees. Their dispute centers on the meaning of the phrase "for which rates are established under the jurisdiction of the Public Utilities Commission."[3] To Uber, this phrase indicates that "it does not matter *who* sets the rates, as long as the rates are established *under the jurisdiction* of the CPUC." Mot. at 11 (emphases in original). Diva, on the other hand, interprets the phrase as applying only to rates *actually established by* the CPUC; it is not enough that the CPUC has the authority to set rates but has not exercised it. Opp. at 8 ("The narrowly-defined exemption . . . . only exempts rates that have been established by the CPUC."). This distinction is critical because while "the parties do not dispute that the CPUC has authority to regulate Uber," Diva alleges that "the CPUC has never used that authority to set Uber's rates." *Id.* at 14; *see* FAC ¶¶ 83–88 (allegations regarding the CPUC's jurisdiction over Uber).

The plain language of the statute and the case law interpreting § 17024 support Uber's position.

1.    Statutory Text and Related Provisions

"[I]n all cases of statutory interpretation, we begin with the language of the governing statute." *Beal Bank, SSB v. Arter & Hadden, LLP*, 42 Cal. 4th 503, 507 (2007); *see Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009). By its terms, the exemption in § 17024(1) covers "any service, article or product for which rates are established under the jurisdiction of the Public Utilities Commission." Notably, the statute does not say "rates *established by* the Public Utilities Commission." This undercuts Diva's assertion that a public utility only qualifies for the exemption if its rates are actually established by the CPUC. Rather,

---

[3] The parties are in accord that Uber is a "public utility corporation" within the meaning of § 17024(1). "'Public utility' includes every common carrier . . . where the service is performed for, or the commodity is delivered to, the public or any portion thereof." Cal. Pub. Util. Code § 216(a). A "common carrier," in turn, "means every person and corporation providing transportation for compensation to or for the public or any portion thereof." *Id.* § 211. "Whenever any common carrier . . . performs a service for, or delivers a commodity to, the public or any portion thereof for which any compensation or payment whatsoever is received, that common carrier . . . is a public utility subject to the jurisdiction, control, and regulation of the commission and the provisions of [the California Public Utilities Act]." *Id.* § 216(b).

United States District Court
Northern District of California

1    the lack of specificity as to who must set the rates suggests that the legislature did not intend to

2    limit the exemption to public utilities whose rates are actually set by the CPUC.  *Cf. Dean v.*

3    *United States*, 556 U.S. 568, 572 (2009) ("The passive voice focuses on an event that occurs

4    without respect to a specific actor . . . .").

5            Diva counters that "[w]ith respect to establishing rates, this provision refers to no actor

6    other than the CPUC," so it must be the CPUC that is setting the rates.  Opp. at 12–13.  Diva cites

7    *Coso Energy Developers v. Cty. of Inyo*, 122 Cal. App. 4th 1512 (2004), in which the court held

8    that one clause in a statute written in the passive voice is not ambiguous where the statute

9    "includes no language suggesting an actor other than the State of California."  *Id.* at 1525.  But the

10   statute in *Coso* differs from the statute at issue here in one critical respect—it identified the actor

11   in the active voice in the clause immediately preceding the passive clause.  In full, the statute

12   provided:

13           The State of California hereby cedes to the United States of America
             exclusive jurisdiction over such piece or parcel of land as may have
14           been or may be hereafter ceded or conveyed to the United States,
             during the time the United States shall be or remain the owner
15           thereof, for all purposes except the administration of the criminal
             laws of this State and the service of civil process therein.
16

17   *Id.* at 1523.  The appellant in *Coso* insisted that the second clause, "land as may have been or may

18   be hereafter ceded or conveyed to the United States," means that "California cedes exclusive

19   jurisdiction over 'all land ceded to the United States *without limitation as to time or identity of the*

20   *ceding party.*'"  *Id.* (emphasis in original).  The court disagreed because the first clause, "[t]he

21   State of California hereby cedes," clearly specifies that "the subject of the sentence and lone actor"

22   is the State of California and dispels any ambiguity that might otherwise have been created by the

23   passive voice in the second clause.  *Id.* at 1525 ("It is reasonable to infer that the undisclosed actor

24   in the second clause is the same actor specified in the first; the lack of disclosure in the second

25   instance can be attributed to the desire to avoid redundancy.").  In marked contrast, § 17024(1)

26   nowhere identifies a rate-setting actor.  It is therefore not amenable to the narrow reading Diva

27   advocates.

28           The applicability of § 17024(1) does not turn on whether the CPUC has actually set rates.

United States District Court
Northern District of California

As Uber points out, the California Public Utilities Code expressly provides that it is within the CPUC's discretion to regulate public utilities within its jurisdiction, including by setting rates, but that the CPUC is not required to do so in all instances.  *See* Cal. Pub. Util. Code § 701 ("The commission may supervise and regulate every public utility in the State and may do all things . . . necessary and convenient in the exercise of such power and jurisdiction."); *id.* § 728.5(a) ("The commission may establish rates or charges for the transportation of passengers and freight by railroads and other transportation companies . . . .").  Similarly, the California Constitution provides that the CPUC "*may* fix rates for all public utilities subject to its jurisdiction[.]"  Cal. Const. Art. XII, § 6 (emphasis added); *see also id.*, Art. XII, § 4 (CPUC "may fix rates and establish rules for the transportation of passengers").  This context lends credence to the notion that the rates established by a public utility which are merely subject to the CPUC's jurisdiction are "rates are established under the jurisdiction of" CPUC irrespective of whether the CPUC actually exercises its rate setting authority.[4]

The broader interpretation of § 17024 is supported by the fact that the statutory scheme allows the CPUC to consider anticompetitive concerns when regulating public utility corporations like Uber.  As alleged, Uber is a "charter-party carrier of passengers" under the Public Utilities Code.  *See* FAC ¶ 4; Cal. Pub. Util. Code § 5360 ("'[C]harter-party carrier of passengers' means every person engaged in the transportation of persons by motor vehicle for compensation, whether in common or contract carriage, over any public highway in this state.").  The CPUC is given broad authority to "supervise and regulate every charter-party carrier of passengers in the State and may do all things, whether specifically designated in this part, or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction."  Cal. Pub. Util. Code § 5381.  In particular, charter-party carriers are required to obtain "a certificate [of] public convenience and necessity" from the CPUC to operate.  *Id.* § 5371.  In granting a certificate of public convenience and necessity, the CPUC "may attach to the permit or certificate such terms

---

[4] To be sure, the statute is not without ambiguity.  Section 17024 does not, for instance, refer to rates "subject to regulation by" CPUC—language which would have made the broader reach of the exemption clear.

United States District Court
Northern District of California

and conditions as, in its judgment, are required in the public interest." *Id.* § 5375.  Although the

Public Utilities Code does not expressly require the CPUC to weigh anticompetitive concerns,

courts have observed that "the PUC undoubtedly does 'take antitrust considerations into account

in determining whether a [transaction] will advance the public interest.'"[5]  *McCaw Pers.*

*Commc'ns, Inc. v. Pac. Telesis Grp.*, 645 F. Supp. 1166, 1171 (N.D. Cal. 1986) (alteration in

original) (quoting *N. California Power Agency v. Pub. Util. Com.*, 5 Cal. 3d 370, 377 (1971)).

That the CPUC retains authority to address anticompetitive behavior in regulating charter-party

carriers suggests that the legislature intended to leave to the CPUC the field of regulating and

monitoring prices of utilities under its jurisdiction.

Diva's statutory arguments to the contrary are not persuasive.  First, Diva purports to rely

on the plain text of the statute:

> A plain reading of Section 17024(1) shows that the exemption only
> applies to a service, such as an Uber ride, "*for which rates are*
> *established*" by the CPUC.  By reading these critical words out of
> the statute, Uber invites the Court to violate fundamental canons of
> statutory interpretation.

Opp. at 11 (emphasis in original).  But it is Diva who reads critical words out of the statute,

ignoring the operative phrase "under the jurisdiction of" from § 17024(1) and replacing it with "by

the CPUC."  *See Abbott Labs. v. Franchise Tax Bd.*, 175 Cal. App. 4th 1346, 1359 (2009)

("Deleting the language . . . from [the statute] rewrites the statute to give the statute a purpose

quite different than the one enacted by the legislature.").

Second, Diva argues that "Uber's interpretation of Section 17024(1) cannot be harmonized

with Section 17024(2)."  Opp. at 11.  Whereas § 17024(1) exempts privately owned public utilities

from the UPA's proscriptions, § 17024(2) exempts publicly owned public utilities for which rate-

---

[5] Uber has also cited examples of the CPUC considering risks of anticompetitive behavior in
regulating rates for other common carriers.  For instance, in 1990 the CPUC adopted a flexible rate
program for the trucking industry whereby "common carriers [were] allowed rate freedom within
a zone of reasonableness."  *Regulation of Gen. Freight Transp. by Truck*, 35 C.P.U.C. 2d 307, 307
(Feb. 7, 1990).  In those proceedings, the CPUC made clear that "[t]he principal reason for
regulation of utility rates in general is to prevent monopoly pricing due to restriction of supply."
*Id.* at 334.  The decision to implement a flexible rate-setting mechanism was "based upon a
finding that workable competition exists" within the industry, and the CPUC pledged to
"continuously monitor the degree of competition and quality of service" under the new scheme.
*Id.* at 334, 353.

United States District Court
Northern District of California

setting authority belongs to municipalities rather than the CPUC.  *See Cty. of Inyo v. Pub. Utilities Com.*, 26 Cal. 3d 154, 165–66 (1980).  Diva asserts that because the two categories of exemptions are analogous, if Uber is correct that § 17024(1) applies to privately owned public utilities whose rates *could* be set by the CPUC, then § 17024(2) would have been written to apply to publicly owned public utilities whose rates "*could have been* established under the jurisdiction of" the CPUC if they had been privately owned.  Opp. at 11–12.  Instead, § 17024(2) applies to publicly owned public utilities whose "rates *would have been* established under the jurisdiction of the Public Utilities Commission of this State if such service, article or product had been sold or furnished by a public utility corporation."  Cal. Bus. & Prof. Code § 17024(2) (emphasis added).

Diva reads too much into the statute.  The "would have been" language in § 17024(2) has a much simpler and logical purpose, as one court explained recently:

> The fact that the private companies are, and the publicly owned entities are not, under the jurisdiction of the PUC, explains the difference in wording in the two subsections: the "would have been" counter factual (or subjunctive) phrase is used in subsection (2) because the PUC doesn't normally have jurisdiction over the public entities.  It is fair, however, to otherwise view the two subsections as creating the same immunity under essentially the same circumstances, thus placing the private utility corporations on equal footing with publicly owned utilities.

*Actions v. Uber Techs.*, No. CJC-17-004925, 2018 Cal. Super. LEXIS 1913, at *6 (Cal. Super. Ct. Mar. 2, 2018), *appeal docketed*, No. A154694 (First App. Dist., Div. One).

Third, Diva points to California Public Utilities Code § 2106 as evidence that the legislature did not intent to "broadly immunize public utilities" from liability via § 17024.  Opp. at 14.  Section 2106 authorizes a private right of action against public utilities.  Even by Diva's description, however, § 2106 only "enshrine[s] a general rule that [public utilities] are liable for violations of the law."  Opp. at 14.  As such, it does not override an express statutory exemption, like § 17024, created by the legislature.

2.    Case Law

No higher court in California has definitively construed § 17024(1), but the Court of Appeal in *Hladek v. City of Merced*, 69 Cal. App. 3d 585 (1977) provided an analysis of § 17024(2) that also illuminates the scope of § 17024(1).  In *Hladek*, a privately owned "dial-a-

bus, dial-a-ride" service sued the City of Merced under the UPA for starting a competing transportation service that allegedly operated at a loss. *Id.* at 588. The City's service was a publicly owned public utility, raising the question whether was exempt from UPA liability under § 17024(2). In resolving the question, the court held that "the pivotal issue is whether the Public Utilities Commission *would have* the jurisdiction to establish the rates for such service if it had been sold or furnished by a privately owned public utility." *Id.* at 590 (emphasis added).

As Uber points out, and the Superior Court in *Actions v. Uber Technologies* observed, *Hladek* supports Uber's interpretation of § 17024(1) because "*Hladek* considered only whether the PUC would have had jurisdiction; it did not consider whether the PUC did in fact, or would, *exercise* its jurisdiction." 2018 Cal. Super. LEXIS 1913, at *6 (emphasis in original). The Superior Court in *Actions* accordingly concluded that "[w]hen [*Hladek*'s] analysis is applied to § 17024(1), then the immunity kicks in to the extent[] the PUC 'does have the jurisdiction to establish the rates for such service.'" *Id.* at *6–7.

Notably, Judge White of this Court has also cited *Hladek* in dismissing with prejudice UPA claims brought in two cases against Uber. In *Desoto Cab Company, Inc. v. Uber Techs., Inc.*, No. 16-cv-06385, Docket No. 64 at 17 (N.D. Cal. Sept. 24, 2018), Judge White noted, "California courts have determined that the section 17024(1) exception . . . applies where the CPUC has the jurisdiction to establish a utility's rates," and therefore "applies if Uber is a public utility."); *see also A White and Yellow Cab, Inc. v. Uber Techs., Inc.*, No. 15-cv-05163, Docket No. 114 at 12 (same).

The courts that have addressed the issue have so concluded that the CPUC is not required to actually establish rates in order for § 17024(1) to apply. This Court agrees.

3.     The Filed Rate Doctrine

Diva makes one final argument for construing the § 17024(1) exemption narrowly by analogizing § 17024 to the federal filed rate doctrine. Opp. at 10. The filed rate doctrine is "a judicial creation" that "bar[s] challenges under state law and federal antitrust laws to rates set by federal agencies." *E. & J. Gallo Winery v. Encana Corp.*, 503 F.3d 1027, 1033 (9th Cir. 2007) (citation omitted). There is no state-law equivalent of the filed rate doctrine in California. *See*

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 992–93 (9th Cir. 2000) (citing *Cellular Plus, Inc., v. Superior Court*, 14 Cal. App. 4th 1224 (1993)).  Diva asserts that the California Legislature intended for § 17024 to function as an analogous exemption to UPA liability for public utilities whose rates are actually set by the CPUC: "in the face of private litigation contesting public utilities rates, the Legislature needed to create a narrow safe-haven for rates approved by state regulators akin to the filed-rate doctrine.  Section 17024 accomplishes this exact purpose." Opp. at 10.  But Diva cites no authority—legislative history or otherwise—for this claim. Moreover, the same argument was made and rejected in *Actions v. Uber Technologies*.  The Superior Court in *Actions* pointed out that "[t]he filed rate doctrine is judge made," and "doesn't affect the patent right of the legislature to step in and independently limit the reach of its own laws." *Actions v. Uber Techs.*, 2018 Cal. Super. LEXIS 1913, at \*8.  There is simply no support for Diva's claim that § 17024 must be construed as narrowly as the filed rate doctrine.

    4.   <u>Conclusion</u>

The plain language of § 17024(1) indicates that the exemption should be construed to apply to all public utilities over which the CPUC has rate-setting authority.  Accordingly, Diva's UPA claim is **DISMISSED with prejudice**.

C.   <u>UCL Claim</u>

The UCL proscribes business practices that are (1) unlawful, (2) unfair, or (3) fraudulent. Cal. Bus. & Prof. Code § 17200.  Each prong of the UCL provides a separate and distinct basis of liability.  Here, Diva alleges that Uber's deliberate decision to misclassify its drivers as independent contractors to save costs is both "unfair" and "unlawful" under the UCL.  FAC ¶ 127. The "unfair" prong creates a cause of action for a business practice that is unfair even if it is not proscribed by some other law.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003).  The "unlawful" prong prohibits "anything that can properly be called a business practice and that at the same time is forbidden by law." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (internal quotation marks omitted).

Uber contends that Diva's claim under the "unfair" prong fails because Uber's alleged conduct does not violate antitrust laws, and that the claim under the "unlawful" prong fails

because causation is not sufficiently alleged.

### 1.    "Unfair" Prong

The California Supreme Court has held that "a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice" must allege "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech*, 20 Cal. 4th at 186–87. "[A]ny finding of unfairness to competitors under section 17200 [must] be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." *Id.* The parties agree that Diva is a direct competitor to Uber, and thus must meet the pleading standard articulated in *Cel-Tech*. *See* Opp. at 19. Uber contends that the allegations in the FAC reveal that Uber's misclassification of drivers results in *more* competition and lower prices for consumers, which means that no antitrust laws were violated even if Diva lost business. Mot. at 18.

Uber is correct that "the antitrust laws' prohibitions focus on protecting the competitive process and not on the success or failure of individual competitors." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 902 (9th Cir. 2008). Thus, "the antitrust laws do not punish economic behavior that benefits consumers and will not cause long-run injury to the competitive process," even if individual competitors may suffer. *Id.* at 903. But of course, economic behavior does not passes muster simply because it might result in lower prices. Courts must "distinguish robust competition from conduct with long-term anticompetitive effects" and ward "against conduct which unfairly tends to destroy competition itself." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458–59 (1993). Predatory pricing can harm competition in the long run.

Diva claims that Uber's conduct crossed the line from robust competition to unfair anti-competition. In particular, the FAC alleges that Uber's misclassification of drivers "violates the policy or spirit of the antitrust laws and threatens an incipient violation of antitrust law, including but not limited to monopolization and/or attempted monopolization under Section 2 of the Sherman Antitrust Act." FAC ¶ 126. However, this conclusory allegation is not accompanied by specific facts that would support a Sherman Act claim. In order to state a claim for

monopolization under Section 2 of the Sherman Act, a plaintiff must prove: (1) possession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury. *SmileCare Dental Grp. v. Delta Dental Plan of California, Inc.*, 88 F.3d 780, 783 (9th Cir. 1996) (citation omitted). And to state a claim for attempted monopolization, the plaintiff must show: (1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct to accomplish the monopolization; (3) dangerous probability of success; and (4) causal antitrust injury. *Id.* The FAC, as currently pleaded, does not speak to many of these elements, so Diva's "unfair" prong claim cannot be sustained by its bare allegations of Sherman Act violations.

However, *Cel-Tech* taught that it is not just conduct that threatens a violation of an actual antitrust law that supports a UCL unfairness claim. Equally actionable is conduct that "violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech*, 20 Cal. 4th at 186–87. Here, Diva has alleged that Uber's misclassification of drivers allows it to shirk its legal obligations under the California Labor Code and Wage Orders issued by the California Industrial Welfare Commission to provide adequate pay and benefits to its drivers. *See* FAC ¶¶ 112–14, 123. The California Supreme Court recently condemned precisely this kind of misclassification practice as a form of unfair competition:

> [T]he risk that workers who should be treated as employees may be improperly misclassified as independent contractors is significant in light of the potentially substantial economic incentives that a business may have in mischaracterizing some workers as independent contractors. Such incentives include *the unfair competitive advantage the business may obtain over competitors that properly classify similar workers as employees* and that thereby assume the fiscal and other responsibilities and burdens that an employer owes to its employees.

*Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903, 913 (2018) (emphasis added). *Dynamex* thus indicates that worker misclassification can violate the policy or spirit of antitrust laws because it significantly threatens or harms competition. Uber attempts to discount the significance of *Dynamex* by insisting that it "cannot be read to overrule *Cel-Tech*'s limitation of competitor suits under the UCL to incipient violations of the antitrust laws." Docket No. 117 at 12

United States District Court
Northern District of California

n.9.  This misses the point because, as explained above, *Cel-Tech* also allows competitor suits predicated on conduct that violates the policy or spirit of antitrust laws by significantly threatening or harming competition.  *Dynamex* affirms that worker misclassification may constitute an example of such conduct.

Further, there is no question that the prohibition on worker misclassification is "tethered to some legislatively declared policy."  *Cel-Tech*, 20 Cal. 4th at 186–87.  The California Labor Code expressly declares that "[i]t is the policy of this state to vigorously enforce minimum labor standards in order . . . to protect employers who comply with the law from those who attempt to gain a competitive advantage at the expense of their workers by failing to comply with minimum labor standards."  Cal. Labor Code § 90.5(a).  Standards codified in the Labor Code concern, among other things, potential harm to competition.  *See Dynamex*, 4 Cal. 5th at 952 ("California's *industry-wide* wage orders are also clearly intended for the benefit of those law-abiding businesses that comply with the obligations imposed by the wage orders, ensuring that such responsible companies are not hurt by unfair competition from competitor businesses that utilize substandard employment practices.") (emphasis in original).

Accordingly, Diva's "unfair" prong claim meets the requirements of *Cel-Tech*.  Uber's motion to dismiss the UCL unfairness claim is **DENIED** to the extent the claim is based on violations of California labor laws.  The motion is **GRANTED** to the extent the unfairness claim is based on Sherman Act violations.  Diva may amend its complaint with specific facts that would support its claim that Uber's misclassification of drivers violates the Sherman Act.

2.    "Unlawful" Prong

Uber next contends that Diva lacks standing to bring a claim under the "unlawful" prong of the UCL.  To establish Article III standing, a plaintiff must demonstrate: (1) injury-in-fact in the form of "concrete and particularized" and "actual or imminent" harm to a legally protected interest; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that a favorable decision would redress the injury-in-fact.  *Barnum Timber Co. v. U.S. E.P.A.*, 633 F.3d 894, 897 (9th Cir. 2011) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *Allen v. Wright*, 468 U.S. 737, 751 (1984)).  Uber maintains that Diva has failed to

United States District Court
Northern District of California

1    establish the causation element.

a.    Standing as to All Plaintiffs

3    Uber argues that Diva has not shown that Uber's driver misclassification is the cause of its

4    unfair cost advantage over its competitors because Diva also alleges that investor subsidies allow

5    Uber to price its rides below cost.  Mot. at 19–20.  Thus, Uber reasons, Diva would have suffered

6    the same harm even if Uber had complied fully with labor laws and paid its drivers as employees.

7    *See Daro v. Superior Court*, 151 Cal. App. 4th 1079, 1099 (2007) (holding that, to establish

8    standing under the UCL, "there must be a causal connection between the harm suffered and the

9    unlawful business activity," and that the "causal connection is broken when a complaining party

10   would suffer the same harm whether or not a defendant complied with the law").

11   The argument is meritless for several reasons.  First, the dismissal of Diva's UPA claim

12   resolves this issue.  As Diva explains, the FAC pleads alternative theories of liability under the

13   UPA and UCL.  Opp. at 21–22.  The UPA cause of action incorporates only the allegations that

14   pertain to Uber's investor-funded loss-leader pricing, whereas the UCL cause of action

15   incorporates only the allegations that pertain to Uber's driver misclassification.  Now that the UPA

16   cause of action has been dismissed, the sole remaining source of Uber's cost advantage is its

17   alleged misclassification practices.  Causation is thus simplified.

18   Second, even if Diva's harm is caused by both Uber's driver misclassification and

19   predatory pricing subsidized by investor financing, Diva has still established standing by asserting

20   that the misclassification is a substantial cause of the harm.  Opp. at 22–23.  It does not appear that

21   the UCL requires the unlawful conduct be the sole factor in causing harm in order to support UCL

22   standing and thus a contributing cause may satisfy standing.  Admittedly, the courts have not

23   definitively decided this question.  *See Law Offices of Mathew Higbee v. Expungement Assistance

24   Servs.*, 214 Cal. App. 4th 544, 562 (2013) ("[C]ourts have not yet defined the contours of the

25   causation element under the 'unlawful' prong of the UCL.") (citing *Kwikset Corp. v. Superior

26   Court*, 51 Cal. 4th 310, 326 n.9 (2011)).  However, the language of the UCL evinces no "sole

27   factor" requirement.  The statute authorizes any "person who has suffered injury in fact and has

28   lost money or property as a result of the unfair competition" to bring suit under the UCL.  Cal.

United States District Court
Northern District of California

18

1   Bus. & Prof. Code § 17204.

2   Notably, the California Court of Appeal has suggested in dicta that a "substantial factor"

3   standard of causation would suffice for UCL standing.  In *Troyk v. Farmers Grp., Inc.*, 171 Cal.

4   App. 4th 1305 (2009), the court stated that it "discern[ed] no legislative intent from [§ 17024]'s

5   language that would require a standard of causation more stringent than the 'a substantial factor'

6   standard that applies to negligence actions . . . for a plaintiff to have UCL standing."  *Id.* at 1350

7   n.33.  As *Troyk* set forth, "a substantial factor in causing harm is a factor that a reasonable person

8   would consider to have contributed to the harm.  It must be more than a remote or trivial factor.  It

9   does not have to be the only cause of the harm."  *Id.* (citation and alteration omitted).  It is well-

10  established that the "substantial factor" standard of causation applies to claims under the

11  "fraudulent" prong of the UCL.  *See In re Tobacco II Cases*, 46 Cal. 4th at 326.  It is noteworthy

12  that the substantial factor test for causation applies in many contexts.  *See, e.g.*, *Nat'l Ass'n of*

13  *African Am.-Owned Media v. Charter Commc'ns, Inc.*, 915 F.3d 617, 623 (9th Cir. 2019)

14  (disparate treatment claims under Title VII); *Nuveen Mun. High Income Opportunity Fund v. City*

15  *of Alameda, Cal.*, 730 F.3d 1111, 1119 (9th Cir. 2013) (securities fraud actions under Section

16  10(b) of the Securities and Exchange Act); *BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, 331 F.

17  Supp. 3d 977, 987 (N.D. Cal. 2018) (breach of contract and tort actions).

18  Assuming the "substantial factor" standard for causation applies here—and Uber has not

19  contended that it does not—Diva's allegations are sufficient to establish that Uber's

20  misclassification practices alone have been a substantial factor in causing Diva's economic harm.

21  The FAC alleges that Diva must pay its drivers at least minimum wage ($13 per hour or more in

22  major cities) because they are employees.  FAC ¶ 69.  Diva must also bear the cost of overtime

23  wages, work breaks, unemployment insurance, workers' compensation insurance premiums, social

24  security tax, and Medicare tax.  *Id.* ¶¶ 70–74.  Uber, by misclassifying its drivers as independent

25  contractors, avoids these obligations.  *Id.* ¶ 114.  Diva estimates that "Uber avoids an average of

26  $9.07 an hour in business expenses and employee benefits that it would have to pay if it properly

27  classified drivers as employees.  As a result, Uber pays costs for the average driver that are

28  equivalent to what an employer would bear if they (illegally) paid their W-2 employees $7.48 per

1     hour," *i.e.*, approximately half of the minimum wage. *Id.* ¶ 118.  Given that "Uber pays over 75

2     percent of gross bookings to drivers," it can reasonably inferred that by paying its drivers

3     effectively half the hourly wage that would be required if they were treated as employees, Uber is

4     able to significantly undercut its competitors on price.  Thus, Uber's driver misclassification as

5     alleged is a "substantial factor" in causing Diva's harm, and not merely a "remote or trivial

6     factor." *Troyk*, 171 Cal. App. 4th at 1350 n.33.

7          The three cases cited by Uber do not suggest otherwise.  In *Overton v. Uber Techs., Inc.*,

8     333 F. Supp. 3d 927 (N.D. Cal. 2018), this Court found that the plaintiffs did not establish a causal

9     link between Uber's failure to register as a motor carrier under federal law and its gaining of an

10    unfair competitive advantage over plaintiffs.  *Id.* at 946–47.  Causation was "highly speculative"

11    in *Overton* because the plaintiffs did not show "what Uber's increased costs would be if it

12    registered, how those increased costs would be born as between Uber and its drivers, [and] how

13    much, if at all, Uber's pricing of rides will be affected." *Id.*  Here, in contrast, Diva has detailed

14    the per-driver cost savings Uber attains through misclassification.  In *Haynish v. Bank of Am.,*

15    *N.A.*, 284 F. Supp. 3d 1037 (N.D. Cal. 2018), the plaintiffs did not establish that the defendant's

16    unlawful conduct caused the foreclosure of their home because the foreclosure was independently

17    triggered by the plaintiffs' default on their home loan.  *Id.* at 1052.  Diva's allegations support the

18    inference that Uber could not have undercut market prices to the same degree without

19    misclassifying its drivers to skirt significant costs.  Finally, unlike Diva, the plaintiff in *Rooney v.*

20    *Sierra Pac. Windows*, No. 10-CV-00905-LHK, 2011 WL 5034675 (N.D. Cal. Oct. 11, 2011)

21    "failed to allege *any* causal connection" between the defendant's alleged violations of law and the

22    plaintiff's injury.  *Id.* at *11 (emphasis in original).

23          Diva has adequately alleged a causal link between Uber's misclassification practices and

24    Diva's UCL injury.

25                    b.     Standing as to Out-of-State Plaintiffs

26          Uber next argues that there is a causation problem specific to the out-of-state affiliates,

27    because the alleged harm to those affiliates arises from Uber's extraterritorial conduct.  It is well-

28    established that the UCL does not apply extraterritorially. *Sullivan v. Oracle Corp.*, 51 Cal. 4th

*United States District Court*
*Northern District of California*

1191, 1207 (2011).  Thus, the UCL does not reach "claims of non-California residents injured by conduct occurring beyond California's borders."  *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222 (1999).  It does, however, apply where the "relevant conduct occur[s] in California."  *Sullivan*, 51 Cal. 4th at 1208.  Uber asserts that the out-of-state affiliates cannot be losing business because of Uber's practices in California; rather, "the only plausible, non-speculative reason is due to competition from Uber . . . *in those other states.*"  Mot. at 22 (emphasis in original).

Uber's argument appears to be grounded in a misunderstanding about how the affiliate system allegedly works.  Uber repeatedly focuses on the fact that the out-of-state affiliates are booking rides for out-of-state clients.  *See id.*; Docket No. 117 at 15.  However, the FAC states that when out-of-state clients want to book rides in California, they do so through out-of-state affiliates who refer the clients to companies (like Diva) in California who provide the rides in California.  FAC ¶¶ 44–45.  The California company and the out-of-state affiliate split the revenue for the ride.  *Id.* ¶ 45.  Thus, when Uber undercuts its competitors' prices *in California*, fewer clients book rides with California limousine companies through out-of-state affiliates.  *Id.*  Uber's pricing practices outside of California do not affect clients' booking decision for rides in California under this model.  In short, there is a direct causal link between Uber's alleged misconduct in California and the out-of-state affiliates' loss of revenue.  That meets the requirement for standing under for the UCL to apply.  *See Sullivan*, 51 Cal. 4th at 1208.

Accordingly, Uber's motion to dismiss Diva's claim under the unlawful prong of the UCL is **DENIED**.

D.    Jurisdiction under CAFA

Uber finally argues that if the Court dismisses the claims of the out-of-state affiliates, it should dismiss the entire action under CAFA's home-state controversy exception.  Mot. at 22–23.  The home-state controversy exception to CAFA jurisdiction provides that a "district court shall decline to exercise jurisdiction" if "two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed."  28 U.S.C. § 1332(d)(4)(B).  Here, the only putative class members that are

not citizens of California are the out-of-state affiliates.  *See* FAC ¶ 29.  Uber therefore contends that if the out-of-states affiliates are removed from the suit for lack of standing, all of the remaining class members would be California citizens and CAFA jurisdiction would be destroyed. However, as explained above, there is no basis to dismiss the claims of the out-of-state affiliates, which comprise "approximately half of the members of each of the putative classes."  *Id.*  Uber's home-state controversy argument accordingly fails.

## IV.     DIVA'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Uber contends that it would be premature to litigate Diva's PSJ motion at this stage because its motion to dismiss presents threshold jurisdictional issues and because the one-way intervention rule prevents adjudication of merits issues prior to class certification.  Docket No. 99 at 1.  As discussed above, the threshold issues Uber raises (minimal diversity and standing) are not fatal to Diva's case.  Therefore, the Court addresses whether the one-way intervention rule bars consideration of the PSJ motion.

The one-way intervention rule exists to "protect defendants from unfair 'one-way intervention,' where the members of a class not yet certified can wait for the court's ruling on summary judgment and either opt in to a favorable ruling or avoid being bound by an unfavorable one." *Villa v. San Francisco Forty-Niners, Ltd.*, 104 F. Supp. 3d 1017, 1021 (N.D. Cal. 2015) (citing *American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 547 (1974)).  "The doctrine is 'one-way' because a plaintiff would not be bound by a decision that favors the defendant but could decide to benefit from a decision favoring the class."  *Id.*  Courts have applied this rule to "deny putative lead plaintiffs' pre-certification motions for summary judgment because" those motions, "if unsuccessful, would not prevent putative class members from filing their own suits with hope for a more favorable ruling.'"  *Magadia v. Wal-Mart Assocs., Inc.*, 319 F. Supp. 3d 1180, 1186 (N.D. Cal. 2018) (citing cases).

As an initial matter, Diva asserts that one-way intervention only becomes a problem when a plaintiff seeks a final judgment on the merits prior to class certification, and the rule is therefore not implicated by a partial summary judgment motion like Diva's.  Docket No. 103.  This contention is meritless.  The one-way intervention rule applies in the context of merits *rulings*, not

just final merits *judgments*. *See, e.g.*, *Gooch*, 672 F.3d at 432 ("The rule against one-way intervention prevents potential plaintiffs from awaiting merits rulings in a class action before deciding whether to intervene in that class action.").  This makes sense, given that the underlying rationale of the rule is to "protect defendants from unfair 'one-way intervention,' where the members of a class not yet certified can wait for the court's ruling on summary judgment and either opt in to a favorable ruling or avoid being bound by an unfavorable one." *Villa*, 104 F. Supp. 3d at 1021.  A merits ruling, even if not a final judgment, can still affect putative class members' decisions whether or not to opt in.  Accordingly, courts have applied the one-way intervention rule to motions for partial summary judgment. *See, e.g.*, *id.*  In particular, one court has rejected the precise argument Diva makes here:

> Plaintiffs assert that because they seek only partial summary judgment and not a final judgment on the merits, which could have a *res judicata* effect on class members, the problem of "one-way intervention" is not implicated.  However, the Court does not find Plaintiffs' proposed limitation to be appropriate when—as is the case here—a motion for partial summary judgment would reach the merits of the case.  Although Plaintiffs are correct that in the abstract, class members may always judge whether to opt-out or not based on how well the litigation is going so far, here, allowing absent plaintiffs to make that determination after the Court adjudicates issues of liability in the underlying case would unfairly prejudice Defendants.

*Gomez v. Rossi Concrete Inc.*, No. 08CV1442 BTM CAB, 2011 WL 666888, at *1 (S.D. Cal. Feb. 17, 2011) (internal citations, quotation marks, and alterations omitted).

Diva's second argument has more merit.  It contends that the one-way intervention rule does not apply here because the misclassification question raised in its PSJ motion pertains to its UCL class claim, which seeks only injunctive relief as a Rule 23(b)(2) class. *See* FAC ¶ 50; Docket No. 103 at 2.  In contrast to Rule 23(b)(3) classes, which permit class members to out-out of an unfavorable decision and require "the best notice that is practicable" to class members, Rule 23(b)(2) class members may not opt out and are only entitled to "appropriate notice" directed in the court's discretion.  Fed. R. Civ. P. 23(c)(2)(A)–(B).  Therefore, some courts have declined to "apply[] the prohibition on one-way intervention to Rule 23(b)(2) class certifications, in which class members may not opt out and therefore make no decision about whether to intervene."

*Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402, 433 (6th Cir. 2012); *see Paxton v. Union Nat. Bank*, 688 F.2d 552, 558–59 (8th Cir. 1982); *Williams v. Lane*, 129 F.R.D. 636, 642 (N.D. Ill. 1990).

Nevertheless, the Court concludes that it would be inappropriate to address the PSJ motion at this stage of the litigation. While there is less concern that putative class members can engage in one-way intervention in the context of a Rule 23(b)(2) class, asymmetrical risks remain because the named plaintiffs can still hedge their bets by opting not to seek class certification if they receive an unfavorable pre-certification merits ruling. The Court therefore exercises its case management authority to **DENY without prejudice** Diva's PSJ motion. *See Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1254–55 (9th Cir. 2010). The Court would be amenable to hearing Diva's class certification and PSJ motions on the same schedule.

## V.      <u>CONCLUSION</u>

Uber's motion to dismiss is **GRANTED in part** and **DENIED in part**. Specifically, (1) Diva's complaint is dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction, with leave for Diva to amend within 30 days of the date of this Order to cure the jurisdictional defects; (2) Diva's UPA claim is dismissed with prejudice; and (3) Diva's claim under the "unfair" prong of the UCL unfairness claim is dismissed to the extent it is predicated on Sherman Act violations, with leave for Diva to amend within 30 days. Diva's motion for partial summary judgment is **DENIED without prejudice**.

This order disposes of Docket Nos. 33 and 113.


**IT IS SO ORDERED**.


Dated: June 20, 2019


_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California